# EXHIBIT 1

# FIRST AMENDED JOINT PLAN OF ORGANIZATION

WILLIAM P. WEINTRAUB, ESQ. (CA Bar No. 108125)
MAXIM B. LITVAK, ESQ. (CA Bar No. 215852)
RAMON M. NAGUIAT, ESQ. (CA Bar No. 209271)
PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Three Embarcadero Center, Suite 1020
San Francisco, California 94111-4023
Telephone: 415/263-7000
Facsimile: 415/263-7010

Attorneys for Sydran Services, LLC, et al.,
Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

In re:

**SYDRAN SERVICES, LLC**, a Nevada limited liability company, et al.,[1]

Debtors.

Federal Tax I.D. # 68-0438151

☒ Affects ALL DEBTORS

☐ Affects SYDRAN SERVICES, LLC

☐ Affects THE SYDRAN GROUP, LLC

☐ Affects SYDRAN DEVELOPMENT, LLC

☐ Affects SYDRAN BK SERVICES, LLC

☐ Affects SYDRAN FOOD SERVICES, L.P.

☐ Affects SYDRAN FOOD SERVICES II, L.P.

☐ Affects SYDRAN FOOD SERVICES III, L.P.

☐ Affects SYDRAN FOOD SERVICES IV, LLC

☐ Affects SYDRAN CASUAL DINING SERVICES, LLC

☐ Affects SYDRAN III TEXAS, INC.

Case No.: 04-45343 (EDJ)

Jointly Administered with
Case Nos. 04-45344 through 04-45352

Chapter 11

**FIRST AMENDED JOINT PLAN OF REORGANIZATION**

**<u>Confirmation Hearing</u>**

Date:
Time:
Place: United States Bankruptcy Court
1300 Clay Street
Oakland, CA
Judge: Honorable Edward D. Jellen

[1] The other debtors in these jointly administered cases are: The Sydran Group, LLC, Sydran Development, LLC, Sydran BK Services, LLC, Sydran Food Services, L.P., Sydran Food Services II, L.P., Sydran Food Services III, L.P., Sydran Food Services IV, LLC, Sydran Casual Dining Services, LLC, and Sydran III Texas, Inc.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 2 of 50

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## TABLE OF CONTENTS

Page

**ARTICLE 1 DEFINITIONS** ..... 1

1.1 "ACIC" ..... 2
1.2 "ACIC Bonds" ..... 2
1.3 "ACIC Documents" ..... 2
1.4 "ACIC Mortgage" ..... 2
1.5 "ACIC Promissory Note" ..... 2
1.6 "ACIC Security Agreement" ..... 2
1.7 "Administrative Claim" ..... 3
1.8 "Administrative Claims Bar Date" ..... 3
1.9 "Administrative Claims Bar Date Order" ..... 3
1.10 "Allied" ..... 3
1.11 "Allied Documents" ..... 3
1.12 "Allied Guaranty or Guarantees" ..... 3
1.13 "Allied Guarantor" or "Allied Guarantors " ..... 3
1.14 "Allied Sub Debt" ..... 4
1.15 "Allied Sub Debt Intercreditor Agreements" ..... 4
1.16 "Allied Subordinated Note" ..... 4
1.17 "Allowed" ..... 4
1.18 "Allowed Secured Claim" ..... 5
1.19 "Allowed Unsecured Claim" ..... 5
1.20 "Alternate Buyer" ..... 5
1.21 "Amended Asset Purchase Agreement" ..... 6
1.22 "Amended JV Purchase Agreement" ..... 6
1.23 "Amended Master Leases" ..... 6
1.24 "Amended Master Real Estate Agreement" ..... 7
1.25 "Amended Transaction Documents" ..... 7
1.26 "Asset Purchase Agreement" ..... 7
1.27 "Assumed Executory Contract" or "Assumed Executory Contracts" ..... 7
1.28 "Assumed Obligations" ..... 7
1.29 "Assumption and Cure Order" ..... 8
1.30 "Available Cash" ..... 8

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**TABLE OF CONTENTS**
**(continued)**

**Page**

1.31 "Avoidance Actions" ....................8
1.32 "Ballot" ....................8
1.33 "Ballot Deadline" ....................8
1.34 "Bankruptcy Code" ....................8
1.35 "Bankruptcy Court" ....................8
1.36 "Bankruptcy Rules" ....................8
1.37 "Bar Date" ....................9
1.38 "BKC" ....................9
1.39 "BKC-Chase Intercreditor Agreement" ....................9
1.40 "BKC Collateral" ....................9
1.41 "BKC Guaranty" or "BKC Guaranties" ....................9
1.42 "BKC Guarantor" or "BKC Guarantors" ....................9
1.43 "BKC Loan Agreement" ....................9
1.44 "BKC Loan Documents" ....................10
1.45 "BKC Security Agreement" ....................10
1.46 "BK-Sydran Ventures" ....................10
1.47 "Blended Rate" ....................10
1.48 "Business Day" ....................10
1.49 "Buyer" ....................10
1.50 "Cash" ....................10
1.51 "Chapter 11 Cases" ....................11
1.52 "Chase" ....................11
1.53 "Chase-ACIC Intercreditor Agreement" ....................11
1.54 "Chase Guaranty" or "Chase Guaranties" ....................11
1.55 "Chase Guarantor" or "Chase Guarantors" ....................11
1.56 "Chase Lender Group Agent" ....................11
1.57 "Chase Lender Group Collateral" ....................11
1.58 "Chase Leasehold Mortgages" ....................12
1.59 "Chase Lender Group" ....................12
1.60 "Chase Loan Agreement" ....................12
1.61 "Chase Loan Documents" ....................12

## TABLE OF CONTENTS
## (continued)

**Page**

1.62 "Chase Mortgage" ....12
1.63 "Chase Security Agreement" ....12
1.64 "Citibank" ....13
1.65 "Claim" ....13
1.66 "Claimant" ....13
1.67 "Claims Reserve Account" ....13
1.68 "Class" ....13
1.69 "Close" or "Closing" ....13
1.70 "Closing Date" ....13
1.71 "Closing Deadline" ....13
1.72 "Closure Properties" ....13
1.73 "Confirmation" ....13
1.74 "Confirmation Date" ....14
1.75 "Confirmation Hearing" ....14
1.76 "Confirmation Order" ....14
1.77 "Consenting Secured Party" ....14
1.78 "Consolidated Estate" ....14
1.79 "Contingent Claim" ....14
1.80 "Credit Support" ....14
1.81 "Creditor" ....14
1.82 "Cure Obligation" or "Cure Obligations" ....14
1.83 "Debt" ....14
1.84 "Debtor" or "Debtors" ....15
1.85 "Deficiency Claim" ....15
1.86 "Designated Contract" or "Designated Contracts" ....15
1.87 "Disallowed Claim" ....15
1.88 "Disbursing Agent" ....15
1.89 "Disclosure Statement" ....15
1.90 "Disputed Claim" ....16
1.91 "Disputed Claims Amount" ....16
1.92 "Effective Date" ....16

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 5 of 50

## TABLE OF CONTENTS
## (continued)

**Page**

1.93 "Escrow Agent" ....16
1.94 "Estate" or "Estates" ....16
1.95 "Estimated Cash Portion" ....17
1.96 "Excluded Assets" ....17
1.97 "Excluded Claims" ....17
1.98 "Exculpated Parties" ....17
1.99 "Existing Holding Company Leases" ....17
1.100 "Expense Deposit" ....17
1.101 "Final Application Date for Professionals" ....17
1.102 "Final Order" ....17
1.103 "Final Purchase Price" ....18
1.104 "Final Resolution Date" ....18
1.105 "FMAC" ....18
1.106 "FMAC Loan Agreements" ....18
1.107 "FMAC Loan Documents" ....19
1.108 "FMAC Security Agreements" ....19
1.109 "Franchise Agreement" or "Franchise Agreements" ....20
1.110 "GEC-BAFC" ....20
1.111 "GEC-BAFC Collateral" ....20
1.112 "GEC-BAFC Confirmation of Pledge and Security Agreement" ....20
1.113 "GEC-BAFC Loan Agreements" ....20
1.114 "GEC-BAFC Loan Documents" ....21
1.115 "GEC-BAFC Master Consent Agreement" ....21
1.116 "GEC-BAFC Security Agreements" ....21
1.117 "GMACCM" ....21
1.118 "GMACCM Collateral" ....21
1.119 "GMACCM Loan Agreements" ....21
1.120 "GMACCM Loan Documents" ....22
1.121 "GMACCM Security Agreements" ....22
1.122 "Holdings Companies" ....22
1.123 "Intercreditor Agreements" ....22

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 6 of 50

## TABLE OF CONTENTS
**(continued)**

**Page**

1.124 "Interest" ....22
1.125 "Interest Holder" ....22
1.126 "JV Purchase Agreement" ....22
1.127 "Lien" ....22
1.128 "Liquidation Proceeds" ....23
1.129 "Litigation" ....23
1.130 "Litigation Recovery" ....23
1.131 "Master Leases" ....23
1.132 "Master Real Estate Agreement" ....23
1.133 "Morgan Hill Property" ....23
1.134 "Net Plan Proceeds" ....24
1.135 "Official Committee" ....24
1.136 "PACA" ....24
1.137 "PACA Claims" ....24
1.138 "Participating Vendors" ....24
1.139 "Petition Date" ....24
1.140 "Plan" ....24
1.141 "Plan Assets" ....24
1.142 "Plan Expenses" ....24
1.143 "Plan Interest Rate" ....25
1.144 "Plan Proceeds" ....25
1.145 "Plan Supplement" ....25
1.146 "Present Value" ....25
1.147 "Priority Employee Claim" ....25
1.148 "Priority Tax Claim" ....25
1.149 "Professional Fees" ....25
1.150 "Professionals" ....26
1.151 "Pro Rata" or "Pro Rata Share" ....26
1.152 "Purchase Price" ....26
1.153 "Purchased Assets" ....26
1.154 "Record Date" ....26

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 7 of 50

## TABLE OF CONTENTS
## (continued)

**Page**

1.155 "Rejection Claim" .......... 26
1.156 "Rejection Claim Bar Date" .......... 27
1.157 "Releasee(s)" .......... 27
1.158 "Releasor(s)" .......... 27
1.159 "Reorganized Debtor" or "Reorganized Debtors" .......... 27
1.160 "Reserve Amount" .......... 27
1.161 "Responsible Officer" .......... 27
1.162 "Restaurant" or "Restaurants" .......... 27
1.163 "Restructuring" .......... 27
1.164 "Restructuring Agreement" .......... 27
1.165 "Restructuring Documents" .......... 28
1.166 "Schedules" .......... 28
1.167 "Secondary Liability Claim" .......... 28
1.168 "Secured Claim" .......... 28
1.169 "Secured Personal Property Tax Claim" .......... 28
1.170 "Seller" or "Sellers" .......... 29
1.171 "Senior Intercreditor Agreement" .......... 29
1.172 "Special Class 12 Distribution" .......... 29
1.173 "Specified Holders of Allowed Unsecured Claims in Class 12" .......... 29
1.174 "Strategic" .......... 29
1.175 "Strategic Asset Purchase Agreement" .......... 29
1.176 "Strategic JV Purchase Agreement" .......... 29
1.177 "Strategic Master Leases" .......... 30
1.178 "Strategic Master Real Estate Agreement" .......... 30
1.179 "Supplemental Payment" .......... 30
1.180 "Sydran I" .......... 30
1.181 "Sydran II" .......... 30
1.182 "Sydran III" .......... 30
1.183 "Sydran III Texas" .......... 30
1.184 "Sydran IV" .......... 30
1.185 "Sydran BK Services" .......... 30

## TABLE OF CONTENTS
## (continued)

**Page**

1.186 "Sydran Casual Dining" ....... 30
1.187 "Sydran Investors" ....... 30
1.188 "Sydran Development" ....... 30
1.189 "Sydran Group" ....... 31
1.190 "Sydran Services" ....... 31
1.191 "Sydran Services Notes" ....... 31
1.192 "Sydran Services Notes Guarantor" or "Sydran Services Notes Guarantors" ....... 31
1.193 "Tax Claim" ....... 31
1.194 "Tax Payment Obligations Agreement " ....... 31
1.195 "Tax Payment Obligations Collateral" ....... 31
1.196 "Tax Payment Obligations Documents" ....... 31
1.197 "Tax Payment Obligations Intercreditor Agreement" ....... 31
1.198 "Tax Payment Obligations Security Agreement" ....... 32
1.199 "Tax Payment Obligees" ....... 32
1.200 "Topping Fee" ....... 32
1.201 "Total Purchase Price" ....... 32
1.202 "Trade Payable Agreement Cure" ....... 32
1.203 "Transaction Documents" ....... 32
1.204 "Transferred Claims" ....... 33
1.205 "Unliquidated Claim" ....... 33
1.206 "Unsecured Claim" ....... 33

**ARTICLE 2 CLASSIFICATION OF CLAIMS AND INTERESTS** ....... 33

2.1 Criterion of Class. ....... 33
2.2 Classes of Claims and Interests. ....... 33
2.2.1 Class 1 Claims. ....... 33
2.2.2 Class 2 Claims. ....... 33
2.2.3 Class 3 Claims. ....... 34
2.2.4 Class 4 Claims. ....... 34
2.2.5 Class 5 Claims. ....... 34
2.2.6 Class 6 Claims. ....... 34

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Page

2.2.7 Class 7 Claims. ....34
2.2.8 Class 8 Claims. ....34
2.2.9 Class 9 Claims. ....34
2.2.10 Class 10 Claims. ....34
2.2.11 Class 11 Claims. ....34
2.2.12 Class 12 Claims. ....34
2.2.13 Class 13 Interests. ....35

**ARTICLE 3 TREATMENT OF UNCLASSIFIED CLAIMS** ....35
3.1 Administrative Claims. ....35
3.2 Final Application Date for Professionals. ....35
3.3 Priority Tax Claims. ....36
3.4 Assumed Obligations. ....36

**ARTICLE 4 TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** ....37
4.1 Class 1 (Priority Employee Claims). ....37
4.2 Class 2 (PACA Claims). ....37
4.3 Classes 3 (Certain Secured Claims). ....38
4.3.1 Class 3. ....38
4.3.2 Selection of Treatment Option With Respect To Class 3 Claims. ....38
4.4 Class 4 Claims (Tax Payment Obligees). ....38
4.5 Class 5 Claims (Chase Lender Group). ....39
4.6 Class 6 Claims (GMACCM). ....40
4.7 Class 7 Claims (GEC-BAFC). ....41
4.8 Class 8 Claims (BKC). ....41
4.9 Class 9 Claims (ACIC). ....42
4.10 Class 10 Claims (Secured Personal Property Tax Claims). ....43
4.11 Class 11 (Participating Vendors). ....43
4.12 Class 12 (Unsecured Claims). ....44
4.13 Class 13 (Interests). ....44
4.14 Assumed Obligations. ....44
4.15 Nonconsensual Confirmation. ....45
4.15.1 Class 1 Cramdown. ....45

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 10 of 50

**TABLE OF CONTENTS**
**(continued)**

**Page**

4.15.2 Class 2 Cramdown. ....45

4.15.3 Class 3 Cramdown. ....45

4.15.4 Class 4 Cramdown. ....45

4.15.5 Class 5 Cramdown. ....45

4.15.6 Class 6 Cramdown. ....45

4.15.7 Class 7 Cramdown. ....45

4.15.8 Class 8 Cramdown. ....45

4.15.9 Class 9 Cramdown. ....45

4.15.10 Class 10 Cramdown. ....46

4.15.11 Class 11 Cramdown. ....46

4.15.12 Class 12 Cramdown. ....46

4.15.13 Class 13 Cramdown. ....46

**ARTICLE 5 MEANS FOR IMPLEMENTATION OF THE PLAN** ....46

5.1 Asset Purchase Agreement. ....46

5.2 Alternate Transaction. ....48

5.3 Substantive Consolidation . ....50

5.4 JV Purchase Agreement. ....51

5.5 Available Cash. ....51

5.6 Handling of Plan Assets and Collection of Plan Proceeds. ....51

5.7 Litigation. ....52

5.8 Payment of Plan Expenses. ....52

5.9 Distribution of Plan Proceeds. ....53

5.10 Post-Confirmation Operations of the Reorganized Debtor. ....53

5.10.1 Power and Authority of Responsible Officer. ....53

5.10.2 Liquidation and Dissolution of the Reorganized Debtors. ....54

5.11 Full and Final Satisfaction. ....54

5.12 Distribution Procedures. ....55

5.13 Disbursing Agent. ....55

5.14 Claims Reserve Account. ....56

5.15 Resolution of Disputed Claims. ....56

5.16 Reserve Provisions for Disputed Claims. ....57

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 11 of 50

## TABLE OF CONTENTS
## (continued)

Page

5.17 Allocation of Distributions. ....59
5.18 Rounding. ....59
5.19 No Interim Cash Payments of $50 or Less on Account of Allowed Claims. ....59
5.20 Disputed Payments. ....59
5.21 Unclaimed Property. ....59
5.22 Setoffs. ....60
5.23 No Distributions on Late-Filed Claims. ....60
5.24 Withholding Taxes. ....60

**ARTICLE 6** **EXECUTORY CONTRACTS** ....60
6.1 Executory Contracts and Unexpired Leases. ....60
6.1.1 Assumption. ....60
6.1.2 Rejection. ....62
6.1.3 Designation of Certain Executory Contracts and Unexpired Leases. ....62
6.2 Satisfaction of Cure Obligations. ....63
6.3 Adequate Assurance. ....63
6.4 Post-Petition Executory Contracts and Unexpired Leases. ....63
6.5 Effect of Confirmation Order. ....64

**ARTICLE 7** **CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND TO THE EFFECTIVE DATE** ....64
7.1 Conditions to Confirmation of the Plan. ....64
7.2 Effect of Failure of Conditions to Confirmation. ....64
7.3 Effective Date. ....65
7.4 Failure of Effective Date. ....65

**ARTICLE 8** **EFFECTS OF CONFIRMATION** ....65
8.1 Binding Effect of Plan. ....65
8.1.1 Asset Purchase Agreement. ....65
8.1.2 Asset Purchase Agreement Controls. ....65
8.2 Revesting of Property of Debtors. ....66
8.3 Property Free and Clear. ....66
8.4 Limitation of Liability. ....66
8.5 Plan Release. ....67

TABLE OF CONTENTS
**(continued)**

**Page**

8.5.1 Consenting Secured Parties. ....67
8.5.2 Participating Vendors. ....68
8.6 Injunction. ....68
8.7 Post-Confirmation Liability of Responsible Officer. ....69
8.8 Insurance. ....69
**ARTICLE 9 RETENTION OF JURISDICTION** ....69
**ARTICLE 10 MISCELLANEOUS** ....71
10.1 Revocation of Plan of Reorganization. ....71
10.2 Severability of Plan Provisions. ....71
10.3 Governing Law. ....71
10.4 Headings. ....72
10.5 Language Interpretation. ....72
10.6 Exhibits. ....72
10.7 Notices. ....72
10.8 Reservation of Rights. ....73
10.9 Computation of Time Periods. ....74
10.10 Defects, Omissions and Amendments. ....74
10.11 Filing of Additional Documents. ....74
10.12 Successors and Assigns. ....75
10.13 Setoffs and Recoupments. ....75
10.14 Tax Exemption. ....75
10.15 Securities Exemption. ....76
10.16 Plan Interest Rate. ....76
10.17 Implementation. ....76
10.18 Record Date. ....76
10.19 Certain Actions. ....76
10.20 Dissolution of Committee. ....77
10.21 Waiver of Ten (10) Day Stay. ....77
10.22 Substantial Consummation. ....78
SCHEDULE A
SCHEDULE B

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

FIRST AMENDED JOINT PLAN OF REORGANIZATION
-xi-
DOCS_NY:7547.1

## PRELIMINARY STATEMENT

Sydran Services, LLC, The Sydran Group, LLC, Sydran Development, LLC, Sydran BK Services, LLC, Sydran Food Services, L.P., Sydran Food Services II, L.P., Sydran Food Services III, L.P., Sydran Food Services IV, LLC, Sydran Casual Dining Services, LLC, and Sydran III Texas, Inc. (each, a "Debtor" and, collectively, the "Debtors"), propose the following First Amended Joint Plan of Reorganization (the "Plan") respecting their Debts pursuant to section 1121 of the Bankruptcy Code. All Creditors should review the Disclosure Statement, and its accompanying exhibits and other information, before voting to accept or reject the Plan.

The Plan sets forth a proposal for the satisfaction of all Claims against the Debtors. With the Plan, Creditors will receive a Ballot for voting on the Plan, and a Disclosure Statement that provides information concerning the Debtors and the Plan. The Disclosure Statement includes a summary of the assets and liabilities of the Debtors, a summary of what Creditors and Interest Holders will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for confirmation of the Plan. You should thoroughly review both the Plan and Disclosure Statement before deciding whether you will accept or reject the Plan.

As more fully described in the Disclosure Statement, the Plan must be approved by the requisite number of Creditors and the Bankruptcy Court must find that it meets the applicable legal standards before the Plan can be confirmed.[2] If the Plan is not confirmed, the Bankruptcy Court may order the case dismissed, or converted to a liquidating case under Chapter 7 of the Bankruptcy Code, or the Debtor or other parties in interest may propose a different plan.

## ARTICLE 1

## DEFINITIONS

For purposes of this Plan, all capitalized terms used herein and not otherwise defined shall have the meanings set forth below. A term used but not defined in the Plan, but defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it in the

[2] Interest Holders will receive nothing under the Plan, and therefore, the Class of Interests is deemed to have rejected the Plan. Accordingly, acceptances are not being solicited from the holders of Interests.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW SAN FRANCISCO, CALIFORNIA)

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 14 of 50

Bankruptcy Code or the Bankruptcy Rules, unless the context clearly requires otherwise. The rules of construction used in section 102 of the Bankruptcy Code shall apply to construction of this Plan. This Plan incorporates and effects the Asset Purchase Agreement, the terms of which, to the extent of the subject matter thereof, shall take precedence over any conflicting terms in this Plan. Therefore, for purposes of this Plan, the phrase "except as provided for in this Plan" and words of similar import shall also mean "except as provided in the Asset Purchase Agreement to the extent of the subject matter thereof." The phrase "promptly after the Effective Date" shall mean within ten (10) Business Days of the Effective Date. Headings and captions are utilized in this Plan for convenient reference only, and shall not constitute a part of this Plan for any other purpose.

1.1 **"ACIC"** shall mean American Contractors Indemnity Company as surety under certain payment bonds issued to certain utilities who provide service to Sydran II and Sydran IV.

1.2 **"ACIC Bonds"** shall mean payment bonds issued by ACIC to certain utilities who provide service to Sydran II and Sydran IV.

1.3 **"ACIC Documents"** shall mean the ACIC Bonds, ACIC Promissory Note, the ACIC Security Agreement, and the ACIC Mortgage.

1.4 **"ACIC Mortgage"** shall mean that certain Deed of Trust, dated as of July 31, 2001, with respect to the Morgan Hill Property, executed by Sydran I, as trustor, in favor of ACIC, as beneficiary, to secure payment of the obligations of Sydran I in respect of bonds issued by ACIC in favor of certain utilities who provide service to Sydran II and Sydran IV.

1.5 **"ACIC Promissory Note"** shall mean that certain Promissory Note Secured by Deed of Trust, in the initial face amount of $650,000, executed by Sydran I, as maker, in favor of ACIC, as payee, in respect of the ACIC Bonds and the ACIC Mortgage.

1.6 **"ACIC Security Agreement"** shall mean that certain Collateral Security Agreement, dated as of August 10, 2001, executed by Sydran I, as debtor, in favor of ACIC, as surety, in respect of the ACIC Bonds, acknowledging the pledge of the Morgan Hill Property pursuant to the ACIC Mortgage.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 15 of 50

1.7 **"Administrative Claim"** shall mean a Claim for an expense of administration of the Debtors arising during the period commencing on the Petition Date and ending on the Effective Date under sections 503(b), 1114(e)(2) or 546(c)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (i) any actual and necessary cost or expense of preserving the Estates of the Debtors or conducting the business of the Debtors, (ii) administrative expenses previously allowed by the Bankruptcy Court, (iii) administrative claims that were timely filed prior to the Administrative Claims Bar Date, (iv) any Tax Claims incurred by the Debtors after the Petition Date or relating to a tax year or period which occurs after the Petition Date, (v) Professional Fees, and (vi) all fees and charges assessed against the Debtors pursuant to 28 U.S.C. § 1930. For purposes of this Plan, Administrative Claims shall also include Cure Obligations.

1.8 **"Administrative Claims Bar Date"** shall mean the last date set by the Bankruptcy Court pursuant to the Administrative Claims Bar Date Order for Claimants to file a request for payment of any Administrative Claim that arose between the Petition Date and the Effective Date.

1.9 **"Administrative Claims Bar Date Order"** shall mean an order setting the Administrative Claims Bar Date, which order could be the Confirmation Order.

1.10 **"Allied"** shall mean Allied Capital Corporation, a Maryland corporation.

1.11 **"Allied Documents"** shall mean the Allied Subordinated Note, the Allied Guarantees, the Allied Sub Debt Intercreditor Agreement, and the agreements and instruments related thereto.

1.12 **"Allied Guaranty or Guarantees"** shall mean, individually, as to each Allied Guarantor, the guaranty signed by such Allied Guarantor of the obligations of Sydran Services to Allied under the Allied Subordinated Note and, collectively, as to all Allied Guarantors, all of the guarantees signed by all of the Allied Guarantors of the obligations of Sydran Services to Allied under the Allied Subordinated Note.

1.13 **"Allied Guarantor" or "Allied Guarantors"** shall mean, individually, each of Sydran Group, Sydran Development, Sydran BK Services, Sydran Casual Dining, Sydran

I, Sydran II, Sydran III and Sydran IV, as guarantors of the obligations of Sydran Services to Allied under the Allied Subordinated Note and, collectively, all of the foregoing.

1.14 **"Allied Sub Debt"** shall mean the debt owed to Allied by Sydran Services under the Allied Subordinated Note.

1.15 **"Allied Sub Debt Intercreditor Agreements"** shall mean, collectively, (i) that certain Subordination Agreement, dated as of June 29, 2000, executed by Allied with respect to the predecessor loan agreement to the Chase Loan Agreement, as ratified and confirmed by Allied with respect to the Chase Loan Agreement in connection with the Restructuring; (ii) that certain Amended and Restated Subordination Agreement, dated as of January 1, 2002, executed by Allied and the holders of the Sydran Services Notes with respect to the Chase Loan Agreement in connection with the Restructuring; and (iii) that certain Subordination Agreement, dated as of January 1, 2002, executed by Allied and the holders of the Sydran Services Notes with respect to the BKC Loan Agreement in connection with the Restructuring.

1.16 **"Allied Subordinated Note"** shall mean that certain Amended and Restated Senior Subordinated Note, dated as of December 21, 2001, in the initial principal amount of $12,973,333, executed by Sydran Services in favor of Allied in connection with the Restructuring.

1.17 **"Allowed"**

1.11.1 shall mean with respect to any Claim (other than an Administrative Claim):

1.11.1.1 a Claim that appears in the Schedules, except a Claim that is listed as disputed, contingent or unliquidated, or for which a contrary proof of Claim has been filed;

1.11.1.2 a Claim for which a proof of Claim has been timely filed as of the Bar Date or Rejection Claim Bar Date, as applicable, and no objection thereto has been made on or before any applicable deadline; provided, however, that prior to any deadline imposed by this Plan or by the Bankruptcy Court to file objections to a given Claim, no Claim shall be

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 17 of 50

treated as Allowed to the extent that it is filed by the holder of such Claim (i) in an amount greater than the amount listed for such Claim by a Debtor in its Schedules or (ii) asserting a priority higher than the priority listed for such Claim by a Debtor in its Schedules; or

1.11.1.3 a Claim that has been allowed, but only to the extent allowed (i) by a Final Order, (ii) under this Plan, or (iii) under any agreements entered into in connection with this Plan (and approved by the Bankruptcy Court) establishing the amount and nature of any Claim.

1.11.2 shall mean with respect to an Administrative Claim:

1.11.2.1 A request for payment that has been filed prior to the Administrative Claims Bar Date, and in accordance with either section 503(b) of the Bankruptcy Code or the procedures for filing requests for payment of an expense of administration set forth in the Administrative Claims Bar Date Order, and as to which no objection has been made on or before any applicable deadline.

1.18 **"Allowed Secured Claim"** shall mean that portion of an Allowed Claim (i) secured by a valid, perfected and enforceable Lien that is not subject to avoidance under bankruptcy or non-bankruptcy law, in an amount equal to the value, as determined by the Bankruptcy Court pursuant to sections 506(a) and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 3012, of the interest of the holder of such Allowed Claim in the property of the Debtor or Debtors, or the Consolidated Estate, securing such Allowed Claim, or (ii) in an amount equal to the amount subject to setoff by the holder of such Claim under section 553 of the Bankruptcy Code.

1.19 **"Allowed Unsecured Claim"** shall mean any Allowed Claim (including any Rejection Claim) that is not an Allowed Administrative Claim, an Allowed Secured Claim, an Allowed Personal Property Tax Secured Claim, an Allowed Priority Employee Claim, or an Allowed Priority Tax Claim.

1.20 **"Alternate Buyer"** shall mean a purchaser of the Purchased Assets other than Strategic (i) whose qualifications to be a new franchisee for the Restaurants are approved by BKC; (ii) who agrees to pay, in Cash, a Purchase Price under Amended Asset Purchase

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 18 of 50

Agreement that both (a) exceeds the initial Purchase Price under the Strategic Asset Purchase Agreement by at least an amount equal to the Topping Fee plus $1,000 and (b) exceeds the Purchase Price offered by any other qualified bidder including Strategic; (iii) who demonstrates to the reasonable satisfaction of the Debtors and the Committee that such proposed purchaser can close and consummate the Amended Transaction Documents to the same extent as Strategic can close and consummate the Transaction Documents; (iv) who arranges for Credit Support that is comparable to the Credit Support (if any) provided in connection with the proposed transactions with Strategic; and (v) who agrees to enter into and immediately perform the Amended Asset Purchase Agreement, the Amended JV Purchase Agreement, the Amended Master Real Estate Agreement, the Amended Master Lease, and each of the other Amended Transaction Documents, with no other changes to such Amended Transaction Documents other than as set forth in the definitions of Amended Asset Purchase Agreement, the Amended JV Purchase Agreement, and the Amended Transaction Documents.

1.21 **"Amended Asset Purchase Agreement"** shall mean the Strategic Asset Purchase Agreement as amended only to replace Strategic with the Alternate Buyer, to increase the Purchase Price, and to eliminate the Alternate Buyer's right to receive the Expense Deposit and the Topping Fee. Except as set forth in the preceding sentence, all other terms, provisions, agreements, covenants, conditions, and requirements of the Strategic Asset Purchase Agreement shall remain unchanged.

1.22 **"Amended JV Purchase Agreement"** shall mean the Strategic JV Purchase Agreement amended only to replace Strategic with the Alternate Buyer. Except as set forth in the preceding sentence, all other terms, provisions, agreements, covenants, conditions, and requirements of the Strategic JV Purchase Agreement shall remain unchanged.

1.23 **"Amended Master Leases"** shall mean the Strategic Master Leases as amended to only replace Strategic with the Alternate Buyer. Except as set forth in the preceding sentence, all other terms, provisions, agreements, covenants, conditions, and requirements of the Strategic Master Leases shall remain unchanged.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 19 of 50

1.24 **"Amended Master Real Estate Agreement"** shall mean the Strategic Master Real Estate Agreement as amended to only replace Strategic with the Alternate Buyer. Except as set forth in the preceding sentence, all other terms, provisions, agreements, covenants, conditions, and requirements of the Strategic Master Real Estate Agreement shall remain unchanged.

1.25 **"Amended Transaction Documents"** shall mean the Transaction Documents amended only to (i) substitute the Amended Asset Purchase Agreement for the Strategic Asset Purchase Agreement, (ii) substitute the Amended JV Purchase Agreement for the Strategic JV Purchase Agreement, (iii) substitute the Amended Master Real Estate Agreement for the Strategic Master Real Estate Agreement, (iv) substitute the Amended Master Leases for the Strategic Master Leases, and (v) replace the Buyer with the Alternate Buyer in the other Transaction Documents. Except as set forth in the preceding sentence, all other terms, provisions, agreements, covenants, conditions, and requirements of the Transaction Documents shall remain unchanged. The term "other Amended Transaction Documents" is intended to include any and all Amended Transaction Documents not specifically listed in the sentence using that term.

1.26 **"Asset Purchase Agreement"** shall mean, as applicable, either (i) the Strategic Asset Purchase Agreement or (ii) the Amended Asset Purchase Agreement. A true and correct copy of the Asset Purchase Agreement will be included with the Plan Supplement.

1.27 **"Assumed Executory Contract" or "Assumed Executory Contracts"** shall mean individually, each executory contract or unexpired lease designated by the Buyer in accordance with the Asset Purchase Agreement for assumption by the applicable Debtor and assignment to the Buyer in connection with the consummation of the purchase and sale transaction contemplated under the Asset Purchase Agreement and, collectively, all such executory contracts and unexpired leases.

1.28 **"Assumed Obligations"** shall have the meaning assigned to it in the Asset Purchase Agreement.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 20 of 50

1.29 **"Assumption and Cure Order"** shall mean, with respect to any Assumed Executory Contract, an order of the Bankruptcy Court approving the assumption and assignment of such executory contract or unexpired lease, and determining any Cure Obligation with respect thereto, in the form required in the Asset Purchase Agreement. The Confirmation Order may constitute an Assumption and Cure Order.

1.30 **"Available Cash"** shall mean the aggregate amount of all Cash held by the Debtors on the Effective Date, including the Cash portion of the Purchase Price and any Litigation Recovery or any Liquidation Proceeds collected by the Debtors prior to the Effective Date, but excluding any Cash that is part of the Purchased Assets.

1.31 **"Avoidance Actions"** shall mean claims or causes of action arising under chapter 5 of the Bankruptcy Code, including, without limitation, claims arising under Bankruptcy Code sections 544, 547, 548 or 549.

1.32 **"Ballot"** shall mean the form for acceptance or rejection of the Plan distributed to those Creditors entitled to vote on the Plan, as such form may be approved by the Bankruptcy Court and which shall otherwise comply with the requirements of Bankruptcy Rule 3018(c).

1.33 **"Ballot Deadline"** shall mean the date set by the Bankruptcy Court as the date by which Ballots for accepting or rejecting the Plan must be received.

1.34 **"Bankruptcy Code"** shall mean Title 11 of the United States Code, §§ 101 et seq., as in effect on the Petition Date, as the same thereafter has been and may be amended.

1.35 **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Northern District of California (Oakland Division) or such other court as may hereafter exercise jurisdiction over the Chapter 11 Cases.

1.36 **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as in effect on the Filing Date, as the same thereafter has been and may be amended, and the Local Rules of the Bankruptcy Court to the extent applicable to the Chapter 11 Cases.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 21 of 50

1.37 **"Bar Date"** shall mean December 21, 2004, which is the date set by that certain Order of the Bankruptcy Court dated October 15, 2004, as the last date for filing a proof of Claim for a Claim that arose before the Petition Date.

1.38 **"BKC"** shall mean Burger King® Corporation.

1.39 **"BKC-Chase Intercreditor Agreement"** shall mean that certain Intercreditor Agreement, dated as of June 29, 2000, by and among BKC, Sydran I, Sydran II, Sydran IV, Sydran Services, Sydran BK Services, and Chase, as agent for itself and the other lenders who were parties to the predecessor loan agreement to the Chase Loan Agreement, as continued in effect pursuant to the Restructuring Agreement, with respect to, inter alia, the sale or disposition of the Restaurants.

1.40 **"BKC Collateral"** shall mean the tangible and intangible real property and personal property assets of the Debtors in which BKC holds valid and perfected Liens as collateral security for payment of: (i) as to the Claims of BKC against Sydran Services under the BKC Loan Documents, the obligations of Sydran Services under the BKC Loan Documents; and (ii) as to the Claims of BKC against the BKC Guarantors under the BKC Guaranties, the obligations of the BKC Guarantors under the BKC Guaranties.

1.41 **"BKC Guaranty" or "BKC Guaranties"** shall mean, individually, as to each BKC Guarantor, the guaranty signed by such BKC Guarantor of the obligations of Sydran Services to BKC under the BKC Loan Agreement and, collectively, as to all BKC Guarantors, all of the guaranties signed by all of the BKC Guarantors of the obligations of Sydran Services to BKC under the BKC Loan Agreement.

1.42 **"BKC Guarantor" or "BKC Guarantors"** shall mean, individually, each of Sydran I, Sydran II, Sydran III, Sydran IV, Sydran Casual Dining, Sydran Development, Sydran BK Services, as guarantors of the obligations of Sydran Services to BKC under the BKC Loan Agreement and, collectively, all of the foregoing.

1.43 **"BKC Loan Agreement"** shall mean that certain Loan Agreement, dated as of January 1, 2002, by and between Sydran Services, as borrower, and BKC, as lender, entered into in connection with the Restructuring.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 22 of 50

1.44 **"BKC Loan Documents"** shall mean the BKC Loan Agreement, the BKC Security Agreement, the BKC Guaranties, the BKC-Chase Intercreditor Agreement, the Senior Intercreditor Agreement, and the instruments and agreements related thereto.

1.45 **"BKC Security Agreement"** shall mean that certain Security Agreement, dated as of January 1, 2002, entered into in connection with the Restructuring, pursuant to which Sydran Services, as borrower and debtor, and each of the BKC Guarantors, as guarantors and debtors, granted Liens to BKC, as secured party, to secure payment of: (i) in the case of Sydran Services, the obligations of Sydran Services under the BKC Loan Documents; and (ii) in the case of the Debtors who are BKC Guarantors, the obligations of the BKC Guarantors under the BKC Guaranties.

1.46 **"BK-Sydran Ventures"** shall mean BK-Sydran Ventures, LLC, an entity owned 50.01% by Sydran Investors and 49.99% by BKC and which owns and operates twenty-five (25) BKC restaurants located in Sacramento and Fresno, California.

1.47 **"Blended Rate"** shall mean, with respect to the Responsible Officer and employees or members of his firm, the lesser of (i) $300 per hour, or (ii) the hourly rate determined by the quotient of the total fees for the engagement (based upon each biller's ordinary hourly rate) divided by the total number of hours worked.

1.48 **"Business Day"** shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by any federal, state or local law to be closed in the City of Los Angeles, California.

1.49 **"Buyer"** shall mean as applicable, either (i) Strategic Restaurants Acquisition Corp., or (ii) the Alternate Buyer.

1.50 **"Cash"** shall mean cash and cash equivalents including, but not limited to, cash on deposit in the bank accounts of the Debtors or the Reorganized Debtors, as applicable, cash and cash equivalents supplied by the Buyer to pay Assumed Obligations or any Trade Payable Agreement Cure, checks, wire transfers, money orders, certificates of deposit, money market or similar investments, and other similar, readily, marketable securities or instruments.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

10 FIRST AMENDED JOINT PLAN OF REORGANIZATION

DOCS_NY:7547.1

1.51 **"Chapter 11 Cases"** shall mean the chapter 11 cases commenced by the Debtors upon the filing with the Bankruptcy Court of voluntary petitions under chapter 11 of the Bankruptcy Code.

1.52 **"Chase"** shall mean JP Morgan Chase Bank, fka The Chase Manhattan Bank and Chase Bank of Texas.

1.53 **"Chase-ACIC Intercreditor Agreement"** shall mean the subordination agreement, dated as of August 27, 2001, pursuant to which the Lien of the Chase Mortgage was made subordinate to the Lien of ACIC Mortgage.

1.54 **"Chase Guaranty" or "Chase Guaranties"** shall mean, individually, as to each Chase Guarantor, the reaffirmation of guaranty delivered by such Chase Guarantor in connection with the Restructuring of the obligations of Sydran Services to the Chase Lender Group under the Chase Loan Agreement and, collectively, as to all Chase Guarantors, all of the reaffirmations of all of the guaranties delivered by all of the Chase Guarantors in connection with the Restructuring of the obligations of Sydran Services to the Chase Lender Group under the Chase Loan Documents.

1.55 **"Chase Guarantor" or "Chase Guarantors"** shall mean, individually, each of Sydran I, Sydran II, Sydran III, Sydran IV, Sydran Casual Dining, Sydran Development, Sydran BK, as guarantors of the obligations of Sydran Services to the Chase Lender Group under the Chase Loan Documents and, collectively, all of the foregoing.

1.56 **"Chase Lender Group Agent"** shall mean, as applicable, Chase, or Citibank as successor to Chase, or any successor to Citibank, in each case, depending upon the context of the reference, as agent under the Chase Loan Agreement, the Chase Security Agreement, and/or the Chase Leasehold Mortgages.

1.57 **"Chase Lender Group Collateral"** shall mean the tangible and intangible real property and personal property assets of the Debtors in which the Chase Lender Group Agent holds valid and perfected Liens as collateral security for payment of: (i) as to the Claims of the Chase Lender Group against Sydran Services under the Chase Loan Documents, the obligations of Sydran Services under the Chase Loan Documents; and (ii) as to the Claims of the Chase



PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 24 of 50

Lender Group against the Chase Guarantors under the Chase Guaranties, the obligations of the Chase Guarantors under the Chase Guaranties.

1.58 **"Chase Leasehold Mortgages"** shall mean, as to each Debtor who is a Chase Guarantor, the leasehold mortgage(s) or leasehold deed(s) of trust executed by such Debtor in favor of the Chase, as collateral agent, pursuant to which such Debtor, as mortgagor or trustor, granted a Lien to the Chase, as mortgagee or beneficiary, to secure payment of the obligations of such Debtor under its Chase Guaranty.

1.59 **"Chase Lender Group"** shall mean each of the current holders of indebtedness under the Chase Loan Agreement, including each current lender under such loan agreement and the Chase Lender Group Agent.

1.60 **"Chase Loan Agreement"** shall mean that certain Amended and Restated Loan Agreement, dated as of January 1, 2002, by and among Sydran Services, as borrower, and Chase, as agent and as a lender, and the other lenders who were or who later became parties thereto, delivered in connection with the Restructuring.

1.61 **"Chase Loan Documents"** shall mean the Chase Loan Agreement, the Chase Security Agreement, the Chase Guaranties, the Chase Mortgage, the Chase Leasehold Mortgages, the BKC-Chase Intercreditor Agreement, the Senior Intercreditor Agreement, and the agreements and instruments related thereto.

1.62 **"Chase Mortgage"** shall mean that certain Deed of Trust and Assignment of Rents, dated as of April 16, 2001, with respect to the Morgan Hill Property, executed by Sydran I, as trustor, in favor of Chase Manhattan Bank, as beneficiary, to secure payment of the obligations of Sydran I, as a Chase Guarantor, under the predecessor guaranty to the Chase Guaranty executed by Sydran I.

1.63 **"Chase Security Agreement"** shall mean that certain Amended and Restated Security Agreement, dated as of January 1, 2002, delivered in connection with the Restructuring, pursuant to which Sydran Services, as borrower and debtor, and the Chase Guarantors, as guarantors and debtors, granted Liens to Chase, as collateral agent and secured party, to secure payment of: (i) in the case of Sydran Services, the obligations of Sydran Services

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 25 of 50

under the Chase Loan Documents; and (ii) in the case of the Chase Guarantors, the obligations of the Chase Guarantors under the Chase Guaranties.

1.64 **"Citibank"** shall mean Citibank, N.A.

1.65 **"Claim"** shall mean a claim against a Debtor within the meaning of section 101(5) of the Bankruptcy Code.

1.66 **"Claimant"** shall mean the holder of Claim.

1.67 **"Claims Reserve Account"** shall mean an interest bearing bank account or money market account to be established and held in trust by the Disbursing Agent on or after the Effective Date for the purpose of holding the Plan Proceeds to be distributed under the Plan and any interest, dividends or other income earned upon the investment of such Claims Reserve Account. The Claims Reserve Account will be funded by the Debtors on or immediately after the Effective Date with the Available Cash and, following the Effective Date, from time to time, by the Reorganized Debtors, with (i) any Liquidation Proceeds realized after the Effective Date, plus (ii) any Litigation Recovery realized after the Effective Date, minus (iii) any amounts necessary to pay Plan Expenses.

1.68 **"Class"** shall mean a category or group of Creditors or Interest Holders which are substantially similar to the Claims or Interests of the other Creditors or Interests Holders in such Class, as designated by this Plan pursuant to sections 1122 and 1123 of the Bankruptcy Code.

1.69 **"Close" or "Closing"** has the meaning assigned to it in the Asset Purchase Agreement.

1.70 **"Closing Date"** shall mean the date of the Closing.

1.71 **"Closing Deadline"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.72 **"Closure Properties"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.73 **"Confirmation"** shall mean the approval of the Plan by and subject to the terms of the Confirmation Order.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

13
FIRST AMENDED JOINT PLAN OF REORGANIZATION
DOCS_NY:7547.1

1.74 **"Confirmation Date"** shall mean the date of Confirmation.

1.75 **"Confirmation Hearing"** shall mean the duly noticed hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code. The Confirmation Hearing may be adjourned by the Bankruptcy Court from time to time without further notice other than the announcement of the adjourned date at the Confirmation Hearing.

1.76 **"Confirmation Order"** shall mean the order of the Bankruptcy Court, in form and substance reasonably acceptable to Debtors and to Buyer, confirming this Plan and providing for the effectuation of the transactions contemplated by this Plan and the Asset Purchase Agreement in accordance with the terms and provisions hereof and thereof.

1.77 **"Consenting Secured Party"** shall mean each holder of an Allowed Secured Claim who votes in favor of the Plan.

1.78 **"Consolidated Estate"** shall mean the estate that arises out of the consolidation of the Debtors' Chapter 11 Cases and the pooling of the Debtors' assets.

1.79 **"Contingent Claim"** shall mean any Claim for which a proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date.

1.80 **"Credit Support"** shall mean any credit support, financial support or other financial accommodation, including, without limitation, any guaranty of payment or performance or any funding commitment, provided by any entity for the benefit of or on behalf of another.

1.81 **"Creditor"** shall mean any entity that holds a Claim that arose or is deemed to have arisen at the time of or before the Petition Date.

1.82 **"Cure Obligation" or "Cure Obligations"** shall mean, individually, any monetary amount payable to the non-debtor party to an Assumed Executory Contract pursuant to section 365(b)(1) of the Bankruptcy Code as a condition to the assumption of such contract or lease and, collectively, all monetary amounts payable to all non-debtor parties to all Assumed Executory Contracts.

1.83 **"Debt"** shall mean liability on a Claim.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 27 of 50

1.84 **"Debtor" or "Debtors"** shall mean, individually, each of Sydran Services, Sydran Group, Sydran Development, Sydran BK Services, Sydran I, Sydran II, Sydran III, Sydran IV, Sydran Casual Dining, and Sydran III Texas, each as a debtor and debtor in possession in its Chapter 11 Case, and, collectively, all of the foregoing, as the debtors and debtors in possession in all of the Chapter 11 Cases.

1.85 **"Deficiency Claim"** shall mean the Claim held by the holder of a Secured Claim, to the extent that the amount of such holder's Claim exceeds the value, as of the date of the Confirmation Hearing, of either, as applicable: (i) the value of the interest (which interest may be a Lien) of the holder of such Claim in the property of the Debtors, the Reorganized Debtors, or the Consolidated Estate, securing such Claim; or (ii) the amount subject to setoff by such Claimant under Bankruptcy Code section 553.

1.86 **"Designated Contract" or "Designated Contracts"** shall have the meaning assigned to it in Section 6.1.3 of this Plan.

1.87 **"Disallowed Claim"** shall mean (i) a Claim or any portion thereof, that has been disallowed by a Final Order of the Bankruptcy Court; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Court, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Court, or other applicable law.

1.88 **"Disbursing Agent"** shall mean the Reorganized Debtors, or such other such person or persons designated to act as the disbursing agent for the purpose of making the distributions required under the Plan. The Confirmation Order shall identify the Disbursing Agent and may provide for one or more persons to serve in the capacity of Disbursing Agent.

1.89 **"Disclosure Statement"** shall mean the disclosure statement respecting the Plan, in the form approved by the Bankruptcy Court, disseminated by the Debtors to the holders of Claims against the Debtors in order to provide to such persons adequate information in

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 28 of 50

accordance with section 1125 of the Bankruptcy Code, as such disclosure statement may be modified, amended or supplemented from time to time.

1.90 **"Disputed Claim"** shall mean: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of the Effective Date or any later deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim for which a proof of Claim is required to be filed and no such Proof of Claim is filed or, if filed, is filed after the Bar Date; (iii) any Contingent Claim or Unliquidated Claim; (iv) any Claim scheduled by the Debtor in the Schedules as disputed, contingent or unliquidated; (v) a Proof of Claim filed in a greater amount, or of a different nature or priority, than the amount, nature, or priority listed for that Claim in the Schedules; or (vi) a Claim that is not listed in the Schedules. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

1.91 **"Disputed Claims Amount"** shall mean the aggregate amount of Disputed Claims that are fixed and absolute. For purposes of calculating distributions of Cash under the Plan, the amount of each Disputed Claim shall be based upon either (i) the face amount of such Creditor's Disputed Claim (or the disputed portion thereof) as set forth in the Creditor's filed proof of Claim, (ii) the amount at which the Bankruptcy Court may estimate such Disputed Claim, or (iii) the amount which the Disbursing Agent determines in its reasonable judgment is the appropriate amount to be reserved for such Disputed Claim.

1.92 **"Effective Date"** shall mean the first Business Day on which each of the conditions specified in Article 7 of the Plan has been satisfied or duly waived.

1.93 **"Escrow Agent"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.94 **"Estate" or "Estates"** shall mean, individually, each of the bankruptcy estates of each of the Debtors created pursuant to Bankruptcy Code section 541 and, collectively, all of the bankruptcy estates of all of the Debtors.

1.95 **"Estimated Cash Portion"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.96 **"Excluded Assets"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.97 **"Excluded Claims"** shall mean, with respect to section 8.5 of this Plan, (i) any debts, liabilities, or obligations of any Consenting Secured Party under any document or agreement entered into by it in connection with the Asset Purchase Agreement or the transactions contemplated therein, including any agreements between or among any Consenting Secured Party, any of the Holdings Companies, and the Buyer; and (ii) any claims against insiders who are Tax Payment Obligees which do not arise out of or relate to the Tax Payment Obligations Documents or the Class 4 Claims of the Tax Payment Obligees.

1.98 **"Exculpated Parties"** shall have the meaning assigned to it in Section 8.4 of this Plan.

1.99 **"Existing Holding Company Leases"** has the meaning assigned to it in the Asset Purchase Agreement.

1.100 **"Expense Deposit"** shall have the meaning assigned to it in the Strategic Asset Purchase Agreement.

1.101 **"Final Application Date for Professionals"** shall mean the last date for Professionals to file an application for final allowance as an Administrative Claim for Professional Fees incurred from the Petition Date through and including the Effective Date, which date shall be the first Business Day that is at least sixty (60) days after the Effective Date, or such other day as may be fixed by the Bankruptcy Court after notice and a hearing. Any Administrative Claim of a Professional for Professional Fees that is not asserted prior to the Final Application Date for Professionals shall be deemed untimely and shall be forever barred.

1.102 **"Final Order"** shall mean an order or judgment of the Bankruptcy Court or other court of competent jurisdiction (i) which has not been reversed, stayed, modified or amended, (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 30 of 50

relief from a judgment under Bankruptcy Rule 9024 has expired), and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

1.103 **"Final Purchase Price"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.104 **"Final Resolution Date"** shall mean the date on which all Disputed Claims in each and every Class shall have been resolved by Final Order or otherwise finally determined.

1.105 **"FMAC"** shall mean Franchise Mortgage Acceptance Company.

1.106 **"FMAC Loan Agreements"** shall mean (i) with respect to eleven (11) separate loans currently owned or serviced by GEC-BAFC, those certain Master Secured Promissory Notes, and any and related instruments and agreements evidencing eleven (11) separate loans originally made by FMAC to Escambia Fast Foods Corporation, Santa Rosa Fast Foods Corporation, Evans Fast Foods Corporation, and Evans Florida Limited Partnership, the predecessors to Sydran IV, relating to eleven (11) Restaurants owned or operated by Sydran IV; and (ii) with respect to twenty-three (23) separate loans currently owned or serviced by GMACCM, those certain Secured Promissory Notes and any related instruments and agreements evidencing twenty-three (23) separate loans originally made by Greenwich Capital Financial Products, Inc. or FMAC to Bessemar Fast Food Corporation, Fairhope Fast Foods Corporation, Grove Hill Restaurants Corporation, Irondale Fast Food Corporation, Lake Shore Fast Food Corporation, Livingston Restaurants Corporation, Evans Alabama One, L.P., Evans Alabama Two, L.P., Evans Alabama Three, L.P.; Marilyn H. Evans; Great South Restaurants Corporation and Murry J. Evans; Daphne Restaurants Corporation, Midtown Restaurants Corporation and Murry J. Evans; Semmes Fast Food Restaurants Corporation, Midtown Restaurants Corporation and Murry J. Evans; Sage Restaurants Corporation, Midtown Restaurants Corporation and Murry J. Evans; Loop Fast Foods Corporation, Midtown Restaurants Corporation and Murry J. Evans; Cottage Hill Restaurants Corporation, Gulf Shores Restaurants Corporation and Murry J. Evans; Robertsdale Fast Foods Corporation and Evans Alabama Two, L.P.; Thomasville Fast Foods Corporation and Evans Alabama Three, L.P.; and Murry J. Evans, all of the foregoing the

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 31 of 50

predecessors to Sydran IV, relating to twenty-three (23) Restaurants owned or operated by Sydran IV.

1.107 **"FMAC Loan Documents"** shall mean, with respect to Sydran IV, the FMAC Loan Agreements, the FMAC Security Agreements, and the agreements and instruments related thereto.

1.108 **"FMAC Security Agreements"** shall mean (i) with respect to eleven (11) loans currently owned or serviced by GEC-BAFC, those certain Master Pledge and Security Agreements originally between Escambia Fast Foods Corporation, Santa Rosa Fast Foods Corporation, Evans Fast Foods Corporation, and Evans Florida Limited Partnership, the predecessors to Sydran IV, as borrowers and debtors, and FMAC, as lender and secured party, relating to eleven (11) Restaurants owned or operated by Sydran IV, pursuant to which the foregoing original debtors granted Liens to FMAC to secure payment of the obligations under the FMAC Loan Documents related to such eleven (11) restaurants; and (ii) with respect to twenty-three (23) loans currently owned or serviced by GMACCM, those certain Pledge and Security Agreements, originally between Bessemar Fast Food Corporation, Fairhope Fast Foods Corporation, Grove Hill Restaurants Corporation, Irondale Fast Food Corporation, Lake Shore Fast Food Corporation, Livingston Restaurants Corporation, Evans Alabama One, L.P., Evans Alabama Two, L.P., Evans Alabama Three, L.P.; Marilyn H. Evans; Great South Restaurants Corporation and Murry J. Evans; Daphne Restaurants Corporation, Midtown Restaurants Corporation and Murry J. Evans; Semmes Fast Food Restaurants Corporation, Midtown Restaurants Corporation and Murry J. Evans; Sage Restaurants Corporation, Midtown Restaurants Corporation and Murry J. Evans; Loop Fast Foods Corporation, Midtown Restaurants Corporation and Murry J. Evans; Cottage Hill Restaurants Corporation, Gulf Shores Restaurants Corporation and Murry J. Evans; Robertsdale Fast Foods Corporation and Evans Alabama Two, L.P.; Thomasville Fast Foods Corporation and Evans Alabama Three, L.P., and Murry J. Evans; and Murry J. Evans, all of the foregoing the predecessors to Sydran IV, as borrowers and debtors, Greenwich Capital Financial Products, Inc. or FMAC, as lender and secured party, relating to twenty-three (23) Restaurants owned or operated by Sydran IV, pursuant to which the foregoing

original debtors granted Liens to Greenwich Capital Financial Products, Inc. or FMAC to secure payment of the obligations under the FMAC Loan Documents related to such twenty-three (23) Restaurants.

1.109 **"Franchise Agreement" or "Franchise Agreements"** shall mean, individually, as to each Debtor who is a franchisee of BKC, the franchise agreement between that Debtor and BKC relating to a Restaurant and, collectively, as to all Debtors who are franchisees of BKC, as the context requires, either (a) all of the franchise agreements relating to all of the Restaurants of a particular Debtor, or (b) all of the franchise agreements relating to all of the Restaurants of all of the Debtors.

1.110 **"GEC-BAFC"** shall mean General Electric Capital Business Asset Funding Corporation, as successor to FMAC under certain of the FMAC Loan Documents relating to eleven (11) Restaurants owned or operated by Sydran IV.

1.111 **"GEC-BAFC Collateral"** shall mean the tangible and intangible real property and personal property assets of Sydran IV in which GEC-BAFC (as successor to FMAC under certain of the FMAC Loan Documents) holds valid and perfected Liens as collateral security for payment of Sydran IV's obligations under the GEC-BAFC Loan Documents.

1.112 **"GEC-BAFC Confirmation of Pledge and Security Agreement"** shall mean those certain eleven (11) Confirmation of Pledge and Security Agreements, each dated as of March 1, 2002, executed by Sydran IV, as borrower and debtor, in favor of GEC-BAFC, as lender and secured party, in connection with the Restructuring, pursuant to which Sydran IV confirmed and acknowledged the Liens previously granted to secure payment of the obligations of Sydran IV under the GEC-BAFC Loan Documents relating to eleven (11) Restaurants owned or operated by Sydran IV.

1.113 **"GEC-BAFC Loan Agreements"** shall mean the FMAC Loan Agreements transferred or assigned to GEC-BAFC relating to eleven (11) Restaurants owned or operated by Sydran IV, together with those certain eleven (11) Amended and Restated Secured Promissory Notes, each dated as of March 1, 2002, in the aggregate initial principal amount of

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 33 of 50

$4,579,577.22, executed by Sydran IV, as maker, in favor of GEC-BAFC, as payee, in connection with the Restructuring.

1.114 **"GEC-BAFC Loan Documents"** shall mean, with respect to eleven (11) Restaurants owned or operated by Sydran IV, the GEC-BAFC Master Consent Agreement, the GEC-BAFC Loan Agreements, the GEC-BAFC Security Agreements, and the agreements and instruments related thereto, and any other FMAC Loan Documents transferred or assigned to GEC-BAFC with respect to the FMAC loans relating to those Restaurants.

1.115 **"GEC-BAFC Master Consent Agreement"** shall mean that certain Master Consent Agreement by and among GEC-BAFC, Sydran IV, and Sydran Holdings IX, LLC, a Nevada limited liability company, executed by such parties in connection with the Restructuring with respect to eleven (11) Restaurants owned or operated by Sydran IV.

1.116 **"GEC-BAFC Security Agreements"** shall mean the FMAC Security Agreements transferred or assigned to GEC-BAFC relating to eleven (11) Restaurants owned or operated by Sydran IV, pursuant to which the predecessors to Sydran IV granted Liens to FMAC to secure their obligations under the FMAC Loan Agreements related to such eleven (11) Restaurants, as amended by the GEC-BAFC Master Consent Agreement, together with the GEC-BAFC Confirmation of Pledge and Security Agreements.

1.117 **"GMACCM"** shall mean GMACCM Commercial Mortgage Corporation, as successor to FMAC under certain of the FMAC Loan Documents relating to twenty-three (23) Restaurants owned or operated by Sydran IV.

1.118 **"GMACCM Collateral"** shall mean the tangible and intangible real property and personal property assets of Sydran IV in which GMACCM (as successor to FMAC under certain of the FMAC Loan Documents) holds valid and perfected Liens as collateral security for payment of Sydran IV's obligations under the GMACCM Loan Documents.

1.119 **"GMACCM Loan Agreements"** shall mean the FMAC Loan Agreements transferred or assigned to GMACCM relating to twenty-three (23) Restaurants owned or operated by Sydran IV.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 34 of 50

1.120 **"GMACCM Loan Documents"** shall mean, with respect to twenty-three (23) Restaurants owned or operated by Sydran IV, the GMACCM Loan Agreements, the GMACCM Security Agreements, and the agreements and instruments related thereto, and any other FMAC Loan Documents transferred or assigned to GMACCM with respect to the FMAC loans relating to those Restaurants.

1.121 **"GMACCM Security Agreements"** shall mean the FMAC Security Agreements transferred or assigned to GMACCM relating to twenty-three (23) Restaurants owned or operated by Sydran IV.

1.122 **"Holdings Companies"** has the meaning assigned to it in the Asset Purchase Agreement.

1.123 **"Intercreditor Agreements"** shall mean, collectively, the BKC-Chase Intercreditor Agreement, the Senior Intercreditor Agreement, the Allied Sub Debt Intercreditor Agreements, the Chase-ACIC Intercreditor Agreement, and the Tax Payment Obligations Intercreditor Agreement.

1.124 **"Interest"** shall mean, as applicable, any membership interest, partnership interest, ownership interest, shareholder or stockholder interest, or equity interest in any Debtor, together with any associated redemption, conversion, exchange, voting, participation or dividend rights (including any rights to accrued and unpaid dividends), and any liquidation preferences, and also including all rights, options, warrants, calls, subscriptions or similar rights or agreements, commitments, or outstanding securities obligating any Debtor to issue, transfer or sell any membership, partnership, ownership, share, stock, or equity interest of any Debtor.

1.125 **"Interest Holder"** shall mean the holder of any Interest in any Debtor.

1.126 **"JV Purchase Agreement"** shall mean, as applicable, either (i) the Strategic JV Purchase Agreement, or (ii) the Amended JV Purchase Agreement.

1.127 **"Lien"** has the meaning assigned to it in the Asset Purchase Agreement, including, without limitation, a charge against or interest in property to secure payment of a Debt or performance of an obligation.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

22
FIRST AMENDED JOINT PLAN OF REORGANIZATION
DOCS_NY:7547.1

1.128 **"Liquidation Proceeds"** shall mean any Cash or other consideration paid to or realized by the Debtors or the Reorganized Debtors, as applicable, upon the sale, transfer, assignment or other disposition of the Plan Assets.

1.129 **"Litigation"** shall mean the interest of the Estates or the Reorganized Debtors, as applicable, in any and all claims, rights and causes of action which have been or may be commenced by the Debtors or the Reorganized Debtors, as applicable, other than the Transferred Claims. Litigation includes, without limitation, other than the Transferred Claims, any action (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to sections 544, 545, 547, 548, 549(a) and 550 of the Bankruptcy Code; (ii) for the turnover of property to the Debtors or the Reorganized Debtors, as applicable; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors or the Reorganized Debtors, as applicable; (iv) for compensation for damages incurred by the Debtors; and (v) equitable subordination actions against Creditors.

1.130 **"Litigation Recovery"** shall mean any Cash or other property received by the Debtors or the Reorganized Debtors, as applicable, from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise. If any Litigation is pursued on a contingent fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

1.131 **"Master Leases"** shall mean, as applicable, either (i) the Strategic Master Leases, or (ii) the Amended Master Leases.

1.132 **"Master Real Estate Agreement"** shall mean, as applicable, either (i) the Strategic Master Real Estate Agreement, or (ii) the Amended Master Real Estate Agreement.

1.133 **"Morgan Hill Property"** shall mean the Restaurant consisting of the real property and improvements owned by Sydran I located in Morgan Hill, California, aka BK Store No. 7928.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 36 of 50

1.134 **"Net Plan Proceeds"** shall mean all Plan Proceeds after the deduction of amounts to be paid for, or deposited to or withheld in the Claims Reserve Account from any unencumbered Cash on account of, or in anticipation of, payment of Plan Expenses.

1.135 **"Official Committee"** shall mean the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Sydran II Chapter 11 Case.

1.136 **"PACA"** shall mean the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a et seq.

1.137 **"PACA Claims"** shall mean Claims under, and qualified for the special treatment contained in, PACA.

1.138 **"Participating Vendors"** has the meaning assigned to it in the Asset Purchase Agreement.

1.139 **"Petition Date"** shall mean September 30, 2004, which is the date upon which the Debtors filed their voluntary petitions pursuant to chapter 11 of the Bankruptcy Code.

1.140 **"Plan"** shall mean this chapter 11 plan of reorganization and any exhibits and schedules hereto and any documents incorporated herein by reference, as the same may from time to time be amended or modified as and to the extent permitted herein or by the Bankruptcy Code.

1.141 **"Plan Assets"** shall mean any and all real property or personal property assets, rights or interests of the Debtors, whether tangible or intangible, including without limitation, the Purchase Price, all Cash of the Debtors including Available Cash (other than Cash that is part of the Purchased Assets), all Litigation, and any Litigation Recovery. Under no circumstances will Plan Assets include any of the Purchased Assets.

1.142 **"Plan Expenses"** shall mean the expenses incurred by the Reorganized Debtors or the Disbursing Agent following the Effective Date (including the fees and costs of attorneys and other professionals) for the purpose of (i) prosecuting or otherwise attempting to collect or realize upon the Litigation; (ii) selling or collecting upon any of the Plan Assets or otherwise incurred following the Effective Date in connection with generating the Liquidation Proceeds; (iii) resolving Disputed Claims and effectuating distributions to Creditors under the

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 37 of 50

Plan; or (iv) otherwise implementing the Plan and closing the Chapter 11 Cases, including, but not limited to post-Effective Date taxes (such as for income in the Disputed Claims Reserve) and wind-down expenses (such as document storage and the cost to prepare W-2's for employees and final tax returns).

1.143 **"Plan Interest Rate"** shall mean the rate of interest determined by the Bankruptcy Court upon Confirmation, if necessary, for purposes of the application of section 1124 (impairment) or section 1129(b) of the Bankruptcy Code (Present Value), as the case may be, to the distributions to certain Creditors under the Plan. The Plan Interest Rate may be different for different Classes of Claims.

1.144 **"Plan Proceeds"** shall mean the aggregate amount of Cash or other funds of the Debtors available for payment of the Allowed Claims of Creditors, including, without limitation, Available Cash and any proceeds of Plan Assets. Plan Proceeds shall include the Purchase Price, all Cash of the Debtors (other than Cash that is part of the Purchased Assets), any Litigation Recovery, and any Liquidation Proceeds. Under no circumstances will Plan Proceeds include any of the Purchased Assets sold to the Buyer under the Asset Purchase Agreement.

1.145 **"Plan Supplement"** shall mean the pleading or pleadings containing copies of the Asset Purchase Agreement and such other documents as are identified in the Plan or Disclosure Statement for inclusion within such pleading(s).

1.146 **"Present Value"** shall mean the present value as of the Effective Date of Cash payments made under the Plan by the Debtor using the Plan Interest Rate.

1.147 **"Priority Employee Claim"** shall mean that portion of an Allowed Claim that is unsecured and that is entitled to priority under sections 507(a)(3) or (a)(4) of the Bankruptcy Code.

1.148 **"Priority Tax Claim"** shall mean that portion of a Tax Claim, if any, entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

1.149 **"Professional Fees"** shall mean all amounts allowed and awarded by the Bankruptcy Court for compensation for services rendered and reimbursement of expenses incurred by Professionals pursuant to sections 330(a) and 503(b) of the Bankruptcy Code.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 38 of 50

1.150 **"Professionals"** shall mean those attorneys, accountants and other financial advisors employed by the Debtor (pursuant to section 327 of the Bankruptcy Code) or the Official Committee (pursuant to section 1103 of Bankruptcy Code) in the Chapter 11 Cases and to be compensated for services rendered and reimbursed for expenses incurred pursuant to sections 330(a) and 503(b) of the Bankruptcy Code.

1.151 **"Pro Rata" or "Pro Rata Share"** shall mean, with respect to distributions on account of Allowed Claims, in the same ratio of an Allowed Claim in a particular Class to the aggregate of all Allowed Claims in that Class.

1.152 **"Purchase Price"** shall mean, as applicable, the Estimated Cash Portion of the Purchase Price paid at the Closing as determined under section 2.5(b) of the Asset Purchase Agreement, or the final cash portion of the Final Purchase Price as determined under sections 2.5(c) and (d) of the Asset Purchase Agreement, to be paid by the Buyer to the Sellers for the Purchased Assets. The Purchase Price shall not include the Reserve Amount, if any, until such time as there is a determination in accordance with the procedures in the Asset Purchase Agreement that all or some portion of the Reserve Amount is payable to the Sellers as part of the Purchase Price. For purposes of the definition of "Purchase Price" as used in this Plan, the term Purchase Price shall not include Assumed Obligations.

1.153 **"Purchased Assets"** has the meaning assigned to it in the Asset Purchase Agreement.

1.154 **"Record Date"** shall mean (a) for the purposes of transmission, notice and voting on the Plan under Bankruptcy Rules 3017 and 3018, _____________, 2004, and (b) for the purposes under Bankruptcy Rules 3001(e), 3001(b) and 3021 of any distribution under the Plan to the holders of Claims and for the determination of which Claims may be disallowed, the Effective Date.

1.155 **"Rejection Claim"** shall mean any Allowed Claim under Bankruptcy Code section 502(g) that arises under Bankruptcy Code section 365(g)(1) in favor of the non-debtor party to any executory contract or unexpired lease that is rejected by a Debtor pursuant to Bankruptcy Code sections 365(a) or 1123(b)(2).

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 39 of 50

1.156 **"Rejection Claim Bar Date"** shall mean the last date established by the Bankruptcy Court by which entities asserting a Rejection Claim against a Debtor must have filed a proof of Claim with respect to such Rejection Claim or be forever barred from asserting such Claim and/or sharing in any distribution hereunder in respect of such Claim. For contracts or leases rejected at least thirty (30) days prior to the Bar Date, the Rejection Claim Bar Date shall be the Bar Date.

1.157 **"Releasee(s)"** shall have the meaning assigned to it in Section 8.5 of this Plan.

1.158 **"Releasor(s)"** shall have the meaning assigned to it in Section 8.5 of this Plan.

1.159 **"Reorganized Debtor" or "Reorganized Debtors"** shall mean, individually, each Debtor as reorganized and reconstituted on and after the Effective Date and, collectively, all of the Debtors as reorganized and reconstituted on and after the Effective Date.

1.160 **"Reserve Amount"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.161 **"Responsible Officer"** shall mean Bradley Sharp of Development Specialists, Inc.

1.162 **"Restaurant" or "Restaurants"** shall mean, individually, as to each Debtor who owns and/or operates restaurants franchised from BKC, each restaurant owned and/or operated by that Debtor and, collectively, as to all Debtors who own and/or operate restaurants franchised from BKC, as the context requires, either (a) all of the restaurants owned and/or operated by a particular Debtor, or (b) all of the Restaurants owned and/or operated by all of the Debtors.

1.163 **"Restructuring"** shall mean out-of-court restructuring effected in or about January, 2002, pursuant to the Restructuring Documents.

1.164 **"Restructuring Agreement"** shall mean that certain Restructuring Agreement, dated as of November 13, 2001, by and among numerous parties, including the Debtors, BKC, Chase, as agent under the predecessor loan agreement to the Chase Loan

Agreement, as collateral agent under the predecessor security agreement to the Chase Security Agreement, and as beneficiary under the Chase Leasehold Mortgages, the members of the Chase Lender Group as of that date, Allied, substantially all of the holders of Interests in the Debtors as of that date, and others, including the Holdings Companies, as part of an out-of-court restructuring of certain debts of the Debtors.

1.165 **"Restructuring Documents"** shall mean the Restructuring Agreement and the other documents, agreements, and instruments entered into by, between and among the parties to the Restructuring.

1.166 **"Schedules"** shall mean the schedules of assets and liabilities and the statement of financial affairs filed by each Debtor pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as further amended from time to time.

1.167 **"Secondary Liability Claim"** shall mean a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort, guaranty or other obligation of another Debtor, including any claim based on (a) vicarious liability; (b) liabilities arising out of piercing the corporate veil, alter ego liability or similar theories; (c) guaranties of collection, payment or performance; (d) indemnity bonds, obligations to indemnify or obligations to hold harmless; (e) performance bonds; (f) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor or relating to the obligations or performance of another Debtor; or (g) any other joint or several liability, including claims for indemnification or contribution that any Debtor may have in respect of any obligation that is the basis of a Claim.

1.168 **"Secured Claim"** shall mean a Claim secured by a Lien on property of the Debtor or Debtors, or the Consolidated Estate, or secured by an amount subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

1.169 **"Secured Personal Property Tax Claim"** shall mean any Claim of a state or local governmental unit arising prior to or relating to a period before the Petition Date for

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

28 FIRST AMENDED JOINT PLAN OF REORGANIZATION

DOCS_NY:7547.1

personal property taxes assessed or assessable against any Debtor based upon personal property owned by such Debtor and which is secured by a Lien on the personal property of such Debtor.

1.170 **"Seller" or "Sellers"** shall mean, individually, each Debtor identified in the Asset Purchase Agreement as a seller and, collectively, all of the Debtors who are identified in the Asset Purchase Agreement as sellers.

1.171 **"Senior Intercreditor Agreement"** shall mean that certain Senior Intercreditor Agreement, dated as of January 1, 2002, by and between Chase, as agent under the Chase Loan Agreement, BKC, as lender under the BKC Loan Agreement, and Chase, as collateral agent under the Chase Security Agreement and the Chase Leasehold Mortgages, entered into in connection with the Restructuring.

1.172 **"Special Class 12 Distribution"** shall mean a voluntary payment to the Specified Holders of Allowed Unsecured Claims in Class 12 which will be made solely at the election of one or more holders of an Allowed Secured Claim in Class 5, in an amount to be determined by such electing holder, from the distribution that would otherwise be made to such electing holder on account of its Allowed Secured Claim in Class 5.

1.173 **"Specified Holders of Allowed Unsecured Claims in Class 12"** shall mean any holder of an Allowed Unsecured Claim in Class 12 other than the Holdings Companies, Allied, any Claimant holding a subordinated note or similar subordinated instrument which is subordinated in the same manner and to the same extent as the Allied Subordinated Note, and any Claimant with a Deficiency Claim.

1.174 **"Strategic"** shall mean Strategic Restaurants Acquisition Corp.

1.175 **"Strategic Asset Purchase Agreement"** shall mean that certain Amended and Restated Asset Purchase Agreement, dated as of September 29, 2004, by and between Sydran Group, Sydran Services, Sydran BK Services, Sydran I, Sydran II and Sydran IV, as sellers, and Strategic, as buyer, and any amendments thereto.

1.176 **"Strategic JV Purchase Agreement"** shall mean that certain Asset Purchase Agreement, dated as of November 4, 2004, pursuant to which Strategic, or an affiliate of Strategic, is purchasing twenty-five (25) BKC restaurants from BK-Sydran Ventures.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 42 of 50

1.177 **"Strategic Master Leases"** shall mean the new "Master Leases" between the Holdings Companies and Strategic as contemplated under and defined in the Strategic Asset Purchase Agreement, and any amendments thereto.

1.178 **"Strategic Master Real Estate Agreement"** shall mean the "Master Real Estate Agreement" between the Holdings Companies and Strategic as contemplated under and defined in the Strategic Asset Purchase Agreement, and any amendments thereo.

1.179 **"Supplemental Payment"** shall mean any portion of the Final Purchase Price paid or refunded to the Sellers after the Closing pursuant to section 2.5(d) of the Asset Purchase Agreement.

1.180 **"Sydran I"** shall mean Sydran Food Services, L.P., a California limited partnership, one of the Debtors herein.

1.181 **"Sydran II"** shall mean Sydran Food Services, II, L.P., a California limited partnership, one of the Debtors herein.

1.182 **"Sydran III"** shall mean Sydran Food Services, III, L.P., a California limited partnership, one of the Debtors herein.

1.183 **"Sydran III Texas"** shall mean Sydran III Texas, Inc., a Texas corporation, one of the Debtors herein.

1.184 **"Sydran IV"** shall mean Sydran Food Services IV, LLC, a Nevada limited liability company, one of the Debtors herein.

1.185 **"Sydran BK Services"** shall mean Sydran BK Services, LLC, a Nevada limited liability company, one of the Debtors herein.

1.186 **"Sydran Casual Dining"** shall mean Sydran Casual Dining Services, LLC, a Nevada limited liability company, one of the Debtors herein.

1.187 **"Sydran Investors"** shall mean Sydran Investors, LLC, a wholly-owned subsidiary of Sydran Group and the owner of a subordinated 50.01% interest in BK-Sydran Ventures.

1.188 **"Sydran Development"** shall mean Sydran Development, LLC, a Nevada limited liability company, one of the Debtors herein.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 43 of 50

1.189 **"Sydran Group"** shall mean The Sydran Group, LLC, a Nevada limited liability company, one of the Debtors herein.

1.190 **"Sydran Services"** shall mean Sydran Services, LLC, a Nevada limited liability company, one of the Debtors herein.

1.191 **"Sydran Services Notes"** shall mean those certain Senior Subordinated Notes, each dated as of December 21, 2001, in the aggregate initial principal amount of $3,000,000, payable by Sydran Services to certain Class A Members of Sydran Group, issued to such Class A Members in connection with the Restructuring.

1.192 **"Sydran Services Notes Guarantor" or "Sydran Services Notes Guarantors"** shall mean, individually, each of Sydran Group, Sydran Development, Sydran I, Sydran II, Sydran III and Sydran IV, as guarantors of the obligations of Sydran Services to the holders of the Sydran Services Notes and, collectively, all of the foregoing.

1.193 **"Tax Claim"** shall mean all or that portion of an Allowed Claim held by a governmental unit for a tax assessed or assessable against the Debtor, including income and employment taxes and any related penalties or interest.

1.194 **"Tax Payment Obligations Agreement"** shall mean that certain Tax Payment Obligations Agreement, dated as of January 1, 2002, by and among Sydran Services, Sydran BK Services, Sydran I, Sydran II, Sydran III, Sydran IV, and the Tax Payment Obligees entered into in connection with the Restructuring.

1.195 **"Tax Payment Obligations Collateral"** shall mean the tangible and intangible real property and personal property assets of the Debtors in which the agent for the Tax Payment Obligees holds a valid and perfected Lien as collateral security for payment of the obligations under the Tax Payment Obligations Documents.

1.196 **"Tax Payment Obligations Documents"** shall mean the Tax Payment Obligations Agreement, the Tax Payment Obligations Security Agreement, and the Tax Payment Obligations Intercreditor Agreement.

1.197 **"Tax Payment Obligations Intercreditor Agreement"** shall mean that certain Intercreditor Agreement, dated as of January 1, 2002, by and among Matthew Schoenberg,

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 44 of 50

as agent for the Tax Payment Obligees, Chase, as agent under the Chase Loan Agreement and the Chase Security Agreement, and BKC, entered into in connection with the Restructuring with respect to the relative priorities of the Liens under the Tax Payment Obligations Security Agreement, the Chase Security Agreement, and the BKC Security Agreement.

1.198 **"Tax Payment Obligations Security Agreement"** shall mean that certain Tax Payment Obligations Security Agreement, dated as of January 1, 2002, by and among Sydran Group, Sydran Services, Sydran BK Services, Sydran I, Sydran II, Sydran III, and Sydran IV, as debtors, and Matthew Schoenberg, as agent for the Tax Payment Obligees, as secured party, entered into in connection with the Restructuring, pursuant to which Liens were granted to secure payment of the obligations under the Tax Payment Obligations Agreement.

1.199 **"Tax Payment Obligees"** shall mean those certain members of Sydran Investors III, LLC, who are beneficiaries under the Tax Payment Obligations Documents.

1.200 **"Topping Fee"** shall have the meaning assigned to it in the Strategic Asset Purchase Agreement.

1.201 **"Total Purchase Price"** shall mean the Purchase Price plus the Assumed Obligations.

1.202 **"Trade Payable Agreement Cure"** shall have the meaning assigned to it in the Asset Purchase Agreement.

1.203 **"Transaction Documents"** shall have the meaning assigned to it in the Strategic Asset Purchase Agreement, together with any amendments to such documents. The Transaction Documents include, without implied limitation, the Strategic Asset Purchase Agreement, the Strategic JV Purchase Agreement, the Strategic Master Real Estate Agreement, the Strategic Master Leases, and all other documents, instruments, or agreements contemplated under or to be executed or delivered in connection with the Strategic Asset Purchase Agreement. The term "other Transaction Documents" is intended to include any and all Transaction Documents not specifically listed in the sentence using that term.

1.204 **"Transferred Claims"** shall mean those claims, rights, and causes of action of the Debtors that are sold, assigned, or transferred to the Buyer as part of or as a result of the sale of the Purchased Assets to the Buyer under the Asset Purchase Agreement.

1.205 **"Unliquidated Claim"** shall mean any Claim for which a proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain, and which Claim has not been estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date.

1.206 **"Unsecured Claim"** shall mean any Claim that is not an Administrative Claim, a Secured Claim, a Priority Employee Claim or a Priority Tax Claim. Unsecured Claims shall include Deficiency Claims.

## ARTICLE 2

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.1 **Criterion of Class.** The following is a designation of Classes of Claims under the Plan. Administrative Claims and Priority Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code. A Claim is classified in a particular Class only to the extent that (i) the Claim qualifies within the description of that Class, and is classified in a different Class to the extent that the remainder of the Claim qualifies within the description of that different Class, and (ii) the Claim, or any portion or Allowed amount of such Claim, is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date. In the event of a controversy as to whether (a) any Class of Claims is impaired, or (b) any Class of Claims is properly designated, the Bankruptcy Court shall, after notice and a hearing, determine such controversy pursuant to applicable provisions of the Bankruptcy Code and Bankruptcy Rule 3013.

2.2 **Classes of Claims and Interests.** All Claims and Interests are divided into the following Classes, which Classes shall be mutually exclusive:

2.2.1 **Class 1 Claims.** Class 1 shall consist of all Priority Employee Claims.

2.2.2 **Class 2 Claims.** Class 2 shall consist of PACA Claims.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 46 of 50

2.2.3 **Class 3 Claims.** Class 3 shall consist of all Secured Claims not otherwise classified in Classes 4, 5, 6, 7, 8, 9 or 10. Each holder of a Secured Claim, other than the holder of a Secured Claim in Classes 4, 5, 6, 7, 8, 9 or 10, shall be in Class 3, each such holder shall be considered to be in its own separate subclass within Class 3, and each such subclass will be deemed to be a separate Class for purposes of this Plan.

2.2.4 **Class 4 Claims.** Class 4 Claims shall consist of the Secured Claims of the Tax Payment Obligees under the Tax Payment Obligations Documents.

2.2.5 **Class 5 Claims.** Class 5 shall consist of the Secured Claims of the Chase Lender Group under the Chase Loan Documents.

2.2.6 **Class 6 Claims.** Class 6 shall consist of the Secured Claims of GMACCM under the GMACCM Loan Documents.

2.2.7 **Class 7 Claims.** Class 7 shall consist of the Secured Claims of GEC-BAFC under the GEC-BAFC Loan Documents.

2.2.8 **Class 8 Claims.** Class 8 shall consist of the Secured Claims of BKC under the BKC Loan Documents.

2.2.9 **Class 9 Claims.** Class 9 shall consist of the Secured Claims of ACIC under the ACIC Loan Documents

2.2.10 **Class 10 Claims.** Class 10 shall consist of the Secured Personal Property Tax Claims. Each holder of a Secured Personal Property Tax Claim shall be considered to be in its own separate subclass within Class 10, and each such subclass will be deemed to be a separate Class for purposes of this Plan.

2.2.11 **Class 11 Claims.** Class 11 shall consist of the Claims of Participating Vendors. Claims arising before the Petition Date of suppliers or vendors who do not qualify as Participating Vendors are not Assumed Obligations.

2.2.12 **Class 12 Claims.** Class 12 shall consist of all Allowed Unsecured Claims other than the Claims of Creditors in Class 11. Class 12 consists of, inter alia, the Deficiency Claims of the members of the Chase Lender Group, the Deficiency Claims of BKC, the Deficiency Claims of GEC-BAFC, and the Deficiency Claims of GMACCM, the Claims of

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 47 of 50

Allied, the Claims of the holders of the Sydran Services Notes, the Claims of suppliers or vendors who do not elect or who are not eligible for treatment in Class 11, and all other Unsecured Claims.

2.2.13 **Class 13 Interests.** Class 13 shall consist of all Interests.

## ARTICLE 3

## TREATMENT OF UNCLASSIFIED CLAIMS

3.1 **Administrative Claims.** Each holder of an Allowed Administrative Claim shall receive, from Net Plan Proceeds, Cash equal to the Allowed amount of such Claim, unless such holder shall have agreed to different treatment of such Claim, at the sole option of the Debtors or the Reorganized Debtors, as the case may be: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtor or the Reorganized Debtor, as the case may be; (c) with respect to Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), until the entry of a final decree or an order converting or dismissing the case. Any Administrative Claim that is an Assumed Obligation (including, without limitation, any Trade Payable Agreement Cure) will be assumed by the Buyer and satisfied after the Effective Date when such Claim becomes due in accordance with its terms or, if already due at the time of the Effective Date, satisfied by the Buyer upon or promptly following the Effective Date.

3.2 **Final Application Date for Professionals.** The Final Application Date for Professionals shall be no later than the first Business Day that is sixty (60) days after the Effective Date. Any Professional that is required to file and serve a final request for allowance and payment of Professional Fees and that fails to timely comply with the Final Application Date for

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 48 of 50

Professionals shall be forever barred from asserting such Claim against the Debtor or any property of the Debtor and from sharing in any distribution under the Plan.

3.3 **Priority Tax Claims.** Unless the holder of a Priority Tax Claim has agreed to different treatment for such Claim, each holder of a Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, as the case may be, from Net Plan Proceeds, a Cash payment equal to the Allowed amount of such Claim: (a) as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) deferred to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the Plan Interest Rate or at a rate to be agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the appropriate governmental unit or, if they are unable to agree, at a rate to be determined by the Bankruptcy Court (provided, however, the Reorganized Debtors may prepay any or all such Claims at any time); or (c) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be. In the event payment to the holder of a Priority Tax Claim is deferred, each such holder shall receive, on account of such Claim, from Net Plan Proceeds, deferred Cash payments, of a Present Value, as of the Effective Date, equal to the Allowed amount of such Claim. A Priority Tax Claim that is an Assumed Obligation will be assumed by the Buyer and satisfied upon or promptly following the Effective Date (unless due at a later date, in which case it will be satisfied when due), or deferred to the extent permitted under section 1129(a)(9) of the Bankruptcy Code, in the manner and within the time frame set forth in subparagraphs (a) and (b) of this Section 3.3.

3.4 **Assumed Obligations.** Nothing in this Article 3 shall prevent the Buyer from contesting in good faith the amount or validity of any Assumed Obligation that is not an Allowed Claim.

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 49 of 50

## ARTICLE 4

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.1 **Class 1 (Priority Employee Claims).** Class 1 shall consist of Priority Employee Claims. Class 1 Claims are impaired. Each holder of an Allowed Priority Employee Claim shall receive at the sole option of the Debtors or the Reorganized Debtors, as the case may be, from Net Plan Proceeds, a Cash payment equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; (b) deferred under Bankruptcy Code section 1129(a)(9)(B)(i) with interest on the unpaid portion of such Claim at the Plan Interest Rate or at a rate to be agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of such Claim, or if they are unable to agree, at a rate to be determined by the Bankruptcy Court (provided, however, the Reorganized Debtors may prepay any or all of such Claim at any time); or (c) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtors or Reorganized Debtors, as the case may be. In the event payment to the holder of a Priority Employee Claim is deferred, each such holder shall receive, on account of such Claim, from Net Plan Proceeds, deferred Cash payments of a Present Value as of the Effective Date equal to the Allowed amount of such Claim. Any Priority Employee Claim that is an Assumed Obligation will be assumed by the Buyer and satisfied upon or promptly following the Effective Date (unless due at a later date, in which case it will be satisfied when due), or deferred to the extent permitted under section 1129(a)(9) of the Bankruptcy Code, in the manner and within the time frame set forth in subparagraphs (a) and (b) of this Section 4.1.

4.2 **Class 2 (PACA Claims).** Class 2 shall consist of PACA Claims. Class 2 Claims are impaired. Each holder of a PACA Claim in Class 2 that is an Allowed Claim shall be paid in Cash, without interest or penalty, the Allowed amount of such holder's PACA Claim on the later to occur of the Effective Date (or as soon thereafter as is practicable) or the date on which such Claim becomes an Allowed Claim. Any PACA Claim that is an Assumed Obligation will be assumed by the Buyer and satisfied, without interest or penalty, upon or promptly

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343 Doc# 242-1 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 50 of 50