# EXHIBIT 2

# DISCLOSURE STATEMENT IN SUPPORT OF

# DEBTORS' [FIRST AMENDED] JOINT PLAN OF

# REORGANIZATION

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  William P. Weintraub (CA Bar No. 108125)
   Maxim B. Litvak (CA Bar No. 215852)
2  Ramon M. Naguiat (CA Bar No. 209271)
   PACHULSKI, STANG, ZIEHL, YOUNG, JONES
3      & WEINTRAUB P.C.
   Three Embarcadero Center, Suite 1020
4  San Francisco, California  94111-4023
   Telephone: 415/263-7000
5  Facsimile:  415/263-7010

6  Attorneys for Sydran Services, LLC, et al.,
   Debtors and Debtors in Possession

7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

                          OAKLAND DIVISION
10

11  In re:                                    Case No.: 04-45343 (EDJ)

    **SYDRAN SERVICES, LLC**,                 Jointly Administered with
12  a Nevada limited liability company, et al.[1]   Case Nos. 04-45344 through 04-45352

                    Debtors.                  Chapter 11
13

    Federal Tax I.D. # 68-0438151
14
    ┌─────────────────────────────────────┐
15  │ ☒   Affects ALL DEBTORS             │   **DISCLOSURE STATEMENT IN
    ├─────────────────────────────────────┤   SUPPORT OF DEBTORS' FIRST
16  │ ☐   Affects SYDRAN SERVICES, LLC    │   AMENDED JOINT PLAN OF
    ├─────────────────────────────────────┤   REORGANIZATION**
17  │ ☐   Affects THE SYDRAN GROUP, LLC   │
    ├─────────────────────────────────────┤   **Disclosure Statement Hearing:**
18  │ ☐   Affects SYDRAN DEVELOPMENT, LLC │
    ├─────────────────────────────────────┤   Date:    December 13, 2004
19  │ ☐   Affects SYDRAN BK SERVICES, LLC │   Time:    10:30 a.m.
    ├─────────────────────────────────────┤   Place:   United States Bankruptcy Court
20  │ ☐   Affects SYDRAN FOOD SERVICES, L.P. │            1300 Clay Street
    ├─────────────────────────────────────┤            Oakland, CA
21  │ ☐   Affects SYDRAN FOOD SERVICES II, L.P. │   Judge:   Honorable Edward D. Jellen
    ├─────────────────────────────────────┤
22  │ ☐   Affects SYDRAN FOOD SERVICES III, L.P. │
    ├─────────────────────────────────────┤
23  │ ☐   Affects SYDRAN FOOD SERVICES IV, LLC │
    ├─────────────────────────────────────┤
24  │ ☐   Affects SYDRAN CASUAL DINING    │
    │       SERVICES, LLC                 │
25  ├─────────────────────────────────────┤
    │ ☐   Affects SYDRAN III TEXAS, INC.  │
    └─────────────────────────────────────┘
26

27  _____
    [1]   The other debtors in these jointly administered cases are:  The Sydran Group, LLC, Sydran Development, LLC,
28  Sydran BK Services, LLC, Sydran Food Services, L.P., Sydran Food Services II, L.P., Sydran Food Services III, L.P.,
    Sydran Food Services IV, LLC, Sydran Casual Dining Services, LLC, and Sydran III Texas, Inc.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND PLAN OVERVIEW ....................................................1

    A.  INTRODUCTION ..............................................................................1

    B.  INFORMATION REGARDING THE PLAN ........................................2

        1.  Exclusive Source of Information. ................................................2

        2.  Plan Governing Document. .........................................................3

        3.  Source of Information. ................................................................3

        4.  Warning Regarding Federal and State Income Tax Consequences
            of the Plan. ..................................................................................3

        5.  Bankruptcy Court Approval. ......................................................3

    C.  VOTING INSTRUCTIONS ...............................................................4

        1.  How to Vote. ...............................................................................4

        2.  Who May Vote. ...........................................................................4

    D.  CONFIRMATION ..............................................................................5

    E.  DISCLAIMERS .................................................................................6

    F.  PLAN OVERVIEW ...........................................................................7

II. OVERVIEW OF CHAPTER 11 CASES ....................................................18

    A.  EVENTS LEADING UP TO THE FILING OF THE CHAPTER 11 CASES ........18

        1.  Description of the Debtors ........................................................18

        2.  Current Corporate Structure .....................................................19

        3.  Corporate History .....................................................................21

        4.  The Roll-Up Transaction ...........................................................25

        5.  Prepetition Restructuring Efforts ..............................................28

        6.  The Debtors' Liabilities .............................................................33

        7.  Financial Performance ..............................................................35

        8.  The Debtors' Prepetition Marketing Efforts ..............................37

        9.  The Asset Purchase Agreement and Need for Bankruptcy Relief .............41

        10. Commencement of the Debtors' Bankruptcy Cases ..................42

    B.  SIGNIFICANT POSTPETITION EVENTS .....................................42

        1.  Appointment of Committees ......................................................42

        2.  Retention of Professionals ........................................................43

        3.  "First Day" Motions .................................................................44

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | |
|---|---|---|
| 4. | Bar Date for the Filing of Proofs of Claim / PACA Procedures | 44 |
| 5. | Schedules and Statements of Financial Affairs | 45 |
| 6. | Authority to Pay Prepetition Sales Taxes | 45 |
| 7. | Examiner Motion Filed by D.E. Shaw Laminar Portfolios, L.L.C. / Due Diligence | 45 |
| 8. | Extension of Time to Assume or Reject Real Property Leases | 47 |
| 9. | Interim Fee Procedures | 47 |
| 10. | Solicitation Procedures | 47 |
| 11. | Topping Fee and Other Buyer Protections | 47 |
| 12. | Sale Motion | 49 |

III. DESCRIPTION OF THE ASSET PURCHASE AGREEMENT AND RELATED AGREEMENTS .................. 49

A. ASSETS TO BE SOLD .................. 50

B. ASSUMED OBLIGATIONS .................. 52

C. CONSIDERATION TO BE PAID .................. 55

D. OTHER MATERIAL PROVISIONS .................. 57

E. RELATED REAL ESTATE TRANSACTIONS .................. 63

   1. The Master Real Estate Agreement .................. 65

   2. New Master Leases/Reduced Rent .................. 67

   3. Debt Resolution and Related Sharing Arrangements .................. 68

F. RELEASE OF GUARANTOR BY BKC .................. 74

G. BKC FRANCHISE AGREEMENTS .................. 75

IV. DESCRIPTION OF THE PLAN .................. 77

A. DESCRIPTION OF CLASSES .................. 77

B. TREATMENT OF CLASSIFIED CLAIMS .................. 78

C. TREATMENT OF UNCLASSIFIED CLAIMS .................. 86

D. IMPLEMENTATION OF THE PLAN .................. 88

   1. Asset Purchase Agreement. .................. 88

   2. Alternate Transaction. .................. 90

   3. Substantive Consolidation. .................. 91

   4. JV Purchase Agreement. .................. 94

   5. Available Cash. .................. 94

   6. Handling of Plan Assets and Collection of Plan Proceeds. .................. 95

Case: 04-43843   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 4 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | |
|---|---|---|---|
| | 7. | Litigation. | 95 |
| | 8. | Payment of Plan Expenses. | 96 |
| | 9. | Distribution of Plan Proceeds. | 96 |
| | 10. | Post-Confirmation Operations of the Reorganized Debtors. | 96 |
| | 11. | Power and Authority of Responsible Officer. | 96 |
| | 12. | Liquidation and Dissolution of the Reorganized Debtors. | 97 |
| | 13. | Full and Final Satisfaction. | 98 |
| | 14. | Distribution Procedures. | 98 |
| | 15. | Disbursing Agent. | 99 |
| | 16. | Claims Reserve Account. | 99 |
| | 17. | Resolution of Disputed Claims. | 100 |
| | 18. | Reserve Provisions for Disputed Claims. | 100 |
| | 19. | Allocation of Distributions. | 102 |
| | 20. | Rounding. | 102 |
| | 21. | No Interim Cash Payments of $50 or Less on Account of Allowed Claims. | 102 |
| | 22. | Disputed Payments. | 103 |
| | 23. | Unclaimed Property. | 103 |
| | 24. | Setoffs. | 103 |
| | 25. | No Distributions on Late-Filed Claims. | 103 |
| | 26. | Withholding Taxes. | 104 |
| | 27. | Setoffs and Recoupments. | 104 |
| | 28. | Tax Exemption. | 104 |
| | 29. | Securities Exemption. | 105 |
| | 30. | Plan Interest Rate. | 105 |
| | 31. | Implementation. | 105 |
| | 32. | Certain Actions. | 105 |
| | 33. | Dissolution of Committee. | 106 |
| E. | | EXECUTORY CONTRACTS | 106 |
| | 1. | Assumption. | 106 |
| | 2. | Rejection. | 108 |
| | 3. | Designation of Certain Executory Contracts. | 108 |
| | 4. | Satisfaction of Cure Obligations. | 109 |
| | 5. | Adequate Assurance. | 109 |
| | 6. | Post-Petition Executory Contracts and Unexpired Leases. | 109 |
| | 7. | Effect of Confirmation Order. | 110 |

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

F.     CONDITIONS TO CONFIRMATION OF THE PLAN .......................................110

G.     EFFECTS OF CONFIRMATION ...................................................................111

    1.     Binding Effect of Plan. ...................................................................111

    2.     Asset Purchase Agreement. .............................................................111

    3.     Asset Purchase Agreement Controls. ...............................................111

    4.     Revesting of Property of Debtors. ...................................................112

    5.     Property Free and Clear. .................................................................112

    6.     Limitation of Liability. ...................................................................112

    7.     Plan Release. ..................................................................................113

    8.     Injunction. .....................................................................................114

    9.     Post-Confirmation Liability of Responsible Officer. .................115

V.     DISTRIBUTIONS TO HOLDERS OF SECURED CLAIMS ....................115

VI.     DISTRIBUTIONS TO HOLDERS OF UNSECURED CLAIMS ....................119

VII.     NO DISTRIBUTIONS TO HOLDERS OF INTERESTS ...........................121

VIII.     KEY PLAN PROVISIONS ............................................................................122

A.     SOURCE OF PLAN FUNDING .................................................................122

    1.     Sale Proceeds .................................................................................122

    2.     Liquidation Proceeds .....................................................................122

    3.     Litigation Recovery .......................................................................122

B.     MANAGEMENT OF REORGANIZED DEBTORS .......................................123

C.     PRIORITY TAX CLAIMS .........................................................................123

D.     PRIORITY EMPLOYEE CLAIMS ..............................................................123

E.     ADMINISTRATIVE CLAIMS AND PLAN EXPENSES. ..................................124

    1.     Administrative Expenses. ...............................................................124

       a.     Services By and Fees of Professionals Prior to the Effective Date. ...........................................124

    2.     Other Administrative Expenses. ......................................................125

    3.     Plan Expenses. ...............................................................................125

       a.     Services by Professionals and Certain Parties After the Effective Date. .....................................125

       b.     Other Plan Expenses. .................................................126

       c.     Summary of Plan Expenses. ........................................126

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | |
|---|---|---|---|
| IX. | | OTHER CRITICAL INFORMATION REGARDING THE PLAN ................................. | 126 |
| | A. | AVOIDANCE ACTIONS ...................................................................... | 126 |
| | B. | TAX IMPLICATIONS ......................................................................... | 127 |
| | C. | RISKS UNDER THE PLAN .................................................................. | 127 |
| X. | | LIQUIDATION ANALYSIS ................................................................ | 127 |
| XI. | | CONFIRMATION OF THE PLAN .......................................................... | 132 |
| | A. | CONFIRMATION HEARING ............................................................... | 132 |
| | B. | REQUIREMENTS FOR CONFIRMATION .............................................. | 132 |
| | C. | CLASSIFICATION OF CLAIMS AND INTERESTS ................................. | 133 |
| | D. | ACCEPTANCE .................................................................................. | 133 |
| | E. | BEST INTERESTS OF CREDITORS ..................................................... | 134 |
| | F. | FEASIBILITY .................................................................................... | 134 |
| | G. | CRAMDOWN ..................................................................................... | 135 |
| | H. | ALTERNATIVES TO CONFIRMATION OF PLAN .................................. | 136 |
| XII. | | RECOMMENDATION AND CONCLUSION .............................................. | 136 |

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AND NO ONE MAY SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER THE BANKRUPTCY CODE.**

**I.**

**INTRODUCTION AND PLAN OVERVIEW**

**A.    INTRODUCTION**

On September 30, 2004 (the "Petition Date"), Sydran Services, LLC ("Sydran Services"), The Sydran Group, LLC ("Sydran Group"), Sydran Development, LLC ("Sydran Development"), Sydran BK Services, LLC ("Sydran BK Services"), Sydran Food Services, L.P. ("Sydran I"), Sydran Food Services II, L.P. ("Sydran II"), Sydran Food Services III, L.P. ("Sydran III"), Sydran Food Services IV, LLC ("Sydran IV"), Sydran Casual Dining Services, LLC ("Sydran Casual Dining"), and Sydran III Texas, Inc. ("Sydran Texas") (each, a "Debtor" and, collectively, the "Debtors"), commenced the above-referenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are jointly administered in the United States Bankruptcy Court for the Northern District of California before the Honorable Edward D. Jellen.

This Disclosure Statement (the "Disclosure Statement") contains information with respect to the Debtors and the *First Amended Joint Plan of Reorganization* (the "Plan") proposed by the Debtors.  Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan, which is attached hereto as **Exhibit A**.  The Plan was filed with the Bankruptcy Court on _____, 2004.  Creditors are also referred to the Plan Supplement, which was filed with the Bankruptcy Court on November 10, 2004, and which contains copies of the definitive agreements that implement the transactions contemplated by the Plan that are described herein.

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtors have examined various alternatives and, based on information contained in this

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  Disclosure Statement, and for the reasons set forth below, the Debtors have concluded that the Plan

2  provides the best recovery to creditors.

3  The Disclosure Statement describes the Plan and contains information concerning, among

4  other matters:  (1) the history, business, results of operations, management, properties and

5  liabilities of and pending litigation of and against the Debtors; (2) the proposed sale of

6  substantially all of the Debtors' assets under the Plan free and clear of liens, claims or interests;[2]

7  and (3) the assets that will be available for distribution under the Plan.  The Debtors strongly urge

8  you to review carefully the contents of this Disclosure Statement and the Plan (including the

9  exhibits to each) before making a decision to accept or reject the Plan.  Particular attention should

10  be paid to the provisions affecting or impairing your rights as a creditor.

11  Your vote on the Plan is important.  In order for the Plan to be accepted by a Class of

12  Claims, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of

13  Allowed Claims in such Class who vote on the Plan must vote for acceptance.  Because the holders

14  of Interests are to receive nothing under the Plan, the holders of Class 13 (Interests) are deemed to

15  have rejected the Plan, and, therefore, the votes of equity holders are not being solicited.

16  Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy

17  Code, or to the confirmation of another plan.  These alternatives may not provide for a distribution

18  of as much value to holders of Allowed Claims as the Plan.  Accordingly, the Debtors urge you to

19  accept the Plan by completing and returning the enclosed ballot no later than _____, 2005.

20  **B.**      **INFORMATION REGARDING THE PLAN**

21           **1.  Exclusive Source of Information.**

22           **No representations concerning the Debtors are authorized by the Debtors other than**

23  **as set forth in this Disclosure Statement.**

---

24  [2]   The Debtors also reserve the right to file a motion or motions (together, the "Sale Motion") pursuant to Bankruptcy
25  Code sections 363(b) and (f), 365(f) and 506 seeking, among other things, the sale of the Purchased Assets (as defined
   below) to the Buyer (as defined below), the assumption by the applicable Debtors and assignment to the Buyer of the
26  Assumed Executory Contracts (as defined in the Plan), and a determination that the Purchased Assets will be
   transferred to the Buyer free and clear of Liens and Claims.  The transactions contemplated under the Asset Purchase
27  Agreement (as defined below), whether consummated pursuant to the Sale Motion or the Plan, shall be referred to
   herein as the "Sale."  In the event of any opposition to the proposed Sale free and clear of liens, claims and interests,
28  the Debtors intend to seek a valuation, under section 506 of the Bankruptcy Code, of any collateral that is included
   within the Sale.

Case: 04-43843   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 9
of 187

**2. Plan Governing Document.**

Although the Debtors believe that this Disclosure Statement accurately describes the Plan, **all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein which are controlling.**

**3. Source of Information.**

Factual information contained in this Disclosure Statement has been provided by the Debtors or has been obtained from the Debtors' records, except where otherwise specifically noted. All financial information contained in this Disclosure Statement has been prepared by the Debtors or has been obtained from their records. None of the Debtors' attorneys, accountants, or other professionals make any representation regarding that information. The Debtors do not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy. The Debtors have, however, made great efforts to present the information accurately and fairly and believe that the information is substantially accurate. The assumptions underlying the projections contained in this Disclosure Statement concerning sources and amounts of payments to creditors represent the best estimate of the Debtors as to what they expect will happen. Because these are only assumptions about or predictions of future events, many of which are beyond the Debtors' control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events which occurred subsequent to the date that the Debtors submitted the Disclosure Statement to the Bankruptcy Court for approval.

**4. Warning Regarding Federal and State Income Tax Consequences of the Plan.**

**The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim. Accordingly, each Creditor is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.**

**5. Bankruptcy Court Approval.**

Following a hearing held on December 13, 2004, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, passed on the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

**C.** **VOTING INSTRUCTIONS**

**1.** **How to Vote.**

A ballot is enclosed herewith for creditors to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan and sign your name and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 4:00 P.M. prevailing Pacific Time on _____, 2005 at the following address:**

**AlixPartners LLC**
**2100 McKinney Avenue, Suite 800**
**Dallas, Texas 75201**
**Attention: Latonya Callaway**

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

**2.** **Who May Vote.**

The Plan divides the Allowed Claims of Creditors into twelve (12) Classes. There is one (1) Class of Interests.

Classes of Creditors which are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed not to have accepted the Plan. Each holder of an Allowed Claim in an impaired Class may vote to accept or reject the Plan. A Class is impaired if legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities. All Classes of Claims are impaired and entitled to vote on the Plan.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Class of Interests is impaired under the Plan and will receive nothing.  Because all Interests will be cancelled, the Class of Interests is deemed to have rejected the Plan.  Accordingly, the Debtors are not soliciting acceptances from the holders of Interests.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim.  Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtors as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan.  The Ballot form which you received does not constitute a proof of Claim.

**D.** **CONFIRMATION**

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization.  At the Confirmation Hearing, in order to confirm the Plan, the Debtors must demonstrate that they have met the requirements of section 1129 of the Bankruptcy Code.  If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan.  The Debtors believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class.  As discussed above, a class of creditors has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors holding allowed claims in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, that plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the negative vote of that class, so long as certain statutory requirements are met by the plan.  This is called a "cram down."  If necessary, the Debtors are prepared to seek confirmation of the Plan through a cram down.

The Bankruptcy Court has set _____, 2005, at __:__0 __.m., for a hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for Confirmation of the Plan have been satisfied.  The hearing may be

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    continued from time to time and day to day without further notice.  If the Bankruptcy Court

2    confirms the Plan, it will enter the Confirmation Order.  Any objections to Confirmation of the

3    Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on

4    counsel for the Debtors and the parties set forth below on or before the date set forth in the notice

5    of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

6    Counsel on whom objections must be served are:

7    **Counsel for the Debtors**
     Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
8    Three Embarcadero Center, Suite 1020
     San Francisco, CA 94111
9    Telephone:  (415) 263-7000
     Facsimile:  (415) 263-7010
10   Attn:  William P. Weintraub, Esq.

11   **Counsel for the Committee**
     Irell & Manella, LLP
12   840 Newport Center Drive, Suite 400
     Newport Beach, CA 92660-6324
13   Telephone:  (949) 760-0991
     Facsimile:  (949) 760-5200
14   Attn:  Jeffrey M. Reisner, Esq.

15   **Counsel for Strategic**
     O'Melveny & Myers LLP
16   400 South Hope Street
     Los Angeles, CA 90071-2899
17   Tel:  (213) 430-6000
     Fax:  (213) 430-6407
18   Attn:  Ben H. Logan, Esq.

19            and

20   **Office of the United States Trustee**
     1301 Clay Street Room 690N
21   Oakland, CA 94612
     Tel:  (510) 637-3200
22   Fax:  (510) 637-3220
     Attn:  Minnie Loo, Esq.

23

24   E.    **DISCLAIMERS**

25          THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR

26   UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN.

27   PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THIS DISCLOSURE

28   STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 13 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE

2   NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS'

3   BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE

4   INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT

5   CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  SEE 11 U.S.C.

6   § 1125(a).

7          FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

8   SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY

9   SUMMARY.  *IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS*

10  *DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.*

11         NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION

12  OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN

13  AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR

14  INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN

15  AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD

16  NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

17         THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

18  CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST

19  HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT

20  AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

21  **F.     PLAN OVERVIEW**

22         The Debtors own or operate 227 franchised Burger King® restaurants.  The Plan provides

23  that the Debtors[3] will sell substantially all of their operating assets relating to 201 of the Debtors'

24  restaurants[4] (with the remainder having been closed or designated for closure) to Strategic

25  _____

26  [3]  The "Sellers" under the Asset Purchase Agreement are Sydran Group, Sydran Services, Sydran BK Services,
    Sydran I, Sydran II and Sydran IV.  The remaining Debtors, which consist of Sydran Development, Sydran Casual
    Dining, Sydran III and Sydran Texas, are either holding companies or corporate shells that do not hold any material

27  assets.  For purposes herein, the term "Debtors" shall, depending on the context, refers either to the Sellers or to all of
    the Debtors in these Chapter 11 cases.

28  [4]  It is possible that the number of restaurants sold under the Plan may be reduced subject to various contingencies in
    the Asset Purchase Agreement and as otherwise described herein.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Restaurants Acquisition Corp. ("Strategic"), a Delaware corporation formed by Cerberus

2    California, Inc. ("Cerberus"), pursuant to the terms of an *Amended and Restated Asset Purchase*

3    *Agreement* dated as of September 29, 2004 (the "Strategic Asset Purchase Agreement").  The

4    transaction also requires the Debtors to assume and assign to Strategic certain executory contracts

5    and unexpired leases and the Debtors intend to reject certain other executory contracts and

6    unexpired leases.  A true and correct copy of the Strategic Asset Purchase Agreement is included

7    within the Plan Supplement.

8        The Plan also contemplates that an Alternate Buyer[5] may submit a higher and better offer

9    to acquire the Purchased Assets and may be selected to purchase such assets, in which case such

10   Alternate Buyer shall be treated as the "Buyer" of the Debtors' assets for all purposes herein

11   pursuant to an Amended Asset Purchase Agreement and other Amended Transaction Documents.

12   The terms of the Amended Asset Purchase Agreement and the other Amended Transaction

13   Documents shall be substantially the same as those in the Strategic Asset Purchase Agreement and

14   the other Transaction Documents, except that Strategic shall be replaced by the Alternate Buyer,

15   the Purchase Price shall be increased, and the Alternate Buyer shall not be entitled to receive the

16   Expense Deposit or the Topping Fee (all as described further below).  Specifically, as set forth and

17   further defined in the Plan, the Alternate Buyer shall step into the shoes of Strategic and the

18   Transaction Documents shall be amended only to (i) substitute the Amended Asset Purchase

19   Agreement for the Strategic Asset Purchase Agreement, (ii) substitute the Amended JV Purchase

20   Agreement for the Strategic JV Purchase Agreement, (iii) substitute the Amended Master Real

21   Estate Agreement for the Strategic Master Real Estate Agreement, (iv) substitute the Amended

22
---
23   [5]   An "Alternate Buyer" is defined in the Plan as a purchaser of the Purchased Assets other than Strategic (i) whose
     qualifications to be a new franchisee for the Restaurants are approved by BKC; (ii) who agrees to pay, in Cash, a
24   Purchase Price under the Amended Asset Purchase Agreement that both (a) exceeds the initial Purchase Price under
     the Strategic Asset Purchase Agreement by at least an amount equal to the Topping Fee plus $1,000 and (b) exceeds
25   the Purchase Price offered by any other qualified bidder including Strategic; (iii) who demonstrates to the reasonable
     satisfaction of the Debtors and the Committee that such proposed purchaser can close and consummate the Amended
26   Transaction Documents to the same extent as Strategic can close and consummate the Transaction Documents; (iv)
     who arranges for Credit Support that is comparable to the Credit Support (if any) provided in connection with the
27   proposed transactions with Strategic; and (v) who agrees to enter into and immediately perform the Amended Asset
     Purchase Agreement, the Amended JV Purchase Agreement, the Amended Master Real Estate Agreement, the
28   Amended Master Lease, and each of the other Amended Transaction Documents, with no other changes to such
     Amended Transaction Documents other than as set forth in the definitions of Amended Asset Purchase Agreement, the
     Amended JV Purchase Agreement, and the Amended Transaction Documents.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

1   Master Leases for the Strategic Master Leases, and (v) replace the Buyer with the Alternate Buyer

2   in the other Transaction Documents.  Except as set forth in the preceding sentence, all other terms,

3   provisions, agreements, covenants, conditions, and requirements of the Transaction Documents

4   shall remain unchanged.  It is also possible that Strategic could agree to increase the Purchase

5   Price contemplated under the Asset Purchase Agreement to match or exceed any competing offer

6   for the Debtors' assets.  As defined in the Plan and used herein, the term "Buyer" refers to, as

7   applicable, either (i) Strategic, or (ii) the Alternate Buyer.  Conversely, references to Strategic

8   herein may, as appropriate, be deemed to refer to the ultimate Buyer of the Debtors' assets.

9   Under the Strategic Asset Purchase Agreement, if Strategic closes the transaction, Strategic

10   will return to the Debtors an Expense Deposit in the amount of $850,000 paid by the Debtors to

11   Strategic prior to the commencement of these bankruptcy cases; this sum is included in the

12   "Purchase Price" under the Strategic Asset Purchase Agreement.  Conversely, if an Alternate

13   Buyer closes the transactions, Strategic will be entitled to keep the $850,000 Expense Deposit and

14   Strategic will receive a Topping Fee in the amount of $500,000.  Thus, in order for an Alternate

15   Buyer to offer a better alternative for the estates, it must exceed the Purchase Price offered by

16   Strategic (including the right to the refund of the $850,000 Expense Deposit under the Strategic

17   Asset Purchase Agreement), provide additional funds so as to allow the estates to pay the $500,000

18   Topping Fee to Strategic and satisfy all the other conditions mentioned above.

19   As currently proposed under the terms of the Strategic Asset Purchase Agreement, in

20   consideration for the Sale of the Purchased Assets, Strategic will pay the Debtors $20 million in

21   cash, plus $850,000 (which represents the return of an amount equal to the Expense Deposit), plus

22   the assumption of certain real and personal property tax liabilities for calendar years 2004-2005

23   (estimated to total approximately $1.4 million), plus the assumption of approximately $9 million of

24   prepetition vendor payables, plus the assumption of the Debtors' ordinary course, postpetition

25   current liabilities (estimated to total approximately $4.7 million),[6] plus the assumption of certain

26   pre-closing accrued vacation and holiday accumulations of those employees whom Strategic

27

28   _____

[6]   It is difficult to estimate the ordinary course post-petition liabilities that Strategic will assume if the transaction closes because this amount will depend on the amount of postpetition trade credit that the Debtors receive.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

rehires (estimated to total approximately $600,000), minus a potential working capital adjustment (estimated to total approximately $3.3 million),[7] unpaid cure amounts, and other possible reductions.[8] The terms and conditions of the Sale (and various related real estate transactions involving the Debtors' non-debtor affiliates) are described in detail in Article III below, but are qualified in all respects by the terms, of the Asset Purchase Agreement.

The Plan contemplates the substantive consolidation of the Debtors' estates, as further described in Article IV.D.2 below. Hence, all assets and liabilities of the Debtors shall be treated as though they were pooled and no duplicate Claims asserted against more than one Debtor shall be allowed. No intercompany claims shall be Allowed.

For illustrative purposes only, the Debtors assume that the Effective Date of the Plan will be January 26, 2005, which coincides with the end of the Debtors' fiscal month. Upon consummation of the Sale and related transactions, all Allowed Claims entitled to priority under the Bankruptcy Code, e.g., Administrative Claims, Priority Tax Claims, and Priority Employee Claims, will be paid in full either on the Effective Date of the Plan or over time, unless otherwise agreed, either from the proceeds of the Sale or, in the case of the Assumed Obligations, by the Buyer. Allowed PACA Claims will be paid in full on the Effective Date. Holders of Allowed Secured Claims will receive an allocation of the cash portion of the purchase price depending on the value of their respective interests in the property of the Debtors which serves as collateral for such Secured Claims, subject to the terms of applicable Intercreditor Agreements. Holders of Allowed General Unsecured Claims that are not Participating Vendors will not receive any distribution from the Sale, unless there is a Special Class 12 Distribution to certain Specified Holders of Allowed Unsecured Claims in Class 12.[9] Any Special Class 12 Distribution would be

---

[7]  This is an estimate only. The actual amount of the working capital adjustment cannot be determined at this time and will require a final accounting and reconciliation after the Closing of the Sale consistent with the procedures set forth in the Asset Purchase Agreement. The working capital adjustment will be impacted by the Debtors' operational performance prior to the Closing and various other factors, such as possible audit adjustments for prior periods. Assuming that the Debtors' current sales remain steady and vendors continue to extend credit to the Debtors on ordinary course terms, the Debtors believe that the working capital adjustment estimated herein could decrease by approximately $500,000 or more.

[8]  In consideration for assuming the various liabilities set forth above, the Buyer is, among other things, acquiring the Debtors' available cash as of the Closing of the Sale and other Purchased Assets.

[9]  The Plan defines "Specified Holders of Allowed Unsecured Claims in Class 12" as any holder of an Allowed Unsecured Claim in Class 12 other than the Holdings Companies, Allied, any Claimant holding a subordinated note or

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   made solely at the election of one or more holders of Allowed Secured Claims in Class 5, in an

2   amount to be determined by such holder, from the distribution that would otherwise be made to

3   such holder on account of its Allowed Secured Claim in Class 5.[10] The prepetition Allowed

4   Claims of Participating Vendors (as described below) shall be assumed by the Buyer as Assumed

5   Obligations under the Asset Purchase Agreement and paid in full without interest or penalty.

6   Holders of Interests will receive nothing on account of such Interests.

7       Generally speaking, Participating Vendors consist of ordinary course vendors and/or

8   suppliers to the Debtors, other than parties holding claims for borrowed money or claims that are

9   secured by collateral, who have in fact continued to provide goods and/or services to the Debtors

10  during these Chapter 11 Cases and who reach agreement with the Buyer to extend credit terms on a

11  going forward basis after the Closing of the Sale. Employees of the Debtors are not eligible to be

12  Participating Vendors. A list of anticipated eligible Participating Vendors is attached hereto as

13  **Exhibit B**.[11] The Debtors anticipate that the prepetition claims of Participating Vendors will total

14  approximately $8.5 million. The Debtors are currently aware of approximately 40 trade vendors or

15  parties to executory contracts or unexpired leases who shall not be treated as Participating Vendors

16  and will be classified in Class 12. These parties are expected to assert prepetition claims totaling

17  approximately $500,000, plus approximately $150,000 in disputed litigation claims.

18      The following chart briefly summarizes the treatment of Creditors and Interest Holders

19  under the Plan. Amounts listed below are estimated. Actual Claims and distributions will vary

20  depending upon the outcome of these cases.

21

22

23

24

---

25  similar subordinated instrument which is subordinated in the same manner and to the same extent as the Allied
    Subordinated Note, and any Claimant with a Deficiency Claim.

26  [10] The Special Class 12 Distribution is purely voluntary. The Debtors cannot currently predict whether there will be a
    Special Class 12 Distribution, but this possibility may be taken into account in considering overbids for the Debtors'
    assets that may be submitted by a Creditor or Creditors in Class 5.

27  [11] Upon mailing of this Disclosure Statement, the Debtors anticipate that the attached listing of Participating Vendors
    shall have been approved by Strategic. Once such list is finalized, no vendor shall be removed from the list unless

28  such vendor alters credit terms or refuses to ship goods or to provide services to the Debtors, without the agreement or
    acknowledgment of the Debtors.

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 18
of 187

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| N/A | Allowed Administrative Claims | $4,700,000 million[12] Est. Recovery: 100% | Satisfied in full, without interest: (a) on or as soon as practicable after the later of (i) the Effective Date (unless due at a later date, in which case it will be satisfied when due), or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be; (c) with respect to Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), until the entry of a final decree or an order converting or dismissing the case. *Administrative Claims that are Assumed Obligations under the Asset Purchase Agreement shall be assumed and satisfied by the Buyer when due.* |
| N/A | Allowed Priority Tax Claims | <u>See</u> Class 10 below Est. Recovery: 100% | Satisfied in full, without interest: (a) as soon as practicable after the later of (i) the Effective Date (unless due at a later date, in which case it will be satisfied when due), or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) deferred to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the Plan Interest Rate or at a rate to be agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the appropriate governmental unit or, if they are unable to agree, at a rate to be determined by the Bankruptcy Court; or (c) in accordance with the terms and conditions of agreements with the holders of such Claims. *Priority Tax Claims that are Assumed Obligations under the Asset Purchase Agreement shall be assumed and satisfied by the Buyer when due.* |

---

[12] This amount is an estimate of ordinary course current liabilities only, exclusive of professional fees and other amounts that will not assumed by the Buyer.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| 1 | Allowed Priority Employee Claims | Approx. $600,000[13]<br><br>Est. Recovery: 100% | **Impaired; entitled to vote.** Satisfied in full, without interest, (a) as soon as practicable after the later of (i) the Effective Date (unless due at a later date, in which case it will be satisfied when due), or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) deferred with interest on the unpaid portion of such Claim at the Plan Interest Rate or at a rate to be agreed to by holder and Debtor; or (c) on such other terms as may be agreed to by holder and the Debtor. *Priority Employee Claims that are Assumed Obligations under the Asset Purchase Agreement shall be assumed and satisfied by the Buyer when due.* |
| 2 | Allowed PACA Claims | Approx. $675,000<br><br>Est. Recovery: 100% | **Impaired; entitled to vote.** Satisfied in full, without interest or penalty, on the later to occur of the Effective Date (or as soon thereafter as is practicable) or the date on which such Claim becomes an Allowed Claim. *PACA Claims that are Assumed Obligations under the Asset Purchase Agreement shall be assumed and satisfied by the Buyer.* |
| 3 | Allowed Secured Claims (not otherwise classified in any other Class) | $0<br><br>Est. Recovery: Full payment of Secured portion of Claim | **Impaired; entitled to vote.** One of the following alternative treatments: (i) each holder of a Class 3 Claim will retain its Lien on its collateral until such collateral is sold (including a sale under the Asset Purchase Agreement) and, upon such sale, the proceeds of such sale will be paid to the Claimant in full satisfaction and release of its Claim; (ii) the holder of such Claim will receive, from Net Plan Proceeds, a Cash payment equal to the amount of its Allowed Secured Claim (as determined by the value of the Lien securing such Claim) in full satisfaction and release of such Claim and, upon such payment the Lien on the property securing such Claim will be extinguished; or (iii) the holder of such Claim will have the collateral securing such Claim abandoned to it in full satisfaction and release of such Claim. |

[13] This amount is the Debtors' estimate of accrued vacation benefits owing to the Debtors' employees as of the Petition Date, a portion of which may not be entitled to priority status. The Debtors have authority from the Bankruptcy Court to continue to honor, but not cash out, vacation benefits of continuing employees in the ordinary course of business on a postpetition basis. To the extent that employees are rehired by the Buyer (which should include most current employees), any accrued vacation benefits of such employees will be assumed by the Buyer and satisfied or honored in the ordinary course when due.

13

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.<br>ATTORNEYS AT LAW<br>SAN FRANCISCO, CALIFORNIA

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| 4 | Allowed Secured Claims of the Tax Payment Obligees | $4,700,000<br><br>Est. Recovery: 100% | **Impaired; entitled to vote.** On the Effective Date (or as soon thereafter as is practicable), the transactions under the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of the Tax Payment Obligees, with such Liens and Claims attaching to the Purchase Price. After giving effect to the Tax Payment Obligations Intercreditor Agreement, each holder of an Allowed Secured Claim in Class 4 shall be paid on the Effective Date, in Cash, from the Purchase Price, in full satisfaction of its Claim, an amount equal to its Claim under the Taxpayer Obligations Agreement. |
| 5 | Allowed Secured Claims of the Chase Lender Group | $116,905,478<br><br>Est. Recovery: 5.9% | **Impaired; entitled to vote.** On the Effective Date (or as soon thereafter as is practicable), the transactions under the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of the Chase Lender Group, with such Liens and Claims attaching to the Purchase Price. After giving effect to the Intercreditor Agreements, each holder of an Allowed Secured Claim in Class 5 shall be paid, on the Effective Date, in Cash, from the Purchase Price, in full satisfaction of its Allowed Secured Claim, an amount equal to its Pro Rata Share of the value of the interest of the Chase Lender Group in the Chase Lender Group Collateral, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of the Chase Lender Group in the portion of the Purchased Assets that consists of Chase Lender Group Collateral. If and to the extent there is a Supplemental Payment after the Effective Date, the portion of such payment attributable to the portion of the Purchased Assets that consists of Chase Lender Group Collateral shall be promptly distributed to each holder of an Allowed Secured Claim in Class 5, on account of such Claim, in an amount equal to its Pro Rata Share of such payment. |
| 6 | Allowed Secured Claims of GMACCM | $9,599,868<br><br>Est. Recovery: 13.9% | **Impaired; entitled to vote.** On the Effective Date (or as soon thereafter as is practicable), the transactions under the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of GMACCM, with such Liens and Claims attaching to the Purchase Price. The holder of the Allowed Secured Claim in Class 6 shall be paid, on the Effective Date, in Cash, from the Purchase Price, in full satisfaction of its Allowed Secured Claim, an amount equal to the value of its interest in the GMACCM Collateral, as determined by the Bankruptcy Court at or before the Confirmation |

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| | | | Hearing, based upon the value of the interest of GMACCM in the portion of the Purchased Assets that consists of GMACCM Collateral. If and to the extent there is a Supplemental Payment after the Effective Date, the portion of such payment attributable to the portion of the Purchased Assets that consists of the GMACCM Collateral shall be promptly distributed to each holder of an Allowed Secured Claim in Class 6 on account of such Claim. |
| 7 | Allowed Secured Claims of GEC-BAFC | $4,769,999 Est. Recovery: 12.0% | **Impaired; entitled to vote.** On the Effective Date (or as soon thereafter as is practicable), the transactions under the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of GEC-BAFC with such Liens and Claims attaching to the Purchase Price. The holder of the Allowed Secured Claim in Class 7 shall be paid, on the Effective Date, in Cash, from the Purchase Price, in full satisfaction of its Allowed Secured Claim, an amount equal to the value of its interest in the GEC-BAFC Collateral, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of GEC-BAFC in the portion of the Purchased Assets that consists of GEC-BAFC Collateral. If and to the extent there is a Supplemental Payment after the Effective Date, the portion of such payment attributable to the portion of the Purchased Assets that consists of the GEC-BAFC Collateral shall be promptly distributed to each holder of an Allowed Secured Claim in Class 7 on account of such Claim. |

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 22 of 187

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| 8 | Allowed Secured Claims of BKC | $6,191,149<br><br>Est. Recovery: 0% | **Impaired; entitled to vote.** On the Effective Date (or as soon thereafter as is practicable), the transactions under the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of BKC, with such Liens and Claims attaching to the Purchase Price. After giving effect to the Tax Payment Obligations Intercreditor Agreement and the Senior Intercreditor Agreement, the holder of the Allowed Secured Claim in Class 8 shall be paid, on the Effective Date, in Cash, from the Purchase Price, in full satisfaction of its Allowed Secured Claim, an amount equal to the value of its interest in the BKC Collateral, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of BKC in the portion of the Purchased Assets that consists of BKC Collateral. If and to the extent there is a Supplemental Payment after the Effective Date, the portion of such payment attributable to the portion of the Purchased Assets that consists of the BKC Collateral shall be promptly distributed to each holder of an Allowed Secured Claim in Class 8 in an amount equal to its Pro Rata Share of such payment. |
| 9 | Allowed Secured Claims of ACIC | up to $600,455<br><br>Est. Recovery: 100% | **Impaired; entitled to vote.** On the Effective Date (or as soon thereafter as is practicable), the transactions under the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of ACIC, with such Liens and Claims attaching to the Purchase Price. After giving effect to the Chase-ACIC Intercreditor Agreement, the holder of the Allowed Secured Claim in Class 9 shall be paid, on the Effective Date, in Cash, from the Purchase Price, an amount equal to the value of its interest in the Morgan Hill Property, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the amount due under the ACIC Promissory Note with respect to the ACIC Bonds and the value of the Morgan Hill Property; provided, however, that to the extent any of the ACIC Bonds are undrawn and have not expired as of the Effective Date, the Debtors shall hold the funds, if any, attributable to such unexpired bonds until such time as either (i) the bonds are drawn, in which event, the funds, if any, shall promptly be disbursed to ACIC, or (ii) the bonds expire, in which event, the funds, if any, shall promptly be distributed to the holders of Allowed Secured Claims in Class 5. From and after the Effective Date, the Morgan Hill Property and the other Purchased Assets will be free and clear of any Liens or Claims of such Claimant. |

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| 10 | Secured Personal Property Tax Claims | Approx. $850,000<br><br>Est. Recovery: 100% | **Impaired; entitled to vote.** To the extent Allowed Secured Personal Property Tax Claims are Assumed Obligations under the Asset Purchase Agreement, they will be satisfied in full by the Buyer after the Closing as and when such obligations come due or, if already due, on the Effective Date. Any Secured Personal Property Tax Claims that are not Assumed Obligations shall be satisfied by the Debtors from the Purchase Price in an amount equal to the value of the interest of the holder of such Claim in the personal property of the applicable Debtor which secured such Claim. Upon satisfaction of such Claims, the Liens securing such Claims shall be discharged. |
| 11 | Allowed Claims of Participating Vendors | Approx. $8,500,000[14]<br><br>Est. Recovery: 100% | **Impaired; entitled to vote.** Satisfied in full, without interest or penalty, by the Buyer on, or promptly following, the Effective Date. |
| 12 | Allowed Unsecured Claims (other than Unsecured Claims in Class 11) | Approx. $135,000,000[15]<br><br>Est. Recovery: 0% (unless there is a Special Class 12 Distribution) | **Impaired; entitled to vote.** The holders of Claims in Class 12 shall be paid nothing from the Purchase Price or any Supplemental Payment under the Asset Purchase Agreement. Notwithstanding the foregoing, if and to the extent any Litigation Recovery or any Liquidation Proceeds result in Net Plan Proceeds in excess of what is distributed or distributable to Administrative Claims, Priority Tax Claims, and Classes 1 through 9 under the Plan, such Net Plan Proceeds will be distributed, Pro Rata, to the holders of Allowed Claims in Class 12. In addition, if there is a Special Class 12 Distribution, such distribution shall be made, promptly after the Effective Date, Pro Rata, only to the Specified Holders of Allowed Unsecured Claims in Class 12. Notwithstanding anything to the contrary herein, no holder of an Allowed Class 12 Claim shall be paid more than the Allowed amount of its Claim from any combination of Special Class 12 Distributions and Net Plan Proceeds, and therefore, any Special Class 12 Distribution received by a Claimant in Class 12 shall be deemed to reduce the Allowed amount of such Claimant's Class 12 Claim for purposes of calculating such Claimant's Pro Rata Share of any Net Plan Proceeds that are distributable to Class 12. |

[14] The Debtors previously estimated the amount of accrued prepetition debt at $7.3 million. The Debtors have since received various additional invoices for prepetition services that have now been posted in the Debtors' accounts payable system. The Debtors' best current estimate of prepetition trade claims is $9 million, of which $8.5 million are expected to be Participating Vendors.

[15] Inclusive of estimated deficiency claims of secured creditors, but exclusive of potential claims arising from the Debtors' rejection of executory contracts or unexpired leases.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| 13 | Allowed Interests | N/A<br><br>Est. Recovery: N/A | **Impaired; deemed to reject.** Each holder of an Interest shall receive nothing under the Plan and its Interest in the applicable Debtor will be deemed cancelled on the Effective Date. Each Holder of an Interest in a Debtor is deemed to have rejected the Plan. |

## II.

## OVERVIEW OF CHAPTER 11 CASES

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Cases to date, including events leading up to the commencement of these cases. Copies of all relevant court papers are on file with the Bankruptcy Court.

### A. EVENTS LEADING UP TO THE FILING OF THE CHAPTER 11 CASES

#### 1. Description of the Debtors

On September 30, 2004 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued in the possession of their properties and are managing their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The combined operations of the Debtors place them among the top dozen restaurant franchisee companies in the United States. The Debtors own or operate 227 Burger King® restaurants and employ approximately 5,500 people.[16] Founded in 1992 by Matthew Schoenberg and managed by Sydran Services, the Debtors consist of several affiliated Burger King® franchisees with operations in California, Louisiana, Mississippi, Arkansas, Alabama, Florida, Missouri and Kansas. Prior to a restructuring and sale that occurred in late 2001 (described in additional detail below), Sydran Services also managed Chili's Grill & Bar® restaurants owned by Sydran III. The Debtors' business is now limited to owning and operating franchised Burger King® restaurants.

---

[16] Of the Debtors' 227 restaurants, 220 are currently open for business.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.<br>ATTORNEYS AT LAW<br>SAN FRANCISCO, CALIFORNIA

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 25 of 187

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

1   Sydran Services is a proven operator and developer of Burger King® restaurants. During

2   the fiscal years 2002, 2003 and 2004, the Debtors' consolidated revenues totaled $242,000,000,

3   $216,000,000 and $207,000,000, with EBITDA in the amounts of $14,184,000, $10,817,000 and

4   $5,743,000, respectively.[17]

5   As an example of the quality of the Debtors' management team, the Debtors were selected

6   by Burger King Corporation ("BKC") to manage the first domestic joint venture between BKC and

7   one of its franchisees. This joint venture, called BK-Sydran Ventures, LLC ("BK-Sydran"), was

8   formed for the purpose of building, acquiring and operating Burger King® restaurants and

9   currently owns and operates 25 Burger King® restaurants.[18] The Debtors were also selected as the

10  first "Anchor Franchisee" in the Burger King® system with exclusive development rights and an

11  assignment of BKC's right-of-first-refusal for the acquisition of existing restaurants within

12  designated territories.

13       **2.  Current Corporate Structure**

14       Sydran Group is the ultimate parent of the Debtors. It is a holding company privately

15  owned by various individuals, institutional investors (including Allied, as defined below), and

16  others. A chart outlining the Debtors' ownership structure is attached hereto as **Exhibit C**. Sydran

17  Services is a direct, wholly-owned subsidiary of Sydran Group. Sydran Services in turn directly

18  and indirectly owns and manages the remaining Debtors, including the Debtors' primary operating

19  entities, Sydran I, Sydran II, Sydran IV and Sydran BK Services (the "Operating Debtors").[19]

20  Sydran III is no longer operating given the sale of its Chili's business. Sydran Casual Dining,

21  Sydran Development, and Sydran Texas also do not have any operations.

22       The Operating Debtors own or operate Burger King® restaurants in eight states as described

23  below:

24

25

26

27  [17]  The term "EBITDA" refers to the Debtors' earnings before deduction for interest, taxes, depreciation and
      amortization. The EBITDA totals provided herein were calculated before certain adjustments.

28  [18]  BK-Sydran is not in bankruptcy.
    [19]  BKC and certain investors also have preferred interests in Sydran BK Services.

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 26
of 187

DISCLOSURE STATEMENT

| Debtor | Restaurants (#) | Location |
|---|---|---|
| Sydran BK Services | 17 | Kansas, Missouri |
| Sydran I | 15 | Northern California |
| Sydran II | 147 | Louisiana, Mississippi, and Arkansas |
| Sydran IV | 48 | Florida, Alabama, and Mississippi |

As described below, the Operating Debtors generally do not own the real estate underlying their restaurants.[20] They lease the real estate from various parties, which include BKC, wholly unrelated third parties, and several affiliated real estate holding companies (each, a "Holdings Company" or together, the "Holdings Companies") which are owned by current and former members of the Debtors' management, including Matthew Schoenberg, and current and former investors in the Debtors.[21] A chart outlining the ownership structure of the Holdings Companies (along with a listing or description of each company's equity holders) is attached hereto as **Exhibit D**. The properties leased to the Debtors by the Holdings Companies are encumbered by mortgage debt totaling in excess of $80 million.

Since May 2001, Todd Werby, an independent real estate professional who does not have any involvement in the management or ownership of the Debtors, has been the President and Chief Executive Officer of the Holdings Companies. Mr. Werby cannot be removed from his position with the Holdings Companies during the term of his agreement, except for gross or intentional neglect of duty, gross misconduct injurious to the Holdings Companies, or a felony criminal conviction.

As is customary in the Burger King® franchise system, the Debtors' President and Chief Executive Officer, Matthew Schoenberg, has personally guaranteed the obligations of the Operating Debtors under various leases, subleases and franchise agreements with BKC (including the payment of royalties and advertising contributions under such franchise agreements).[22] Mr.

---

[20] The one exception is Sydran I's fee simple interest in a Burger King restaurant in Morgan Hill, CA.
[21] The Debtors lease 116 restaurants from the Holdings Companies.
[22] The guarantees were amended in November 2001 to provide that, upon the occurrence of certain events in a bankruptcy case (including appointment of a trustee, denial of authority to use cash collateral to pay royalties to BKC, or approval of a sale of the Debtors' restaurants that is supported by BKC), Mr. Schoenberg will be released from his obligations under such guarantees.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 27 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Schoenberg also has an approximate 34% indirect ownership interest (through his majority interest

2    in Sydran Investors III, LLC) in Sydran Group.[23]

3        **3.  Corporate History**

4        The Debtors initially consisted of a single entity, Sydran I, which was formed on or about

5    March 26, 1992.  Sydran I was initially owned by Matthew Schoenberg and a syndicate of

6    investors.  Three days after its formation, Sydran I purchased 14 Burger King® restaurants in

7    California from BKC.  Sydran I owned and operated these restaurants and subsequently acquired

8    and developed additional new restaurants.  BKC provided some of the initial financing for Sydran

9    I's acquisition of restaurants from BKC, which was later replaced with a term and revolving line of

10   credit from Bank of the West.  Sydran I owned some of the real estate or improvements underlying

11   its restaurants, but most of the premises were leased from BKC or third party landlords.

12       On or about August 30, 1994, Sydran II was formed for the purpose of acquiring 98 Burger

13   King® restaurants in Louisiana and one Burger King® restaurant in Mississippi.  Sydran II was

14   initially owned by Matthew Schoenberg and various investors.  As part of Sydran II's acquisition

15   of restaurants and consistent with the objectives of Sydran II's investors and lenders (and with

16   their consent), an affiliated entity was formed, Sydran Holdings Limited Partnership ("Holdings

17   I"), to acquire 25 related parcels of real estate underlying the restaurants acquired by Sydran II in

18   Louisiana.[24]  Holdings I was owned by Matthew Schoenberg and various other investors.  Sydran

19   II leased the real estate from Holdings I, much as it did with real estate owned by third parties

20   underlying the other restaurants acquired by Sydran II.  The terms of the leases with Holdings I

21   were generally 30 years.  The base rent payable by Sydran II to Holdings I was set at 8.5% of the

22   prior year's sales for each restaurant, with annual increases of 2.5% above the previous year's

23   rent.[25]

24

25   [23]  Under the Plan, Sydran Investors III, LLC, and hence Mr. Schoenberg, will receive nothing on account of their
     interests in the Debtors.

26   [24]  The real property underlying the remaining restaurants acquired by Sydran II in 1994 was leased or subleased from
     third parties, including BKC.

27   [25]  Due to the requirements of certain lenders and lessors, Sydran II and the other Operating Debtors usually paid a
     portion of the rent necessary to cover the Holdings Companies' debt service obligations directly to the Holdings

28   Companies' lenders and the portion of any ground rent directly to lessors.  The remainder of the rent was paid to the
     Holdings Companies.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Sydran II subsequently developed and acquired over 50 new restaurants in Louisiana and

2   Mississippi, and acquired a few restaurants in Arkansas. Sydran II also closed some

3   underperforming stores. In certain instances, the real estate parcels underlying Sydran II's

4   restaurants were purchased (or leased) by Holdings I or other affiliated companies (i.e., the

5   Holdings Companies) and then leased to Sydran II, with the Holdings Companies incurring

6   indebtedness to finance the transaction. On new restaurants developed by Sydran II, the base rent

7   payable by Sydran II to the various Holdings Companies was generally set in the range of 110% to

8   125% of the debt service payable by such entities to their lenders (or lessors) for each parcel of

9   real property.

10   BKC provided some of the initial financing for Sydran II's acquisition of restaurants,

11   which was later replaced by a loan from Texas Commerce Bank (subsequently Chase, as defined

12   below). BKC also provided financing to Holdings I to enable it to purchase the relevant real

13   property parcels or ground leases for some of Sydran II's restaurants. The obligations of Holdings

14   I to BKC were refinanced in 1995 with loans from FFCA Acquisition Corporation ("FFCA").

15   To summarize, by 1994, Sydran I owned and operated approximately 20 restaurants and

16   Sydran II owned and operated approximately 99 restaurants. In some instances, the physical

17   premises were leased from BKC or third parties, and in other instances, the restaurant premises

18   were leased from the Holdings Companies.

19   On or about August 12, 1994, Sydran Services, Inc. ("SSI") was formed by Matthew

20   Schoenberg. Its purpose was to provide joint management services for Sydran I and Sydran II

21   following Sydran II's original acquisition of 99 restaurants. For such services, SSI charged the

22   operating companies (initially, Sydran I and Sydran II, and later, other Debtors) a management fee

23   equivalent to the overhead costs and other expenses (including employee salaries) incurred by SSI

24   attributable to each operating entity. In June 2000, SSI transferred its assets to Sydran Services.

25   On or about June 19, 1996, Sydran III was formed for the purpose of acquiring 17 Chili's®

26   restaurants in Idaho, Utah, Texas, New Mexico, Nebraska, Wyoming, North Dakota, Arkansas and

27   Iowa from a franchisee of Brinker International, Inc., the franchisor of the Chili's® restaurant

28   chain. As part of the sale and with the consent of all equity investors and lenders of Sydran III,

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   two related parcels of real estate were also acquired by a Holdings Company created for this

2   purpose.

3          Sydran III subsequently developed 22 additional new Chili's® restaurants.  In certain

4   instances, the real property underlying these restaurants was sold (or leased) to a Holdings

5   Company and then leased to Sydran III, with the Holdings Companies incurring indebtedness to

6   finance the transactions.  The base rent payable by Sydran III to the Holdings Companies was set

7   in the same manner as described above for Sydran II.  Texas Commerce Bank provided financing

8   and New York Life Ins. Co. ("NYL") provided an equity and subordinated debt investment to

9   Sydran III to fund its acquisitions and operational expenses.  The associated real estate acquired by

10  various Holdings Companies was financed by FFCA.  Sydran III was initially owned by NYL,

11  which had a 50% equity interest, with the remainder owned by Matthew Schoenberg and Sydran

12  III's management team.

13         In December 1998, Sydran II redeemed the interests of its equity investors and repaid the

14  subordinated debt of certain outside investors, through a new credit facility with Chase Bank of

15  Texas ("Chase") and the proceeds of new subordinated debt issued to Allied Capital Corporation

16  ("Allied") and Trust Company of the West or an affiliate thereof ("TCW").  After the redemption

17  and debt repayments, with the exception of certain preferred interests, Matthew Schoenberg and

18  certain members of SSI's management team became the sole owners of Sydran II.  Both before and

19  after the redemption, Sydran II's creditor constituencies (including Chase, Allied and TCW) were

20  aware of, and consented to, the landlord-tenant relationship between the Holdings Companies and

21  Sydran II with respect to each of the restaurants leased by Sydran II from the Holdings Companies.

22         On or about October 1, 1999, Sydran IV was formed for the purpose of purchasing 50

23  Burger King® restaurants in Alabama, Mississippi, and Florida from another franchisee of BKC.

24  Sydran IV was initially owned entirely by Matthew Schoenberg.  Sydran IV's acquisition was

25  financed by a loan from BKC and, with respect to 34 of the 50 restaurants, the assumption of

26

27

28

DISCLOSURE STATEMENT

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  existing debt by Sydran IV owed to Franchise Mortgage Acceptance Corporation ("FMAC"), as

2  lender or servicer.[26]

3      With the consent of all equity investors and lenders of Sydran IV, thirty-nine (39) related

4  fee parcels on which restaurants were situated were acquired by the Holdings Companies.  Twelve

5  of the 39 parcels were acquired by Sydran Holdings X, LLC[27] with loans from GEC-BAFC and

6  then leased to Sydran IV.  The remaining 27 fee parcels were among the 34 with FMAC loans.

7      Prior to Sydran IV's acquisition of the 34 FMAC restaurants, 27 of these restaurants were

8  each governed by a single loan agreement in favor of FMAC that covered both real and personal

9  property collateral at the restaurant.  The FMAC loans for each of the remaining 7 restaurants were

10  secured only by the affected restaurant's personal  property.  When Sydran IV purchased the 27

11  restaurants with loans secured by both real and personal property, the loan obligations for these

12  restaurants were divided.  A Holdings Company named Sydran Holdings IX, LLC ("Holdings

13  IX"), which acquired the real estate, assumed a portion of the loan obligation for each restaurant,

14  and this portion of the loan was thereafter secured only by the real estate at the affected premises.

15  Sydran IV, which acquired the restaurant assets, became the borrower on the remaining FMAC

16  loan obligation for each restaurant, and this portion continued to be secured by both the real and

17  personal property for each restaurant.[28]  FMAC did not release the lien on the real estate as to

18  either portion of the bifurcated loan, but did release the personal property from the portion of the

19  loan assumed by Holdings IX.  Put another way, the personal property loans assumed by Sydran

20  IV were secured by both by Sydran IV's personal property at the applicable restaurant and

21  Holdings IX's real estate for that restaurant; but the real property loans assumed by Holdings IX

22  were not secured by the personal property of Sydran IV.

23      On or about November 10, 1999, BKC and the Debtors' management team created a joint

24  venture called BK-Sydran for the purpose of consolidating and transforming BKC's franchise

25

26  [26]  For a time, FMAC remained as the lender or servicer under all 34 of its loans.  As described below, FMAC
subsequently sold 11 of its 34 loans to GEC-BAFC (as defined below).

27  [27]  Sydran Holdings X, LLC was subsequently merged into Sydran Holdings, LLC as part of the roll-up transaction
described below.

28  [28]  The loans for any particular restaurant were cross-defaulted -- meaning that a default on the personal property loan
for that restaurant would cause a default of the real property loan for that same restaurant, and vice versa.

DISCLOSURE STATEMENT

operations in the Sacramento and Fresno, California ADI or Area of Dominant Influence. BKC invested $18 million in BK-Sydran and acquired a 49.99% common ownership interest in the company. BKC is also entitled to receive the first $18 million plus a compounding priority return, out of any equity distribution from that entity. SSI or Sydran Services managed BK-Sydran, but did not make a material financial investment in the company. Matthew Schoenberg and other members of management initially owned a 50.01% common ownership interest in BK-Sydran through a company called Sydran Investors, LLC. Such interest was subordinated to BKC's interest in BK-Sydran. As part of a roll-up transaction in June 2000 described below, the non-BKC 50.01% interest in BK-Sydran owned by Sydran Investors, LLC was transferred to Sydran Group. The joint venture ultimately acquired over 25 Burger King® restaurants in central California, 14 of which were purchased from Sydran I. Also as part of the roll-up, BKC and the Debtors' management formed two Holdings Companies to own 12 parcels of real estate associated with BK-Sydran's restaurants, 8 of which were acquired from Sydran I. BK-Sydran acquired its remaining restaurants from other existing franchisees of BKC.

In April 2000, BKC announced its Early Successor Incentive Program ("ESIP"). Under this program, franchisees could pay an initial franchise fee in an amount necessary to extend their remaining franchise term to a full twenty (20) years and would be required to remodel their restaurants in accordance with BKC's new image requirements. In exchange, franchisees received temporary royalty reductions if the remodeling was timely completed. The Debtors committed to participating in the ESIP in June 2000 as part of the roll-up transaction described below and ultimately paid BKC approximately $4 million in fees relating thereto. The Debtors also have ongoing capital expenditure requirements during the term of their franchise agreements as well as requirements for restaurant upgrades at the time franchise agreements are renewed.[29]

**4. The Roll-Up Transaction**

In order to meet the anticipated requirements under the ESIP, to enhance the borrowing capacity of the companies to satisfy existing debt and to enable them to continue to grow, on June

---

[29]  As addressed below, the Debtors' contractual obligations to BKC for capital expenditures, if fulfilled, could total up to $44,470,000 over the next four to five years.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

29, 2000, the Debtors completed a roll-up transaction involving all of their Burger King® and Chili's® operating entities.[30]  As part of the roll-up, Matthew Schoenberg and management contributed their equity interests in the Operating Companies and received a 50.1% common ownership interest in a new parent company called Sydran Group, which is now held by Sydran Investors III, LLC.  A group of outside investors that included New York Life Capital Partners, Kinsman Holdings, LLC, BancBoston Capital, Inc., GATX Capital Corporation, and SunTrust Equity Funding LLC made a cash equity investment in Sydran Group in the amount of $87.5 million in exchange for a preferred return on their investment and a 49.9% common ownership interest in Sydran Group.

Pursuant to an *Amended and Restated Operating Agreement* dated June 29, 2000 (the "Operating Agreement"), Sydran Group is a "manager managed" limited liability company.  The manager of Sydran Group is Sydran Investors III, LLC, which as mentioned above, is owned by Matthew Schoenberg and other members of management.  The Operating Agreement authorizes Sydran Investors III, LLC, as manager, to manage the ordinary course business affairs of Sydran Group, but requires consent from a majority of interest holders, excluding Sydran Investors III, LLC, for <u>inter alia</u> any material changes to the business or indebtedness of the company (<u>i.e.</u>, incurring debt in excess of $25 million), any disposition of assets valued in excess of $5 million, or any alteration to the management structure of the company.

As a result of the roll-up, Sydran Services became a wholly-owned subsidiary of Sydran Group and entered into a $245 million new term loan and revolving credit facility (subsequently reduced to $170 million) with Chase and a syndicate of lenders (the "Chase Lender Group").  The obligations of Sydran Services to the Chase Lender Group were guaranteed by the other Debtors (with the exception of Sydran Texas).

With the money raised through the creation of Sydran Group and the new loan with the Chase Lender Group, the Debtors redeemed the equity interests of the remaining non-insider investors in Sydran I and Sydran II, paid off Sydran I's obligations to Bank of the West, satisfied the subordinated debt of TCW in Sydran II, satisfied NYL's equity and subordinated debt in

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

---

[30]  In conjunction with the roll-up, the Debtors also became an "Anchor Franchisee" in the Burger King® system.

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 33 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Sydran III, repaid various loans to BKC, and refinanced all of the debt previously owed to Chase

2   by Sydran III. Allied chose to retain its subordinated debt in Sydran II, but converted such debt to

3   an obligation of Sydran Services. In addition, Matthew Schoenberg's and management's

4   subordinate interest in BK-Sydan owned by Sydran Investors, LLC was transferred to Sydran

5   Group, and Sydran Investors, LLC became a wholly-owned subsidiary of Sydran Group.

6           The roll-up also resulted in the formation of an entity called Sydran BK Services, which

7   became owner of the equity interests in Sydran I, Sydran II, and Sydran IV. Sydran BK Services

8   was owned by Sydran Services, with certain preferred interests held by BKC. Sydran BK Services

9   was not a mere holding company. As part of the roll-up, it acquired 18 Burger King® restaurants

10  in the Kansas City ADI from BKC. This acquisition was funded by a $22.5 million preferred

11  equity investment in Sydran BK Services from BKC. Eleven related parcels of real estate were

12  acquired by a newly-formed Holdings Company named Sydran Group Holdings, LLC, which then

13  leased the real estate to Sydran BK Services pursuant to two master leases.

14          Because at the time of the roll-up BKC was controlled by Diageo PLC, an international

15  conglomerate with interests in alcohol distillation and manufacturing, BKC was prohibited from

16  acquiring an equity position in restaurant establishments that served alcohol, such as the Debtors'

17  Chili's® restaurants. The roll-up was therefore structured such that BKC's equity interests were

18  limited to Sydran BK Services and its operating subsidiaries, excluding Sydran III and its

19  numerous Chili's® restaurants, which were instead owned by Sydran Services through a newly-

20  created holding company called Sydran Casual Dining.[31]

21          Finally, at the insistence of the Debtors' lenders, the roll-up transaction required a

22  significant restructuring of the Debtors' leases with the Holdings Companies in order to make the

23  Debtors' balance sheet attractive to a new syndicate of lenders and to prepare the Debtors for a

24  possible future public debt offering. In particular, the lenders required the terms of the Debtors'

25  leases to be reduced from about 25 to 30 years, to just about 10 years, which naturally required

26  significant negotiation with the lenders and lessors to the Holdings Companies. In order to obtain

27

28  [31]   Sydran Texas was created because Texas law required a domestic corporation to hold the liquor licenses for Sydran
     III's Chili's® restaurants in Texas.

the requisite consents, the Holdings Companies, the Debtors and BK-Sydran were required to, among other things, amend and restate many of the individual Holdings Companies' leases.[32] All such transactions were done with the consent of the Debtors' principal creditors (including Allied and the members of the Chase Lender Group).

By the end of 2000, significant declines in sales at the Debtors' Burger King® restaurants caused a liquidity crisis and defaults under the Debtors' agreements with their principal lenders and under the leases with the Holdings Companies. Negotiations ensued between the Debtors and the Chase Lender Group to resolve the defaults. In the course of these negotiations, Chase, the collateral agent at the time, requested that the Debtors sell their Chili's® restaurant business to pay down their obligations, and otherwise restructure their affairs.

### 5. Prepetition Restructuring Efforts

On November 13, 2001, the Debtors entered into a Restructuring Agreement with their major creditors (including Allied and the members of the Chase Lender Group) and investors and the Holdings Companies and their lenders, which implemented a global restructuring of the Debtors' affairs (the "Restructuring").

A major component of the Restructuring was Sydran III's sale of its 39 Chili's® restaurants for a purchase price exceeding $55 million. Because the Chili's® restaurants were sold as going concerns, the purchase price exceeded $55 million -- far more than what would have been realized in a foreclosure sale. The proceeds from the sale were used to pay down the Debtors' obligations to the Chase Lender Group, which at that time included JPMorgan Chase Bank (formerly Chase) as agent.

The Restructuring also implemented a number of significant real estate transactions involving the Holdings Companies (as reorganized as part of those transactions), including the creation of certain new master leases involving Sydran II, Sydran IV and Sydran BK Services, as tenants, and the Holdings Companies, as landlords. The master leases were created at the insistence of the Holdings Companies' secured mortgage lenders.

---

[32] Even prior to the roll-up transaction, the Holdings Companies voluntarily accepted reduced rents from the Debtors as a result of significant sales declines in the Debtors' restaurants and throughout the Burger King® system.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Pursuant to the master leases, Sydran II's and Sydran IV's pre-existing leases of real

2    property with the Holdings Companies were consolidated into groups.[33]  The master leases were

3    created to eliminate various defaults by Sydran II and Sydran IV under certain of their leases with

4    the Holdings Companies, which were, in turn, in default to their mortgage lenders.  Pursuant to

5    modifications in the leases and the mortgages which were implemented as part of the

6    Restructuring, master leases were created, various defaults under certain of the mortgages and the

7    existing leases were waived and eliminated, and certain covenants contained in the mortgages and

8    leases were modified or eliminated.  Because all of the parties to the Restructuring (including the

9    Chase Lender Group and Allied) recognized the importance of the master leases to the overall

10   restructuring effort, all of the parties agreed not to challenge the master leases.  Sydran Services

11   and Sydran Group guaranteed the obligations of Sydran II under the master leases.  The Operating

12   Debtors' current monthly base rent obligations to the Holdings Companies total $1,171,895, of

13   which $967,712 constitutes the required principal and/or interest payments to the Holdings

14   Companies' lenders.  As addressed further below, the Debtors have not been meeting their full

15   base rent obligations to the Holdings Companies for some time.

16   Also, as part of the Restructuring, in addition to the pay-down of debt mentioned above

17   from the proceeds of the sale of Chili's® restaurants, the existing loan documents with the Chase

18   Lender Group were amended and restated in an amended and restated loan agreement and

19   amended and restated security agreement.  Under the amended and restated loan agreement,

20   Sydran Services is the borrower and the other Debtors (with the exception of Sydran Texas) are

21   guarantors.

22   As of the Petition Date, the Debtors' obligations to the Chase Lender Group under the

23   amended and restated loan agreement and guarantees totaled approximately $117 million,

24   exclusive of accrued interest.[34]  The Debtors' obligations to the Chase Lender Group are secured

---

[33]  Sydran IV assigned 12 of its leases with Sydran Holdings, LLC (as successor landlord by way of merger with
Sydran Holdings X, LLC) to Sydran II, which then subleased the premises back to Sydran IV, by way of a sublease
subordinate to the applicable master lease.

[34]  In December 2003, BKC purchased a majority of the debt held by the Chase Lender Group and JPMorgan Chase
Bank was replaced as collateral agent by Citibank, N.A. ("Citibank").  Earlier in the year, during September 2003, a
New York-based hedge fund called D.E. Shaw Laminar Portfolios, L.L.C. ("Laminar") began purchasing the Debtors'
bank debt at a significant discount from the members of the Chase Lender Group.  Subsequent purchases by BKC and

82700-003\DOCS_SF:41578.4    Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 36
of 187                                                                                              DISCLOSURE STATEMENT

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

by an amended and restated security agreement and existing leasehold mortgages and leasehold deeds of trust, pursuant to which the Debtors granted security interests in favor of Chase (which are now held by Citibank as the successor to Chase) in substantially all of the Debtors' assets (including the Debtors' interests in most real property leases, but excluding certain defined assets). In addition, there are certain intercreditor arrangements between and among the Chase Lender Group, BKC and others (discussed below) and senior liens and rights granted by Sydran IV in favor of other lenders (also as discussed below) in connection with 34 of its restaurants.

Separate and apart from the foregoing obligations, but in furtherance of the Restructuring, Sydran Services also entered into a secured loan agreement directly with BKC (the "BKC Loan Agreement"), guaranteed again by the other Debtors (with the exception of Sydran Texas), the proceeds of which were used by the Debtors for capital expenditures on their Burger King® restaurants. As of the Petition Date, the Debtors' obligations to BKC under the BKC Loan Agreement totaled approximately $6.2 million, exclusive of accrued interest. To secure payment of the obligations to BKC under the BKC Loan Agreement, the Debtors granted a security interest in favor of BKC in substantially the same assets as Chase referenced in the paragraph above (other than leasehold mortgages and leasehold deeds of trust).[35]

In order to prioritize their respective secured claims against the Debtors arising as part of the Restructuring, Chase and BKC entered into a *Senior Intercreditor Agreement*.[36] Generally speaking, under this intercreditor agreement, the Chase Lender Group is entitled to first payment of its claims up to $60 million ahead of BKC under the BKC Loan Agreement, after which the Debtors' remaining obligations to the Chase Lender Group and BKC are paid pro rata. Although BKC is now the majority member of the Chase Lender Group, its rights as a member of the Chase Lender Group are separate and distinct from its rights as the lender under the BKC Loan

---

Laminar ultimately resulted in BKC holding 62% of the Chase Lender Group debt and Laminar holding 38% of the Chase Lender Group debt.

[35] Chase also has a lien against Sydran I's fee simple interest in a Burger King restaurant in Morgan Hill, CA, which BKC and the other secured creditors described below do not. Chase's lien is subordinate to certain contingent obligations to a bonding company in connection with surety bonds issued to various utility companies that provide services to the Debtors' restaurants.

[36] The parties also have a pre-restructuring intercreditor agreement that remains in effect. Under that agreement, Chase's security interests in the Debtors' franchise agreements with BKC are limited to the proceeds from the sale of the Debtors' Burger King® restaurants under certain circumstances.

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 37
of 187

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

Agreement. Thus, BKC has the benefit of the provisions of the Senior Intercreditor Agreement to the extent of its interests as a member of the Chase Lender Group.

Under a separate *Intercreditor Agreement* also executed as part of the Restructuring, Chase (as agent for the Chase Lender Group) and BKC (as lender under the BKC Loan Agreement) agreed to subordinate the priority of their respective liens in the Debtors' assets to satisfy certain tax payment obligations in the amount of $4.7 million (the "Tax Payment Obligations") that will be owed by the Debtors' current and former management team (the "Tax Payment Obligees") upon, among other things, a sale or disposition of the Debtors' assets. The Tax Payment Obligations are secured by the Debtors' assets and are payable to the Tax Payment Obligees by the Debtors upon, among other things, a sale or disposition of the Debtors' assets.[37]

In addition, as part of the Restructuring, Sydran Services entered into an amended agreement with a holder of subordinated debt, Allied, and certain other participating investors (collectively, the "Sub-Debt Holders"), guaranteed by the other Debtors (with the exception of Sydran Texas). Under these agreements, the principal indebtedness to Allied was restated to approximately $15.9 million (a portion of which is now held by the other Sub-Debt Holders) in exchange for equity interests and warrants in Sydran Group. This debt is unsecured and subordinate to the Debtors' obligations to the Chase Lender Group and BKC. By virtue of such contractual subordination and in light of the anticipated deficiency claims that will be asserted by the Chase Lender Group and BKC (such deficiency claims are estimated to exceed $115 million), Allied and the other Sub-Debt Holders will not receive any recovery on account of their claims against the Debtors in these Chapter 11 Cases.

Separate and apart from the Restructuring, as described above, Sydran IV has secured obligations to other lenders under various pledge and security agreements in connection with 34 of Sydran IV's Burger King® restaurants (one of which has been closed). These loans were originally

---

[37]   Because the Debtors are pass-through entities for tax purposes, the Tax Payment Obligees are liable for certain tax obligations upon, among other things, a sale or disposition of the Debtors' assets. The relevant organizational documents provide for distributions to the Tax Payment Obligees for their tax liabilities. As an accommodation to the Chase Lender Group in connection with the Chili's sale, reimbursement of certain tax liabilities was deferred, thereby allowing the Chase Lender Group to maximize the proceeds that they received from the Chili's sale. To secure repayment of the deferred tax reimbursements, the Debtors granted a security interest in the Debtors' assets and Chase and BKC agreed to subordinate their security interests to such lien to enable the satisfaction of the tax liabilities.

with FMAC. Eleven of these loans are currently held by General Electric Capital Business Asset Funding Corporation ("GEC-BAFC") [38] and 23 loans (one of which relates to the restaurant that has been closed) are held by GMACCM Commercial Mortgage Corporation ("GMACCM"), as servicer and successor to FMAC. Each loan to GMACCM is secured by a senior security interest in all personal property at the particular restaurant location relating to each loan, excluding the Debtors' franchise agreements with BKC.

As a result of the Restructuring, pursuant to a *Master Consent Agreement*, <u>all</u> of the loans assigned to GEC-BAFC were cross-defaulted and partially cross-collateralized, such that a default by Sydran IV under <u>any</u> of its eleven loans with GEC-BAFC would constitute a default by Holdings IX under its four loans. Likewise, a default by Holdings IX under its loans with GEC-BAFC would constitute a default under Sydran IV's loans. The four mortgages securing Holdings IX's obligations to GEC-BAFC also secure all of Sydran IV's obligations to GEC-BAFC, but not vice versa. Sydran IV's personal property does not collateralize Holdings IX's obligations to GEC-BAFC.

As of the Petition Date, Sydran IV's secured obligations (exclusive of accrued interest) to to GEC-BAFC total approximately $4.8 million and to GMACCM total approximately $9.6 million. Sydran IV's remaining 16 restaurants (one of which has also been closed) were pledged directly to Chase, BKC, and Matthew Schoenberg as collateral agent for the Tax Payment Obligees.

Despite the Restructuring, the Debtors' financial picture did not improve. As described further below in Article III.E, beginning in 2004, the Debtors were forced to reduce the rent payable to, or for the benefit of, the Holdings Companies. These rent reductions were implemented by way of reduced debt service payments negotiated with the Holdings Companies' lenders. The Holdings Companies have also continued to pay the Debtors a monthly restructuring fee commenced as part of the Restructuring in January 2002, which currently totals approximately $83,000 per month.

---

[38]   Four of the eleven loans held by GEC-BAFC are also collateralized with real property at the applicable premises owned by the Holdings IX. All 23 loans held by GMACCM are also collateralized with real property at the affected premises owned by Holdings IX.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

As of the beginning of 2003, Sydran Services implemented a mandatory salary reduction program under which executive salaries were reduced by 10% and all other salaries of Sydran Services' employees were reduced by 5%.  During the pendency of the mandatory salary reduction program, Sydran Services' employees receive one additional personal day every four months.

For the period commencing on January 1, 2002 and ending on September 30, 2003, Matthew Schoenberg agreed with certain lenders to reduce his base salary from $1,504,828 for calendar year 2002 and $1,542,449 for calendar year 2003, to $500,000 per year, minus another 10% to $450,000 total base annual salary pursuant to the Debtors' salary reduction program.[39] Even though the commitment for reduced salary lapsed on September 30, 2003, for the one year prior to the Petition Date, Mr. Schoenberg voluntarily agreed to continue to accept a reduced base salary of approximately $900,087, instead of the approximate $1,571,370 base annual salary to which he was then entitled under his employment agreement with Sydran Services.[40]  From and after the commencement of these cases, Mr. Schoenberg has voluntarily agreed to reduce his salary to $450,000 per year and to forego the additional fringe benefits and perquisites to which he is contractually entitled.

**6.   The Debtors' Liabilities**

To summarize the foregoing, the Debtors' liabilities as of the Petition Date (exclusive of accrued interest) are as follows:

| Creditor | Approx. Debt | Type of Debt |
|---|---|---|
| Tax Payment Obligations | $4.7 million | Secured |
| Chase Lender Group | $117 million | Secured[41] |
| GMACCM[42] | $9.6 million | Secured |
| GEC-BAFC[43] | $4.8 million | Secured |
| BKC | $6.2 million[44] | Secured |
| Sub-Debt Holders | $15.9 million | Unsecured |

---

[39]   For the period, January 1, 2002 through September 30, 2003, Mr. Schoenberg's entitlement to fringe benefits and perquisites under his employment agreement were reduced from 20% of his regular non-discounted base salary to $150,000 per year -- a reduction of nearly 50%.

[40]   Mr. Schoenberg also continued to receive his regular fringe benefits and perquisites during this period.

[41]   Citibank is the current collateral agent and secured party.

[42]   Sydran IV only.

[43]   Sydran IV only.

[44]   Not including the Debtors' obligations to BKC as a member of the Chase Lender Group.

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 40 of 187

| Misc. Trade Debt[45] | $9 million[46] | Unsecured |
|---|---|---|
| **TOTAL** | **$167.2 million** | |

In addition, the Debtors estimate that BKC is owed approximately $3.7 million on account of accrued royalties and advertising contributions under the parties' franchise agreements for restaurants that the Debtors propose to sell to the Buyer.

The Debtors also anticipate that various secured and unsecured personal and real property tax claims will be asserted against the estates. For calendar years 2004 and 2005, the Debtors estimate that the estates' real and personal property tax liabilities will total approximately $1.4 million.[47] The Debtors are contractually obligated under their various restaurant leases to pay real property taxes associated with the premises. These obligations will generally be assumed by the Buyer under the proposed Sale. Personal property taxes are generally secured obligations that are first priority liens against the Debtors' personal property. These obligations are also being assumed by the Buyer pursuant to the Sale.

Finally, the Debtors are in default of their obligations under various leases with the Holdings Companies. As of the Petition Date, the Debtors have unpaid accrued base rent obligations owing to the Holdings Companies in the amount of approximately $3.37 million. In conjunction with the proposed sale to the Buyer contemplated in the Plan, the Holdings Companies have agreed to continue to accept reduced rent from the Debtors on a postpetition basis equal to a monthly shortfall of $259,099 and, as noted above, have continued to pay the Debtors a monthly restructuring fee of approximately $83,000 per month. This arrangement is memorialized in a letter agreement dated as of September 29, 2004, which is included in the Plan Supplement.

---

[45] The Debtors have also scheduled various prepetition debts owed to employees. Most of these claims have been satisfied in the ordinary course of business on a postpetition basis consistent with an order of the Bankruptcy Court authorizing the Debtors to pay and/or honor prepetition wages and benefits of employees. The Debtors estimate that approximately $600,000 of accrued vacation benefits, a portion of which may be entitled to priority status, will remain unpaid as of the Effective Date of the Plan.

[46] The Debtors previously estimated the amount of accrued prepetition debt at $7.3 million. The Debtors have since received various additional invoices for prepetition services that have now been posted in the Debtors' accounts payable system. The Debtors' best current estimate of prepetition trade claims is $9 million, of which $8.5 million are expected to be Participating Vendors.

[47] The Debtors have scheduled approximately $850,000 in personal property tax obligations as of the Petition Date.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### 7.  Financial Performance

Since the inception of the Sydran companies in early 1992, the Debtors' pro forma revenues have grown through acquisitions and new restaurant development, from $17,200,000 in 1992 to $207,000,000 million for fiscal year 2004.  EBITDA for this period initially increased from $3,100,000 to $32,342,000, but has since decreased to $5,700,000.  Despite the Restructuring outlined above, the Debtors have continued to suffer losses, resulting in a net loss of $25,200,000 for fiscal year 2003 and a net loss of $21,800,000 for fiscal year 2004.[48]  These losses can be traced to significant declines in sales at the Debtors' Burger King® restaurants beginning in 1999.  As a result of these losses and other reasons, the Debtors have been unable to service their secured debt or to remain current on their lease obligations to the Holdings Companies.

In addition, the Operating Debtors have been unable to comply with the capital improvement requirements of their franchise agreements with BKC.  The Debtors are informed that BKC contends that the Operating Debtors must expend up to $44,470,000 over the next four to five years in order to remain in compliance with their franchise agreements, of which up to approximately $33,220,000 is either past due or will become due by the end of 2005.  Customary maintenance-related capital expenditures add about $3,000,000 per year to these obligations.

In early 2003, when Sydran Services defaulted on a quarterly debt service payment to the Chase Lender Group, the Debtors began to pursue restructuring options with the Chase Lender Group and BKC.  No payments have since been made to the Chase Lender Group on account of its senior secured debt.

Beginning in June 2003, and continuing through February 2004, the Operating Debtors and BKC entered into a series of workout agreements (collectively the "Triage Agreements") which permitted the Operating Debtors to pay only a portion of the royalties otherwise due to BKC under their franchise agreements during such period and to defer, but not release, the unpaid portion of such royalties.  Generally speaking, the Operating Debtors deferred payment of 50% of the royalty payments otherwise due to BKC for the months of June, July, August, November, and December

---

[48]   Net losses were calculated based on Generally Accepted Accounting Practices and are inclusive of depreciation, but may not include the cumulative effect of certain changes in accounting principles that went into effect in 2003.  Financial results for fiscal year 2004 are preliminary and subject to certain adjustments.

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 42 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2003, and January 2004, and 100% of the royalty payments and advertising contributions otherwise to BKC for the month of September 2003, and 100% of the royalty payments otherwise due to BKC for the month of February 2004. The Triage Agreements also permitted the Operating Debtors to pay the non-deferred royalties for certain of those months on dates other than the ordinary due dates under the franchise agreements. As part of the Triage Agreements, as a condition to the relief from BKC, the Operating Debtors were required to obtain or maintain rent reductions from the Holdings Companies, to attempt to enter into forbearance arrangements with the Chase Lender Group, to assist the Holdings Companies in obtaining debt service relief from their mortgage lenders, and to generally attempt to implement a financial restructuring, including a possible sale.

In addition, Matthew Schoenberg, as guarantor of the obligations of the Operating Debtors under the franchise agreements, was released from liability for certain of the royalty deferral amounts and conditions were negotiated with BKC to release Mr. Schoenberg from liability for anticipated future deferrals under the Triage Agreements so long as the Debtors cooperated by assisting the Holdings Companies in obtaining the rent and forbearance relief described above and, to the extent not inconsistent with fiduciary duties, the Debtors and Mr. Schoenberg cooperated with BKC and Trinity Capital, LLC ("Trinity") by attempting to effect a restructuring of the Operating Debtors' businesses, including seeking a purchaser for those businesses.

As a result of the Triage Agreements, expected cash flow shortages for the Operating Debtors were averted; however, the Operating Debtors currently owe approximately $3.7 million to BKC for past due royalties deferred under the Triage Agreements with respect to the restaurants that the Debtors propose to sell to the Buyer.

In this context, the Debtors commenced (with the support of the Chase Lender group) an effort to market their business and retained the firm of Conway, Del Genio, Gries & Co., L.L.C. ("CDG") to act as investment bankers. CDG is a New York-based, nationally-recognized investment banking and financial services firm with extensive experience in providing investment and financial advice to companies in distressed situations, including debtors in possession, and other creditor constituencies in both bankruptcy and non-bankruptcy contexts. CDG had already

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

been serving as financial advisor to the Debtors for over two years.  Given its investment banking expertise, experience in the restaurant industry, and specific knowledge of the Debtors' operations and financial affairs, CDG was well qualified to market the Debtors' assets.

**8.  The Debtors' Prepetition Marketing Efforts**

CDG commenced the marketing process in June 2003 by compiling a list of 59 potential buyers (attached hereto as **Exhibit E**) with input from the Debtors, the Chase Lender Group and its financial advisors (initially, Arthur Andersen LLP, and later, Loughlin Meghji & Co.) and BKC.  The list of potential buyers was comprised of 25 potential strategic buyers, including Burger King® franchisees and franchisees of other brands, and 34 potential financial buyers.  As reflected in the attached, Allied was included in this marketing effort.

CDG began contacting potential buyers at the end of June 2003.  In general terms, each buyer approached by CDG was given the opportunity to purchase all or part of the Debtors' Burger King® franchise operations.  Each potential buyer expressing interest in the Debtors' assets was sent a confidentiality agreement for signature.  Upon execution, each party was provided with information about the Debtors and their operating performance.  After allowing potential buyers to review the information for a couple weeks, CDG contacted buyers to determine their level of interest.

Of the 59 potential buyers contacted by CDG, 33 expressed no interest in pursuing a transaction.  The remaining 26 potential buyers (which included Allied) were sent additional information about the Debtors.  Subsequent to reviewing this information, 16 potential buyers withdrew from the process.  As of November 2003, two potential buyers (but not Allied) submitted non-binding, written proposals to acquire the Debtors' assets.  Both proposals were inadequate for various reasons (one potential buyer lacked financing) and were rejected by the Chase Lender Group.

In late 2003, BKC acquired a majority of the outstanding debt owed to the Chase Lender Group at approximately 15 cents on the dollar.  BKC subsequently also acquired the bank debt held by Citibank and another lender, and currently holds approximately 62% of the outstanding debt to the Chase Lender Group.  The remaining portion of the debt is held by D.E. Shaw Laminar

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 44
of 187

Portfolios, L.L.C. ("Laminar"), a New York-based hedge fund. The Debtors understand that Laminar purchased its interests in the bank debt over several months beginning in September 2003, with an average cost basis of approximately 12 cents on the dollar. Soon after BKC's initial acquisition of the bank debt and with the consent of the Chase Lender Group (which, at that time, included Laminar), Trinity was designated to continue the marketing process.

Trinity is a financial services firm with offices in Los Angeles and New York, offering mergers & acquisitions, corporate finance, and financial restructuring services with emphasis on quick-service restaurants. Trinity is focused primarily on the multi-unit retail and food sectors and has been engaged in over $3 billion of financial advisory transactions, including transactions involving BKC. Trinity has substantial experience assisting Burger King® franchisees given that BKC has made Trinity's financial advisory services available to many of its troubled franchisees. However, Trinity did not provide financial advisory services to the Debtors because the Debtors have been represented by CDG since 2000.[49]

Trinity began its marketing efforts for the Debtors in early 2004. Trinity initially participated in a series of meetings with the Debtors' management team to outline a marketing strategy for the Debtors' assets. The critical tasks at the initial stage of the marketing effort included the preparation of an offering memorandum, obtaining necessary consents (including consents from BKC), creating protocols for the sale process, outlining a timetable of critical events and deadlines, identifying potential buyers, coordinating the creation of a due diligence room, conducting management interviews and on-site visits, and determining the specific assets available for sale. During this time frame, Trinity obtained extensive data from the Debtors, including but not limited to:

- Historical and projected balance sheets, profit and loss statements, cash flow statements, and various other accounting records;

- Historical sales data by restaurant, including gross margins, market share, comparables, and unit level economics;

---

[49] The Debtors were not required to and did not compensate Trinity for its work in locating the Buyer.

Case: 04-43343 Doc# 242-3 Filed: 12/10/04 Entered: 12/10/04 15:39:52 Page 45 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    • Property data, including lease agreements, lease abstracts and analysis, capital

2        improvements and expenditures, equipment lease data, deferred rent amounts and

3        modifications, and estimated BKC capital expenditure requirements;

4    • Franchise and other operating agreements; and

5    • Details regarding the Debtors' liabilities, such as loan agreements and accounts

6        payable schedules.

7        Armed with this information and a strategy for marketing the Debtors' assets, Trinity

8    completed a comprehensive empirical analysis of the Debtors' assets and prepared an Information

9    Memorandum, which was subsequently approved by the Debtors and distributed to potential

10   buyers.  The Information Memorandum included an executive summary and narrative of the

11   Debtors' history and current status, summary and detailed profit and loss statements, balance

12   sheets, cash flow statements, sales data, expense schedules, property schedules, asset rankings and

13   estimated valuations.  Each of the schedules to the Information Memorandum was broken down

14   by, among other things, Debtor, store, region, and property type.  The Information Memorandum

15   also included profit and loss projections based on various scenarios contemplating a combination

16   of store closures, alternate operational structures, or a debt restructuring.  The Information

17   Memorandum was revised on two occasions during the marketing process to keep the data as

18   current as possible.

19       Trinity and the Debtors implemented a qualification process to procure potential buyers.

20   Because the CDG sale process had focused broadly on both strategic and financial buyers, Trinity

21   prepared a carefully selected list of approximately 35 equity firms for consideration.  Trinity and

22   the Debtors eventually focused on six parties (including Allied) based on their expected level of

23   interest in the Debtors as well as the parties' ability to execute a complex transaction.  The list of

24   35 original parties considered by Trinity and the 6 parties that were ultimately targeted is attached

25   hereto as **Exhibit F**.

26       All six parties were introduced to the opportunity to bid on the Debtors' assets

27   simultaneously via scheduled conference calls.  The agenda of the initial calls provided a verbal

28   description of the Debtors' assets and their current operations and the desired direction for a

82700-003\DOCS_SF:41578.4                                                              DISCLOSURE STATEMENT
Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 46
of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  potential transaction. All 6 parties requested further information which was distributed upon the

2  execution of a confidentiality agreement. Once a confidentiality agreement was executed, the

3  parties were provided the Information Memorandum. Most of the potential buyers requested

4  additional information, which was procured, prepared and distributed by Trinity. While the

5  various parties contemplated their involvement in the bidding process, numerous follow-up

6  conference calls took place between Trinity and each of the 6 parties to address their review of the

7  Debtors' information and to answer additional questions or to respond to comments or concerns.

8      Of the 6 parties who signed confidentiality agreements and received the Information

9  Memorandum, three parties submitted bids (one of which was from Allied). Each of these bids

10 was carefully scrutinized by the Debtors focusing on factors that included: (i) the cash versus debt

11 component of the purchase price, (ii) the buyer's ability to fund the business and, in particular,

12 capital expenditures that are estimated to total up to $44,470,000 over the next four to five years;

13 (iii) the buyer's ability to close the sale promptly in light of the Debtors' deteriorating financial

14 condition; (iv) the buyer's experience in the Debtors' line of business and with the purchase of

15 assets in distressed or bankruptcy situations; (v) whether the buyer had been able to negotiate a

16 term sheet with the Holdings Companies; and (vi) the likelihood that the buyer will actually close

17 the transaction.

18      Perhaps most importantly, an all-cash offer (such as the one submitted by Cerberus) was a

19 particularly important consideration for the Debtors because a proposed sale to a well-funded (and

20 under-leveraged) acquirer would make it much more likely that (i) BKC would consent to the

21 buyer as a new franchisee, and (ii) the Holdings Companies would be able to refinance their own

22 existing debt obligations (based on the creditworthiness and ability of the buyer to fund future rent

23 payments) and otherwise restructure their relationships with the Debtors. Given the requirements

24 of the existing master leases between the Holdings Companies and the Debtors, and in order to

25 realize maximum value from the sale of the Debtors' assets, any transaction would require a

26

27

28

82700-003\DOCS_SF:4157841                    DISCLOSURE STATEMENT

restructuring or satisfaction of the Debtors' accrued obligations to the Holdings Companies for rent and a refinancing of the Holdings Companies' mortgage debt.[50]

Each of the foregoing points was openly discussed by the Debtors with the three parties that submitted bids on the Debtors' assets and each party was given a reasonable opportunity to modify their bids to address these issues. Ultimately, the Debtors (in consultation with Trinity and CDG) determined that the bid submitted by Cerberus was the highest or best bid for the Debtors' assets for the following reasons, among others:

- Provides for an all-cash purchase price;
- No financing contingencies;
- Acceptable franchisee to BKC;
- Commits to make required capital expenditures on the Debtors' restaurants;
- Successfully negotiated term sheet with the Holdings Companies;
- Utilizes a superior management team;
- Possesses the best understanding of the Debtors' business;
- Holds significant prior purchase experience via the bankruptcy process;
- Brings the best capitalized sponsor to the transaction;
- Results in the most value to creditors; and
- Most likely to close the transaction.

Upon selecting Cerberus, the Debtors and Cerberus signed an exclusivity letter, Cerberus immediately commenced due diligence, and the parties began negotiations on the terms of the definitive agreements for the Sale.

**9. The Asset Purchase Agreement and Need for Bankruptcy Relief**

On or about August 9, 2004, Sydran Services and the Operating Debtors, on the one hand, and Strategic, an entity recently formed by Cerberus, on the other hand, entered into an asset purchase agreement. On or about September 29, 2004, this agreement was amended and restated to incorporate certain technical changes, clarify some provisions, and to address other issues that

---

[50] The Debtors' existing leases with the Holdings Companies are structured as a series of master leases. Each master lease covers more than one store and, in some cases, numerous stores. The Debtors must assume or reject each master lease in its entirety.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

had surfaced since the original agreement was signed. The resulting asset purchase agreement (the "Strategic Asset Purchase Agreement") contemplates the sale of substantially all of the operating assets of Sydran Services and the Operating Debtors to Strategic, as described in more detail at Article III below, subject to a potential higher and better offer from an Alternate Buyer.[51] Under the Strategic Asset Purchase Agreement, the Sale is to be effectuated through the Plan proposed by the Debtors in these Chapter 11 Cases.

In the event that there is a sale to an Alternate Buyer, such Alternate Buyer will execute an Amended Asset Purchase Agreement. For the sake of simplicity, the Plan defines the "Asset Purchase Agreement" to be either the Strategic Asset Purchase Agreement or the Amended Asset Purchase Agreement depending on whether there is a sale to Strategic or an Alternate Buyer. Likewise in the Plan, the term "Buyer" is defined as either Strategic or an Alternate Buyer.

**10. Commencement of the Debtors' Bankruptcy Cases**

On September 30, 2004 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in order to effectuate the Sale and to promptly reorganize the Debtors' financial affairs. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors remain in possession of their properties and are managing their affairs and operating their business as debtors in possession.

**B.    SIGNIFICANT POSTPETITION EVENTS**

The following is a summary of significant postpetition events that have taken place in these Chapter 11 Cases as of November 30, 2004.

**1.  Appointment of Committees**

On October 22, 2004, the Office of the United States Trustee appointed two official unsecured creditors' committees in these Chapter 11 Cases.

One committee was appointed in Sydran II's bankruptcy case. The members of that committee originally consisted of Entergy Services, Inc. ("Entergy"), F.J.B. Construction, Inc., Flowers Baking Co. of Baton Rouge LLC, Kojis & Sons, Inc., Raymond Plumbing & Heating,

---

[51]   Any description of the Asset Purchase Agreement herein is qualified by the terms of the agreement itself, which controls. The Asset Purchase Agreement is included in the Plan Supplement.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

Inc., The Coca-Cola Company and U.S. Foodservice, Inc.  On October 29, 2004, the Office of the United States Trustee appointed Allied to the committee.

The other committee was appointed in Sydran IV's bankruptcy case.  The members of that committee originally consisted of Coca-Cola Company, U.S. Foodservice, Inc., and A-Bear Refrigeration, Inc.  The committee of Sydran IV has since been disbanded.

The committee of Sydran II (referred to herein as, the "Committee") currently consists of Entergy, F.J.B. Construction, Inc., Flowers Baking Co. of Baton Rouge LLC, Kojis & Sons, Inc., Raymond Plumbing & Heating, Inc., The Coca-Cola Company, U.S. Foodservice, Inc., and Allied.  Entergy is the chair of the Committee.

### 2. Retention of Professionals

The Bankruptcy Court has authorized the Debtors to retain the following professionals: Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. (general bankruptcy counsel); CDG (financial advisors); Greene Radovsky Maloney & Share LLP (transactional counsel) ("Greene Radovsky"); and Stone Pigman Walther Wittmann L.L.C. (special counsel) ("Stone Pigman"). The retentions of CDG, Greene Radovsky and Stone Pigman were approved on November 1, 2004, over the objection of Laminar, which argued that these firms were conflicted from representing the Debtors on the basis of such firms' relationships with the Holdings Companies.  The Debtors took the position that these firms would never be placed in a position of conflict because separate counsel has been retained to the extent that any potential conflicts arise.  The Bankruptcy Court overruled the objection and approved the engagements of CDG, Greene Radovsky and Stone Pigman by the estates.

Given the size and complexity of these cases, the Debtors have also obtained authority from the Bankruptcy Court to continue to employ various other professionals in the ordinary course of business.  In addition, the Debtors have been authorized to employ BDO Seidman, LLP as accountants and tax consultants.

At the Debtors' request, the Bankruptcy Court has appointed AlixPartners LLC as the official claims, noticing, and balloting agent in these Chapter 11 Cases.

82700-003\DOCS_SF:41578.4  DISCLOSURE STATEMENT

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Finally, the Bankruptcy Court has authorized the Committee to retain Irell & Manella LLP as general bankruptcy counsel, and Mesirow Financial Consulting, LLC as financial advisors.

**3. "First Day" Motions**

Concurrently with the commencement of these cases, the Debtors filed various "first day" motions with the Court. Pursuant to these motions, the Debtors sought, among other things:

- Authority to use cash collateral consistent with the terms of a stipulation granting, among other things, replacement liens as adequate protection of the interests of the Debtors' principal secured creditors;

- Authority to honor and pay various employee obligations under ordinary course employee benefit policies;

- Authority to maintain the Debtors' existing cash management system;

- An order limiting notice in the case to the principal creditors and parties in interest; and

- An order establishing procedures for determining adequate assurance of payment for future utility services.[52]

Each of the foregoing motions was granted by the Bankruptcy Court in October 2004.

**4. Bar Date for the Filing of Proofs of Claim / PACA Procedures**

In light of the filing of the Plan and this Disclosure Statement, the Debtors proposed and the Bankruptcy Court has set December 21, 2004, as the bar date for all prepetition creditors (other than PACA Claimants, as defined below), including governmental authorities, to file proofs of claim asserting prepetition Claims against the Debtors. Any Claims filed after this date will be considered late and disallowed pursuant to Bankruptcy Code section 502(b)(9).

The Bankruptcy Court has also approved procedures for addressing claims under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499 et seq (the "PACA Claims"). PACA Claims are separately classified and paid in full under the Plan. Under the procedures

---

[52]   The utility order did not apply to Alabama Power Company or Entergy and its affiliates. The Debtors subsequently entered into separate stipulations with these entities.

approved by the Bankruptcy Court, the holders of PACA Claims had until November 11, 2004, to assert PACA Claims against the Debtors' estates.

Two claimants submitted PACA Claims: U.S. Foodservice, Inc. in the amount of $822,048.13, and Reinhart FoodService, Inc. in the amount of $55,551.28. The Debtors have entered into separate stipulations with these creditors to stay any objections to, or litigation involving, such PACA Claims pending the outcome of the plan confirmation process and consummation of the Sale. Under the Plan, the prepetition debt owed to these claimants is eligible to be assumed by Strategic or an Alternate Buyer as Participating Vendors, in which case any allegations as to whether such claims are covered by PACA would be moot.

**5. Schedules and Statements of Financial Affairs**

The Debtors electronically filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (together, the "Schedules") on October 15, 2004. The Schedules have since been amended. The Schedules, as amended, are available for review on the internet at www.pszyjw.info. The Debtors have also filed their first monthly operating report for the fiscal month ending October 27, 2004.

**6. Authority to Pay Prepetition Sales Taxes**

On October 6, 2004, the Debtors filed a motion seeking authority to pay sales taxes first coming due on a postpetition basis, totaling up to an estimated amount of approximately $1,550,000 collected by the Debtors from their customers during the thirty-day period immediately prior to the commencement of the Chapter 11 Cases. The Bankruptcy Court approved the motion on an expedited basis on October 20, 2004.

**7. Examiner Motion Filed by D.E. Shaw Laminar Portfolios, L.L.C. / Due Diligence**

On October 12, 2004, Laminar filed a motion to appoint an examiner in the Chapter 11 Cases to investigate, among other things, the fairness of the sales price proposed under the Asset Purchase Agreement; the allocation of the sales price amongst the Debtors; and whether the marketing and sales price was designed to maximize recovery to the Debtors' estates. Allied filed a joinder to the motion. Laminar sought to have its motion heard on an expedited basis on November 1, 2004. The Debtors objected to this request and the Bankruptcy Court did not grant

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   an order shortening time for the hearing.  The hearing on the examiner motion was subsequently

2   set for December 13, 2004.

3       On or about November 5, 2004, without reference to the examiner motion or any other

4   particular contested matter, Allied served a series of extensive document requests upon the

5   Debtors.  Similar requests in the form of subpoenas were served on the Holdings Companies,

6   Matthew Schoenberg, BK-Sydran, BKC, GEC-BAFC, GMACCM, Strategic, and Cerberus.

7   Laminar purported to join in these discovery requests.

8       Subsequently, Allied and Laminar expressed an interest to the Debtors in conducting due

9   diligence on the Debtors' assets in order to formulate an overbid to acquire such assets on the same

10   terms as Strategic, except at a greater price.  The Debtors agreed to provide Allied and Laminar

11   with information about the Debtors' business and assets in the context of a good faith due

12   diligence effort.  At the same time, Allied and Laminar agreed to withdraw the examiner motion,

13   without prejudice, and to take their discovery requests to all parties (except Strategic and Cerberus)

14   off calendar.  Since then, the Debtors have provided Allied and Laminar with thousands of pages

15   of electronic files and scanned documents, including the Debtors' detailed recent financial

16   information and copies of real property leases, franchise agreements and vendor contracts.

17       As agreed, on November 22, 2004, Laminar withdrew its examiner motion, without

18   prejudice.  Allied subsequently joined in the withdrawal of the motion.  Because Allied and

19   Laminar did not withdraw their discovery requests as to Strategic or Cerberus, Strategic and

20   Cerberus filed their objection to such discovery requests on November 24, 2004, arguing among

21   other things, that other than the Transaction Documents (all of which have been made available to

22   Allied and Laminar), it is highly inappropriate and unduly burdensome for potential competing

23   bidders to seek discovery from a third party bidder.  Strategic and Cerberus assert that Allied

24   and/or Laminar must move the Bankruptcy Court to compel production of such documents if they

25   want to pursue this discovery against Strategic and Cerberus.  This matter has yet to be considered

26   by the Bankruptcy Court.

27       Allied and Laminar have advised the Debtors that, if Allied and Laminar are given a fair

28   opportunity to bid on the Debtors' assets against Strategic, they will not oppose confirmation of

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

the Plan. The Debtors have also been contacted by two additional parties expressing an interest in acquiring aspects of the Debtors' restaurant business.

### 8. Extension of Time to Assume or Reject Real Property Leases

On October 18, 2004, the Debtors filed a motion seeking an extension of time, from November 29, 2004 to February 28, 2005, to assume or reject the Debtors' unexpired nonresidential real property leases. The Bankruptcy Court granted the motion on November 1, 2004.

### 9. Interim Fee Procedures

On October 18, 2004, the Debtors filed a motion seeking approval of interim fee procedures for professionals employed by the estates. The procedures allow estate professionals to be compensated on a monthly, rather than a quarterly basis, subject to certain limitations and notice requirements. The Bankruptcy Court granted the motion on November 1, 2004.

### 10. Solicitation Procedures

For purposes of soliciting votes on the Plan and the dissemination of this Disclosure Statement, the Debtors have requested that the Court approve the manner and form of notice of the Plan and the procedures for obtaining confirmation of the Plan. The Court's order approving the solicitation procedures motion will be enclosed with this Disclosure Statement upon mailing.

### 11. Topping Fee and Other Buyer Protections

On October 4, 2004, the Debtors filed a motion seeking approval of certain protections for Strategic required by the Asset Purchase Agreement. These protections (the "Buyer Protections") include: (i) payment of a "topping fee" of $500,000 (the "Topping Fee") which will be paid to Strategic if an alternative transaction is consummated and the Asset Purchase Agreement has not been terminated, with such fee to be paid solely out of the proceeds of such alternative transaction, (ii) provisions of the Asset Purchase Agreement which provide that Strategic will return as part of the Purchase Price an $850,000 expense deposit (the "Expense Deposit") that the Debtors paid to Strategic prior to filing these bankruptcy cases, plus interest, if the sale provided for in the Asset Purchase Agreement closes or if the Asset Purchase Agreement is terminated because of a breach by Strategic or the failure of Strategic to provide the adequate assurance of future performance that

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  the Court requires in order to approve the assumption and assignment of the unexpired leases and

2  executory contracts to be assumed and assigned to Strategic under the Asset Purchase Agreement,

3  and that Strategic will be entitled to retain the Expense Deposit if the Asset Purchase Agreement is

4  terminated for certain other reasons, (iii) approval of the provisions of the Asset Purchase

5  Agreement providing for Strategic's access to information and the Debtors' facilities prior to the

6  closing of the Asset Purchase Agreement, and (iv) approval of the provisions of the Asset Purchase

7  Agreement providing that the Debtors will not solicit an alternative proposal, but may, if

8  unsolicited, consider a competing offer, subject to giving Strategic certain information about the

9  alternative proposal and an opportunity to match or exceed it.

10  Laminar and Allied filed objections to approval of the Buyer Protections. The Debtors and

11  Strategic replied in support of the Buyer Protections. On November 1, 2004, the Bankruptcy Court

12  approved the Buyer Protections over the objections of Laminar and Allied. The terms and

13  conditions of the payment of the Topping Fee and the other Buyer Protections are further described

14  in Article III.D below. [53]

15  Consistent with the Bankruptcy Court's order approving the Buyer Protections, the Debtors

16  will not actively solicit other offers, but if the Debtors receive any requests for information from

17  potential bidders or competing offers, they intend to provide the information requested and to

18  consider any such competing offers and to consult with the Committee and other major creditors

19  about such offers. For any competing proposal to be considered higher and better than the

20  transaction provided for in the Asset Purchase Agreement, the Debtors believe that a number of

21  factors should be considered, including: (i) the consideration offered by a competing proposal net

22  of the Topping Fee and the Expense Deposit, (ii) the prospects that an alternative transaction could

23  close, which could include such matters as whether or not the prospective buyer has been approved

24  by BKC as a franchisee, and (iii) the arrangement made by the prospective buyer with landlords,

25  including the Holdings Companies, with respect to whatever leases are to be assumed and

26  assigned.

27

28  [53]  As reflected below, BKC has also agreed, by separate agreement included in the Plan Supplement, to fund a cost
fee for the benefit of the Buyer under certain circumstances.

**12. Sale Motion**

In addition to the Plan, the Debtors reserve the right to file a motion or motions for approval of the Sale to the Buyer and/or the assumption by the Debtors and assignment to the Buyer of certain executory contracts and unexpired leases pursuant to Bankruptcy Code sections 363(b) and (f), 365(f) and 506. Among other things, the Sale Motion would seek approval of the sale of the Purchased Assets (as defined below) to the Buyer, the assumption by the applicable Debtors and assignment to the Buyer of the Assumed Executory Contracts (as defined in the Plan), and a determination that the Purchased Assets will be transferred to the Buyer free and clear of Liens and Claims. If filed, the Sale Motion will be heard on the same date and time as the Confirmation Hearing (or earlier), and if for any reason the Bankruptcy Court does not confirm the Plan (or the Debtors choose to move forward with the Sale Motion instead of the Plan), the Debtors will nonetheless seek approval of the Sale to the Buyer. In the event of any opposition to the proposed Sale free and clear of liens, claims and interests, the Debtors intend to seek a valuation, under section 506 of the Bankruptcy Code, of any collateral that is included within the Sale.

**III.**

**DESCRIPTION OF THE ASSET PURCHASE
AGREEMENT AND RELATED AGREEMENTS**

This section summarizes the principal terms of the Asset Purchase Agreement, the Master Real Estate Agreement (described below), and certain related agreements. True and correct copies of all agreements executed or to be executed in connection with the Sale are included within the Plan Supplement and generally described herein. ALL DESCRIPTIONS OF THE PROVISIONS OF THE ASSET PURCHASE AGREEMENT, THE MASTER REAL ESTATE AGREEMENT, AND ALL RELATED AGREEMENTS, WHETHER MADE IN THIS SECTION OR OTHER SECTIONS OF THIS DISCLOSURE STATEMENT, ARE QUALIFIED IN THEIR ENTIRETY BY THE ACTUAL TERMS OF THESE AGREEMENTS AND THE SCHEDULES AND EXHIBITS THERETO.

IN ADDITION, IF THERE IS AN ALTERNATE BUYER, SUCH BUYER WILL STEP INTO, AND ASSUME PERFORMANCE OF, THE STRATEGIC ASSET PURCHASE

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1 AGREEMENT (MODIFIED ONLY TO INCREASE THE PURCHASE PRICE AND OMIT THE

2 BUYER PROTECTIONS), THE MASTER REAL ESTATE AGREEMENT, AND ALL

3 RELATED TRANSACTION DOCUMENTS.  SUCH AMENDED ASSET PURCHASE

4 AGREEMENT, AMENDED MASTER REAL ESTATE AGREEMENT, AND OTHER

5 AMENDED TRANSACTION DOCUMENTS SHALL THEN BE THE DEFINITIVE

6 TRANSACTION DOCUMENTS FOR ALL PURPOSES IN THE PLAN AND HEREIN.

7 　　　　As discussed above, the Plan defines the "Asset Purchase Agreement" to be either the

8 Strategic Asset Purchase Agreement or the Amended Asset Purchase Agreement depending on

9 whether there is a sale to Strategic or an Alternate Buyer.  Likewise, the term "Buyer" is defined in

10 the Plan as either Strategic or an Alternate Buyer.

11 **A.**　　　**ASSETS TO BE SOLD**

12 　　　　Pursuant to the Asset Purchase Agreement, Strategic has agreed (or potentially an Alternate

13 Buyer will agree) to purchase substantially all of the assets necessary to operate the Debtors'

14 business on an ongoing basis at 201 restaurants (with the remainder designated for closure),[54]

15 including Sydran I's single owned parcel of real property; the Debtors' tangible personal property

16 (such as furniture, fixtures, equipment, materials and supplies); inventory (such as food, paper and

17 uniforms); intellectual property; contracts assumed by the Buyer; records (other than privileged

18 litigation files); marketing materials; accounts receivable; claims relating to the Debtors' business

19 operations or the assets being sold, including, claims (if any) of the Debtors against non-debtor

20 affiliates of the Debtors (i.e., the Holdings Companies) from whom the Debtors lease certain

21 restaurants, including any Avoidance Actions against the Holdings Companies; promotional

22 allowances, vendor rebates, and vendor credits; office supplies; prepaid deposits; permits, licenses

23 and certifications; goodwill; telephone numbers; indemnities; tax refunds relating to the assets

24 being sold; and any and all bank accounts (the "Purchased Assets").

25 　　　　Although potential claims against the Holdings Companies (including potential Avoidance

26 Actions) are part of the Purchased Assets and the transfer of such claims is supported by the

27 consideration from the Sale, the Debtors are not aware of the existence of any potential claims

28

---

[54]　As mentioned above in footnote 4, it is possible that the number of restaurants sold to the Buyer could be reduced.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

against the Holdings Companies. As part of the negotiations between the Debtors, Strategic, and the Holdings Companies in connection with the Asset Purchase Agreement and related transactions, the Holdings Companies required that the Debtors transfer any potential claims against the Holdings Companies to Strategic, which in turn, has agreed to provide a release in favor of the Holdings Companies of such claims. The Holdings Companies made this demand in light of the substantial concessions that they were requested to make as part of the contemplated transactions, including, among other things: (i) waiving any monetary or non-monetary cures under the Holdings Companies' existing master leases with the Debtors, including $3.37 million of accrued unpaid prepetition base rent and a deferral of unpaid real property taxes; (ii) continuing to receive reduced rent from the Debtors on a postpetition basis equal to a monthly shortfall of $259,099 (and waiving any claim arising therefrom); (iii) continuing to pay the Debtors a restructuring fee in the amount of approximately $83,000 per month; and (iv) restructuring the existing master leases, including accommodating the request of the Debtors and Strategic to close certain restaurant locations. Strategic supported and independently requested the transfer of potential claims against the Holdings Companies because Strategic understood that, unless such claims were resolved, the Holdings Companies would not be willing to agree to the substantial rent reductions described below and which are necessary conditions to the Strategic Asset Purchase Agreement. In addition, even if the Holdings Companies were willing to agree to such rent reductions without resolving such matters (which is highly unlikely), Strategic's relations with its major landlord would be unstable if that landlord could potentially be harassed and distracted by litigation with the Debtors' estates, which in turn, could interfere with ordinary restaurant operations and impact the ability of the Holdings Companies to refinance their existing debt. This last concern -- the refinancing -- is important because the refinancing is a critical element of the overall transaction. In light of these considerations, the Debtors agreed as part of the contemplated transactions that the assets to be acquired by the Buyer would include any potential claims of the estates against the Holdings Companies.[55] Given that the Holdings Companies have substantial claims against the Debtors' estates and the Debtors are not aware of any countervailing claims

---

[55] These claims against the Holdings Companies will then be released by the Buyer.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   against the Holdings Companies, the Debtors believe that the transfer of potential claims

2   (assuming that any such claims even exist) to the Buyer as part of the Sale is reasonable and

3   appropriate under the circumstances.

4        The Purchased Assets do not include the following assets (in summary form only and to the

5   extent not included in the Purchased Assets):  cash retainers held by professionals retained by the

6   Debtors; rights under the Asset Purchase Agreement; Avoidance Actions (other than any

7   Avoidance Actions against the Holdings Companies); any claims or causes of action against

8   vendors who are not Participating Vendors under the Plan, solely to the extent assertable as

9   defenses, counterclaims or setoffs, and all other claims or causes of action not attributable to the

10   Purchased Assets; ownership interests in the Debtors; assets and rights relating solely to the

11   restaurants that the Debtors have closed; any contracts or leases rejected by the Debtors or not

12   assumed by the Buyer; insurance policies unrelated to the Purchased Assets; the name "Sydran"

13   and the intellectual property rights relating thereto; tax returns and corporate records relating solely

14   to the organization and structure of the Debtors; all refunds of income or similar taxes; and certain

15   other designated assets unrelated to the Debtors' operations (the "Excluded Assets").

16   **B.**    **ASSUMED OBLIGATIONS**

17        In addition to acquiring the Purchased Assets, Strategic has agreed (or potentially an

18   Alternate Buyer will agree), to assume the following obligations (in summary form only):  (i) all

19   liabilities with respect to the Purchased Assets arising after the Closing of the Sale; (ii) all

20   liabilities arising after the Closing Date with respect to the Assumed Executory Contracts (which

21   may include the Debtors' franchise agreements with BKC and the Debtors' various real estate

22   leases with BKC and the Holdings Companies);[56] (iii) all of the Debtors' Current Liabilities (as

23   defined in the Asset Purchase Agreement), including Administrative Claims that are accounts

24   payable to vendors for goods and services used in the operation of the Debtors' business and that

25   arise on and after the Petition Date; (iv) accounts payable arising prepetition to Participating

26

[56]  The Debtors' accrued and unpaid prepetition base rent obligations to the Holdings Companies under various real

27  estate leases that will be assumed as part of the Sale total approximately $3.37 million.  However, in light of the real
estate transactions described in Article III.E below, the Holdings Companies will not require the payment of any cure

28  amounts by the Debtors or the Buyer in connection with the assumption and assignment of Sydran Holdings' leases to
the Buyer.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Vendors; (v) liabilities relating to the vacation and holiday accumulations of employees whom the

2    Buyer elects to rehire; (vi) real property taxes and assessments for the entire calendar years of

3    2004 and 2005; and (vii) personal property taxes and assessments for the entire calendar years of

4    2004 and 2005 (the "Assumed Obligations").

5        It bears separate mention that the Buyer will agree to assume and pay the prepetition

6    Allowed Claims of Participating Vendors.  Generally speaking, Participating Vendors consist of

7    ordinary course vendors and/or suppliers to the Debtors, other than parties holding claims for

8    borrowed money or claims that are secured by collateral, who have in fact continued to provide

9    goods and/or services to the Debtors during these Chapter 11 Cases and who reach agreement with

10   the Buyer to extend credit terms on a going forward basis after the Closing of the Sale.  A list of

11   anticipated eligible Participating Vendors is attached hereto as Exhibit B. [57]  Also, if a cure under

12   an Assumed Contract would otherwise fall within the scope of the Claim of a Participating

13   Vendor, Strategic will pay such cure (a "Trade Payable Agreement Cure").

14       In addition, the Assumed Obligations include, as to each of three key employees of Sydran

15   Services (Matthew Schoenberg, Kenneth Freed, and Charles T. Dooly) (together, the "Key

16   Employees), those certain *Retention, Consulting and Noncompete Agreements* (the "Retention

17   Agreements"), each dated as of August 9, 2004, by and between Sydran Services and such

18   employee.  The Retention Agreements were executed as an accommodation to Strategic (or an

19   Alternate Buyer) to ensure the continued employment of the Key Employees, whom Strategic and

20   the Debtors consider essential to the preservation of the Debtors' operations and ability to

21   complete the Sale.  The Retention Agreements also ensure the availability of the Key Employees

22   to the Buyer as consultants for a six-month transition period after the Sale, and to protect the Buyer

23   through covenants of non-competition and non-solicitation for a period of one-year after the Sale.

24   In consideration of these accommodations, the Retention Agreements contemplate payment to

25   Matthew Schoenberg in the amount of $600,000, and to each of Kenneth Freed and Charles T.

26

27   [57]   As mentioned above, upon mailing of this Disclosure Statement, the Debtors anticipate that the attached listing of
         Participating Vendors shall have been approved by Strategic.  Once such list is finalized, no vendor shall be removed

28       from the list unless such vendor alters credit terms or refuses to ship goods or to provide services to the Debtors,
         without the agreement or acknowledgment of the Debtors.

Dooly in the amount of $354,600, payable on the Effective Date of the Plan or the termination of such employee's employment with the Debtors by the Debtors or due to the death or disability of the employee. There is no reduction in the Purchase Price (as defined below) on account of the Retention Agreements. These agreements are in lieu of any severance to which the Key Employees might otherwise be entitled.

The Assumed Obligations do not include any liabilities of the Debtors that the Buyer does not expressly assume, including (without limitation) the following liabilities (in summary form only): any obligations relating to the Excluded Assets; cure amounts owed under assumed contracts, except to the extent that such cure would otherwise be part of Current Liabilities or is a Trade Payable Agreement Cure under the Asset Purchase Agreement, subject, however, to triggering a reduction in the Purchase Price, via a working capital adjustment, all as provided in the Asset Purchase Agreement; any obligations to any employee not assumed by the Buyer as part of the Assumed Obligations; any liabilities with respect to litigation claims relating to the Purchased Assets arising prior to the Closing of the Sale; any environmental liabilities arising prior to the Closing; any taxes (including taxes arising from the sale of the Purchased Assets) not expressly assumed by the Buyer; the Debtors' fees and expenses associated with the Sale; any liabilities for borrowed money; any accounts payable not assumed by the Buyer as part of the Assumed Obligations; any liabilities relating to services or products provided by the Debtors; any contractual obligations not expressly assumed by the Buyer; any obligations to the Debtors' shareholders or affiliates; any indemnity obligations to the Debtors' directors, officers or employees; any liabilities arising out of non-compliance with law; any liabilities for infringement of intellectual property; any obligations of the Debtors under the Asset Purchase Agreement; and any liabilities of the Debtors based upon acts or omissions occurring after the Closing (the "Excluded Liabilities").

The Debtors and Strategic have agreed (or an Alternate Buyer will agree) to share in the payment of any sales, use, or transfer taxes that may be imposed in connection with the Sale. The Debtors and the Buyer shall each be responsible and obligated to pay for one-half of such taxes up

Case: 04-43343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 61 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to $150,000 each (or $300,000 in the aggregate). Any obligations for transfer taxes in excess of $300,000 shall reduce the Purchase Price.

## C.   CONSIDERATION TO BE PAID

The consideration to be paid by Strategic for the purchase of the Debtors' assets (the "Purchase Price") consists of cash in the amount of $20 million (subject to certain adjustments described below), plus an amount equal to the Expense Deposit (as defined below) and interest thereon and the assumption of the Assumed Obligations. In the event that an Alternate Buyer takes the place of Strategic or Strategic increases its offer to match a competing bid, the Purchase Price shall be increased, but the Debtors cannot currently predict whether any competing offers will be submitted or selected as the highest and best bid on the Debtors' assets.

Whatever the ultimate cash portion of the Purchase Price, it shall be adjusted downward based on the following:

- the amount by which the Debtors' Current Liabilities (subject to certain adjustments) exceed Current Assets as of the Closing by more than $6,389,377;

- the amount of any cure payment made by the Buyer on behalf of the Debtors, except to the extent that such cure would otherwise be part of Current Liabilities or is a Trade Payable Agreement Cure under the Asset Purchase Agreement;

- the amount of any reductions based on deletions of store locations due to title exceptions or issues arising in connection with investigations of properties that result in the reduction of the purchase price by $100,000 per location;

- the amount of any costs incurred by the Buyer based on the inability of the Debtors to obtain requisite consents to transfer designated software licenses;

- the book value of any capitalized personal property leases assumed by the Buyer that the Debtors are unable to terminate prior to the Closing Date;

- in the event that the Debtors' franchise agreements are rejected (rather than assumed by the applicable Debtor and assigned to the Buyer), an amount equal to any "new franchise" or other fees charged to the Buyer by BKC in connection with the execution of new or replacement franchise agreements for the operation of any

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1      acquired restaurants, provided that such amount will not exceed the cure amounts

2      that would have been payable to BKC by the Debtors in order to assume and assign

3      their existing franchise agreements for restaurants that are being acquired by the

4      Buyer (which the Debtors estimate at $3,700,000); and

5      •   50% of the amount of any transfer taxes that may be due and payable up to

6      $300,000 (meaning a reduction in the Purchase Price of up to $150,000) and 100%

7      of the amount of all transfer taxes above such amount.

8      The Asset Purchase Agreement provides for a working capital adjustment what will be

9 made based upon a Closing Balance Sheet to be prepared by the Buyer and approved by the

10 Debtors.  If the calculation of the Closing Working Capital is less than the Working Capital Target

11 (which is defined in the Asset Purchase Agreement as negative $6,389,377), then the Purchase

12 Price will be reduced by an amount equal to the such excess negative working capital.  Schedule

13 2.5(c) to the Asset Purchase Agreement sets forth the methodology for determining which assets

14 are to be considered Current Assets and which liabilities are to be considered Current Liabilities

15 for purposes of the calculation.  Generally speaking, any liabilities assumed by the Buyer as

16 Assumed Obligations will be factored into the calculation of the Closing Working Capital.  The

17 Debtors tentatively estimate that the working capital adjustment will total approximately $3.3

18 million, but could be materially less than that depending on the Debtors' operational performance

19 and other factors.  The Asset Purchase Agreement contains a dispute resolution mechanism in the

20 event the Sellers disagree with the Closing Balance Sheet or the resulting Purchase Price

21 Calculation.

22      The Asset Purchase Agreement also requires that a portion of the cash consideration

23 payable to the Debtors in the amount of $2,000,000 (the "Reserve") shall be deposited by the

24 Buyer into an escrow account as a reserve.  The Buyer is permitted to withhold an additional

25 amount (only to the extent that such amount exceeds the Reserve) based on a good faith estimate

26 of the Debtors' working capital as of the Closing Date.  The Reserve and any additional amounts

27

28

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    withheld by the Buyer shall be distributed upon the completion of a final accounting, which is

2    expected to take place within two to three months after the Closing Date.[58]

3    **D.    OTHER MATERIAL PROVISIONS**

4    The Asset Purchase Agreement contains representations, warranties, covenants and other

5    provisions that are generally similar to those contained in comparable asset sale transactions in

6    bankruptcy.

7    Under the Asset Purchase Agreement, the Debtors will assume and assign to Strategic (or

8    potentially an Alternate Buyer) all rights and interests under certain executory contracts and

9    unexpired leases (the "Assumed Executory Contracts") listed in the Schedules to the Asset

10   Purchase Agreement (which may include the Debtors' franchise agreements with BKC).[59]  The

11   listing of such Assumed Executory Contracts will also be separately appended to the Plan as

12   Schedule A.  As adequate assurance of future performance, the Buyer shall promise to perform all

13   of the obligations under the Assumed Executory Contracts after the Closing Date of the Sale.

14   The Buyer will be well capitalized -- e.g., the Asset Purchase Agreement requires that, on

15   the Closing and after all payments required by the Buyer under the Asset Purchase Agreement, the

16   Buyer shall have cash on hand of at least $3,000,000 and no indebtedness other than the Assumed

17   Obligations.  Cerberus has advised the Debtors that it intends to capitalize Strategic in excess of

18   what is required by the Asset Purchase Agreement.  For example, Strategic's agreement in

19   principle with BKC indicates that, during the first three years after the Closing, Strategic will be

20   capitalized with up to $20 million of outside capital (of which at least $8 million will be invested

21   in the first year) to finance working capital needs and capital expenditures.  An Alternate Buyer

22   shall also be adequately capitalized in accordance with the terms of the Asset Purchase Agreement

23   and must have the same ability as Strategic to close and consummate the contemplated

24   transactions.  In addition, any transaction with an Alternate Buyer must have Credit Support that is

25   comparable to that provided in the transaction with Strategic.  Any costs associated with curing

26

27   [58]   Any additional amounts paid to the Sellers for the Purchased Assets will be promptly paid to the secured creditors
      entitled thereto.

28   [59]   The Debtors reserve the right to add contracts or leases from Schedule A to the Plan up to twenty-eight (28) days
      prior to the Confirmation Hearing.  The Debtors may remove contracts or leases from Schedule A to the Plan up until
      the time that an order is entered approving the assumption and assignment of such contracts or leases.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    outstanding obligations under any Assumed Executory Contracts shall be borne by the Debtors,

2    except to the extent that such cure would otherwise be part of Current Liabilities or is therefore a

3    Trade Payable Agreement Cure under the Asset Purchase Agreement.

4          The Trade Payable Agreement Cure will not include any cure obligations in connection

5    with the Debtors' franchise agreements with BKC relating to those restaurants that will be

6    acquired by the Buyer.  The Debtors shall be obligated to satisfy such obligations (which the

7    Debtors estimate at approximately $3,700,000) out of unencumbered cash or authorized use of

8    cash collateral.  In the event that the Debtors do not have adequate funds available to satisfy the

9    requisite cure payment to BKC, the Debtors may, subject to the Buyer's approval which shall not

10   be unreasonably withheld, remove all of the Debtors' franchise agreements with BKC from the list

11   of Assumed Executory Contracts.  In such event, the Purchase Price shall be reduced by an amount

12   equal to any "new franchise" or other fees charged to the Buyer by BKC in connection with the

13   execution of new or replacement franchise agreements for the operation of any acquired

14   restaurants, provided that such amount will not exceed the cure amounts that would have been

15   payable to BKC by the Debtors in order to assume and assign their existing franchise agreements

16   (i.e., approximately $3,700,000, but in no event more than $4,200,000).

17         The Asset Purchase Agreement prohibits the Debtors from actively soliciting proposals for

18   an alternative transaction with other possible purchasers, but also recognizes that the Debtors have

19   the responsibility and obligation to respond to any inquiries relating to alternative proposals.  If the

20   Debtors propose to accept an alternative proposal, Strategic shall have a period of 72 hours after

21   notice thereof to modify the terms of the Asset Purchase Agreement to match or exceed such

22   alternative proposal.  The Debtors intend to respond to requests for information from potential

23   bidders and to negotiate with any party interested in pursuing an alternative transaction with the

24   estates.  Also, nothing in the Asset Purchase Agreement prevents the Committee, or any party

25   other than the Debtors, from actively soliciting competing bids.

26         The Asset Purchase Agreement provides that, from and after the Closing of the Sale, the

27   Buyer broadly releases the Debtors and their respective representatives and agents of any and all

28

82700-003\DOCS_SF:41578.4

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    claims or liabilities relating to the Purchased Assets, except as to any claims based on bad faith,

2    intentional misconduct, fraud, or any willing and knowing violation of law.

3         The obligations of the Debtors and Strategic (or an Alternate Buyer) to consummate the

4    transactions set forth in the Asset Purchase Agreement are subject to certain conditions, which may

5    be waived by the party for whose benefit they exist.  The obligations of both parties are subject to

6    Confirmation of the Plan.  Other conditions to the Buyer's obligation to Close the Sale include the

7    following:  (i) assumption and assignment to the Buyer of each contract or lease designated for

8    assignment to the Buyer as an Assumed Executory Contract under the Asset Purchase Agreement

9    (including the Debtors' franchise agreements with BKC, unless new agreements have been

10   executed with the Buyer); (ii) the Buyer shall have simultaneously acquired substantially all of the

11   assets of BK-Sydran;[60] (iii) there shall not have occurred a material adverse change to the Debtors'

12   business; (iv) the Buyer shall have obtained rent reductions for restaurants leased from BKC of at

13   least $1.1 million per year; (v) the transactions under the Master Real Estate Agreement and

14   associated real estate transactions (described below) shall have occurred or take place

15   simultaneously with the Closing of the Sale; (vi) the Debtors' trailing twelve month earnings

16   before interest, taxes, depreciation and amortization ("EBITDA") is not less than $3,179,000; and

17   (vii) the Bankruptcy Court shall have established a claims bar date that is at least 15 days prior to

18   the initial hearing on confirmation of the Plan and appropriate notice thereof has been provided to

19   all creditors of the Debtors.

20        Pursuant to a master lease with Sydran BK Services, a non-debtor affiliated real estate

21   company called Sydran Group Holdings, LLC leases the premises underlying seven (7) of the

22   restaurants operated by Sydran BK Services that the Buyer intends to acquire as part of the Sale.[61]

23   Pursuant to a separate master lease with Sydran II, Sydran Group Holdings, LLC leases two (2) of

24   the restaurants operated by Sydran II, both of which the Buyer intends to acquire as part of the

25

26   [60]   The Debtors will not share in the proceeds from the disposition of BK-Sydran because the Debtors' indirect
       membership interests in BK-Sydran are structurally subordinated to BKC and the proceeds of this sale are anticipated
27     to be substantially less than BKC's senior interests in BK-Sydran.
       [61]   This master lease between Sydran Group Holdings, LLC and Sydran BK Services initially covered 11 restaurants.
28     One of the restaurants was closed prepetition, and three additional restaurants are slated for closure, which leaves 7
       restaurants that are part of the proposed Sale to the Buyer.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  Sale.  The restructuring of the master leases with Sydran Group Holdings, LLC as part of the Sale

2  of these nine (9) restaurants is contingent on, among other things, the consent of a two-thirds

3  majority of the owners of Sydran Group Holdings, LLC, which consent has not yet been obtained.

4  If such consent is not timely obtained, the Debtors will seek to reach an agreement with the Buyer

5  and other parties in interest to exclude the foregoing nine (9) restaurants from the Sale and to make

6  appropriate modifications to the real property transactions relating to the premises underlying such

7  nine (9) restaurants.[62]

8      As a requirement to Strategic committing its time and resources to pursuing the sale

9  transaction, because Strategic has expended and will expend a considerable amount of money in

10  conducting due diligence, negotiating and documenting the Asset Purchase Agreement, and

11  moving ahead to consummate the sale, and also because Strategic may be unwittingly acting as a

12  "stalking horse" bidder on the Debtors' assets and may be overbid by another purchaser, the

13  Debtors paid Strategic the Expense Deposit of $850,000 prior to the Petition Date.[63]  The payment

14  of the Expense Deposit was a condition to Strategic's willingness to move ahead with the Asset

15  Purchase Agreement.  An additional purpose of the Expense Deposit was to cover and reimburse

16  Strategic for a portion of its reasonable out-of-pocket expenses, including reasonable legal fees, in

17  connection with the Asset Purchase Agreement in the event that, for instance, the Bankruptcy

18  Court approves an alternate proposal for the sale of the Debtors' assets or the Debtors are in

19  material default of the terms of the Asset Purchase Agreement and Strategic terminates the Asset

20  Purchase Agreement as a result of such material default.  If the Asset Purchase Agreement is

21  terminated for any reason other than Strategic's breach or Strategic's failure to provide adequate

22

23  _____

24  [62]   No agreement has yet been reached, but Strategic has indicated that if Sydran Group Holdings, LLC is unable to
consummate the related real estate transactions, Strategic is willing to consider eliminating these nine (9) restaurants

25  from the transactions, subject to agreeing to a reduction in the Purchase Price paid to the Debtors and reductions in the
rents paid to the Holdings Companies.  The Strategic Asset Purchase Agreement provides that if restaurants are
dropped from the transaction for environmental or title reasons, there will be a reduction in the Purchase Price of

26  $100,000 per restaurant.  While this section of the Strategic Asset Purchase Agreement is not directly applicable to
eliminating these nine (9) restaurants, Strategic has suggested that a reduction in the Purchase Price paid to the

27  Debtors of $100,000 per restaurant might be appropriate, assuming that adjustments to the rents paid to the Holdings
Companies to reflect the loss of these properties could also be agreed upon.

28  [63]   If the Sale to the Buyer under the Asset Purchase Agreement closes, the full Expense Deposit will be refunded to
the Debtors as an additional component of the Purchase Price.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    assurance of future performance under the executory contracts and unexpired leases to be assigned

2    to Strategic, then Strategic will be entitled to retain the Expense Deposit.

3         In addition, if an alternative transaction with an Alternate Buyer closes and the Asset

4    Purchase Agreement has not been terminated, then the Debtors are obligated to pay Strategic,

5    solely out of the proceeds of such alternative transaction, the Topping Fee of $500,000.  By

6    separate agreement, BKC has agreed under certain circumstances to pay Strategic a cost fee of up

7    to $500,000 solely out of the amounts recovered by BKC on account of its claims against the

8    Debtors.  This payment does not come from the Debtors and thus does not affect any creditors

9    other than BKC.

10        The Topping Fee and certain other Buyer Protections have been approved by the

11   Bankruptcy Court to the extent set forth and expressly required by the Asset Purchase Agreement.

12   Specifically, the Topping Fee has been allowed as an administrative expense under sections

13   503(b)(1) and 507(a)(1) of the Bankruptcy Code, and if and when due and payable, subject to the

14   terms of the Asset Purchase Agreement, constitutes an authorized use of cash collateral of any

15   secured creditor with an interest therein pursuant to sections 363(c) and (e) of the Bankruptcy

16   Code and a permissible surcharge on the cash and non-cash collateral of any such secured creditor

17   pursuant to section 506(c) of the Bankruptcy Code.

18        As mentioned above, the Debtors believe that an appropriate allocation of the Purchase

19   Price will result in GEC-BAFC and GMACCM receiving recoveries of approximately 12.0% and

20   13.9%, respectively, of the principal amounts of their secured equipment loans owed by Sydran

21   IV.  These loans are secured both by the equipment at certain of Sydran IV's restaurants and also

22   certain of the real property on which these restaurants are situated.  In developing the Plan and the

23   related real estate transactions described below, the Debtors and the Holdings Companies

24   negotiated with GEC-BAFC and GMACCM over the appropriate treatment of their secured claims

25   against Sydran IV.  GEC-BAFC and GMACCM argued that they were entitled to at least the

26   distributions mentioned above, but agreed to support the Plan and the real estate transactions if

27   they were assured of receiving at least certain minimal recoveries under the Plan.

28

In exchange for the support of GEC-BAFC and GMACCM for the Plan and the related real estate transactions, Strategic has agreed (or an Alternate Buyer will agree) to provide a limited guaranty to each of GEC-BAFC and GMACCM of the amounts to be distributed to GEC-BAFC and GMACCM in these Chapter 11 Cases on account of GEC-BAFC's and GMACCM's respective Claims against Sydran IV (each, a "Buyer's Guaranty"). Under the Buyer's Guaranties, in the event that the distribution to GEC-BAFC in these Chapter 11 Cases is less than $333,884 or the distribution to GMACCM is less than $640,500 (such amounts, as applicable, being the "Floor Recovery"), the Buyer will pay to GEC-BAFC or GMACCM, as appropriate, an amount equal to the excess of (i) the Floor Recovery for such claimant over (ii) the distribution made to the claimant. In the case of GMACCM, this support is structured as an obligation from the Holdings Companies to GMACCM, backstopped by an obligation from the Buyer to the Holdings Companies.

In order to facilitate a fair and equitable allocation of the cash portion of the Purchase Price amongst the Debtors' secured creditors, the Debtors have agreed to use their best reasonable efforts in the Chapter 11 Cases to advocate an allocation of the cash portion of the Purchase Price amongst all secured creditors which will result in GEC-BAFC and GMACCM being paid at least the Floor Recovery in the Bankruptcy Cases on account of their respective Claims against Sydran IV. The Floor Recovery is substantially less than what the Debtors believe is an appropriate allocation to the GEC-BAFC and GMACCM loans to Sydran IV. There is also no consequence to the Debtors or the estates if the Debtors are unsuccessful in obtaining the Floor Recovery provided that they have exercised reasonable best efforts in trying to achieve this goal.

Strategic has further agreed (or an Alternate Buyer will agree) that, in the event that following the Closing and the consummation of the transactions contemplated under the Plan, any of the restaurants acquired from the Debtors in which GEC-BACF or GMACCM, respectively, asserts a security interest are refinanced or sold by the Buyer pursuant to an agreement entered into by the Buyer within one (1) year after the Sale and the Buyer's recovery from such disposition exceeds the recovery obtained by GEC-BACF or GMACCM on account of each of their respective interests in such personal property assets, the Buyer shall pay GEC-BACF or GMACCM, as

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   appropriate, an amount equal to the excess, if any, of (i) the net proceeds received by the Buyer

2   from the refinancing or sale over (ii) the amount recovered by GEC-BACF or GMACCM during

3   the Chapter 11 Cases for such collateral, up to the full amount of the debt owed to GEC-BACF or

4   GMACCM for such collateral.

5           The transactions contemplated by the Asset Purchase Agreement (and any related

6   agreements) are intended to be consummated upon fulfillment or waiver of the conditions to the

7   Sale, which include confirmation of the Plan.

8   **E.      RELATED REAL ESTATE TRANSACTIONS**

9           The proposed Sale is also contingent on various real estate transactions generally outlined

10  in a *Master Real Estate Agreement* dated as of August 9, 2004, as supplemented by certain letter

11  agreements, between Strategic, on the one hand, and three non-debtor real estate holding

12  companies affiliated with the Debtors, Sydran Holdings, LLC, Sydran Holdings IX, LLC (i.e.,

13  Holdings IX), and Sydran Group Holdings, LLC, on the other hand (i.e., the Holdings Companies),

14  and certain other related agreements.  In the event that an Alternate Buyer steps into the shoes of

15  Strategic, such Buyer shall become party to an Amended Master Real Estate Agreement on the

16  same terms as the one with Strategic.  The real estate transactions contemplated under the Master

17  Real Estate Agreement and associated agreements are necessary in order to effectuate the Sale

18  because Strategic requires (or an Alternate Buyer will require), as a condition to the Sale, a

19  reduction in rents payable to the Holdings Companies from the operation of the Debtors'

20  restaurants following the Sale.

21          Because the rents paid by the Debtors are used by the Holdings Companies to service the

22  mortgage debt on the real estate owned (or leased) by the Holdings Companies and leased to the

23  Debtors, the rent obligations can only be reduced from and after the Closing of the Sale with the

24  consent of the Holdings Companies.  That consent will require, among other things, a refinancing

25  of the Holdings Companies' outstanding real estate debt and a reduction of associated debt service

26  obligations at the same time that the Sale closes.  Therefore, the refinancing of the Holdings

27  Companies' debt is a mandatory predicate to the Sale.  Without the requisite rent reduction, the

28

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-43843   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 70
of 187

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

Buyer would be entitled to terminate the Asset Purchase Agreement and the proceeds that may be recovered from the Debtors' assets would likely be very significantly reduced.

Given the strength of Strategic's (or potentially an Alternate Buyer's) financial position and that the consideration under the Asset Purchase Agreement is payable entirely in cash (as opposed to debt or a combination of debt and cash), the Debtors believe that the proposed Sale to Strategic (or an Alternate Buyer) maximizes the likelihood that the Holdings Companies' debt can be refinanced, which will, in turn, enable the Debtors to generate as much value as possible for their assets.

In order to facilitate both the Debtors' operations during the Chapter 11 Cases and the Closing of the Sale, the Holdings Companies have provided significant relief to the Debtors in the form of reduced rent during these cases under the terms of a letter agreement dated as of September 29, 2004. The Holdings Companies have also agreed, in conjunction with the Sale to the Buyer, to waive unpaid cure amounts (including payment of the rent arrearages caused by such reduced rent) in connection with the Debtors' assumption and assignment (to the Buyer) of their leases with the Holdings Companies.

Under the Debtors' existing lease agreements with the Holdings Companies, the Debtors' rent obligations are divided into two components: a priority portion and a non-priority portion. The priority portion of the Debtors' rent obligations equals the amount (inclusive of principal and interest) necessary to service the Holdings Companies' mortgage obligations to their lenders. On a monthly basis, the Debtors are contractually obligated to pay $967,712 in priority rent to the Holdings Companies or their lenders and $204,183 in non-priority rent to the Holdings Companies.

In light of the Debtors' financial difficulties, the Holdings Companies successfully negotiated reduced current cash debt service payments to their lenders and have passed the savings on to the Debtors. As a result, the Debtors have been paying, and continue to pay, reduced priority rent in the amount of $708,613 per month, instead of $967,712 -- a shortfall of $259,099 per month. These rent reductions are not waivers. The Debtors are accruing unpaid base rent obligations to the Holdings Companies, which as of the Petition Date, totaled approximately $3.37 million. Although the Debtors are continuing to pay full non-priority rent to the Holdings

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Companies in the amount of $204,183 per month, a portion of such rent is refunded to the Debtors

2   by the Holdings Companies through the means of a monthly restructuring fee payable to the

3   Debtors in the amount of approximately $83,000 per month.  The Debtors do not accrue any

4   obligations to the Holdings Companies on account of such restructuring fee.

5         Subject to the satisfaction of various continuing obligations of the Debtors under their

6   existing leases with the Holdings Companies and consummation of the transactions contemplated

7   by the Asset Purchase Agreement and the Master Real Estate Agreement, the Debtors and the

8   Holdings Companies have agreed that:  (i) in connection with the assumption by the Debtors and

9   assignment to the Buyer of  the Debtors' leases with the Holdings Companies as part of the

10  Closing of the Sale and the transactions under Master Real Estate Agreement, no monetary cure

11  payment will be required with respect to either the prepetition monetary defaults that existed under

12  the parties' leases, or with respect to the anticipated shortfalls in postpetition rent payments due

13  and owing to the Holdings Companies by the Debtors and no cure will be required with respect to

14  existing non-monetary defaults; and (ii) the Holdings Companies will continue to pay the Debtors

15  the monthly restructuring fee that was paid prepetition.  Such restructuring fee will be paid until

16  the time of the Closing except in the event of a breach or termination of the Asset Purchase

17  Agreement.

18      **1.  The Master Real Estate Agreement**

19        The Holdings Companies either own or lease the real property (and improvements)

20  underlying approximately 116 of the Debtors' currently operating Burger King® restaurants.  The

21  Holdings Companies lease or sub-lease these premises to the Debtors under eight master leases.

22  Under the Master Real Estate Agreement, the existing master leases will be assigned to the Buyer

23  and immediately replaced with one or more new master leases between a Holdings Company (or

24  its successor-in-interest through a restructuring merger transaction), as landlord, and the Buyer, as

25  tenant.  The new master leases will only cover the properties owned or leased by the Holdings

26  Companies underlying the restaurants acquired by the Buyer (totaling 99 locations) (the "Retained

27  Holdings Properties").  The remaining restaurants covered by the existing master leases between

28  the Debtors and the Holdings Companies (totaling 17 locations) will be closed and the real

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   property (and improvements) associated with those restaurants marketed and sold (the "Closure

2   Properties"),[64] pursuant to the procedures outlined below.[65]  As addressed in subpart 2 below, the

3   aggregate rent payable to the Holdings Companies for the Retained Holdings Properties under the

4   new master leases with the Buyer will be less than currently payable by the Debtors, but will be

5   sufficient to enable the Holdings Companies to make debt service payments to their new lenders.[66]

6   The Master Real Estate Agreement is contingent on the refinancing of the existing

7   mortgage debt of the Holdings Companies, which is held or serviced by (i) GE Capital Franchise

8   Finance Corporation (as successor by merger to Franchise Finance Corporation of America)

9   ("GECFFC"); (ii) General Electric Capital Business Asset Funding Corporation ("GEC-BAFC"),

10  as successor to FMAC; and (iii) GMACCM Commercial Mortgage Corporation ("GMACCM"), as

11  successor to FMAC.  GECFFC, GEC-BAFC and GMACCM are referred to herein as the "Existing

12  Holdings Lenders."  Because GECFFC is affiliated with GEC-BAFC, these entities are referred to

13  collectively herein as "GE."

14  The Holdings Companies currently owe the Existing Holdings Lenders, as holders of the

15  debt or as agents and servicers, approximately $81 million in principal obligations relating to both

16  the Retained Holdings Properties and the Closure Properties.  This debt is secured by mortgages in

17  favor of the Existing Holdings Lenders covering all of the real property owned by the Holdings

18  Companies.  The Master Real Estate Agreement contemplates that the Holdings Companies will

19  refinance their obligations to the Existing Holdings Lenders with respect to the Retained Holdings

20  Properties through new loans (or a conveyance of the existing loans) in an aggregate principal

21  amount not to exceed $61,850,000, with a fixed rate of interest not to exceed 7.5% per annum.[67]

22

---

23  [64]  One additional location has already been closed and sold.

    [65]  With respect to the Closure Properties, the equipment and personal property belonging to the applicable Debtor are

24  "Excluded Assets" under the Asset Purchase Agreement and may be separately sold for the benefit of the Debtors'

    creditors.

25  [66]  As discussed in greater detail below, as part of the real estate transactions, and as one of the conditions to the

    Closing of the Asset Purchase Agreement, the real estate owned or leased by the Holdings Companies is being

26  refinanced in part to enable the Holdings Companies to lower its debt service burden so that the Holdings Companies

    will be able to fund their debt service obligations out of the reduced rents that will be paid by the Buyer as the new

27  tenant.

    [67]  The new loans (or conveyed loans) would be secured by the real property owned or leased by the Holdings

28  Companies.  These are the same properties that will be leased to the Buyer under the new master leases, as described

    below.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

Under the Master Real Estate Agreement, the parties will finance up to $4,463,000 of "Initial Transaction Costs" (as defined therein), either through new first mortgage loans, separate loans, or a combination thereof. In certain instances, the Buyer may provide the financing for the Initial Transaction Costs.

### 2. New Master Leases/Reduced Rent

The Master Real Estate Agreement provides that the Holdings Companies (or, in some cases, their successors by merger), as landlords, and the Buyer, as tenant, will enter into one or more new master leases for the Retained Holdings Properties. The new master leases provide for several components of rent. First, at the commencement of the master leases, the Buyer will pay to the Holdings Companies, as prepaid rent, the lump sum of $7,350,000, plus either $734,100 or $534,100, depending on whether the financing of the "Initial Transaction Costs" described above will also entail the financing of the $200,000 difference between such latter two amounts. The $7,350,000 component of prepaid rent will be applied by the Holdings Companies towards the satisfaction (as described below) of their liabilities to the Existing Holdings Lenders for the Retained Holdings Properties. As a result, the Holdings Companies will potentially have available an aggregate amount of new loan proceeds and prepaid rent of approximately $69,200,000 that will be deployed to satisfy their liabilities to the Existing Holdings Lenders in accordance with the agreements negotiated by the Holdings Companies with the Existing Holdings Lenders.

Under the new master leases, the Buyer, as tenant, will pay the Holdings Companies, as landlord, aggregate annual base rent totaling $7,394,610.52 as compared to annual base rent under the existing master leases of approximately $14 million. The new annual base rent is subject to adjustment, based on certain matters related to refinancing the real estate loans of the Holdings Companies.[68] The initial annual base rent will also be subject to escalation, beginning in the fourth lease year. The base rental rate is less than currently payable to the Holdings Companies by the Debtors. The Holdings Companies can only absorb this reduction given a contemporaneous refinancing of the Holdings Companies' mortgage debt. Assuming that the contemplated

---

[68] The Buyer, as tenant, will also be obligated under the new master leases to pay ad valorem taxes, percentage rent once an established breakpoint in sales is achieved, and other amounts typical for lease transactions of this kind.

1  refinancing transaction actually closes, the reduced rent to be paid by the Buyer will be sufficient

2  to enable the Holdings Companies to make debt service payments to their new lenders.[69] The form

3  of new master lease is attached to the Plan Supplement as an exhibit to the Master Real Estate

4  Agreement.

5       **3.  Debt Resolution and Related Sharing Arrangements**

6       The Holdings Companies have entered into agreements with GE and GMACCM to resolve

7  their real estate indebtedness that is secured by the Retained Holdings Properties and in connection

8  with the disposition by the Holdings Companies of the Closure Properties, which will be closed

9  and omitted from the new master leases mentioned above.  The Holdings Companies have also

10 entered into agreements with BKC that confer upon BKC certain rights, and burden BKC with

11 certain obligations, relative to the Closure Properties.  These arrangements are summarized below.

12      **a.       Arrangements with GE and BKC**

13      **i.       Retained Properties**

14      GE is owed approximately $70.5 million in principal obligations by the Holdings

15 Companies.  This debt is secured by mortgages on certain real property owned (or leased) by the

16 Holdings Companies.  Subject to its right to receive certain contingent payments described below,

17 GE has agreed to convey to the Holdings Companies' new lender all of GE's indebtedness that is

18 secured by the Retained Holdings Properties in return for $58,271,912 paid to GE concurrent with

19 the closings under the Asset Purchase Agreement (or an alternative transaction in which the Buyer

20 or an affiliate thereof acquires substantially all of the operating assets of the Debtors) and the

21 Master Real Estate Agreement, but in no event later than April 5, 2005.[70]

22      If, however, the Holdings Companies are unable, through the use of their commercially

23 reasonable efforts, to structure the resolution of GE's debt as a purchase by a new lender, the

24 resolution may be structured as the pay-off of such debt with the proceeds of new indebtedness

25

26  [69]  As part of the real estate transactions, and as one of the conditions to the Closing of the Asset Purchase Agreement, the real estate owned or leased by the Holdings Companies is being refinanced in part to enable the Holdings

27  Companies to lower its debt service burden so that the Holdings Companies will be able to fund their debt service obligations out of the reduced rents that will be paid by the Buyer as the new tenant.

28  [70]  GE has required that, rather than accepting a payoff of its debt from the proceeds of a new loan, it prefers to transfer its debt to the new lender to the Holdings Companies.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    obtained by the Holdings Companies. Simultaneously with the resolution of GE's indebtedness

2    that is secured by Retained Holdings Properties, and provided that GE receives the Floor Recovery

3    in the Chapter 11 Cases (including through the use of the Buyer's Guaranty), GE will release all of

4    its liens against the Retained Holdings Properties and against the equipment and other personal

5    property assets held by Sydran IV.

6          Pending the resolution of GE's indebtedness that is secured by the Retained Holdings

7    Properties, GE has agreed to forbear from enforcing remedies in connection with that indebtedness

8    and in connection with the guaranty by Holdings IX of the obligations of Sydran IV to GEC-

9    BACF. GE has agreed to support the sale to the Buyer under the Asset Purchase Agreement

10    pursuant to the Plan, and not to contest or oppose any allocation of the Purchase Price payable for

11    the assets of the Debtors that is negotiated by the applicable parties in interest or approved by the

12    Bankruptcy Court, provided that this covenant of support expressly excludes any obligation on the

13    part of GE to vote in favor of the Plan. GE's obligations to forbear, to resolve its indebtedness in

14    the manner described above, and to support the Plan are conditioned upon a series of factors,

15    including that the Holdings Companies make weekly debt service payments to GE and that they

16    satisfy certain non-monetary obligations (including maintenance) in connection with the Retained

17    Holdings Properties and the Closure Properties that secure the indebtedness to GE.

18          The Holdings Companies have also agreed to make certain contingent payments to GE.

19    First, if the net proceeds received by the Holdings Companies from a new lender, together with the

20    $7.35 million component of prepaid rent described above that the Holdings Companies are to

21    receive from the Buyer, exceed the pay-off amount of the Holdings Companies' existing debt plus

22    the "Initial Transaction Costs" within the meaning of the Master Real Estate Agreement, the

23    Holdings Companies are to pay such excess to GE up to the remaining aggregate unpaid principal

24    balance of GE's indebtedness that is secured by nine specified Retained Holdings Properties

25    (collectively, the "Wamu Properties").[71]

26

27    [71] Because GE acquired the debt associated with the Wamu Properties at a discount, GE has agreed to accept the
actual amount that it paid for such debt, rather than the face amount of the debt. If, however, these properties are

28    ultimately refinanced or sold within a certain period of time at an amount in excess of the agreed payoff amount, GE
would be entitled to such excess, up to the face amount of such Wamu debt.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

Second, if within five years following the closing with GE, the Holdings Companies receive net proceeds from the refinancing or sale of one or more of the Wamu Properties in excess of that portion of the Conveyance Amount that is allocable to such Wamu Properties, the Holdings Companies are to pay such excess to GE up to the unpaid principal balance of the GE indebtedness that is secured by such Wamu Properties.[72]

Finally, as set forth in Article III.D above (the next to last paragraph in that section), an additional payment is to be made to GE in connection with certain refinancings or sales by the Buyer of restaurants whose equipment and other personal property assets secure indebtedness of Sydran IV held by GEC-BACF if the refinancing or sale by the Buyer with respect to the applicable restaurant is pursuant to an agreement entered into within one year following the resolution of GE's indebtedness that is secured by the Retained Holdings Properties. In addition, the Holdings Companies are obligated to reimburse GE's reasonable out-of-pocket attorneys' fees and costs through the date of filing of the Chapter 11 Cases and up to $25,000 of attorneys' fees following such date ($50,000 if the resolution of GE's indebtedness occurs more than 120 days following such date), and are also obligated to reimburse reasonable out-of-pocket costs (other than attorneys' fees) incurred by GE.

### ii. Closure Properties

There are 15 Closure Properties that secure indebtedness of the Holdings Companies to GE in the approximate principal amount of $9.5 million. A "Target Price" has been established for each such Closure Property, upon the receipt of which GE has agreed to release its lien against the Closure Property. The Holdings Companies and BKC have agreed to work together in an effort to market and to sell such Closure Properties throughout the one-year period following the closing of the resolution of GE's indebtedness that is secured by the Retained Holdings Properties. The Holdings Companies and BKC have agreed jointly to bear the aggregate costs of maintenance and upkeep for the Closure Properties and of any Target Price shortfalls relative to net sales proceeds during such one-year period. If any Closure Properties remain unsold as of the expiration of the one-year period, BKC is obligated to pay GE the aggregate unpaid Target Price attributable to such

---

[72] See preceding footnote.

unsold Closure Properties, net of certain potential offsets, determined on a loan pool by loan pool basis, attributable to prior sales of Closure Properties, and upon the receipt of such payment, GE is obligated to release its liens against any such unsold Closure Properties.

The sharing arrangement between the Holdings Companies and BKC is that BKC is responsible for the first $2 million of aggregate Closure Property maintenance expenses and Target Price shortfalls; the Holdings Companies are responsible for the next $500,000 of such obligations; and all such additional amounts are the responsibility of BKC. Any "Excess Proceeds", being net sales proceeds in excess of "Target Prices" that are received by the Holdings Companies attributable to the sale of such Closure Properties during the one-year period, are payable first to BKC to the extent of its aggregate payments for Closure Property maintenance expenses and Target Price shortfalls; then to the Holdings Companies to the extent of such payments by it; then to GE to the extent of certain unpaid amounts payable with respect to its Holdings Companies indebtedness; and finally, 50% to BKC and 50% to the Holdings Companies. By a separate agreement, Strategic has agreed (or an Alternate Buyer will agree) to bear 50% of the exposure of the Holdings Companies for Closure Property maintenance expenses and Target Price shortfalls relative to the Closure Properties that secure indebtedness to GE, such that the maximum exposure of each of the Buyer and the Holdings Companies in this regard is $250,000.

GE has agreed that, upon the expiration of the one-year period following the resolution of its indebtedness that is secured by the Retained Holdings Properties, and the payment in full of any contingent amount payable to GE as a consequence of the refinancing or disposition (as described above) of certain restaurants by the Buyer pursuant to an agreement entered into within such one-year period, GE will release the guaranty of Holdings IX of the indebtedness of Sydran IV.

BKC has been given the right to veto any proposed sale of a Closure Property by the Holdings Companies prior to the resolution of GE's indebtedness that is secured by the Retained Holdings Properties. The Holdings Companies and BKC have established a "Minimum Sales Price" for each Closure Property. Following the resolution of the indebtedness, the Holdings Companies have the right, without the need to obtain the prior consent of BKC, to sell any Closure Property for an all cash purchase price at least equal to the Minimum Sales Price of the Closure

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-43843   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 78 of 187

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

Property. All sales of Closure Properties by the Holdings Companies are, however, subject to a purchase option that the Holdings Companies have granted to BKC, pursuant to which BKC has the right to acquire (or to cause its designee to acquire) any one or more of the Closure Properties prior to its sale to a third party for a cash purchase price equal to the Target Price of the Closure Property.

### b. Arrangements with GMACCM and BKC

#### i. Retained Properties

GMACCM is owed approximately $10.5 million in principal obligations by Holdings IX. This debt is secured by mortgages on certain real property owned by Holdings IX. GMACCM is also owed approximately $9.6 million by Sydran IV, which has been guaranteed by Holdings IX and is secured by mortgages on the real property owned by Holdings IX on which 23 of Sydran IV's restaurants are situated. Thus, apart from its claims against Sydran IV, GMACCM is owed in excess of $20 million by Holdings IX secured by certain real estate owned by Holdings IX.

As payment in full of such indebtedness, GMACCM has agreed to accept an amount equal to the amount by which (i) $12,025,000,[73] including $200,000 of attorneys' fees and cost reimbursements, exceeds (ii) the aggregate amount received by GMACCM from the Chapter 11 Cases and from the Buyer pursuant to the Buyer's Guaranty, up to the Floor Recovery. GMACCM has agreed to forbear from the enforcement of its remedies with respect to all such indebtedness against Holdings IX (the only Holdings Company that is an obligor of GMACCM), and in connection with the guaranty by Holdings IX of obligations of Sydran IV to GMACCM, and to accept such loan pay-off amount, provided that the pay-off amount is paid to GMACCM concurrently with the closing under the Asset Purchase Agreement (or an alternative transaction in which the Buyer or an affiliate of the Buyer acquires substantially all of the operating assets of the Debtors) and the Master Real Estate Agreement, but in no event later than April 5, 2005.

Upon its receipt of such pay-off amount, GMACCM is obligated to release the guaranty by Holdings IX of the indebtedness of Sydran IV to GMACCM. GMACCM has also agreed to support the sale by the Debtors under the Asset Purchase Agreement or an alternative agreement

---

[73] Consisting of $11,400,015 for Retained Holdings Properties and $624,985 relating to Closure Properties.

Case: 04-43843   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 79 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   pursuant to which the Buyer or an affiliate of the Buyer acquires substantially all of the operating

2   assets of the Debtors, whether the same is effectuated through a sale of assets pursuant to section

3   363 of the Bankruptcy Code or pursuant to the Plan, and has further agreed not to contest or

4   oppose any allocation of the purchase price payable for the assets of the Debtors that is negotiated

5   in connection with such transaction, or determined or approved by the Bankruptcy Court.

6   The foregoing obligations of GMACCM are also conditioned upon the satisfaction by

7   Holdings IX of certain obligations, and its compliance with certain covenants, including that

8   Holdings IX make interim monthly debt service payments and that it comply with certain non-

9   monetary obligations, including those related to maintenance of the Retained Holdings Properties

10  and Closure Properties that secure indebtedness to GMACCM and certain reporting requirements.

11  Upon GMACCM's receipt of its loan pay-off amount, GMACCM is to release its liens against the

12  Retained Holdings Properties as well as its liens against the equipment and other personal property

13  owned by Sydran IV located at the Closure Properties, and is to release the guaranty by Holdings

14  IX of the indebtedness of Sydran IV to GMACCM.

15  Strategic has agreed (or an Alternate Buyer will agree) that, if within one year following

16  the Closing of the Sale and the pay-off of the GMACCM indebtedness that is secured by Retained

17  Holdings Properties, the Buyer enters into an agreement to refinance or to sell any restaurant

18  whose equipment and other personal property was secured by indebtedness of Sydran IV to

19  GMACCM, Holdings IX is obligated to pay to GMACCM the excess, if any, of the net proceeds

20  attributable to the transaction over the aggregate amount received by GMACCM from the Chapter

21  11 Cases and the Buyer's Guaranty, up to the unpaid principal balance of such indebtedness of

22  Sydran IV.  By a separate agreement, the Buyer is obligated to bear the economic burden of any

23  such contingent payment obligation of Holdings IX.

24  ### ii. Closure Properties

25  Holdings IX and GMACCM have established "Target Prices" aggregating $640,500 for the

26  two Closure Properties that secure indebtedness of Holdings IX to GMACCM.  Holdings IX and

27  BKC have agreed to work cooperatively to pursue the marketing and sales of such Closure

28  Properties.  They have established a "Minimum Sales Price" for each such Closure Property.  Prior

to the closing of the pay-off of the GMACCM indebtedness that is secured by Retained Holdings Properties, BKC has the right to veto any sale by Holdings IX of such a Closure Property. After such closing, BKC has the no right to prevent such a sale for an all cash amount at least equal to the Minimum Sales Price, provided that prior to the sale of each such Closure Property, BKC has the option to acquire (or to cause its designee to acquire) the Closure Property for cash equal to the Target Price.

GMACCM has agreed to accept the Target Price of each Closure Property as payment in full of the indebtedness payable by Holdings IX to GMACCM with respect to such Closure Property. If a Closure Property remains unsold by Holdings IX as of April 5, 2005, Holdings IX is obligated then to pay GMACCM the Target Price for such Closure Property, and upon the receipt of such payment, GMACCM is obligated to release its lien on the Closure Property.

Holdings IX and BKC, by separate agreement, have agreed equally to share between them all maintenance and upkeep expenses attributable to the Closure Properties following the closing of the pay-off of the GMACCM indebtedness that is secured by Retained Holdings Properties and any aggregate Target Price shortfalls relative to net proceeds derived from the sale of such Closure Properties. Holdings IX and BKC will also share equally any net proceeds from the sale of such Closure Properties in excess of their aggregate Target Price.

The transactions contemplated under the Master Real Estate Agreement and the associated real estate agreements described above would be consummated simultaneously with the closing of the transactions under the Asset Purchase Agreement after confirmation of the Plan.

## F.    **RELEASE OF GUARANTOR BY BKC**

As is customary for Burger King® franchise arrangements, the President and Chief Executive Officer of the Debtors, Matthew Schoenberg, has personally guaranteed the obligations of the Debtors under various leases and subleases with BKC and the franchise agreements with BKC (including the payment of certain royalties and advertising contributions under the franchise agreements). There is currently approximately $3.7 million of past due royalty payments due BKC under the franchise agreements for restaurants that the Debtors propose to sell to the Buyer, of which approximately $1.7 million is covered under Mr. Schoenberg's guarantees. The guarantees

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  were amended in November 2001 (and again in September 2004) to provide that, upon the

2  occurrence of certain events in a bankruptcy case, such as a sale of the Debtors' assets supported

3  by BKC, Mr. Schoenberg will be released from his obligations under such guarantees. Thus, if the

4  Plan is confirmed or the Asset Purchase Agreement otherwise closes (both of which have the

5  support of BKC), Mr. Schoenberg will be released from his obligations under the guarantees.

6  **G.    BKC FRANCHISE AGREEMENTS**

7        The Debtors believe that the highest and best use of their restaurant locations are as Burger

8  King$^{®}$ restaurants. The buildings and signage at these locations are set and styled as Burger King$^{®}$

9  restaurants. The equipment in place is customized and configured to prepare Burger King$^{®}$

10  products. The Debtors' vendors are already "approved" Burger King$^{®}$ suppliers. In addition,

11  based on a third party valuation of certain of the Debtors' leases (some of which are leased or

12  subleased from BKC), the Debtors have determined that there is no significant intrinsic value in

13  most of their leases.

14        Each of the Debtors' restaurants is operated pursuant to a franchise agreement with BKC.

15  BKC takes the position that these agreements cannot be assumed and assigned without its consent

16  because, among other things, the franchise agreements include licenses of trademarks and other

17  intellectual property that BKC argues cannot be assumed and assigned over BKC's objection. In

18  addition, in order to assume and assign the franchise agreements, BKC would have to be paid past

19  due royalties which the Debtors estimate at approximately $3,700,000 and any assignee would

20  have to spend substantial sums for capital expenditures at the restaurants -- which BKC estimates

21  at approximately $44,470,000 over the next four to five years. The Debtors do not necessarily

22  accept BKC's assertion that the franchise agreements could not be assumed or assigned over

23  BKC's objection, but because of this issue and the substantial cure payments that would be

24  required, the even more substantial capital expenditures that would need to be committed in order

25  to provide BKC with adequate assurance of future performance under these franchise agreements,

26  and the fact that BKC holds approximately 62% of the senior secured debt owed to the Chase

27  Lender Group, the Debtors concluded that it would be preferable to propose a plan of

28

Case: 04-43843   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 82
of 187

1   reorganization or sale transaction that was supported by BKC.  The BKC franchise approval

2   process is an arduous and time-consuming exercise.

3       As with Strategic, any prospective franchisee for the Burger King® system, including an

4   Alternate Buyer for the Debtors' restaurants, would need to make application to BKC for approval

5   as a franchisee, which approval process includes, among other things, operational approval and

6   financial approval.  Thus, in evaluating the bids that they received prior to the filing of these

7   Chapter 11 Cases, the Debtors and their investment bankers considered, among other things, the

8   financial strength of the bidders, their ability to fund capital expenditures under the franchise

9   agreements with BKC, and their likely acceptability to BKC as a franchisee.

10      BKC has advised the Debtors that it supports the Sale and has approved Strategic as a

11  franchisee, conditioned on final documentation which BKC anticipates will be completed so as to

12  allow the Closing to occur promptly.  Specifically, BKC and Strategic have entered into a non-

13  binding letter of intent (the "LOI"), which LOI addresses and sets forth the terms and conditions

14  concerning the franchise relationship between BKC, as franchisor, and Strategic, as franchisee, as

15  well as the landlord/tenant relationship between BKC, as lessor, and Strategic, as lessee, of certain

16  Burger King restaurants.  Among other things, the LOI includes the proposed agreements between

17  BKC and Strategic regarding franchise fees, royalty rates, advertising rates, the term of the

18  franchise agreements and leases, the significant capital expenditure requirements for the Debtors'

19  restaurants, the applicable time frames for completion of such capital expenditures and the

20  applicable guarantees.  The terms of the LOI are unique to Strategic.  Any other prospective

21  franchisee, including an Alternate Buyer for the Debtors' restaurants, would need to make separate

22  application to BKC to be a franchisee, enter into discussions and negotiations with BKC

23  concerning their desire to qualify as a franchisee for the Debtors' restaurants, obtain all of BKC's

24  requisite approvals to become a franchisee, as such approvals relate to the Debtors' restaurants,

25  and otherwise come to terms with BKC in connection therewith.

26

27

28

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IV.

## DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims is set forth below.  The discussion of the Plan which follows constitutes a summary only, and should not be relied upon for voting purposes.  You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Debtors.  If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

**A.** **DESCRIPTION OF CLASSES**

The Plan divides Creditors into Classes.  Creditors with similar Claims are placed in the same Class.  There are ten (12) Classes of Claims and one (1) Class of Interests under the Plan as follows:

**Class 1 Claims**.  Class 1 shall consist of all Priority Employee Claims.

**Class 2 Claims**.  Class 2 shall consist of PACA Claims.

**Class 3 Claims**.  Class 3 shall consist of all Secured Claims not otherwise classified in Classes 4, 5, 6, 7, 8, 9 or 10.  Each holder of a Secured Claim, other than the holder of a Secured Claim in Classes 4, 5, 6, 7, 8, 9 or 10, shall be in Class 3, each such holder shall be considered to be in its own separate subclass within Class 3, and each such subclass will be deemed to be a separate Class for purposes of the Plan.

**Class 4 Claims**.  Class 4 Claims shall consist of the Secured Claims of the Tax Payment Obligees under the Tax Payment Obligations Documents.

**Class 5 Claims**.  Class 5 shall consist of the Secured Claims of the Chase Lender Group under the Chase Loan Documents.

**Class 6 Claims**.  Class 6 shall consist of the Secured Claims of GMACCM under the GMACCM Loan Documents.

**Class 7 Claims**.  Class 7 shall consist of the Secured Claims of GEC-BAFC under the GEC-BAFC Loan Documents.

**Class 8 Claims**.  Class 8 shall consist of the Secured Claims of BKC under the BKC Loan Documents.

DISCLOSURE STATEMENT

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 84

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**Class 9 Claims**.  Class 9 shall consist of the Secured Claims of ACIC under the ACIC Loan Documents.  ACIC is defined in the Plan as American Contractors Indemnity Company.  ACIC is the surety under certain payment bonds, which currently total $600,455 in the aggregate, issued in favor of various utilities that provide service to Sydran II and Sydran IV.  Sydran I is obligated under a promissory note to reimburse ACIC to the extent of any payments by ACIC under such bonds.  Sydran I's contingent obligation to ACIC is secured by a first lien against Sydran I's real property interest in a restaurant located in Morgan Hill, California.  The Chase Lender Group has a subordinate lien against this property.

**Class 10 Claims**.  Class 10 shall consist of the Secured Personal Property Tax Claims.  Each holder of a Secured Personal Property Tax Claim shall be considered to be in its own separate subclass within Class 10, and each such subclass will be deemed to be a separate Class for purposes of the Plan.

**Class 11 Claims**.  Class 11 shall consist of the Claims of Participating Vendors.  Claims arising before the Petition Date of suppliers or vendors who do not qualify as Participating Vendors are not Assumed Obligations.

**Class 12 Claims**.  Class 12 shall consist of all Allowed Unsecured Claims other than the Claims of Creditors in Class 11.  Class 12 consists of, inter alia, the Deficiency Claims of the members of the Chase Lender Group, the Deficiency Claims of BKC, the Deficiency Claims of GEC-BAFC, and the Deficiency Claims of GMACCM, the Claims of Allied, the Claims of the holders of the Sydran Services Notes, the Claims of suppliers or vendors who do not elect or who are not eligible for treatment in Class 11, and all other Unsecured Claims.

**Class 13 Interests**.  Class 13 shall consist of all Interests.

**B.**     **TREATMENT OF CLASSIFIED CLAIMS**

The treatment of the Classes created under the Plan is as follows:

**Class 1 (Priority Employee Claims)**.  Class 1 shall consist of Priority Employee Claims.  Class 1 Claims are impaired.  Each holder of an Allowed Priority Employee Claim shall receive at the sole option of the Debtors or the Reorganized Debtors, as the case may be, from Net Plan Proceeds, a Cash payment equal to the Allowed amount of such Claim:  (a) on or as soon as

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy

2  Court enters a Final Order determining or allowing such Claim; (b) deferred under Bankruptcy

3  Code section 1129(a)(9)(B)(i) with interest on the unpaid portion of such Claim at the Plan Interest

4  Rate or at a rate to be agreed to by the Debtors or the Reorganized Debtors, as the case may be,

5  and the holder of such Claim, or if they are unable to agree, at a rate to be determined by the

6  Bankruptcy Court (provided, however, the Reorganized Debtors may prepay any or all of such

7  Claim at any time); or (c) in accordance with the terms and conditions of agreements that either

8  have been or may be approved by the Bankruptcy Court between the holders of such Claims and

9  the Debtors or Reorganized Debtors, as the case may be.  In the event payment to the holder of a

10  Priority Employee Claim is deferred, each such holder shall receive, on account of such Claim,

11  from Net Plan Proceeds, deferred Cash payments of a Present Value as of the Effective Date equal

12  to the Allowed amount of such Claim.  Any Priority Employee Claim that is an Assumed

13  Obligation will be assumed by the Buyer and satisfied upon or promptly following the Effective

14  Date (unless due at a later date, in which case it will be satisfied when due), or deferred to the

15  extent permitted under section 1129(a)(9) of the Bankruptcy Code, in the manner and within the

16  time frame set forth in subparagraphs (a) and (b) of this paragraph.

17      **Class 2 (PACA Claims).**  Class 2 shall consist of PACA Claims.  Class 2 Claims are

18  impaired.  Each holder of a PACA Claim in Class 2 that is an Allowed Claim shall be paid in

19  Cash, without interest or penalty, the Allowed amount of such holder's PACA Claim on the later

20  to occur of the Effective Date (or as soon thereafter as is practicable) or the date on which such

21  Claim becomes an Allowed Claim.  Any PACA Claim that is an Assumed Obligation will be

22  assumed by the Buyer and satisfied, without interest or penalty, upon or promptly following the

23  Effective Date (unless due at a later date, in which case it will be satisfied when due).

24      **Class 3 (Certain Secured Claims).**  Class 3 shall consist of certain Secured Claims not

25  otherwise classified in Classes 4, 5, 6, 7, 8, 9 or 10.

26          **Class 3.**  Class 3 Claims are impaired.  At the option of the Debtors or the

27  Reorganized Debtors, as applicable, in consultation with the Buyer, to the extent the Claimant has

28  an Allowed Secured Claim in Class 3, such Claim will receive one of the following alternative

DISCLOSURE STATEMENT

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

treatments to the extent not inconsistent with the Asset Purchase Agreement:  (i) the holder of such Claim will retain its Lien on its collateral until such collateral is sold (including a sale under the Asset Purchase Agreement) and, upon such sale, the proceeds of such sale will be paid to the Claimant in full satisfaction and release of its Claim; (ii) the holder of such Claim will receive, from Net Plan Proceeds, or if such Claim is an Assumed Obligation, from the Buyer, a Cash payment equal to the amount of its Allowed Secured Claim (as determined by the value of the Lien securing such Claim) in full satisfaction and release of such Claim and, upon such payment the Lien on the property securing such Claim will be extinguished; or (iii) the holder of such Claim will have the collateral securing such Claim abandoned to it in full satisfaction and release of such Claim.  The Debtors are not aware of any Class 3 Claims.

**Selection of Treatment Option With Respect To Class 3 Claims.**  The Debtors or Reorganized Debtors, as applicable, shall advise each holder of an Allowed Secured Claim in this Class in writing of which option it has selected for such Claimant on or before three (3) Business Days prior to the Ballot Deadline.

**Class 4 Claims (Tax Payment Obligees).**  Class 4 shall consist of the Secured Claims of the holders of Claims under the Tax Payment Obligations Documents.  Class 4 Claims are impaired.  On the Effective Date, the purchase and sale transaction provided for under the Asset Purchase Agreement will close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of the Tax Payment Obligees, with such Liens and Claims attaching to the Purchase Price.  After giving effect to the Tax Payment Obligations Intercreditor Agreement, each holder of an Allowed Secured Claim in Class 4 shall be paid on the Effective Date (or as soon thereafter as is practicable), in Cash, from the Purchase Price, in full satisfaction of its Claim, an amount equal to its Claim under the Taxpayer Obligations Agreement.  From and after the Effective Date, the Purchased Assets will be free and clear of any Liens or Claims of such Claimants.

**Class 5 Claims (Chase Lender Group).**  Class 5 shall consist of the Secured Claims of the Chase Lender Group under the Chase Loan Documents.  Class 5 Claims are impaired.  On the Effective Date, the purchase and sale transaction provided for under the Asset Purchase Agreement

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

will close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and

Claims of the Chase Lender Group, with such Liens and Claims attaching to the Purchase Price.

After giving effect to the Tax Payment Obligations Intercreditor Agreement and the Senior

Intercreditor Agreement, each holder of an Allowed Secured Claim in Class 5 shall be paid, on the

Effective Date (or as soon thereafter as is practicable), in Cash, from the Purchase Price, in full

satisfaction of its Allowed Secured Claim, an amount equal to its Pro Rata Share of the value of

the interest of the Chase Lender Group in the Chase Lender Group Collateral, as determined by the

Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of

the Chase Lender Group in the portion of the Purchased Assets that consists of Chase Lender

Group Collateral. From and after the Effective Date, the Purchased Assets will be free and clear of

any Liens or Claims of such Claimants. If and to the extent there is a Supplemental Payment after

the Effective Date, the portion of such payment attributable to the portion of the Purchased Assets

that consists of Chase Lender Group Collateral shall be promptly distributed to each holder of an

Allowed Secured Claim in Class 5, on account of such Claim, in an amount equal to its Pro Rata

Share of such payment. Following the Effective Date, any Excluded Assets that constitute Chase

Lender Group Collateral (other than Litigation that is part of Chase Lender Group Collateral) shall

be sold by the Reorganized Debtors as quickly as practicable, free and clear of the Liens of the

Chase Lender Group against such property, and each holder of an Allowed Secured Claim in Class

5 shall be paid, from the proceeds of such sale(s), on account of such Claim, an amount equal to its

Pro Rata Share of the value of the interest of the Chase Lender Group in the property sold. Upon

such payment, the property sold will be free and clear of the Liens and Claims of such Claimants.

In addition, following the Effective Date, any Litigation Recovery realized from Litigation that is

part of the Chase Lender Group Collateral shall be paid or distributed to each holder of an Allowed

Secured Claim in Class 5, on account of such Claim, in an amount equal to such holder's Pro Rata

Share thereof. The Debtors believe the Chase Lender Group is undercollateralized.

**Class 6 Claims (GMACCM).** Class 6 shall consist of the Secured Claims of GMACCM

under the GMACCM Loan Documents. Class 6 Claims are impaired. On the Effective Date, the

purchase and sale transaction provided for under the Asset Purchase Agreement will close, and the

Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of GMACCM, with such Liens and Claims attaching to the Purchase Price. The holder of the Allowed Secured Claim in Class 6 shall be paid, on the Effective Date (or as soon thereafter as is practicable), in Cash, from the Purchase Price, in full satisfaction of its Allowed Secured Claim, an amount equal to the value of its interest in the GMACCM Collateral, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of GMACCM in the portion of the Purchased Assets that consists of GMACCM Collateral. From and after the Effective Date, the Purchased Assets will be free and clear of any Liens or Claims of such Claimant. If and to the extent there is a Supplemental Payment after the Effective Date, the portion of such payment attributable to the portion of the Purchased Assets that consists of GMACCM Collateral shall be promptly distributed to the holder of the Allowed Secured Claim in Class 6 on account of such Claim. Following the Effective Date, any Excluded Assets that constitute GMACCM Collateral (other than Litigation that is part of the GMACCM Collateral) shall be sold by the Reorganized Debtors as quickly as practicable, free and clear of the Liens of GMACCM against such property, and the holder of the Allowed Secured Claim in Class 6 shall be paid, from the proceeds of such sale(s), on account of such Claim, an amount equal to the value of its interest in the property sold. Upon such payment, the property sold will be free and clear of the Liens and Claims of such Claimant. In addition, following the Effective Date, any Litigation Recovery realized from Litigation that is part of the GMACCM Collateral shall be paid or distributed to the holder of the Class 6 Claim on account of such Claim. The Debtors believe GMACCM is undercollateralized.

**Class 7 Claims (GEC-BAFC).** Class 7 shall consist of the Secured Claims of GEC-BAFC under the GEC-BAFC Loan Documents. Class 7 Claims are impaired. On the Effective Date, the purchase and sale transaction provided for under the Asset Purchase Agreement will close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of GEC-BAFC with such Liens and Claims attaching to the Purchase Price. The holder of the Allowed Secured Claim in Class 7 shall be paid, on the Effective Date (or as soon thereafter as is practicable), in Cash, from the Purchase Price, in full satisfaction of its Allowed Secured Claim, an amount equal

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to the value of its interest in the GEC-BAFC Collateral, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of GEC-BAFC in the portion of the Purchased Assets that consists of GEC-BAFC Collateral. From and after the Effective Date, the Purchased Assets will be free and clear of any Liens or Claims of such Claimant. If and to the extent there is a Supplemental Payment after the Effective Date, the portion of such payment attributable to the portion of the Purchased Assets that consists of GEC-BAFC Collateral shall be promptly distributed to the holder of the Allowed Secured Claim in Class 7 on account of such Claim. Following the Effective Date, any Excluded Assets that constitute GEC-BAFC Collateral (other than Litigation that is part of the GEC-BAFC Collateral) shall be sold by the Reorganized Debtors as quickly as practicable, free and clear of the Liens of GEC-BAFC against such property, and the holder of the Allowed Secured Claim in Class 7 shall be paid, from the proceeds of such sale(s), on account of such Claim, an amount equal to the value of its interest in the property sold. Upon such payment, the property sold will be free and clear of the Liens and Claims of such Claimant. In addition, following the Effective Date, any Litigation Recovery realized from Litigation that is part of the GEC-BAFC Collateral shall be paid to the holder of the Class 7 Claim on account of such Claim. The Debtors believe GEC-BAFC is undercollateralized.

**Class 8 Claims (BKC).** Class 8 shall consist of the Secured Claims of BKC under the BKC Loan Documents. Class 8 Claims are impaired. On the Effective Date, the purchase and sale transaction provided for under the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of BKC, with such Liens and Claims attaching to the Purchase Price. After giving effect to the Tax Payment Obligations Intercreditor Agreement and the Senior Intercreditor Agreement, the holder of the Allowed Secured Claim in Class 8 shall be paid, on the Effective Date (or as soon thereafter as is practicable), in Cash, from the Purchase Price, in full satisfaction of its Allowed Secured Claim, an amount equal to the value of its interest in the BKC Collateral, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of BKC in the portion of the Purchased Assets that consists of BKC Collateral. From and after the Effective

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Date, the Purchased Assets will be free and clear of any Liens or Claims of such Claimant. If and to the extent there is a Supplement Payment after the Effective Date, the portion of such payment attributable to the Purchased Assets that consists of BKC Collateral shall be promptly distributed to the holder of the Allowed Secured Claim in Class 8 on account of such Claim. Following the Effective Date, any Excluded Assets that constitute BKC Collateral (other than Litigation that is part of the BKC Collateral) shall be sold by the Reorganized Debtors as quickly as practicable, free and clear of the Liens of BKC against such property, and the holder of the Allowed Secured Claim in Class 8 shall be paid, from the proceeds of such sale(s), on account of such Claim, an amount equal to the value of its interest in the property sold. Upon such payment, the property sold will be free and clear of the Liens and Claims of such Claimant. In addition, following the Effective Date, any Litigation Recovery realized from Litigation that is part of the BKC Collateral shall be paid or distributed to the holder of the Class 8 Claim on account of such Claim.

**Class 9 Claims (ACIC).** Class 9 shall consist of the Secured Claims of ACIC under the ACIC Documents. Class 9 Claims are impaired. On the Effective Date, the purchase and sale transaction provided for in the Asset Purchase Agreement will Close, and the Purchased Assets will be sold to the Buyer, free and clear of the Liens and Claims of ACIC, with such Liens and Claims attaching to the Purchase Price. After giving effect to the Chase-ACIC Intercreditor Agreement, the holder of the Allowed Secured Claim in Class 9 shall be paid, on the Effective Date, in Cash, from the Purchase Price, an amount equal to the value of its interest in the Morgan Hill Property, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the amount due under the ACIC Promissory Note with respect to the ACIC Bonds and the value of the Morgan Hill Property; provided, however, that to the extent any of the ACIC Bonds are undrawn and have not expired as of the Effective Date, the Debtors shall hold the funds, if any, attributable to such unexpired bonds until such time as either (i) the bonds are drawn, in which event, the funds, if any, shall promptly be disbursed to ACIC, or (ii) the bonds expire without being drawn, in which event, the funds, if any, shall promptly be distributed to the holders of Allowed Secured Claims in Class 5 in accordance with the provisions in section 4.5 of the Plan.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

From and after the Effective Date, the Morgan Hill Property and the other Purchased Assets will be free and clear of any Liens or Claims of such Claimant.

**Class 10 (Secured Personal Property Tax Claims).** Class 10 shall consist of Secured Personal Property Tax Claims. Class 10 Claims are impaired. Pursuant to the Asset Purchase Agreement, Secured Personal Property Tax Claims which are Assumed Obligations will be assumed by the Buyer as part of the Assumed Obligations and the Buyer shall pay each Secured Personal Property Tax Claim after the Effective Date, in Cash, as and when such obligation comes due or, if already due at the time of the Effective Date, the Buyer shall pay such Secured Personal Property Tax Claim upon or promptly following the Effective Date. Any Secured Personal Property Tax Claims which are not Assumed Obligations shall be paid by the Debtors, in Cash, from the Purchase Price, in an amount equal to the value of the interest of the holder of such Claim in the personal property of the Debtors which secures such Claim, as determined by the Bankruptcy Court at or before the Confirmation Hearing, based upon the value of the interest of the applicable governmental unit or taxing authority in the portion of the Purchased Assets that is subject to such governmental unit's or taxing authority's Claim. Upon payment of such Claims, the Liens securing such Claims shall be discharged.

**Class 11 (Participating Vendors).** Class 11 shall consist of the Claims of Participating Vendors that arose before the Petition Date. Class 11 Claims are impaired. Claims arising before the Petition Date of trade suppliers or vendors who do not qualify as Participating Vendors are not Assumed Obligations. A list of anticipated eligible Participating Vendors is attached hereto as Exhibit B.[74] The Allowed Claim of each holder of a Class 11 Claim will be assumed by the Buyer and satisfied, without interest or penalty, upon or promptly following the Effective Date.

**Class 12 (Unsecured Claims).** Class 12 shall consist of Unsecured Claims other than the Claims of Participating Vendors. Class 12 Claims are impaired. The holders of Claims in Class 12 shall be paid nothing from the Purchase Price or any Supplemental Payment. Notwithstanding

---

[74] As mentioned above, upon mailing of this Disclosure Statement, the Debtors anticipate that the attached listing of Participating Vendors shall have been approved by Strategic. Once such list is finalized, no vendor shall be removed from the list unless such vendor alters credit terms or refuses to ship goods or to provide services to the Debtors, without the agreement or acknowledgment of the Debtors.

the foregoing, if and to the extent any Litigation Recovery or any Liquidation Proceeds result in Net Plan Proceeds in excess of what is distributed or distributable to Administrative Claims, Priority Tax Claims, and Classes 1 through 10 under the Plan, such Net Plan Proceeds will be distributed, Pro Rata, to the holders of Allowed Claims in Class 12. In addition, if there is a Special Class 12 Distribution, such distribution shall be made, promptly after the Effective Date, Pro Rata, only to the Specified Holders of Allowed Unsecured Claims in Class 12. Notwithstanding anything to the contrary herein, no holder of an Allowed Class 12 Claim shall be paid more than the Allowed amount of its Claim from any combination of Special Class 12 Distributions and Net Plan Proceeds, and therefore, any Special Class 12 Distribution received by a Claimant in Class 12 shall be deemed to reduce the Allowed amount of such Claimant's Class 12 Claim for purposes of calculating such Claimant's Pro Rata Share of any Net Plan Proceeds that are distributable to Class 12.

**Class 13 (Interests)**. Class 13 Interests are impaired. Each holder of an Interest shall receive nothing under the Plan and its Interest in the applicable Debtor will be deemed cancelled on the Effective Date. Each Holder of an Interest in a Debtor is deemed to have rejected the Plan.

**Assumed Obligations**. Nothing in the Plan shall prevent the Buyer from contesting in good faith the amount of validity of any Assumed Obligation that is not an Allowed Claim.

## C.    TREATMENT OF UNCLASSIFIED CLAIMS

**Administrative Claims**. Each holder of an Allowed Administrative Claim shall receive, from Net Plan Proceeds, Cash equal to the Allowed amount of such Claim, unless such holder shall have agreed to different treatment of such Claim, at the sole option of the Debtors or the Reorganized Debtors, as the case may be: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtor or the Reorganized Debtor, as the case may be; (c) with respect to Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 93 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), until the entry of a final decree or an order converting or dismissing the case. Any Administrative Claim that is an Assumed Obligation (including, without limitation, any Trade Payable Agreement Cure) will be assumed by the Buyer and satisfied after the Effective Date when such Claim becomes due in accordance with its terms or, if already due at the time of the Effective Date, satisfied by the Buyer upon or promptly following the Effective Date.

**Priority Tax Claims**. Unless the holder of a Priority Tax Claim has agreed to different treatment for such Claim, each holder of a Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, as the case may be, from Net Plan Proceeds, a Cash payment equal to the Allowed amount of such Claim: (a) as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) deferred to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the Plan Interest Rate or at a rate to be agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the appropriate governmental unit or, if they are unable to agree, at a rate to be determined by the Bankruptcy Court (provided, however, the Reorganized Debtors may prepay any or all such Claims at any time); or (c) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be. In the event payment to the holder of a Priority Tax Claim is deferred, each such holder shall receive, on account of such Claim, from Net Plan Proceeds, deferred Cash payments, of a Present Value, as of the Effective Date, equal to the Allowed amount of such Claim. A Priority Tax Claim that is an Assumed Obligation will be assumed by the Buyer and satisfied upon or promptly following the Effective Date (unless due at a later date, in which case it will be satisfied when due), or deferred to the extent permitted under section 1129(a)(9) of the Bankruptcy Code, in the manner and within the time frame set forth in subparagraphs (a) and (b) of this paragraph.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 94 of 187

## D. **IMPLEMENTATION OF THE PLAN**

The Plan will be implemented as follows:

### 1. **Asset Purchase Agreement.**

The Plan shall be implemented on the Effective Date by the Closing of the Asset Purchase Agreement. The entry of the Confirmation Order shall act as an order authorizing and approving the entry into and performance under the Asset Purchase Agreement by each of the Sellers who are Debtors and each of the Reorganized Debtors who are Sellers and their respective successors and assigns. On the Effective Date, the Asset Purchase Agreement shall be binding upon and enforceable against the Debtors and upon the Reorganized Debtors, the Consolidated Estate and the Disbursing Agent as successors in interest to the Debtors, as well as their respective managers, employees or agents, including the Responsible Officer. The Asset Purchase Agreement is incorporated herein and shall control with respect to the subject matters addressed therein. For purposes of clarification, nothing in the Plan shall alter or expand the obligations of the Buyer under the Asset Purchase Agreement, and the Buyer's sole obligations to the Debtors, the Reorganized Debtors or the holders of any Claims or Interests shall be those set forth in and enforceable under the Asset Purchase Agreement without reference to the Plan, and nothing in the Plan shall be deemed to or shall impose upon Buyer any additional obligations. Without limiting the generality of the foregoing, and without denigrating or altering the terms of the Asset Purchase Agreement in any manner, on (or, where appropriate, after) the Effective Date, the following actions shall occur:

(i)     The purchase and sale transaction contemplated under the Asset Purchase Agreement shall be consummated;

(ii)     The Buyer shall, among other things, pay the Estimated Cash Portion of the Purchase Price to the Sellers and deposit the Reserve Amount with the Escrow Agent;

(iii)     Each Cure Obligation required to be paid under section 365(b)(1) of the Bankruptcy Code to a non-debtor party under an Assumed Executory Contract shall be paid (i) if the Cure Obligation is not a Trade Payable Agreement Cure, by the Debtors (or by the

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Buyer on behalf of the Debtors) to such party; or (ii) if the Cure Obligation is a Trade Payable Agreement Cure, by the Buyer to such party;

(iv)     The Buyer shall assume and, when required under the terms of the Asset Purchase Agreement or the Plan, satisfy, the Assumed Obligations;

(v)     The Purchased Assets shall be transferred to the Buyer free and clear of Liens and Claims;

(vi)     All Liens on the Purchased Assets shall attach to the Purchase Price and to any Supplemental Payments, or to the portions thereof, to which such Liens relate;

(vii)     Upon the Effective Date, all promissory notes, loan agreements, security agreements, leasehold mortgages, and leasehold deeds of trust, and similar documents, instruments, and agreements, with respect to Claims against the Debtors, including, without limitation, the Chase Loan Documents, the BKC Loan Documents, the GEC-BAFC Loan Documents, the GMACCM Loan Documents, and the ACIC Documents, shall be of no further force or effect with respect to the Purchased Assets, and each of the foregoing documents, instruments, and agreements will only represent, and shall only be enforceable with respect to, the rights of holders of Allowed Claims to receive payments or distributions under the Plan.

(viii)     Following entry of the Assumption and Assignment Order with respect to the Existing Holdings Company Leases, the Closure Properties that are subject to the Existing Holdings Company Leases will be deleted from such leases and shall be abandoned to the applicable Holdings Company free and clear of Liens and Claims at the Closing, immediately prior to the point in time at which the Asset Purchase Agreement and related transactions are actually consummated and the Master Leases become effective. Any Chase Lender Group Collateral, GEC-BACF Collateral or GMACCM Collateral that is personal property located on the premises of the Closure Properties that are subject to the Existing Holdings Company Leases shall be sold by the Debtors, free and clear of Liens and Claims, with all such Liens and Claims to attach to the proceeds thereof, or abandoned.

Case: 04-43843    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 96 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(ix)     Any adjustments to the Purchase Price will be determined in accordance with the Asset Purchase Agreement;

(x)     Pursuant to Bankruptcy Code section 510(a), the Intercreditor Agreements shall be implemented and enforced;

(xi)     After giving effect to the Intercreditor Agreements, the portions of the Purchase Price for the Purchased Assets allocable to payment of the Allowed Secured Claims of the Tax Payment Obligees, the Chase Lender Group, GMACCM, GEC-BAFC, BKC, and ACIC, if any, shall be paid to the appropriate parties as the holders of Allowed Secured Claims in Classes 4, 5, 6, 7, 8 and/or 9; and

(xii)     Any Supplemental Payments will be delivered to the party or parties entitled thereto.

**2.     Alternate Transaction.**

The Debtors (in consultation with the Committee) have agreed to permit potential purchasers to bid on the Debtors' assets against Strategic provided such potential purchasers unequivocally agree to step into and assume Strategic's position in each of the Transaction Documents, to match Strategic's financial strength and financial commitments, to pay Cash, to demonstrate to the reasonable satisfaction of the Debtors and the Committee that such bidder can close and consummate the Amended Transaction Documents to the same extent as Strategic can close and consummate the Transaction Documents, to arrange for or provide comparable Credit Support to that provided with respect to Strategic, and to perform Strategic's obligations under each of the Transaction Documents, except as to the limited variations permitted under this Plan. In addition, an Alternate Buyer must be approved by BKC as a franchisee for the Restaurants. Thus, an Alternate Buyer must enter into and perform the Amended Transaction Documents in the same manner and within the same time frame as Strategic, except the Alternate Buyer must increase the initial Purchase Price under the Strategic Asset Purchase Agreement by at least an amount that is sufficient to exceed the initial amount bid by Strategic plus the amount of the Topping Fee that will become due to Strategic if Strategic is replaced with an Alternate Buyer, and in any event, to be successful, the Alternate Buyer must present and offer to pay a Purchase Price

Case: 04-43343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 97 of 187

that exceeds the highest and best offer from any other qualified bidder including Strategic. In the event there is an Alternate Buyer who qualifies to replace Strategic, (i) such Alternate Buyer shall be the Buyer for all purposes under this Plan; (ii) the Amended Asset Purchase Agreement shall be the Asset Purchase Agreement for all purposes under this Plan; (iii) the Amended Transactions Documents shall be substituted for the Transaction Documents and the Amended Transaction Documents shall be consummated at the Closing in lieu of the Transaction Documents; (iv) the Purchase Price shall be the highest offered by any qualified bidder including Strategic and must, at a minimum, exceed the initial Purchase Price in the Strategic Asset Purchase Agreement[75] by an amount equal to the Topping Fee plus $1,000; and (v) upon the Effective Date and occurrence of the Closing, Strategic shall retain the Expense Deposit provided to it under the Strategic Asset Purchase Agreement and the Debtors shall pay the Topping Fee to Strategic from the Purchase Price paid by the Alternate Buyer under the Amended Asset Purchase Agreement. Other than the changes to the Transaction Documents to substitute the Alternate Buyer for Strategic to increase the Purchase Price, and to eliminate the Alternate Buyer's ability to receive the Expense Deposit and the Topping Fee, there shall be no other changes to the terms, provisions, agreements, covenants, conditions and requirements of the Transaction Documents. For clarity, if there is not an Alternate Buyer, then Strategic shall be the Buyer, the Asset Purchase Agreement shall be the Strategic Asset Purchase Agreement, the Transaction Documents will be unchanged, and there will not be any Amended Transaction Documents; provided, however, if Strategic increases the Purchase Price, such increased price shall be the Purchase Price.

**3. Substantive Consolidation.**

The Plan provides for the substantive consolidation of the Debtors' estates. The applicable provision from the Plan is quoted below, followed by the Debtors' rationale for substantive consolidation of the estates.

**Plan Provision**. The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code,

---

[75] Since the Purchase Price in the Strategic Asset Purchase Agreement will include a refund of the $850,000 Expense Deposit, but Strategic will be able to retain the Expense Deposit if it is outbid, a competing bid must include payment of this $850,000 sum in its Purchase Price.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    effective as of the Effective Date, of the substantive consolidation of the Debtors and their

2    respective Estates, for all purposes relating to the Plan, including for purposes of voting,

3    confirmation, and distributions.  On and after the Effective Date, except as set forth below, (a) all

4    assets and liabilities of the Debtors shall be treated as though they were pooled; (b) no distribution

5    shall be made under the Plan on account of any Claim held by any one of the Debtors against any

6    of the other Debtors, other than Administrative Claims of one Debtor against another Debtor; (c)

7    no distribution shall be made under the Plan on account of any Interest held by any one of the

8    Debtors in any of the other Debtors; (d) all guaranties of any one of the Debtors of the obligations

9    of any of the other Debtors shall be eliminated so that any Claim against any one of the Debtors,

10   and any guaranty thereof executed by any of the other Debtors, shall be one obligation of the

11   Consolidated Estate; (e) all Secondary Liability Claims will be entitled to a single recovery, and

12   thus a single distribution (and no multiple recovery) on any such Claims; and (f) every  Claim filed

13   or to be filed in the Chapter 11 Case of any of the Debtors shall be deemed filed against the

14   Consolidated Estate and shall be one Claim against, and one obligation of, the Consolidated Estate.

15          In addition, notwithstanding any provision hereof to the contrary, any Claimant holding

16   multiple Allowed Claims against more than one Debtor that do not constitute Secondary Liability

17   Claims and that arise from the contractual joint, joint and several, or several liability of such

18   Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances

19   may not receive, in the aggregate, from all Debtors, more than 100% of the amount of the

20   underlying Claim giving rise to such multiple Claims.

21          Notwithstanding the foregoing, (i) the consolidation of the Debtors shall not affect the legal

22   and organizational structure of the Debtors, (ii) any Liens that are maintained, recognized, or

23   preserved under the Plan shall be unaffected by the consolidation, and (iii) claims under or with

24   respect to any insurance policy of any Debtor (or any right to the proceeds of any such policy or

25   policies) shall be unaffected by the consolidation.

26          The Plan shall be deemed to be a motion by the Debtors for substantive consolidation.  Any

27   objection by an affected Creditor to such consolidation shall be treated as an objection to

28

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1 Confirmation and shall be determined by the Bankruptcy Court at the Confirmation Hearing.

2 Failure to timely object to substantive consolidation may result in consolidation of the Debtors.

3 **Rationale.** Each of the Debtors (other than Sydran Texas)[76] has guaranteed the secured

4 debt owing to the Chase Lender Group and BKC. This debt alone aggregates approximately $123

5 million (exclusive of fees or interest). Under various existing Intercreditor Agreements, most of

6 the funds distributed by the Debtors from the Sale of substantially all of their assets (excluding the

7 assets pledged to GMACCM and GEC-BAFC) will go first to the Tax Payment Obligees (who are

8 owed $4.7 million), then to the Chase Lender Group, and lastly to BKC on the BKC Loan, to the

9 extent of any remaining value. Given that the value of the collateral securing such claims (the

10 maximum Purchase Price payable by the Buyer, before the working capital adjustment and not

11 counting the Assumed Obligations, totals $20 million) is far less than the size of the aggregate

12 secured debt of the Debtors (about $127 million), it is manifestly clear that each Debtor is

13 insolvent, that the holders of Allowed Secured Claims are substantially undersecured, and that

14 there will not be any value remaining for unsecured creditors of the Debtors' estates. The Claims

15 of GMACCM and GEC-BAFC against Sydran IV, which are secured by separate collateral at

16 thirty-four (34) of the Debtors' restaurant locations, are similarly undercollateralized.

17 Under these circumstances and given the complex corporate and capital structure of the

18 Debtors, the most efficient mechanism for purposes of implementing the Plan and winding-up the

19 Debtors' affairs is to substantively consolidate the Debtors' estates. The Plan provides that each of

20 the Debtors' secured creditors is paid solely based upon the value of its own collateral, subject to

21 existing Intercreditor Agreements. There is no "excess" value available for unsecured creditors or

22 to the holders of Interests, and thus, no practical advantage to keeping the estates separate.[77]

23 Whether the Debtors are consolidated or not, each of the principal holders of Allowed Secured

24 Claims in these cases will have significant unsecured deficiency claims. These claims and all

25 other unsecured claims will be treated the same regardless of whether the estates are substantively

26 consolidated because, under any scenario, secured creditors can only look to their collateral and

27

28

---

[76] Sydran Texas does not have any material assets.

[77] Certain unsecured obligations are assumed by the Buyer as part of the Sale based on the Buyer's desire to have an operating business in place upon the consummation of the Sale.

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 100
of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

unsecured creditors, for whom there is no value, can only look to the Buyer to the extent of any Assumed Obligations. In other words, no one will be prejudiced by substantive consolidation.

At the same time, substantive consolidation will allow for the Plan to be administered in a more efficient and less costly manner, without the complexities of having ten different Debtors and without prejudice to any constituency. It also bears mention that several of the Debtors, consisting of Sydran Development, Sydran Casual Dining, Sydran III and Sydran Texas, are either holding companies or corporate shells that do not hold any material assets. The wind-up of these entities can be accomplished more effectively if they are consolidated with the other Debtors. Finally, substantive consolidation will extinguish all intercompany claims amongst the Debtors, further simplifying the process of implementing the Plan.

### 4. JV Purchase Agreement.

Sydran Group shall cause Sydran Investors to approve and consent to and cause BK-Sydran to enter into the JV Purchase Agreement and effect and complete the transactions and its obligations therein. The JV Purchase Agreement provides for a sale price of approximately $3 million. The proceeds of such purchase and sale transaction shall be distributed in accordance with the terms of the agreements governing BK-Sydran. Because the interest of Sydran Investors in BK-Sydran is structurally subordinated to BKC's interest in BK-Sydran Investors and the proceeds from this sale will be significantly less than BKC's senior claims (which exceed $18 million), there will be nothing paid or distributed to Sydran Investors or to Sydran Group from the sale of the twenty-five (25) BKC restaurants owned by BK-Sydran. A copy of the JV Purchase Agreement is included in the Plan Supplement.

### 5. Available Cash.

On or as soon as practical following the Effective Date, the Claims Reserve Account shall be opened by the Disbursing Agent and funded with the Available Cash to the extent of any unencumbered Cash, which funds shall constitute Plan Proceeds. Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, such funds will be promptly delivered by the Reorganized Debtors to the Disbursing Agent for deposit into the Claims Reserve Account and shall become part of the Plan Proceeds.

**6. Handling of Plan Assets and Collection of Plan Proceeds.**

On the Effective Date, the Plan Assets and any other property of the Estates or the Consolidated Estate shall revest in the Reorganized Debtors, free and clear of all Claims and Liens other than those Liens recognized by the Plan. The Plan Assets shall be held by the Reorganized Debtors in trust for creditors and shall be distributed only in accordance with the Plan. From and after the Effective Date, and subject to section 5.7 of the Plan, the Reorganized Debtors shall retain and pursue the Litigation on such terms and conditions as are consistent with the interests of Creditors and the reasonable business judgment of the Reorganized Debtors, sell or liquidate Plan Assets, and collect the accounts receivable, if any, of the Debtors. In addition, from and after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, the Reorganized Debtors shall be free to operate without any limitation or restriction by, and without any requirement to comply with, the Bankruptcy Code, Bankruptcy Rules, or Guidelines of the United States Trustee. All Cash, all Liquidation Proceeds, and all Litigation Recoveries realized or obtained by the Reorganized Debtors shall be promptly delivered to the Disbursing Agent for deposit into the Claims Reserve Account and such funds shall be held in trust by the Disbursing Agent as Plan Proceeds. Except as otherwise provided in the Plan and the Confirmation Order, such Plan Proceeds shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan. To the extent required to make distributions to the holders of Allowed Claims, fund the Claims Reserve Account, pay Plan Expenses, and otherwise implement the Plan, all Plan Proceeds shall be held in trust by the Disbursing Agent and shall be distributed to Creditors in accordance with section 1123 of the Bankruptcy Code.

**7. Litigation.**

Except as otherwise provided in the Plan, all Litigation is retained and preserved pursuant to section 1123(b) of the Bankruptcy Code. From and after the Effective Date, all Litigation will be prosecuted or settled by the Reorganized Debtors. To the extent any Litigation is already pending on the Effective Date, the Reorganized Debtors as successor to the Debtors will continue the prosecution of such Litigation. Any Litigation Recovery from the Litigation will be deposited in the Claims Reserve Account as Plan Proceeds.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**8. Payment of Plan Expenses.**

All Plan Expenses may be paid by the Disbursing Agent from the Claims Reserve Account without further notice to creditors or approval of the Bankruptcy Court. The Confirmation Order shall advise Creditors and other parties in interest of the right to deliver a written request to the Reorganized Debtors for notice of any post-Confirmation applications by the post-Confirmation professionals seeking approval of post-Confirmation fees and expenses. Any disputes concerning the payment of Plan Expenses shall be submitted to the Bankruptcy Court for resolution.

**9. Distribution of Plan Proceeds.**

The Plan Proceeds shall be used to satisfy the payments required under the Plan, provided that the Disbursing Agent shall only distribute Net Plan Proceeds to the holders of Allowed Claims in such amounts and at such times as are set forth in the Plan. No payments or distributions shall be made by the Disbursing Agent on account of Disputed Claims unless and to the extent such Claims become Allowed Claims. The Net Plan Proceeds allocated to Disputed Claims will not be distributed but will be held in the Claims Reserve Account by the Disbursing Agent in accordance with the Plan pending resolution of such Disputed Claims.

**10. Post-Confirmation Operations of the Reorganized Debtors.**

Following the Effective Date, the Reorganized Debtors shall sell or dispose of any remaining assets, collect any accounts receivable, generate Liquidation Proceeds, prosecute or settle the Litigation, promptly transfer all receipts and collections to the Disbursing Agent for deposit into the Claims Reserve Account, and generally administer the Plan.

**11. Power and Authority of Responsible Officer.** From and after the Effective Date, the Reorganized Debtors will be managed and governed by the Responsible Officer who shall act as the representative of the Reorganized Debtors. The Plan designates Bradley Sharp of Development Specialists, Inc. as the Responsible Officer. Activities of the Reorganized Debtors as permitted and limited under this Plan will be managed by the Responsible Officer. The Responsible Officer may use lower priced employees of his firm as he deems appropriate, but in any event the Responsible Officer and any employees or members of his firm who perform work for the Responsible Debtors shall be compensated for time expended at the Blended Rate. Under

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Plan, the Blended Rate means, with respect to the Responsible Officer and employees or members of his firm, the lesser of (i) $300 per hour, or (ii) the hourly rate determined by the quotient of the total fees for the engagement (based upon each biller's ordinary hourly rate) divided by the total number of hours worked. The Responsible Officer shall be reimbursed for reasonable out of pocket expenses. Such compensation and reimbursement shall be considered Plan Expenses. Confirmation of the Plan shall constitute the appointment of the Responsible Officer by the Bankruptcy Court as the representative of the Reorganized Debtors to (a) exercise the rights, power and authority of the Reorganized Debtors under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, (b) retain professionals to represent the Reorganized Debtors in performing and implementing the Plan, (c) marshal and liquidate the Plan Assets and to collect the Plan Proceeds for the benefit of Creditors, (d) prosecute the Litigation and otherwise attempt to collect or realize upon the Plan Assets, (e) resolve Disputed Claims and effectuate distributions to Creditors under the Plan, and (f) otherwise implement the Plan, wind up the affairs of the Debtors and close the Chapter 11 Cases. On the Effective Date, the Responsible Officer will be deemed to have retained the Debtors' Professionals under the arrangements existing on the Effective Date, without any need for new retention agreements or further orders of the Bankruptcy Court. The Confirmation Order shall provide that the Responsible Officer is authorized to execute a certificate of dissolution for the Reorganized Debtors pursuant to applicable non-bankruptcy law, at such time as the Reorganized Debtors have fully wound up its affairs in accordance with applicable law pursuant to the provisions of the Plan.

**12. Liquidation and Dissolution of the Reorganized Debtors.**

The Reorganized Debtors shall conduct no business following the Effective Date other than winding up their affairs in accordance with applicable law and the provisions of the Plan. Without limiting the generality or effect of the foregoing, following the Effective Date, the Reorganized Debtors shall: (i) undertake those transactions that are necessary, advantageous or practicable to obtain the maximum value from the Plan Assets; and (ii) exercise their best efforts and endeavor in good faith and without undue delay to liquidate all of the Plan Assets and to successfully prosecute the Litigation. Pursuant to applicable bankruptcy and non-bankruptcy law, the Reorganized

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtors (acting through the Responsible Officer) shall be authorized to (i) wind up their affairs and

dissolve, and (ii) put into effect and carry out the terms of the Plan and any orders of the

Bankruptcy Court entered in the Chapter 11 Cases, without further action by their managers,

partners, owners, boards of directors, investors, stockholders, or shareholders.

**13. Full and Final Satisfaction.**

Commencing upon the Effective Date, the Disbursing Agent shall be authorized and

directed to distribute the amounts required under the Plan to the holders of Allowed Claims

according to the provisions of the Plan. Upon the Effective Date, all Debts of the Debtor shall be

deemed fixed and adjusted pursuant to the Plan and the Debtors shall have no further liability on

account of any Claims or Interests except as set forth in the Plan. All payments and all

distributions made by the Disbursing Agent under the Plan shall be in full and final satisfaction,

settlement and release of all Claims; provided, however, that nothing contained in section 5.11 of

the Plan, or in any other provision of the Plan, shall be deemed to constitute or result in a discharge

of the Debtor under Bankruptcy Code section 1141(d).

**14. Distribution Procedures.**

Except as otherwise agreed by the holder of a particular Claim, or as provided in the Plan,

all amounts to be paid by the Disbursing Agent under the Plan shall be distributed in such amounts

and at such times as is reasonably prudent. On the Effective Date, or as soon as practicable

thereafter, the Disbursing Agent shall: (i) marshal all then available Plan Proceeds; (ii) to the

extent of unencumbered Cash or Cash distributable to the holders of Allowed Claims in Class 10,

establish and fund the Claims Reserve Account pursuant to section 5.14 of the Plan; (iii) promptly

pay the holders of Allowed Secured Claims the portions of the Purchase Price encumbered by the

Liens of those Claimants, after first giving effect to the Intercreditor Agreements; and (iv) make

interim and final distributions of Plan Proceeds from the Claims Reserve Account in the amounts

and according to the priorities set forth in Articles 3 and 4 of the Plan. Notwithstanding any

provision to the contrary in the Plan, distributions may be made in full or on a Pro Rata basis

depending on (i) the amount of the Allowed Claim, (ii) the then available Plan Proceeds in the

Claims Reserve Account, and (iii) the then anticipated Plan Proceeds. The Disbursing Agent shall

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

make the Cash payments to the holders of Allowed Claims: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank selected by the Disbursing Agent in its sole discretion, or by wire transfer from a domestic bank, at the Disbursing Agent's option, and (b) by first-class mail (or by other equivalent or superior means as determined by the Disbursing Agent).

**15. Disbursing Agent.**

The Disbursing Agent may employ or contract with other entities to perform the obligations created under the Plan. Any third party Disbursing Agent shall receive reasonable compensation for services rendered and reimbursement for expenses incurred in connection with the Plan or any functions or responsibilities adopted under the Plan which amounts may be deducted from the Claims Reserve Account as Plan Expenses. The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. To the extent the one or more of the Reorganized Debtors acts as the Disbursing Agent, the Reorganized Debtors shall not receive a fee for such services, although the Reorganized Debtors may employ and pay persons or entities salaries, wages or ordinary compensation for services performed.

**16. Claims Reserve Account.**

On or as soon as practicable after the Effective Date, the Disbursing Agent shall (a) to the extent of any Cash or, where applicable, unencumbered Cash, create and fund the Claims Reserve Account, and (b) periodically deposit the Cash from Plan Proceeds into the Claims Reserve Account to satisfy the obligations created under the Plan. The Claims Reserve Account shall contain the following five sub-accounts: (1) Secured, (2) Administrative, (3) Priority Claims, (4) Plan Expenses, and (5) Allowed Unsecured Claims. Each sub-account within the Claims Reserve Account shall contain an amount of Cash deemed sufficient by the Reorganized Debtors for the payment of Allowed Claims in accordance with the priorities and amounts set forth in Articles 3

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

82700-002\DOCS_SF:4778.4

99

DISCLOSURE STATEMENT

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 106 of 187

and 4, all anticipated Plan Expenses, and Disputed Claims. The Disbursing Agent shall be authorized to transfer funds among sub-accounts as necessary to replenish any sub-accounts as and when distributions are made to Creditors. All Plan Expenses may be deducted and paid from sub-account 4 without further order of the Bankruptcy Court. The Disbursing Agent shall periodically transfer all earnings and interest income on the Claims Reserve Account for deposit to and distribution from sub-account 5. Unless otherwise provided in the Confirmation Order, the Claims Reserve Account shall be invested by the Disbursing Agent in a manner consistent with the objectives of section 345(a) of the Bankruptcy Code.

**17. Resolution of Disputed Claims.**

All objections to Claims shall be filed and served not later than 180 days following the Effective Date; provided, however, such date may be extended beyond 180 days by the Bankruptcy Court for cause shown. Buyer shall be deemed a party in interest with standing to object to the Claim and any Administrative Claim that is an Assumed Obligation. If an objection is not timely filed by the deadline established in section 5.15 of the Plan, any remaining Disputed Claims shall be deemed to be Allowed Claims for purposes of the Plan. Unless otherwise provided in the Confirmation Order, the Reorganized Debtors shall be authorized to settle, or withdraw any objections to, any Disputed Claim following the Confirmation Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of the Plan; provided however, that the Reorganized Debtors may not settle any Claims that are Assumed Obligations without the consent of the Buyer. Under no circumstances (i) will any distributions be made on account of Disallowed Claims or (ii) will any Disallowed Claim constitute an Assumed Obligation.

**18. Reserve Provisions for Disputed Claims.**

The Disbursing Agent shall implement the following procedures with respect to the allocation and distribution of Cash in the Claims Reserve Account, after payment of all senior Claims, to the holders of Disputed Claims that become Allowed Claims:

       i.      Cash respecting Disputed Claims shall not be distributed, but, if necessary, shall be withheld by the Disbursing Agent in an amount equal to the amount of the distributions

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

that would otherwise be made to the holders of such Claims if such Claims had been Allowed Claims, based on the Disputed Claims Amount.

  ii.  All holders of Allowed Unsecured Claims shall be entitled to receive interim distributions under the Plan. No distributions may be made to the holders of Allowed Unsecured Claims unless adequate reserves are established for the payment of Disputed Claims, and sufficient funds are also reserved for expected Plan Expenses. Upon the Final Resolution Date, after payment of all senior Claims, all amounts (if any) remaining in sub-accounts 1-5 of the Claims Reserve Account, after reservation of an appropriate amount for anticipated Plan Expenses, shall be transferred to sub-account 5 for final distribution to the holders of Allowed Class 12 Claims.

  iii.  For the purposes of effectuating the provisions of section 5.16 of the Plan, the Bankruptcy Court may estimate the amount of any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan. In lieu of estimating the amount of any Disputed Claim, the Bankruptcy Court or the Disbursing Agent may determine the Disputed Claims Amount to be reserved for such Disputed Claim, or such amount may be fixed by agreement in writing by and between the Debtor and the holder thereof.

  iv.  When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holder of such Allowed Claim, in accordance with the provisions of the Plan, Cash equal to a Pro Rata Share of the Cash set aside for Disputed Claims within the applicable sub-account of the Claims Reserve Account, but in no event shall such holder be paid more than the amount that would otherwise have been paid to such holder if the Claim (or the Allowed portion of the Claim) had not been a Disputed Claim.

  v.  Interim distributions may be made from time to time to the holders of Allowed Claims prior to the resolution by Final Order or otherwise of all Disputed Claims, provided that the aggregate amount of Cash to be distributed at such time from the Claims Reserve Account is practicable in comparison to the anticipated costs of such interim distributions.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

vi.　　No holder of a Disputed Claim shall have any Claim against the Cash reserved with respect to such Claim until such Disputed Claim shall become an Allowed Claim.  In no event shall any holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) from the Debtor, the Reorganized Debtors, or the Claims Reserve Account any payment (x) which is greater than the amount reserved for such Claim by the Bankruptcy Court pursuant to section 5.16 of the Plan, or (y) except as otherwise permitted under the Plan, of interest or other compensation for delays in distribution.  In no event shall the Reorganized Debtors have any responsibility or liability for any loss to or of any amount reserved under the Plan.

vii.　　To the extent a Disputed Claim ultimately becomes an Allowed Claim in an amount less than the Disputed Claim Amount reserved for such Disputed Claim, then the resulting surplus of cash shall be retained in the Claims Reserve Account and shall be distributed among the holders of Allowed Claims until such time as each holder of an Allowed Claim has been paid the Allowed amount of its Claim.

**19. Allocation of Distributions.**

Distributions to any holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**20. Rounding.**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

**21. No Interim Cash Payments of $50 or Less on Account of Allowed Claims.**

If an interim distribution to be received by the holder of an Allowed Claim would be $50 or less, notwithstanding any contrary provision in the Plan, at the discretion of the Disbursing Agent, no such interim payment will be made to such holder, and such Cash shall be held for such holder until the earlier of (i) the next time an interim distribution is made to the holders of Allowed Claims (unless the distribution would still be less than $50 in which case section 5.19 of the Plan

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

shall again apply), or (ii) the date on which final distributions are made to the holders of Allowed Claims.

**22. Disputed Payments.**

In the event of any dispute between and among Creditors as to the right of any entity to receive or retain any payment or distribution to be made to such entity under the Plan, the Disbursing Agent may, in lieu of making such payment or distribution to such entity, instead hold such payment or distribution until the disposition thereof shall be determined by the Bankruptcy Court.

**23. Unclaimed Property.**

Any entity which fails to claim any Cash within 180 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Upon forfeiture, such Cash (including interest thereon) shall be deposited into the Claims Reserve Account to be distributed to the holders of Allowed Claims in the manner described in section 5.16.7 of the Plan for distribution of excess amounts. Entities which fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor, the Reorganized Debtors, or the Disbursing Agent or any holder of an Allowed Claim to whom distributions are made by the Disbursing Agent.

**24. Setoffs.**

Nothing contained in the Plan shall constitute a waiver or release by the Debtors of any right of setoff or recoupment the Debtors may have against any Creditor or Interest Holder.

**25. No Distributions on Late-Filed Claims.**

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was first filed after the Bar Date shall be a Disallowed Claim, and the Reorganized Debtors shall not make any distribution to a holder of such a Claim; provided, however, that to the extent such Claim was listed in the Schedules (other than as contingent, disputed, or unliquidated) and would be an Allowed Claim but for the lack of a timely proof of Claim, the Reorganized Debtors shall treat such Claim as an Allowed Claim in the amount in which it was so listed.

**26. Withholding Taxes.**

Pursuant to section 346(f) of the Bankruptcy Code, the Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. The Debtors shall comply with all reporting obligations imposed on it by any governmental unit.

**27. Setoffs and Recoupments.**

The Disbursing Agent may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtors, the Reorganized Debtors, the Estates, or the Consolidated Estate, as applicable, may have against the holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Reorganized Debtors, the Estates, or the Consolidated Estate, against such holder.

**28. Tax Exemption.**

Pursuant to Bankruptcy Code section 1146, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors or the Disbursing Agent of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, the transfer of the Purchased Assets under the Asset Purchase Agreement), or any transfers by the Holdings Companies (including any transfers by the Holdings Companies pursuant to or in furtherance of the Transaction Documents or Amended Transaction Documents, as applicable), shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee. In this regard, the Closing of the Asset Purchase Agreement is contingent on the successful refinancing of the existing Holdings Companies' debt, which in turn will be conditioned on the formation of new single purpose entities and the transfer of the Holding Companies' properties to those new entities to satisfy the lender requirements. The Holdings Companies' refinancing, including the transfer of properties securing such refinancing, is therefore incident to and an integral and necessary part of, and a condition to, the reorganization of the Debtors, as well as one of the principal means for

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 111 of 187

1 implementation of this Plan. Accordingly, such refinancing and related transfers and other

2 transactions are exempt from state and local documentary stamp taxes, intangible and similar taxes

3 pursuant to Bankruptcy Code section 1146(c). Consistent with the foregoing, each recorder of

4 deeds or similar official for any county, city or governmental unit or parish in which any

5 instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and

6 directed to accept such instrument, without requiring the payment of any documentary stamp tax,

7 deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

8 **29. Securities Exemption.**

9 Any rights issued under, pursuant to or in effecting the Plan, and the offering and issuance

10 thereof by any party, including without limitation, the Reorganized Debtors or the Disbursing

11 Agent, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any

12 state or federal securities laws requiring registration for offer or sale of a security or registration or

13 licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise

14 enjoy all exemptions available for distributions of securities under a plan of reorganization in

15 accordance with all applicable law, including without limitation, section 1145 of the Bankruptcy

16 Code.

17 **30. Plan Interest Rate.**

18 If and to the extent it is determined by the Bankruptcy Court that interest is required to be

19 paid on an Allowed Claim other than as set forth in the Plan, the interest rate to be used shall be

20 the Plan Interest Rate as determined by the Bankruptcy Court for such Claim.

21 **31. Implementation.**

22 Upon Confirmation, the Debtors shall be authorized to take all steps and execute all

23 documents necessary to effectuate the provisions contained in the Plan.

24 **32. Certain Actions.**

25 By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as

26 appropriate), all matters provided for under the Plan that would otherwise require approval of the

27 owners, stockholders, shareholders, members, directors, managers, or partners of one or more of

28 the Debtors under the Plan, including, without limitation, (i) the distribution of Cash pursuant to

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of any Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to the applicable general corporation, limited liability, or partnership law of the state in which the Debtors or the Reorganized Debtors are chartered, organized or incorporated, without any requirement of further action by the owners, stockholders, shareholders, members, directors, managers, or partners of the Debtors.

Effective upon the Effective Date, the Debtors' formation documents shall each be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Responsible Officer shall be authorized to cancel, annul and extinguish all Interests.

**33. Dissolution of Committee.**

On the Effective Date, the Official Committee will dissolve, and the members of the Official Committee and the Official Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases. The Professionals retained by the Official Committee and the members thereof will not be entitled to assert any fee claims for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to section 3.2 of the Plan.

**E.  EXECUTORY CONTRACTS**

**1.  Assumption.**

Upon the Effective Date, the Debtors will assume, and assign to the Buyer, free and clear of any Liens or Claims, each Assumed Executory Contract, including each of the executory contracts and unexpired leases identified on Schedule A to the Plan as Assumed Executory

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

Contracts.  The Debtors reserve the right to make additions to Schedule A up to 28 days prior to the commencement of the Confirmation Hearing and deletions from Schedule A, to the extent permitted or required under the Asset Purchase Agreement, at any time prior to entry of the Confirmation Order or an Assumption and Cure Order with respect to such executory contract or unexpired lease.  If necessary, an updated version of Schedule A will be filed with the Bankruptcy Court as part of the Plan Supplement prior to the commencement of the Confirmation Hearing.  The Debtors also intend, consistent with section 6.2(d)(i) of the Asset Purchase Agreement, to file a motion seeking entry of an Assumption and Cure Order on or before the Confirmation Hearing.  The proposed Cure Obligation due to each non-debtor party to an Assumed Executory Contract shall be set forth in any such motion and is listed on Schedule A to the Plan opposite the name of such non-debtor party.  The non-debtor party to an Assumed Executory Contract who disputes the Cure Obligation identified for such Assumed Executory Contract, or who disputes the Buyer's ability to provide adequate assurance of future performance within the meaning of Bankruptcy Code section 365(f)(2), must file an objection to the proposed Cure Obligation, or to the Buyer's ability to assure future performance, by the deadline for filing objections to Confirmation of the Plan (any applicable motion) or be forever barred from asserting a different Cure Obligation for such Assumed Executory Contract or from challenging the proposed assignment to the Buyer based upon the Buyer's ability to perform in the future under such Assumed Executory Contract.  Failure to file an objection to the proposed assumption and assignment of an executory contract or unexpired lease by the applicable deadline shall be deemed to be consent by the non-Debtor party to such executory contract or unexpired lease to its assumption and assignment.  Any disputes over Cure Obligations or adequate assurance of the Buyer's future performance will be determined by the Bankruptcy Court, but in all cases, subject to the Debtors' rights or obligations under the Asset Purchase Agreement to remove any particular executory contract or unexpired lease from Schedule A or to withdraw a motion to approve the assumption and assignment of any such executory contract or unexpired lease.  Inclusion of a contract or lease on Schedule A does not constitute a waiver by the Debtors of the right to contend that some or all of such contract or lease is not executory.  Notwithstanding anything contrary in any Assumption and Cure Order, the assumption

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 114 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  and assignment of any Assumed Executory Contracts shall be conditioned on the occurrence of the

2  Effective Date.  Nothing in section 6.1.1 of the Plan shall alter or affect the rights or powers of the

3  Buyer or the Sellers under section 6.2.(d) of the Asset Purchase Agreement to add or remove

4  contracts or leases from Schedule 2.1(e) of the Asset Purchase Agreement.

5  **2. Rejection.**

6  In addition to any executory contracts and unexpired leases previously rejected by the

7  Debtors, upon the Effective Date, the Debtors will reject each executory contract or unexpired

8  lease that is not listed on Schedule A (or any supplement thereto), including without limitation

9  each of the executory contracts and unexpired leases identified on Schedule B to the Plan, but

10  excluding the Designated Contracts and contracts and leases covered under section 6.4 of the Plan.

11  The Debtors reserve the right to make additions to or deletions from Schedule B up to the time of

12  entry of the Confirmation Order.  If necessary, an updated version of Schedule B will be filed with

13  the Bankruptcy Court as part of the Plan Supplement prior to commencement of the Confirmation

14  Hearing.  Inclusion of a contract or lease on Schedule B does not constitute a waiver by the

15  Debtors of the right to contend that some or all of such contract or lease is not executory.  Any

16  Rejection Claim arising from the rejection of an executory contract or unexpired lease pursuant to

17  section 6.1.2 of the Plan shall be filed within thirty (30) days of service of the Confirmation Order

18  (such date being the Rejection Claims Bar Date).  Any Rejection Claim not filed by the Rejection

19  Claims Bar Date shall be a Disallowed Claim and shall be forever barred as a Claim against the

20  Debtors or any property of the Debtors and from sharing in any distribution under the Plan.

21  **3. Designation of Certain Executory Contracts.**

22  At any time prior to entry of an Assumption and Cure Order assigning to Buyer an

23  executory contract or unexpired as an Assumed Executory Contract, to the extent permitted or

24  required under the Asset Purchase Agreement, the Buyer may designate, in accordance with

25  section 6.2(d)(v) of the Asset Purchase Agreement, such executory contract or unexpired lease

26  (each, a "Designated Contract," and collectively, the "Designated Contracts") to be handled as an

27  "Excluded Asset" under the Asset Purchase Agreement.  In that event, to the extent required under

28  the Asset Purchase Agreement, the Debtors will cooperate with the Buyer in any reasonable

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1. arrangement designed to provide the Buyer with the benefits and obligations under any such

2. Designated Contract, including, to the extent permitted by the Bankruptcy Court, enforcement of

3. all rights of the Debtors against the other party or parties thereto arising out of the breach or

4. cancellation by such other party or otherwise.

5. **4. Satisfaction of Cure Obligations.**

6. The Debtors, or the Buyer to the extent set forth in section 2.7 of the Asset Purchase

7. Agreement, shall satisfy any Cure Obligations for the Assumed Executory Contracts by making a

8. Cash payment, in the manner provided in section 3.1 of the Plan, equal to the lesser of the amount:

9. (a) set forth on Schedule A or in any other notice or motion filed and served in connection with the

10. Confirmation Hearing or as may be determined in an Assumption and Cure Order, or (b) agreed to

11. in writing between the Debtors and the non-debtor parties to such contracts or leases. In the event

12. that an objection is timely filed with the Bankruptcy Court to the Cure Obligations proposed by the

13. Debtors and served on counsel to the Debtors, and the Bankruptcy Court, after notice and hearing,

14. determines that the Debtor is obligated to pay a different amount under section 365 of the

15. Bankruptcy Code than proposed by the Debtors, then the Debtors shall have the right (to the extent

16. provided in the Asset Purchase Agreement) within twenty (20) days after such determination to

17. seek an order of the Bankruptcy Court rejecting such executory contract or unexpired lease.

18. **5. Adequate Assurance.**

19. Buyer's promise to perform its obligations under each Assumed Executory Contract will

20. constitute adequate assurance of future performance in accordance with Bankruptcy Code section

21. 365(f)(2)(B) with respect to that Assumed Executory Contract unless otherwise provided in the

22. Assumption and Cure Order.

23. **6. Post-Petition Executory Contracts and Unexpired Leases.**

24. Except as may be provided otherwise by the Confirmation Order, all agreements and

25. stipulations entered into by the Debtors on or after the Petition Date, and all executory contracts

26. and unexpired leases previously assumed by the Debtors on or after the Petition Date, shall remain

27. in full force and effect following Confirmation to the extent and in the manner set forth in such

28. agreements, stipulations and assumed contracts or leases, in each case as approved and authorized

82700-002\DOCS_SF:4778.4

DISCLOSURE STATEMENT

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

by the Bankruptcy Court, and as the same may have been amended, modified or transferred. For purposes of clarification, the fact that an agreement has been assumed or entered into by the Debtors after the Petition Date but prior to the Effective Date shall not except such agreement from being a Purchased Asset or Assumed Executory Contract if such agreement otherwise would be a Purchased Asset or Assumed Contract under the terms of the Asset Purchase Agreement.

**7. Effect of Confirmation Order.**

Subject to section 6.1.3 of the Plan with respect to Designated Contracts, the Confirmation Order (or if set forth in a separate order from the Confirmation order, the Assumption and Cure Order applicable to such Assumed Executory Contract) shall constitute an order of the Bankruptcy Court approving (effective only upon the occurrence of the Effective Date) the assumption or rejection, as the case may be, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code of all executory contracts and unexpired leases under this Article of the Plan. The contracts and leases under Article 6 to the Plan will be assumed or rejected, respectively, only to the extent that such contracts or leases constitute executory contracts or unexpired leases, and the identification of such agreements on Schedules A or B shall not constitute an admission with respect to the characterization of such agreements or the existence of any unperformed obligations, defaults, or damages thereunder.

**F.** **CONDITIONS TO CONFIRMATION OF THE PLAN**

Confirmation of the Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors: (i) the substantive consolidation of the Debtors shall have been approved; and (ii) the Bankruptcy Court shall have signed the Confirmation Order. If any one or more of the foregoing conditions is not met, the Debtors may, at their option, withdraw the Plan. Provided no stay of the Confirmation Order is then in effect, the Plan shall become effective and the Effective Date shall occur upon the Closing Date.

In the event the Asset Purchase Agreement is properly terminated as permitted by the Buyer or the Sellers, or if the Closing does not occur by the Closing Deadline (or any mutually

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

agreed extension thereof), the Plan shall be of no force or effect and the Debtors will promptly seek revocation of the Confirmation Order.

## G.     EFFECTS OF CONFIRMATION

### 1.  Binding Effect of Plan.

The provisions of the confirmed Plan shall bind the Debtors, the Reorganized Debtors, any entity acquiring property under the Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan.  All Claims and Debts shall be as fixed and adjusted pursuant to the Plan.  With respect to any taxes of the kind specified in Bankruptcy Code section 1146(c), the Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded.

### 2.  Asset Purchase Agreement.

Upon entry of the Confirmation Order, (i) the Buyer and the Sellers shall be bound by the Asset Purchase Agreement to the extent provided therein, and (ii) the Sellers are authorized to perform their obligations under the Asset Purchase Agreement and to take such steps as are necessary, reasonable or convenient to effect the Closing.  Subject to the terms of the Confirmation Order and to any conditions to the Closing that remain to be satisfied, the Asset Purchase Agreement and the transactions contemplated therein are approved by the Plan.

### 3.  Asset Purchase Agreement Controls.

The Asset Purchase Agreement shall be deemed to be a part of the Plan and is incorporated into the Plan by reference.  In the event of any inconsistency between the Plan and the Asset Purchase Agreement or this Disclosure Statement and the Asset Purchase Agreement, the terms and provisions of the Asset Purchase Agreement shall control with respect to the subject matter thereof.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
Attorneys At Law
San Francisco, California

**4. Revesting of Property of Debtors.**

Upon the Effective Date, other than with respect to the Purchased Assets and the Designated Contracts, title to all property of the Estates of the Debtors in the Chapter 11 Cases shall revest in the Reorganized Debtors, free and clear of any Liens or Claims except those Liens and Claims expressly preserved by the Plan or the Confirmation Order, and shall be retained by the Reorganized Debtors for the purposes contemplated under the Plan. Without limiting the generality of the foregoing, all Litigation Recoveries, rights to Liquidation Proceeds, and all resulting Plan Proceeds earmarked for disbursement to Creditors under the Plan, shall vest in the Reorganized Debtors upon the Effective Date and shall no longer constitute property of the Estates.

**5. Property Free and Clear.**

Except as otherwise provided in the Plan or the Confirmation Order, all property that shall revest in the Reorganized Debtors shall be free and clear of all Claims, including Liens, interests, charges or other encumbrances of Creditors or Interest Holders, other than Liens specifically recognized and continued under the Plan. Following the Effective Date, the Reorganized Debtors may transfer and dispose of any property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

**6. Limitation of Liability.**

The Debtors, the Buyer, each Consenting Secured Party, and the Official Committee, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Cases or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Asset Purchase Agreement, the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Cases; provided, however, that this limitation will not affect or modify the obligations created under the Asset Purchase Agreement, or any agreements entered into in connection with

the Asset Purchase Agreement (including, without limitation, any agreements between and among the Buyer, any affiliates of the Buyer, the Holdings Companies, any Consenting Secured Party, and any third parties), or the Plan, or the rights of any holder of an Allowed Claim to enforce its rights under the Plan, nor shall the foregoing exonerate any of the Released Parties from any liability that is determined that would otherwise result from an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct.  In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Released Party for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Asset Purchase Agreement, Plan, the Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for:  (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan (including, without limitation, the Asset Purchase Agreement or any agreements entered into in connection with the Asset Purchase Agreement, including any agreements between and among the Buyer, any affiliates of the Buyer, the Holdings Companies, any Consenting Secured Party, and any third parties) or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

**7.  Plan Release.**

**Consenting Secured Parties.**  Upon the Effective Date, the Debtors, their respective Estates, and the Consolidated Estate (each, a "Releasor" and, collectively, the "Releasors") shall, and hereby do, pursuant to and by operation of section 8.5 of the Plan, release, remise and discharge each Consenting Secured Party and its officers, directors, shareholders, parents, subsidiaries, affiliates, attorneys, accountants, agents and employees (each, a "Releasee" and,

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

collectively, the "Releasees") of any and all claims, debts, torts, liabilities, damages, causes of action or claims for relief (other than the Excluded Claims) that any of such Releasors have, had, or ever had, of any kind or nature, suspected or unsuspected, latent or patent, contingent or liquidated, in any way arising out of or relating to the debtor-creditor relationship or business relationship between the Releasors and the Releasees with respect to the Debtors or the Holdings Companies.  Furthermore, in connection with the foregoing release, the Releasors waive any benefits conferred by California Civil Code section 1542 (or similar applicable law or rule) which provides:  "A general release does not extend to claims which the Creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

**Participating Vendors.**  Each Participating Vendor who has properly elected treatment in Class 11 and who has executed an agreement to provide credit terms to the Buyer shall be released of any liability for Avoidance Actions.

**8.  Injunction.**

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Reorganized Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, the Estates, or the Consolidated Estate, or any property of the Debtors, the Reorganized Debtors, the Estates, or the Consolidated Estate, any Consenting Secured Party, or the Buyer, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Estates, the Consolidated Estate, any Consenting Secured Party, or the Buyer, or any property of the Debtors, the Reorganized Debtors, the Estates, the Consolidated Estate or the Buyer, with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance or any kind against the

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtors, the Reorganized Debtors, the Estates, the Consolidated Estate or the Buyer, or any property of the Debtors, the Reorganized Debtors, the Estates, the Consolidated Estate or the Buyer, with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors, the Reorganized Debtors, the Estates, the Consolidated Estate, any Consenting Secured Party, or the Buyer, or any property of the Debtors, the Reorganized Debtors, the Estates, the Consolidated Estate or the Buyer, with respect to any such Claim or Interest; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this section shall prohibit the holder of a timely-filed proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Reorganized Debtors under the Plan.

**9. Post-Confirmation Liability of Responsible Officer.**

The Responsible Officer shall not be liable to the holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of his or her duties under the Plan, except the Responsible Officer will be liable for actions or inactions that are grossly negligent or which constitute willful misconduct.

**V.**

**DISTRIBUTIONS TO HOLDERS OF SECURED CLAIMS**

The Plan creates eight (8) Classes of Allowed Secured Claims: Class 3 (Allowed Secured Claims Not in Another Class), 4 (Tax Payment Obligees), 5 (Chase Lender Group), 6 (GMACCM), 7 (GEC-BAFC), 8 (BKC), 9 (ACIC), and 10 (Secured Personal Property Tax Claims). The Debtors are not aware of any Class 3 Claims. The Debtors estimate that the principal amounts of the prepetition claims in the remaining Classes of Secured Claims are as follows: Class 4 - $4,700,000; Class 5 - $116,905,478; Class 6 - $9,599,868; Class 7 – $4,769,999; Class 8 - $6,191,149; Class 9 – up to $600,455; and Class 10 – approximately $850,000. The Buyer shall assume the obligation to pay those Class 10 Claims that are Assumed

82700-001\DOCS_SF:4778.4     DISCLOSURE STATEMENT

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Obligations.  The Debtors are not aware of any Class 10 Claims that are not Assumed

2   Obligations.[78]

3        The Debtors believe that the holders of Secured Claims in Classes 5 (Chase Lender Group),

4   6 (GMACCM), 7 (GEC-BAFC), and 8 (BKC) are undercollateralized.  The Plan contemplates that

5   all or substantially all of the assets securing such claims (as well as the Claims of Class 4 and Class

6   9) shall be sold to the Buyer pursuant to the Asset Purchase Agreement, free and clear of Liens,

7   Claims or interests, with any such Liens, Claims or interests attaching to the Purchase Price.  After

8   giving effect to any applicable Intercreditor Agreements, each holder of an Allowed Secured

9   Claim in Classes 4, 5, 6, 7, 8 and 9 shall be paid, on the Effective Date, in Cash, from the Purchase

10  Price, in full satisfaction of its Allowed Secured Claim, an amount equal to the value of its interest,

11  in that portion of the Purchased Assets that consists of such Creditor's collateral, as determined by

12  the Bankruptcy Court at or before the Confirmation Hearing.  In particular, based upon the

13  Purchase Price paid by the Buyer for the Purchased Assets, after taking into account the

14  Intercreditor Agreements, (i) the holders of Allowed Claims in Classes 4 and 9 will be paid in full,

15  (ii) the holders of Allowed Claims in Class 5 will each receive their Pro Rata Share of the portion

16  of the Purchase Price allocated to Class 5 based on the value of the portion of the Purchased Assets

17  that are Chase Collateral, (iii) the holders of Allowed Claims in Class 6 and Class 7 will be paid

18  their respective shares of the Purchase Price based on the value of the portion of the Purchase

19  Assets that are GMACCM Collateral and GEC-BAFC Collateral, respectively, and (iv) the holder

20  of the Allowed Class 8 Claim shall receive whatever of the Purchase Price remains undistributed,

21  if anything, to the extent attributable to the BKC Collateral on account of its Class 8 Claim.  The

22  Debtors do not expect that there will be any distribution to BKC on account of its Class 8 Claim.

23        If and to the extent there is a Supplemental Payment after the Effective Date based on a

24  recalculation of the estimated purchase price and resulting release of the Reserve, the portion of

25  such payment attributable to the Purchased Assets that consists of collateral of the holders of

26

27  [78]  To the extent not assumed by the Buyer, the Debtors shall pay Allowed Class 10 Claims in an amount equal to the
     value of the interest of the holder of such Claim in the personal property of the Debtors which secures such Claim.

28  Under the law of several of the relevant jurisdictions (such as Alabama, Louisiana, and Florida), the lien for personal
     property taxes is a superior lien that primes consensual security interests.

Allowed Secured Claims, shall be distributed in the same manner as the Purchase Price described above.

In addition, following the Effective Date, any Excluded Assets that constitute collateral for Allowed Secured Claims shall be sold by the Reorganized Debtors as quickly as practicable, free and clear of Liens, and each holder of an Allowed Secured Claim with respect to such assets shall be paid, from the proceeds of such sale(s), an amount equal to its Pro Rata Share of the value of its interest in the property sold. Each holder of an Allowed Secured Claim shall also be entitled to its share of distributions from any Litigation Recovery realized from the prosecution of litigation claims in which such holder has an interest.

The primary distribution in these cases, however, will come from the Purchase Price realized from the Sale. The Debtors intend to ask the Bankruptcy Court to allocate the Purchase Price (net of any cure payments or other price reductions provided for in the Asset Purchase Agreement, such net being the "Net Collateral Proceeds"), amongst the holders of Allowed Secured Claims (other than Classes 3 and 10) as follows: the Net Collateral Proceeds will be divided by the number of restaurants sold or transferred to the Buyer (assuming 201 restaurants) to determine the "Per-Restaurant Allocation," provided that any proceeds attributable to a fee simple real property interest in the single Burger King® restaurant in Morgan Hill, California owned by Sydran I (the "Real Property"), which the Debtors believe is valued at approximately $1,375,000,[79] shall be distributed, first, to ACIC, to satisfy any unpaid reimbursement obligations up to $600,455 in connection with utility bonds issued in favor of Sydran II and Sydran IV, and second, to the extent of any remaining proceeds, to the Chase Lender Group pro rata. Assuming a purchase price of $20,850,000 ($20,000,000 without reductions for payment of administrative expenses, plus the refund of the $850,000 Expense Deposit), minus a working capital adjustment of $3,000,000,[80]

---

[79]  The Debtors believe that the Real Property is valued in the range of $1,250,000 to $1,500,000. For the sake of simplicity, the Debtors use the midpoint of this range or $1,375,000 in the calculation of secured creditor recoveries above.

[80]  As set forth in footnote 7 above, the Debtors cannot predict with certainty the working capital adjustment that may be made against the Purchase Price. The Debtors currently estimate that such adjustment will total approximately $3.3 million, but recognize that a continuation of the Debtors' current sales trend and ongoing credit support from vendors may result in a reduction of such adjustment by $500,000 or more. For the sake of simplicity, the Debtors have assumed a working capital adjustment of $3,000,000 for purposes herein of calculating anticipated returns to secured creditors.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   minus cure costs in the amount of approximately $3,700,000 that would be payable to BKC under

2   the Debtors' franchise agreements for restaurants that are being acquired by the Buyer,[81] and

3   minus a deduction in the amount of $1,375,000 on account of the Real Property, the Per-

4   Restaurant Allocation totals $63,557.21.[82]

5          The restaurants and related collateral subject to the security interests of the holders of Class

6   4 and Class 5 Claims shall be referred to herein as the "Combined Class 4-Class 5 Collateral"

7   because the holders of Class 4 and Class 5 Claims generally have security interests in common

8   collateral (with the exception of, inter alia, the Real Property). Under the Intercreditor

9   Agreements, the holders of Class 4 Claims are entitled to a priority distribution up to the full

10  amount of such Claims out of the proceeds of the common collateral shared with the holders of

11  Class 5 Claims. The restaurants and related collateral subject to the security interests of the holder

12  of the Class 6 Claim shall be referred to herein as the "Class 6 Collateral," and the restaurants and

13  related collateral subject to the security interests of the holder of the Class 7 Claim shall be the

14  "Class 7 Collateral." The Class 6 Collateral and the Class 7 Collateral are excluded from the

15  security interests of the holders of Class 4 and Class 5 Claims. There is also no overlap between

16  the Class 6 Collateral and the Class 7 Collateral.

17         The portion of the Net Collateral Proceeds allocated to the Combined Class 4-Class 5

18  Collateral shall be the number of restaurants in the Class 4-Class 5 Collateral multiplied by the

19  Per-Restaurant Allocation. The Debtors believe that this amount is $10,868,282.91 (171

20  restaurants[83] multiplied by $63,557.21). The holders of the Allowed Class 4 Claim shall be paid in

21  full $4,700,000 from the portion of the Purchase Price allocated to the Combined Class 4-Class 5

22  Collateral and, following such payment, each holder of an Allowed Claim in Class 5 shall be paid

23  its Pro Rata Share of the remaining balance of the portion of the Purchase Price allocated to the

24

25  [81]  The Debtors' obligations to BKC under the parties' franchise agreements for restaurants that are being acquired by
    the Buyer would either be payable by the Debtors as cure obligations, in the event that the franchise agreements are

26  assumed by the Debtors and assigned to the Buyer, or as a reduction to the Purchase Price, in the event that the
    franchise agreements are rejected by the Debtors and the Buyer is required to enter into new franchise agreements with

27  BKC that require the payment of "new franchise" or other fees.
    [82]  Dividing $12,775,000 by 201 restaurants.

28  [83]  The Buyer is only acquiring 171 of the 195 restaurants originally pledged by the Debtors in favor of the Chase
    Lender Group. The remaining 24 restaurants have either been closed or designated as Closure Properties.

Combined Class 4-Class 5 Collateral or $6,168,282.91 (plus its Pro Rata Share of $774,545 on account of the Real Property, which is the value of the Real Property after payment to ACIC in the amount of up to $600,455). The foregoing reflects an aggregate distribution to the Chase Lender Group of approximately 5.9%. The holders of the Allowed Class 5 Claim shall also be entitled to their respective shares of any Litigation Recoveries.

The portion of the Net Collateral Proceeds allocated to the Class 6 Collateral, and Class 7 Collateral, respectively, shall be the number of restaurants in the Class 6 Collateral and the Class 7 Collateral, respectively, multiplied by the Per-Restaurant Allocation. The Debtors believe that for Class 6 this amount is $1,334,701.41 (21 restaurants[84] multiplied by $63,557.21), which reflects an aggregate distribution of approximately 13.9%, and for Class 7 this amount is $572,014.89 (9 restaurants[85] multiplied by $63,557.21), which also reflects an aggregate distribution of approximately 12.0%. The holders of the Allowed Class 6 and Class 7 Claims shall also be entitled to their respective shares of any Litigation Recoveries.[86]

The Debtors anticipate that there will be no remaining value out of the Purchase Price available to the holder of the Class 8 Claim due to the insufficiency of the BKC Collateral and the effects of the Intercreditor Agreements. However, as with Classes 5, 6 and 7, the holder of the Class 8 Claim is entitled to its share of any Litigation Recoveries.

## VI.

## DISTRIBUTIONS TO HOLDERS OF UNSECURED CLAIMS

The Plan creates two (2) Classes of Allowed Unsecured Claims: Class 11 (Allowed Claims of Participating Vendors) and Class 12 (Allowed Unsecured Claims Other than Claims of Creditors of Participating Vendors). The Debtors estimate that the amounts of the prepetition claims in these Classes are as follows: Class 11 – approximately $8.5 million[87] and Class 12 –

---

[84] The Buyer is only acquiring 21 of the 23 restaurants originally pledged by Sydran IV in favor of GMACCM. The remaining two restaurants have either been closed or designated as Closure Properties.

[85] The Buyer is only acquiring 9 of the 11 restaurants originally pledged by Sydran IV in favor of GEC-BAFC. The remaining two restaurants have either been closed or designated as Closure Properties.

[86] The holders of Allowed Secured Claims in Classes 6 and 7 receive a higher percentage return than the Chase Lender Group because there is less debt against the restaurants securing these obligations than against the restaurants securing the debt owed to the Chase Lender Group.

[87] The actual amount of Claims in Class 11 will depend on the amount of Claims held by holders who elect to be treated as Participating Vendors.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    approximately $135 million (inclusive of estimated deficiency claims of secured creditors, but

2    exclusive of potential claims arising from the Debtors' rejection of executory contracts or

3    unexpired leases).

4    The Debtors also anticipate that certain vendors may attempt, under applicable state law, to

5    reclaim goods recently delivered to the Debtors (the "Reclamation Claims").  With respect to such

6    Reclamation Claims, the Debtors intend to treat such claims as non-priority unsecured claims

7    against the estates (without any obligation on the part of the Debtors to return goods or any other

8    products to reclaiming sellers) because any reclamation rights in the Debtors' assets have been cut

9    off by various blanket secured claims asserted against the estates.  Reclamation Claims are

10   therefore included in the estimates of Claims in Classes 11 and 12 set forth in the foregoing

11   paragraph.  Nonetheless, putative Reclamation Claims may be paid as part of the Participating

12   Vendor Class or as part of a cure payment with respect to the assumption and assignment of

13   executory contracts.  Also, to the extent that a Reclamation Claim is also a PACA Claim, such

14   claim will be paid under the provisions of the Plan governing the treatment of PACA Claims.

15   Allowed Claims in Class 11 (Participating Vendors) shall be assumed by the Buyer and

16   paid in full upon or promptly following the Effective Date of the Plan, without interest or penalty.

17   Participating Vendors in Class 11 consist of those trade vendors or suppliers of the Debtors who

18   continue to do business with the Debtors after the Petition Date and agree to execute an agreement

19   with the Buyer to extend trade credit to the Buyer from and after the Effective Date of the Plan.  It

20   is expected that such agreements would be at least on the same credit terms as the ordinary

21   prepetition arrangements between the applicable Debtor and the applicable vendor.  A list of

22   anticipated eligible Participating Vendors is attached hereto as Exhibit B.[88]  The Debtors anticipate

23   that the prepetition claims of Participating Vendors will total approximately $8.5 million.  The

24   Debtors are currently aware of approximately 40 trade vendors or parties to executory contracts or

25   unexpired leases who shall not be treated as Participating Vendors.  These parties are expected to

26

27   [88]  As mentioned above, upon mailing of this Disclosure Statement, the Debtors anticipate that the attached listing of
     Participating Vendors shall have been approved by Strategic.  Once such list is finalized, no vendor shall be removed

28   from the list unless such vendor alters credit terms or refuses to ship goods or to provide services to the Debtors,
     without the agreement or acknowledgment of the Debtors.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    assert prepetition claims totaling approximately $500,000, plus approximately $150,000 in

2    disputed litigation claims.

3           Unsecured Claims in Class 12 consist of Allowed Unsecured Claims other than Claims of

4    Participating Vendors.  Claims in this Class include the deficiency claims of undersecured

5    Creditors, the subordinated unsecured claims of Allied and the other Sub-Debt Holders, and

6    prepetition claims of Creditors who are ineligible to be Participating Vendors or who do not

7    qualify as Participating Vendors.

8           The holders of Allowed Claims in Class 12 (Unsecured Claims) shall not receive any

9    distribution from the Buyer or any part of the Purchase Price under the Asset Purchase Agreement,

10   but will share in the Net Plan Proceeds, if and to the extent any Litigation Recovery or any

11   Liquidation Proceeds result in Net Plan Proceeds in excess of what is distributed or distributable to

12   Administrative Claims, Priority Tax Claims, and Classes 1 through 11 under the Plan.  In addition,

13   if there is a Special Class 12 Distribution,[89] such distribution shall be made, promptly after the

14   Effective Date, Pro Rata, only to the Specified Holders of Allowed Unsecured Claims in Class

15   12.[90]  The Debtors do not anticipate that there will be any distribution to the holders of Claims in

16   Class 12, unless there is a Special Class 12 Distribution.

17                                      **VII.**

18                   **NO DISTRIBUTIONS TO HOLDERS OF INTERESTS**

19          The Plan classifies Interests in Class 13.  There will be no distributions of any kind to the

20   holders of Interests and each Interest in the Debtors shall be deemed cancelled on the Effective

21   Date.

22

23

24

25   _____

26   [89]   The Special Class 12 Distribution is purely voluntary.  The Debtors cannot currently predict whether there will be a
     Special Class 12 Distribution, but this possibility may be taken into account in considering overbids for the Debtors'
     assets that may be submitted by a Creditor or Creditors in Class 5.

27   [90]   The Plan defines "Specified Holders of Allowed Unsecured Claims in Class 12" as any holder of an Allowed
     Unsecured Claim in Class 12 other than the Holdings Companies, Allied, any Claimant holding a subordinated note or

28   similar subordinated instrument which is subordinated in the same manner and to the same extent as the Allied
     Subordinated Note, and any Claimant with a Deficiency Claim.

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 128
of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# VIII.

## KEY PLAN PROVISIONS

A.    **SOURCE OF PLAN FUNDING**

The Plan will be funded by the "Plan Proceeds" consisting of:

**1.  SALE PROCEEDS**

On the Effective Date and upon the closing of the transactions contemplated in the Strategic Asset Purchase Agreement (which the Debtors assume for illustrative purposes to occur on January 26, 2005), the Debtors' estates shall principally consist of Cash realized from the sale, net of any adjustments and reserves and excluding any Cash that is part of the Purchased Assets. The Debtors estimate Available Cash will total approximately $14,150,000[91] on the Effective Date, consisting primarily of the anticipated proceeds from the Sale minus certain cure costs paid to BKC.

**2.  LIQUIDATION PROCEEDS**

Liquidation Proceeds will consist of the proceeds realized by the Reorganized Debtors after the Effective Date including any Cash or other consideration paid to or realized by the Debtors or the Reorganized Debtors, as the case may be, upon the sale, transfer, assignment or other disposition of the Plan Assets. The Debtors do not anticipate that there will be any material value in the Liquidation Proceeds.

**3.  LITIGATION RECOVERY**

The Litigation preserved by the Debtors for the Reorganized Debtors under the Plan includes:

  a.    Any Avoidance Actions, other than the Transferred Claims;

  b.    any claims or causes of action against vendors who are not Participating Vendors under the Plan, solely to the extent assertable as defenses, counterclaims or setoffs; and

---

[91]   As addressed in Article V above, this amount assumes a purchase price of $20,850,000 ($20,000,000 without reductions for payment of administrative expenses, plus the refund of the $850,000 Expense Deposit), minus a working capital adjustment of $3,000,000, and minus cure costs in the amount of approximately $3,700,000 that would be payable to BKC under the Debtors' franchise agreements for restaurants that are being acquired by the Buyer.

c. all other claims or causes of action not attributable to, or part of, the Purchased Assets.

**PROJECTED PLAN PROCEEDS**

| | |
|---|---|
| Available Cash | $14,150,000 |
| Liquidation Proceeds | $0 |
| Litigation Recovery | Unknown |
| TOTAL | $14,150,000 |

**B. MANAGEMENT OF REORGANIZED DEBTORS**

The Reorganized Debtors will be managed and governed by the Responsible Officer. The Plan designates Bradley Sharp of Development Specialists, Inc. as Responsible Officer. Any connections between the Responsible Officer and the Debtors or their Creditors shall also be disclosed at or prior to the Confirmation Hearing. The Responsible Officer shall be compensated at the Blended Rate[92] and shall be reimbursed for reasonable out of pocket expenses. The Asset Purchase Agreement contemplates that Matthew Schoenberg, Kenneth Freed and Charles Dooly may consult with the Buyer for up to six (6) months after the Effective Date.

**C. PRIORITY TAX CLAIMS**

The Debtors anticipate that the estates will be obligated to satisfy certain tax claims entitled to priority under section 507(a)(8) of the Bankruptcy Code. The Debtors estimate that Priority Tax Claims in these cases will total approximately $850,000, but the Debtors anticipate that most such Claims will be assumed by the Buyer under the Asset Purchase Agreement. Any remaining Claims entitled to priority will be paid in full under the Plan.

**D. PRIORITY EMPLOYEE CLAIMS**

The Debtors believe that most employee claims entitled to priority under sections 507(a)(3) or (a)(4) of the Bankruptcy Code have been paid by the Debtors pursuant to authority granted by the Bankruptcy Court in connection with the "first day" motions (described in Article II.B above).

---

[92] Under the Plan, the Blended Rate means, with respect to the Responsible Officer and employees or members of his firm, the lesser of (i) $300 per hour, or (ii) the hourly rate determined by the quotient of the total fees for the engagement (based upon each biller's ordinary hourly rate) divided by the total number of hours worked.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Debtors anticipate that only accrued vacation benefits totaling approximately $600,000 will remain unpaid as of the Effective Date. Most such Claims will be assumed by the Buyer under the Asset Purchase Agreement and satisfied or honored in the ordinary course when due. Any remaining Claims entitled to priority will be paid in full under the Plan.

## E. ADMINISTRATIVE CLAIMS AND PLAN EXPENSES.

The Plan contemplates that Administrative Claims shall be paid in full by the Debtors, unless such obligations are Assumed Obligations in which case such Administrative Claims will be paid by the Buyer under the Asset Purchase Agreement. The Bankruptcy Court shall set a bar date for the filing of Administrative Claims against the estates, which may be encompassed in the Confirmation Order. The Plan provides that the deadline for Professionals to file requests for payment of Professional Fees is sixty (60) days after the Effective Date of the Plan. Additional information regarding Administrative Expenses (including Professional Fees) and anticipated Plan Expenses can be found below.

### 1. Administrative Expenses.

#### a. Services By and Fees of Professionals Prior to the Effective Date.

The Plan provides that fees and expenses for the Professionals retained by the Debtors for services rendered and costs incurred after the Petition Date and prior to the Effective Date will be paid by the Debtors or the Reorganized Debtors following approval by the Bankruptcy Court after notice and a hearing. The following chart is an estimate of the unpaid professional fees for the principal Professionals involved in these cases as of November 30, 2004, without taking into account payments made to Professionals (if any) during the pendency of the Chapter 11 Cases.[93]

| NAME | ROLE | TOTAL AMOUNT INCURRED | AMOUNT UNPAID | UNUSED RETAINER BALANCE | TREATMENT UNDER PLAN |
|------|------|------------------------|---------------|--------------------------|----------------------|
| Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. | Debtors' general bankruptcy counsel | $457,160.28 | $457,160.28 | $550,000.00 | Payment in full |
| Conway, Del Genio, Gries & Co., LLC | Debtors' financial advisors | $309,223.95 | $309,223.95 | $300,000.00 | Payment in full |

[93] It is anticipated that a portion of such fees will be paid prior to the Effective Date in accordance with interim fee procedures approved by the Bankruptcy Court in the case. The Professionals listed all have the benefit of a "carve-out" from the secured creditors to cover a portion of their Professional Fees. The carve-out is currently estimated to be sufficient, when added to retainers and interim payments, to enable full payment of all Professionals.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| Greene Radovsky Maloney & Share LLP | Debtors' transactional counsel | $101,422.54 | $101,422.54 | $45,688.00 | Payment in full |
|---|---|---|---|---|---|
| Stone Pigman Walther Wittmann L.L.C. | Debtors' special counsel | $71,883.47 | $71,883.47 | $20,000.00 | Payment in full |
| Irell & Manella LLP | Committee's general bankruptcy counsel | $175,000.00 | $175,000.00 | N/A | Payment in full |
| Mesirow Financial Consulting, LLC | Committee's financial advisors | $21,000.00 | $21,000.00 | N/A | Payment in full |

### 2. Other Administrative Expenses.

The Plan provides for the payment as an Administrative Claim of the actual and necessary costs or expenses of preserving the Debtors' estates or conducting the affairs of the Debtors. The Debtors do not believe that they have incurred any expenses not already paid in the ordinary course of the Debtors' postpetition affairs, or that would not be assumed by the Buyer as Assumed Obligations under the Asset Purchase Agreement.

### 3. Plan Expenses.

#### a. Services by Professionals and Certain Parties After the Effective Date.

The Plan provides that fees for services rendered and costs incurred on and after the Effective Date by the Responsible Officer or by the Responsible Officer's Professionals to assist in the implementation of the Plan will be paid out of the Plan Proceeds. The Reorganized Debtors will likely need assistance from legal counsel to, among other things, analyze Claims and potential litigation actions, and handle the sale, liquidation, or collection of the Reorganized Debtors' remaining assets. The Reorganized Debtors will also likely require assistance from tax professionals to file final tax returns. Because Bankruptcy Court review of the fees and expenses of Professionals will entail additional costs, and thereby reduce distributions to Creditors, the Plan provides that all fees and expenses of the Responsible Officer and the Responsible Officer's Professionals in implementing the Plan and making distributions under the Plan may be paid without further notice to Creditors or approval of the Bankruptcy Court. In addition, the Reorganized Debtors may require administrative or clerical assistance in tracking claims, accounting, document and file management and correspondence.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**b.** **Other Plan Expenses.**

Although the Debtors do not presently anticipate any other Plan Expenses, it is possible that the Reorganized Debtors will retain additional professionals to assist with the closing of the estates, such as special litigation counsel to resolve pending or potential litigation.

**c.** **Summary of Plan Expenses.**

The following chart briefly summarizes the Estimated Plan Expenses projected for implementing the Plan after the Effective Date. The figures represent the Debtors' best current estimate. If the Responsible Officer acts as the Disbursing Agent under the Plan, the estimate for the Responsible Officer is expected to cover such services.

| DESCRIPTION | ESTIMATED AMOUNT OF PLAN EXPENSES |
|---|---|
| Responsible Officer | $75,000 |
| Estate Legal Counsel | $100,000 |
| Tax Preparation Fees | $50,000 |
| Claims Administration | $25,000 |
| Other Professionals | $20,000 |
| U.S. Trustee Fees | $15,000 |
| Miscellaneous | $15,000 |
| TOTAL | $300,000 |

**IX.**

**OTHER CRITICAL INFORMATION REGARDING THE PLAN**

**A.** **AVOIDANCE ACTIONS**

The Debtors have not yet analyzed the preference and fraudulent transfer claims (i.e., Avoidance Actions) that the Estates may have against third parties and have not commenced any actions against potential transferees. The fact that the Debtors have not commenced actions prior to the Effective Date of the Plan should in no way imply that they are waiving their rights to bring such actions.[94]

Specifically and except as set forth in the Plan, the Debtors expressly reserve the right to seek to avoid any transfer, including those listed on Tab 29 of the Plan Supplement, made within

---

[94] Except that, under the Asset Purchase Agreement, the Transferred Claims are being assigned to the Buyer. Thus, the Debtors will be unable to pursue any claims against the Holdings Companies; however, the Debtors are unaware of any such claims.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   ninety (90) days of the Petition Date and one (1) year of the Petition Date (as to Insiders) or such

2   longer periods as may be available under applicable non-bankruptcy law.  The Debtors intend to

3   prosecute only those Avoidance Actions that are cost effective or otherwise can be raised as a valid

4   defense to the allowance of a Claim pursuant to Bankruptcy Code section 502(d).

5   **B.**      **TAX IMPLICATIONS**

6   The tax consequences of the Plan will vary based on the individual circumstances of each

7   holder of a Claim or Interest.  Accordingly, each Creditor and Interest Holder is strongly urged to

8   consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of

9   the Plan.

10  **C.**      **RISKS UNDER THE PLAN**

11  The only material risk to implementation of the Plan is the failure of the Sale to close.  The

12  Debtors believe that all conditions to the Sale will be satisfied or addressed and that the Sale will

13  close.

14  **X.**

15  **LIQUIDATION ANALYSIS**

16  Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of

17  the Plan by an impaired Class, the Debtors must demonstrate that, and the Bankruptcy Court must

18  determine that, with respect to such Class, each holder of a Claim or Interest will receive property

19  of a value, as of the Effective Date of the Plan that is not less than the amount that such holder

20  would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the

21  Effective Date of the Plan.  This requirement is commonly referred to as the "Best Interests Test."

22  For the reasons set forth below, the Debtors submit that the proposed Sale to Strategic (or

23  potentially an Alternate Buyer for additional consideration) easily satisfies the "Best Interests

24  Test" and therefore should be approved.

25  In a chapter 7 liquidation, holders of Allowed Claims would receive distributions based on

26  the liquidation or collection of the Debtors' assets.  Such assets would include the same assets that

27  are being sold as part of the Debtors' operating business under the Plan.  However, in a chapter 7

28  case, the Debtors' assets would probably not generate going concern value because a chapter 7

82700-002\DOCS_SF:4477S.4                                                              DISCLOSURE STATEMENT

trustee will not have the capability, expertise, or knowledge to maintain the Debtors' operations long enough to consummate a sale.[95]  Any property available for distribution to Creditors would be further reduced by the commission payable to the chapter 7 trustee and the trustee's attorneys and accountants, which costs would be in addition to the administrative costs of the Chapter 11 Cases (such as the compensation for Professionals) that have already been incurred.

To estimate what members of each Impaired Class of Claims would receive if the Debtors were liquidated pursuant to chapter 7 of the Bankruptcy Code, the Debtors must first determine the aggregate dollar amount that would be available if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of the Debtors would consist of the proceeds from the disposition of the Debtors' assets, augmented by any Cash held by the Debtors, minus the considerable expenses that would be incurred during the liquidation process.

The Debtors have prepared a Liquidation Analysis attached hereto as **Exhibit G** that clearly demonstrates that Creditors will receive significantly less in the context of a chapter 7 liquidation than under the Plan.  As reflected in the Liquidation Analysis, given the complexity and scope of the Debtors' operations and the expense of conducting an orderly liquidation, it is possible that a liquidation scenario may fail to generate any material positive return to the estates, which means that the most effective and risk-free method for maximizing value in the context of a chapter 7 liquidation may be to simply shut-down and abandon all of the Debtors' property at their various restaurant locations.  Even under the best possible scenario in a chapter 7 case, the Debtors estimate that the estates will only recover gross proceeds in the range of approximately $6.8 million to $8.2 million from a liquidation, before reduction for costs such as utilities and rent.  The Sale under the Plan, on the other hand, will result in proceeds of approximately $20 million in Cash (less any price adjustments), plus the assumption of certain Assumed Obligations.

---

[95]  Because the Debtors believe that the Asset Purchase Agreement is the highest and best alternative for maximizing recoveries to Creditors, the Debtors do not expect that limited operation of the Debtors' restaurants by a chapter 7 trustee -- even assuming that was possible -- would yield greater value for Creditors than the consideration available under the Asset Purchase Agreement.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   The primary reason for the reduced recovery in a liquidation is that the Debtors will be

2   unable to realize the going concern value of their business, and will be limited to the liquidation

3   value of various "hard" assets such as furniture, equipment, and inventory, and the collection of

4   accounts receivable and various pre-paid items.  At the same time, the estates would incur

5   significant expense in attempting to liquidate the Debtors' assets in a chapter 7 case.  The Debtors

6   have 227 restaurant locations located in 8 states.  In a chapter 7 case, unless the decision is made to

7   simply abandon the Debtors' assets, the chapter 7 trustee would be required to continue to pay rent

8   at each of the Debtors' restaurants for up to 60 days and to hire employees throughout the country

9   to effectuate the liquidation.  As reflected in the Liquidation Analysis, the Debtors anticipate that

10  this process could cost in the range of approximately $6.9 million to $7.8 million (inclusive of

11  estimated professional fees and trustee fees at 3% of the total asset proceeds), which may exceed

12  the proceeds that are likely to be generated from the liquidation effort.

13  The proposed Sale will yield a significantly better recovery for Creditors because the

14  Debtors will realize their going concern value, which is tied directly to the operation of the

15  Debtors' store locations as Burger King® restaurants.  If these cases were converted to chapter 7,

16  the Debtors' franchise agreements would probably be terminated or rejected and the Debtors'

17  restaurants closed, creating very substantial rejection damages claims that do not exist under the

18  Plan.  But, even if the franchise agreements were not rejected, the Allowed Secured Claims in

19  Classes 4, 5, 6, 7, 8, 9 and 10 would subsume all of the value of the Debtors' assets, leaving

20  nothing for unsecured creditors.  Also, in the absence of the transaction with the Buyer that is

21  proposed under the Plan, the Assumed Obligations (which consist largely of Unsecured Claims)

22  would not be assumed.

23  As described in the attached Liquidation Analysis, the Debtors anticipate that their business

24  operations will cease immediately upon conversion of the case to chapter 7.[96]  Within seven to ten

25  days thereafter, the Debtors assume that all of their inventory could be sold to other Burger King®

---

[96] Even if a series of smaller sales of the Debtors' operating restaurants were feasible, such restaurants would have to be operated, and royalties and rent would have to be paid, for the duration of the marketing and sale period.  The Debtors believe that such a scenario is too speculative and, in any event, would not realize sale proceeds superior to the proceeds that will be generated from the Sale to the Buyer.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    restaurant operators at recoveries estimated at between 52% to 63% of original cost. The Debtors

2    further assume that their furniture, fixtures and equipment would be sold over an approximately

3    six-week period by a professional liquidator, during which the chapter 7 trustee would also attempt

4    to collect on accounts receivable and various pre-paid items. The Debtors expect that the chapter 7

5    trustee will elect to retain and pay certain employees of the Debtors to assist in the liquidation

6    process, all of which will require the estate to incur additional costs. Ultimately, as set forth in

7    much greater detail in the attached liquidation analysis, the Debtors believe that the estates may

8    recover anywhere from $0 to $1.3 million in net proceeds in the context of a chapter 7 liquidation,

9    and will be unable to preserve the going concern value of the Debtors' operations.

10          The Plan, on the other hand, maximizes the operational value of the Debtors' assets and

11   contemplates a recovery for the estates of approximately $20 million in cash (assuming no material

12   price adjustments), plus the assumption of certain creditor claims and the elimination of potentially

13   significant rejection damages. As a result, the Plan provides for significantly better recoveries for

14   Creditors than in the context of a liquidation under chapter 7 of the Bankruptcy Code and satisfies

15   the Best Interests Test, in particular because the Buyer is paying going concern value and

16   assuming the Assumed Obligations.

17          It also bears emphasis that the Debtors have already absorbed the costs of marketing their

18   assets, negotiating the terms of a sale, and executing a definitive Asset Purchase Agreement with

19   Strategic. In a chapter 7 case, the trustee would be entitled to seek a sliding scale commission of

20   up to 3% of the funds distributed by such trustee to creditors. The Debtors estimate that a trustee

21   could seek compensation in the range of up to approximately $204,000 to $246,000 assuming

22   distributions (inclusive of total asset proceeds) in the range of approximately $6.8 million to $8.2

23   million), even though the Debtors may have already incurred the expense associated with

24   generating those funds. So, even in the unlikely event that a chapter 7 trustee were able to close

25   either the same or a different sale, Creditors would probably recover less because the trustee would

26   be entitled to a portion of the proceeds as a commission. Although under Bankruptcy Code section

27   326 the trustee's compensation is capped by this sliding scale, and the trustee should be required to

28   demonstrate the reasonableness of his or her commissions in relation to work actually performed

or results obtained, the Debtors cannot predict whether the trustee would seek or obtain a straight commission based solely on distributions or some lesser amount. Nonetheless, whatever the amount of compensation for a trustee, there is a reasonable likelihood that Creditors would "pay again" for the proceeds realized from a sale of the Debtors' assets because the chapter 7 trustee would be entitled to receive a commission in some amount for distributing the proceeds from a transaction effectively "handed over" to the trustee by the Debtors.

In addition, the trustee will invariably employ legal counsel and accountants which would add additional administrative expenses that would be paid ahead of Creditors. The Debtors already have legal counsel who have extensive knowledge of the complexities of these cases. The learning curve for the trustee, new counsel, and perhaps new staff will simply increase expense and reduce the recoveries to Creditors.

It must be noted that the Debtors' business is complex. Restaurant operations are best handled by the Debtors' own experienced staff. These persons are especially important because of their knowledge of the Debtors' business and their collective operational abilities that cannot be easily transferred to a trustee. There is no assurance that the Debtors' staff would remain in a chapter 7 liquidation.

Because the Plan effectuates the priorities set forth in the Bankruptcy Code consistent with existing Intercreditor Agreements amongst the Creditor constituencies, each Creditor will receive under the Plan proposed by the Debtor property of a value that is not less than the amount such Creditor would receive in a chapter 7 case. The Plan proposed by the Debtors presents a better alternative to Creditors than a chapter 7 liquidation because the Debtors can maximize the value of their assets through a going concern sale of an operating business, with the assistance of employees and Professionals with significant institutional knowledge and experience in the Debtors' affairs, and they can do so quicker and cheaper than a trustee who is unfamiliar with the Debtors' business and their assets and liabilities.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 138 of 187

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# XI.

## CONFIRMATION OF THE PLAN

The Debtors will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code.

## A.    CONFIRMATION HEARING

The Bankruptcy Court will hold a hearing on _____, 2005, at __:__ _.m. to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied.  The hearing on confirmation will be held at the United States Bankruptcy Court, 1300 Clay Street, Room 215, Oakland, California 94612.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Any objection to confirmation of the Plan must be made in writing and specify the legal grounds for such objection, the nature and amount of the Claim or Interest held by such party, and must be filed with the Bankruptcy Court, together with proof of service, and served on all required parties by the objection deadline set by the Bankruptcy Court.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.    REQUIREMENTS FOR CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied.   If all of the provisions of section 1129 of the Bankruptcy Code are met, the Bankruptcy Court may enter an order confirming the Plan.  The Debtors believe that all of the requirements of section 1129 of the Bankruptcy Code will be satisfied.  Among other things, the Debtors believe that the Plan will be accepted by the requisite number of votes and satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code.  The Debtors submit that they have complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and is made in good faith.  In addition, the Debtors submit that the Plan satisfies the "best interest" of Creditors and is not likely to be followed by liquidation or the need for further reorganization.

82780-001\DOCS_SF:4778.4

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## C.    CLASSIFICATION OF CLAIMS AND INTERESTS

The Bankruptcy Code requires that a plan of reorganization place each creditor's claim and each equity interest in a class with other claims or interests that are "substantially similar." The Plan establishes thirteen (13) Classes of Claims and Interests. Under the Plan, Claims which are secured or entitled to priority are placed in separate Classes from unsecured Claims. The Classes of Certain Assumed Obligations and Participating Vendors have been classified separately from other Unsecured Claims because Strategic has agreed (or an Alternate Buyer will agree) to assume such Claims. For a detailed description of the Classes of Claims and Interests under the Plan, see Article IV.

The Debtors believe that the Plan's classification of Claims and Interests fully complies with the requirements of the Bankruptcy Code.

## D.    ACCEPTANCE

As a condition to Confirmation, the Bankruptcy Code requires that each class of holders of claims or interests accept the plan, with the exceptions described in Article XI.G below. The Bankruptcy Code defines acceptance by a class of holders of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims of that class, but for this purpose counts only those who actually vote to accept or reject the plan. Holders of claims who fail to vote are not counted as either accepting or rejecting the plan.

Classes of claims and interest that are not "impaired" under a plan are deemed to have accepted the plan. A class is generally "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturities or by payment in full in cash. A class that receives nothing under a plan is deemed to reject such plan.

IN THIS CASE, THE FOLLOWING CLASSES ARE IMPAIRED UNDER THE PLAN: CLASSES 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 AND 13. CLASS 13 IS NOT ENTITLED TO VOTE ON THE PLAN AND IS DEEMED TO REJECT THE PLAN.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1

## E.     BEST INTERESTS OF CREDITORS

As addressed in Article X above, the Debtors believe that confirmation of the Plan is in the best interests of the holders of Claims because it provides to holders of Impaired Claims distributions having a present value as of the Effective Date of not less than the value such holders would likely receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In sum, as reflected by the Debtors' Liquidation Analysis above, the Debtors believe that the holders of Claims and Interests would only realize a fraction of the value available under the Plan in a chapter 7 liquidation primarily because the Debtors would be unable to maximize the going concern value of the Debtors' operational assets.  Consequently, the Debtors believe that the Plan is in the best interests of the holders of Claims and Interests in these cases.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the holders of Claims and Interests in any Impaired Class that has not voted to accept the Plan would receive a distribution under the Plan that is at least as great as the distribution that such holders would receive upon a liquidation of the Debtor pursuant to chapter 7 of the Bankruptcy Code.

## F.     FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Plan proposed by the Debtors satisfies these requirements and is "feasible" because the implementation of the Plan and the reorganization of the Debtors' affairs will be funded by the proceeds from the sale of the Debtors' assets under the Asset Purchase Agreement.  Following the Effective Date, the Debtors will cease all business operations and the payments to Creditors under the Plan will not depend on the Debtors continuing to operate their businesses.  The Buyer will demonstrate at or prior to the Confirmation Hearing that it has the financial wherewithal to consummate the purchase and to satisfy its obligations under the Asset Purchase Agreement.

1  Therefore, the Debtors believe that confirmation of the Plan is not likely to be followed by

2  a liquidation of the Reorganized Debtors or a need for a further financial reorganization of the

3  Reorganized Debtors.

4  **G.   CRAMDOWN**

5  A court may confirm a plan, even if it is not accepted by all impaired classes, if the plan

6  has been accepted by at least one impaired class of claims and the plan meets the "cramdown"

7  requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the

8  Bankruptcy Code requires that the court find that a plan is "fair and equitable" and does not

9  "discriminate unfairly" with respect to each nonaccepting impaired class of unsecured claims or

10  interests.  With respect to a dissenting class of unsecured claims, the "fair and equitable" standard

11  requires, among other things, that a plan contain one of two elements.  It must provide either that

12  each holder of an unsecured claim in such class receive or retain property having a value, as of the

13  effective date of a plan, equal to the allowed amount of its claim, or that no holder of allowed

14  claims or interests in any junior class receive or retain any property on account of such claims or

15  interests.  With respect to a dissenting class of interests, the "fair and equitable" standard requires

16  that the plan contain one of two elements.  It must provide either (i) that each holder of an interest

17  in the class receive or retain property having a value, as of the Effective Date, equal to the greater

18  of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the

19  value of such interests, or (ii) that no holder of an interest in any junior class receive or retain any

20  property on account of such interests.  The strict requirement of the allocation of full value to

21  dissenting classes before junior classes can receive a distribution is known as the "absolute priority

22  rule."

23  In the event that any impaired Class shall fail to accept the Plan in accordance with section

24  1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to request that the Bankruptcy

25  Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or modify the

26  Plan in accordance with the terms thereof.  The Debtors are also prepared to seek a valuation of the

27  interests of the holders of Allowed Secured Claims in Classes 5, 6, 7, 8 and 9, if necessary, to

28  support the Sale, free and clear of such Liens and Claims.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI, STANG, ZEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**H.**     **ALTERNATIVES TO CONFIRMATION OF PLAN**

If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives include (i) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code; or (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtors will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Debtors, their Creditors and other parties in interest. However, the Debtors believe that the Plan, as proposed, provides the greatest possible return currently available for the holders of Claims in these Chapter 11 Cases.

## XII.

## RECOMMENDATION AND CONCLUSION

Based on the foregoing, the Debtors believe that the Plan is in the best interests of Creditors and urge creditors to vote to accept the Plan.

82780/002\DOCS_SF:4578.4                                                           DISCLOSURE STATEMENT

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 143 of 187

Dated: _____, 2004                    Respectfully submitted,


**SYDRAN SERVICES, LLC,**                    **SYDRAN FOOD SERVICES IV, LLC,**
a Nevada limited liability company           a Nevada limited liability company

By:_____                 By:_____
Name:   Matthew Schoenberg                   Name:   Matthew Schoenberg
Title:    President and CEO                   Title:    President and CEO

**THE SYDRAN GROUP, LLC,**                   **SYDRAN BK SERVICES, LLC,**
a Nevada limited liability company           a Nevada limited liability company

By:_____                 By:_____
Name:   Matthew Schoenberg                   Name:   Matthew Schoenberg
Title:    President and CEO                   Title:    President and CEO

**SYDRAN FOOD SERVICES, L.P.,**              **SYDRAN DEVELOPMENT, LLC,**
a California limited partnership             a Nevada limited liability company

By:  Sydran Services, LLC, its General Partner   By:_____
                                             Name:   Matthew Schoenberg
By:_____                 Title:    President and CEO
Name:   Matthew Schoenberg
Title:    President and CEO


**SYDRAN FOOD SERVICES II, L.P.,**           **SYDRAN CASUAL DINING SERVICES,**
a California limited partnership             **LLC**
                                             a Nevada limited liability company
By:  Sydran Services, LLC, its General Partner
                                             By:_____
By:_____                 Name:   Matthew Schoenberg
Name:   Matthew Schoenberg                   Title:    President and CEO
Title:    President and CEO

**SYDRAN FOOD SERVICES III, L.P.,**          **SYDRAN III TEXAS, INC.**
a California limited partnership             a Texas corporation

By:  Sydran Services, LLC, its General Partner   By:_____
                                             Name:   Matthew Schoenberg
By:_____                 Title:    President and CEO

Name:   Matthew Schoenberg
Title:    President and CEO

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

82780-002\DOCS_SF:4778.4                                      DISCLOSURE STATEMENT

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 144
of 187

Submitted by:

PACHULSKI, STANG, ZIEHL, YOUNG,
    JONES &  WEINTRAUB P.C.


By:_____
        William P. Weintraub, Esq.
        Attorneys for:
        Sydran Services, LLC,
        The Sydran Group, LLC,
        Sydran Development, LLC,
        Sydran BK Services, LLC,
        Sydran Food Services, L.P.,
        Sydran Food Services II, L.P.,
        Sydran Food Services III, L.P.,
        Sydran Food Services IV, LLC,
        Sydran Casual Dining Services, LLC,
        and Sydran III Texas, Inc.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

S-2

**EXHIBIT A**

**JOINT PLAN OF REORGANIZATION**


**[FILED SEPARATELY]**

# EXHIBIT B

# LIST OF PARTICIPATING VENDORS

# List of Anticipated Eligible Participating Vendors[1]

| | | |
|---|---|---|
| 7 24 Rooter Service | A Bear Refrigeration Inc | A Bear Refrigeration Inc |
| A&A Discount Services Inc | A1 Alabama Key & Locksmith Inc | A1 Flue & Fire |
| AA Speedy Lksmiths & Sec | AAA Locksmith Service Mobile | AAA Restaurant Fire |
| AAA Safe Co LLC | AAA Safe Lock & Key Inc. | ABC Lighting Inc |
| ABCO Products | Access Safe & Lock LLC | Ace Lock & Safe |
| Acme Security Systems | Acoustical Ceiling | Action Plumbing (Tuscaloosa) |
| Ac-Vin Inc. dba River Road | Adam & Qobti Refrigeration | Adam & Qobti Refrigeration |
| Adams Drain & Sewer Cleaning Inc | Adams Repair & Maint Co | ADT Security Srvcs Inc (04) |
| ADT Security Systems Inc | Advance Lock Co Inc | Advanced Risk Technologies |
| AE Apollo Electric | Air Clean Service Inc | Air Masters Inc |
| Alabama Gas Corporation | Alamo Glass Co Inc | Alarm & Security Inc |
| Albert Tung | Alexander Properties Co | Alfreds Plumbing Service Inc |
| All Phase of Louisiana | All Plumbing Inc. | All Star Services |
| All Tech Mechanical | Allegra Print & Imaging | Allied Glass Co. Inc. |
| Allied Lock and Key | Allwest Business Machines | Altrua Marketing Designs |
| America Sign Maintenance | American Classified | American Glass & Mirrorworks Inc |
| American Lock & Safe | American Sound & Music | Ameristar Casino Hotel |
| Ami Mechanical Inc | Anselmos | Anthonys Septic Tank Service |
| Appliance Commercial Service | Aquila / Missouri Public Service | Armor Seal Asphalt Coatings Inc |
| Armstrong Electric Company Inc | ASP LLC | Associate Electric & Building Service Inc |
| Associated Services Co | AT & T Universal Biller | AT&T |
| Atmos Energy | Atmos Energy Louisiana-Lgs | Atmos Energy Louisiana-Lgs |
| Avilas Plumbing | Aws Distributing Inc | B & C Sheet Metal  Inc. |

---

[1]  Upon mailing of the Disclosure Statement, the Debtors anticipate that this listing of Participating Vendors shall have been approved by Strategic.  Once this list is finalized, no vendor shall be removed from the list unless such vendor alters credit terms or refuses to ship goods or to provide services to the Debtors, without the agreement or acknowledgment of the Debtors.

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 148 of 187

| | | |
|---|---|---|
| B&S Carpet One | Babineaux Plumbing Inc | Badgeco Inc |
| Badgecorp Inc | Badgemaster Inc | Baileys Lawn Service Inc |
| Baldwin County Electric Membership Corp. | Baldwin Locksmith | Baldwin Paper Co. |
| Baldwin Rural Area Transportation | Baldwin Septic Tank Service | Bana Parts Inc |
| Bano Distributors | Basin River Electrical | Bastrop Printing & Office |
| Bay Area Equipment | Bayou Cajun Pest Control Inc | Bayou Lighting and |
| Bayou Locksmith | Beaullieu Refrig Inc | Beaumont Bus Music Inc |
| Bell South | Bell Supply Inc | Benninks Refrigeration Service Inc |
| Benny Prejean Service Co Inc | Bertrands Printing & | Best Lighting Products |
| Betsy Ross Flag Company | Binswanger Glass 585 | Bio-Solutions of Baldwin County Inc |
| Bio-Solutions of Mobile | Birch Telecom | Blackwell Shepards Locksmith |
| Blanchards | Blossman Gas Inc | Blue Flash Sewer Svc Inc |
| Board of Police Commissioners Kcmo Police Dept | Board of Public Utilities | Bodemuller |
| Bourque Plumbing Heating A/C | Bozeman Distributors | BP Plumbing |
| BPS Products Inc | BPS Reprographic Services | Brantley Lawn Care |
| Brimstone Rentals Inc | Browning Ferris Industries | Buddy Frank |
| Budget Printing Company | Bufords Locksmith Service | Bunny Bread Inc |
| Burger King Corp[2] | Burger King Marketing[3] | Burnett Electric |
| Business Music of Arkansas | Buxton Properties Inc | C F Rives J F Robins and |
| C G Parts | C&W Refrigeration | C/C Chemical & Janitorial |
| Calaway Plumbing | California Water Service | Canfab Inc |
| Carencro Utilities System | Carr & Osborne | Carter Electric Svc Inc |
| Carter Microwave | Carters Jamese Glass & Design | CDW Computer Centers Inc |
| Celamark Corporation | Celeste Kochis | Centerpoint Energy |
| Central Glass Company Inc | Central Office Supply | Central Plumbing |

[2] Exclusive of prepetition amounts that may be owed on account of franchise agreements or leases.
[3] See preceding footnote.

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 149 of 187

| | | |
|---|---|---|
| Central Transport Int'l Inc | Century Tel | Certified Hood Cleaners |
| Chancellors Business Supply | Chapman Plumbing Company Inc | Charles Guillory Inc |
| Charter Communications | Charter House Holdings LLC | Cherokee Lock Works |
| Chi Chiu Lo Trust | Choicepoint Public Records Inc | Chrystal Rogers |
| Cintas Corp | Cintas First Aid & Safety | City Fire Equipment Co |
| City Glass (Hammond) | City Light & Water Plant | City of Abbeville |
| City of Alexandria | City of Baker | City of Breaux Bridge |
| City of Chickasaw | City of Covington | City of Crowley |
| City of Denham Springs | City of Deridder | City of Eunice |
| City of Fairhope | City of Franklin | City of Gilroy |
| City of Gladstone | City of Gonzales | City of Greenfield |
| City of Gretna | City of Gulf Breeze | City of Hammond |
| City of Independence Finance Dept | City of Independence Utilities | City of Jennings |
| City of Lake Charles Water Division | City of Laurel Public Utility | City of Livermore |
| City of Long Beach | City of Mandeville | City of Meridian Water & Sewerage |
| City of Milpitas | City of Milton | City of Mobile False Alarm Officer |
| City of Morgan City | City of Morgan Hill | City of New Roads Utility |
| City of Oakdale | City of Olathe | City of Opelousas |
| City of Overland Park | City of Patterson | City of Pensacola |
| City of Pineville | City of Pleasanton | City of Rayne |
| City of Ridgeland Water | City of Robertsdale | City of Ruston |
| City of Slidell | City of Sulphur | City of Thibodaux |
| City of Tuscaloosa (Util) | City of Vicksburg | City of Vidalia |
| City of Ville Platte | City of West Monroe | City of Westlake |
| City of Westwego | City of Wiggins | City of Winnsboro |
| City of Zachary | City Water Works | CJ Goulas Plumbing Repair Inc |
| Clare Computer Solutions | Clarion Hotel Alexandria | Clarke-Mobile Counties Gas District |
| Clean and Light | Clean Play | Clear View Janitorial Service |

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 150
of 187

| | | |
|---|---|---|
| Cleco Corporation | Clyteals Lawn Care | CM Service Inc |
| CMC Services | CNL Income Fund III Ltd | Coast Electric |
| Coca Cola Usa | Cognos Corporation | Comcast |
| Comfort Suites | Commercial Electronics | Commercial Plant Services |
| Commercial Signs | Computer Source | Concordia Lumber & Supply |
| Connelly Press & Copy Inc | Conner Electric Service Inc | Consolidated Waterworks District No.1 |
| Consolidated Commercial | Cooper Atkins Corporation | Coopers Lock & Key Service |
| Copy Connection Inc | Corovan | Courier (Atlanta) |
| Courtyard Marriot | Cowart Maint & Repair / Edward E Cowart | CPM Collins Project Management |
| Crown Decal Printers Inc | Crump Plumbing & Heating | CSI of Louisiana |
| Custom Metal Fabricators Inc | Custom Security Systems Inc | Cut & Clean Rite |
| D & L Rooter | DA Exterminating Co of Houma Inc | DA Water Werks Inc |
| Damm Plumber Inc | Danka Office Imaging Co | Darling International Inc |
| Darrell Denney Plumbing & Heating | Davids True Value Hardware | Davies Air Design Inc. |
| Daydots International Inc | Dees Paper Company | Deloach Safe & Lock |
| Delta Equipment Co Inc | Deluxe Refrig & Air Cond | Dequincy Utilities |
| Dhl Express Usa Inc | Diamond Disposal Ii | Diamond Edge Inc |
| Diamondhead Fire Protection District | Diamondhead Water & Sewer | Diez Business Mach Inc |
| Dixie Electric Membership Corporation | Dixie Electric Power Association | Dixie Office Products Inc |
| Dixie Produce and Packaging, Inc | DMI Manufacturing Inc | DMX Music |
| Doerle Food Service Inc | Does Appliances Services | Don the Plumber |
| Dougs Produce | Dowdle Gas | Druid Fire Equipment Co Inc |
| Druid Glass Company Inc | Dublin Backflow Professionals | Dublin San Ramon Services |
| Dukes Dukes Keating & Faneca Pa | Dunbar Armored Inc | Dunrite Hood & Duct Cleaning |
| Duraparts | Dysons Mid South Service Co Inc | Eagle Refrigerations & Mechanical |
| Earnest Joseph Lawn Service | Earthgrains Baking Co Inc | Earthlink Inc |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 151 of 187

| | | |
|---|---|---|
| East Baton Rouge | East Bay Municipal Utilit | Eatel |
| Ecolab Pest Elimination | Ecua | Eddie Rankin Building & Repairs |
| EJ Hedrick Construction | El Dorado Lumber Co Inc | El Dorado Water Utilities |
| Elite Fire Protection | Elliott Painting & Remodelinig | Emerald Coast Finest Produce Co |
| Entek Environmental Laboratories | Entergy | Environmental Progress Inc |
| Environmental Security | Ernies Plumbing & Repair Service Inc | ERO Inc |
| ERO Maintenance Inc | Etheridge True Val Hrdwr. | Eubanks General Contractors |
| Evergreen Band Booster | Express Office Prod. Inc | F J B Construction Inc |
| F R Blankenstein Co | Facilitec | Farley & Hysaw Inc |
| Faucet Parts of America Inc | Fax Doctor | FB Johnston Group |
| Federal Express Corp | Ferris A1 Glass Shop Inc | Filtercorp |
| Filtercorp Southwest | Finocchiaro Wine Co | Fire Ext & Supply Co. Inc |
| Fire King Security Products LLC | Flawless Finish | Fleming & Hall Administrators Inc |
| Flowers Baking Co of Baton Rouge Inc | Flowers Baking Co. of Thomasville | Flowers Baking Co/Tyler |
| Flowers By Janice | Flowers-Hardins Bakery Inc | Foreman Glass Co Inc |
| Franke Commercial Systems Inc | Franklin Machine Products | Freeman Sheet Metal Inc |
| Freund Baking Co (41) | Front Line Sales Inc | FVR FVTER Sales & Service Inc |
| G & H Electric LLC | G & T Tech Refrigeration Co | Garden City Supply |
| Gayle Oil Company | Gaylord Opryland Resort | GBP Direct |
| GCS Service Inc (Indianapolis) | GEAC Restaurant Systems | General Parts & Supply Co |
| George Dukes Plumbing | Get Rid of It of Arkansas Inc | Glass 1 Inc |
| Glenns Electric | Great Lakes Computer | Greenes Plumbing & Heating |
| Grove Hill Contracting | Grove Hill Water Works Board & | Guaranty Glass Inc |
| Gulf Coast Restaurant Service | Gulf Ice Systems Inc | Gulfland Off. Sup. Inc. |
| Gulftel Communications | Gumbusters of New Orleans LLC | Gunter Welding & Machine |
| Hampton Inn Tuscaloosa | Hampton Inn Ruston | Harris Lawn Care Services |
| Harris Refrigeration | Hart Property Mgmt | Hasler Mailing Inc |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 152 of 187

| | | |
|---|---|---|
| Hatco Corporation | Hayward Rubber Stamp | Heritage Service Group of Jackson |
| Heritage Service Group Pensacola | Hewlett Packard Company | HFE Fire Protection Inc |
| High-Tech Services | Hilary Wilson | Hiltons Foodservice |
| Hinds County Health Dept / Medical Mall | HM Electronics Inc | Hobart Sales & Service (Salinas) |
| Holiday Inn Express Laurel | Holiday Inn New Orleans-Metairie | Holiday Inn Slidell / Ascension Hotels LLC |
| Home Hardware Center | Home Sweet Home | Houma La Commercial Prop Dev |
| Hotel & Restaurant Supply | Humane Society of Houma Terrebonne | Huval Bakery Inc |
| Iberia Office Supply Inc | Ice Busters | Ice Masters |
| Icemakers Inc | IESI Alexandria Hauling | Ikon Office Solutions Northwest District |
| Infrared Specialists Inc | Inner Parish Security Corporation | Integrated Control Corp |
| International Cold Storage Co Inc | International Fire & Safety (Mobile/Laurel) | International Mailing |
| Iron Crafters Inc | Iron Mountain Inc | J & L Plumbing |
| J and K Printing Inc | Jacks Lock Shop | Jackson County Public Water Dist#1 |
| Jacksons Grease Trap Inc | James P Theriot Jr | J B Levert Land Co |
| JD Esco Inc | Jeffer Mangels Butler & Marmaro Llp | Jims Lock & Safe Service Inc |
| JNS Sound Products Company | Jo El Electric Supply Co LLC | John LS Plumbing Inc |
| Johnson County Wastewater | Jolys Metal Works Inc | Jones Mcleod Inc |
| Josephs Electrical Center | Juarez Yard Maintenance | Kansas City Power & Light |
| Kansas City Star | Kansas Gas Service/KPL | Kay Chemical Company - NC |
| KC Tile Solutions | KCMO Water Services Dept | KDM Electric Inc |
| Kenmar Microwave Specialists | Kent Trailer Rental | Kentwood Spring Water Inc |
| Kesco | Kinkos Inc (Dallas) | K-Jon Inc |
| Kleen Air | Kojis & Sons Sign Inc | Koorsen Protection Services Inc |
| Kyle Office Supply | Lafayette Electric | Lafayette Police Dept |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 153 of 187

| | | |
|---|---|---|
| Lafayette Utilities System | Lafleurs Safe & Lock | Lafourche Parish Water District No. 1 |
| Lafourche Telephone Co Inc | Lamar Companies | Lamar Properties |
| Lamm Food Service Inc | Lanclos T.V. Service Inc. | Lane Commercial Equipment |
| Larry Smith Locksmith Service | Larson & Savage Inc | Laser Printer Technology Inc |
| Lawn Care Complete | LDS Service | Leavenworth Glass & Mirror Co |
| Lees Glass & Window Factory Inc | Lens Electrical Service | Lepaul Co Dba Security Contractors |
| Leroy Hill Coffee Co Inc | Letter Perfect | Littler Mendelson Pc |
| Livermore Dublin Disposal | LJK | Long Life Lighting |
| Loomis Fargo & Co | Louis E. Edelman | Louisiana Dept of Health |
| Louisiana Fire Ext. Inc | Louisiana Fountain Inc | Louisiana Office Supply |
| LSI Images | LSI Industries Inc | Lynhaven Elementary Pta |
| Lynn Park Shopping Center | Magnolia Water System | Magnon Electric Inc |
| Mark Rhodes | Marrero Land & Improvement | Marvin Hillard |
| Mattos Newspapers Inc | McDaniel Plumbing Co | McElroy Plumbing & Heating Co Inc |
| MCM Wireless | McWard Painting Inc | Meaders Equipment Inc |
| Melody Music Company | Menulink Computer | Meridian Fruit & Produce |
| Meridian Star | Metro Communications Inc | Metro Maintenance Supplies Co Inc |
| Microtech | Microwave Oven Services | Mid South Fire Protection Inc |
| Mid South Welding Supply Inc | Midway Water System Inc | Midwest Equipment Co Inc |
| Midwest Paving & Sealcoating | Mighty Joe Young | Mike Castille Plumbing |
| Mike Pagans Bell Plumbing Inc | Miller Business Services | Mississippi Power |
| Mississippi Valley Gas Company | Missouri American Water Co. | Missouri Gas Energy |
| Mobile Area Water & Sewer System | Mobile County Water Sewer & Fire Prot. Authority | Mobile Fixture & Equip Co Inc |
| Mobile Gas Service Corportion | Mobile Gear Inc | Mobile Glass Company Inc (Baton Rouge) |
| Mobile Register | Modern Sound & Communication Inc | Modern Supply Co Inc |
| Monti Electric Supply Inc Waveland | Mr Cs | Mr Rooter Plumbing Mobile |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 154 of 187

| | | |
|---|---|---|
| Ms Cash Drawer Corp. | Mt Pleasant Shop Center | Muzak LLC Orlando (04) |
| Muzak Mid Continent | Muzak Northern California | Muzak Systems Operations Center |
| Myeorders.Com (Aka Hitech Ribbon) | N2 Construction | Natchez Heating and |
| Natchez Water Works | National Readerboard Supply | NBS Realty Investors |
| Necaise Locksmith Service | Ned Miller / Lori Miller Trustee | Nelmar |
| Neutron Industries Inc | New Orleans Police Department | Newell Paper Co |
| Newsouth Communications | Nexair LLC Memphis | Nicotri Electric Inc |
| Nolans Mowing Service Inc | Northport Water Works | Notoco Industries Inc |
| NuCo2 Inc Fowler Carbon | Office Direct | OI Distribution |
| Ol Rustys Sales & Service | One Calais Inc | Original Julius Lips Door & Glass Company Inc |
| Orkin Exterminating Co Inc | Oscars Penko Inc | Pace Water Systems Inc. |
| Pacific Coast Parts Dist. | Pacific Gas & Electric | Parallax Digital Studios Inc |
| Parish of Jefferson Water | Paul Glass Dba Pauls Repair Inc | Payment Processing Center |
| Pearl River Valley Epa | Pelican Ice & Coldstorage Inc | Pennant Shop Inc |
| Peoples Water Service Co of Bastrop Inc. | Performance Plus Plumbing | Personnel Concepts Ltd |
| Phillips Building Supply | Picayune Utility Department | Pinner Plumbing & Heating Inc |
| Pistols Plmb & Mnt Corp | Planning Group | Pleasanton Garbage Serv. |
| PMA Inc | Pointe Coupee Electric | Pointe Coupee Office |
| Pop-A-Lock | Portwoods Mobile Welding | Posco Pro Audio Systems Inc |
| Power Clean | Power Safe & Lock Service | Prairie Elementary |
| Praxair Distribution Inc (Illinois) | Premier Playland Services | Presley Roofing & Const Co Inc |
| Price Office Supply | Prichard Waterworks | Prince Castle Inc |
| Pro Clean | Pro Security Safe & Lock LLC | Pro Tech Communication Inc |
| Professional Image | PYA Monarch Inc | Q Tec LLC |
| Qi Exchange LLC | Quality Electric Co Inc | Quality Flow Inc |
| Quality Water Enterp. Inc | Qualserv Corporation | Quill Corporation |
| Qwest (Louisville) | R & R Locksmith | Rainer Office Machines & Equipment |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 155 of 187

| | | |
|---|---|---|
| Ramada Inn | Ransom Construction Company | Ratcliff Village Store Alls |
| Raymond Plumbing & | Rayne Plastics Signs Inc | RB Paper & Chemicals |
| Record | Redd Pest Control Co Inc | Reddi Rootr Plumbing |
| Reddi Services Inc | Reddy Ice Baton Rouge | Refrigeration Service Inc |
| Reinhart Foodservice Omaha | Reliable | Reliable Corporation |
| Reliable Plumbing Inc | Renfrew Paper Supplies | Renfrew Paper Supplies |
| Renovations Inc | Rescue Rooter | Resolve Systems Inc |
| Restaurant Equipment Company Inc | Restaurant Supply | RF Technologies Inc |
| Richard A Benson Plumbing | Richard Hadley | Richard Hemker Repairs |
| Richards Lawn Service | Richards Restaurant Suppl | River City Air Conditioning Inc |
| Riviera Utilities | RM Fire Protection Co Inc (Opelousas) | Robertson Fruit & Produce |
| Robin Hood & Vent Cleaning | Romar Services Inc | Roto Rooter |
| Roto Rooter Sewer Service | Rowley Mechanical Services | Royal Fire Protection Inc |
| Rush Contractors | S & L Office Supplies Inc | S & S Industrial Maintenance |
| S & S Sprinkler Company LLC | Safe Dimensions Inc | Safety Lock & Key Inc |
| Salinas Tallow Company Inc | San Jose Plumbing | San Jose Water Company |
| Sanford Store Equipment Inc | Saraland Water Service | Savon Office Supplies |
| SBC Southwestern Bell | Scardina Refrigeration Co | Scherba Industries Inc |
| Security Contractors Inc | Selig Industries | Service Specialists |
| Sewerage & Water Board of New Orleans | Shared Technologies Fairchild | Shenandoah Hardware |
| Sherwin Williams | Shoes For Crews Inc | Shoreline True Value Hardware |
| Signs Plus Inc | Silver King | Simplexgrinnell |
| SBS LLC | Sleep Inn Inn & Suites | Smith Printing |
| Sound Products Inc | Soundcom LLC | South Alabama Electric Co Inc |
| South Coast Gas Co Inc. | South County Lock & Safe | South Louisiana Ice |
| South Louisiana Publishing | South Valley Disposal & Recycling | South Valley Middle School |
| Southern Company | Southern Glass Inc | Southern Ice Eq. Dist Inc |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 156 of 187

| | | |
|---|---|---|
| Southern Office Equipment | Southern Sign Inc | Southern Steam Services |
| Southern Tile Company Inc | Spankys Drain & Sewer Service | Spanton Readerboard |
| Special Kare Services | Specialty Contractors Inc | Specialty Lighting Inc |
| Sprint | St Bernard Parish Government | St Charles Parish |
| St Mary Parish Police Jur | St Mary Parish Water and Sewer | Stainless Incorporated Use Franke |
| Stansbury Restaurant Service Inc | Stat Waste Stream Services Inc | Steam On Wheels |
| Stine Lumber Co | Stover Smith Electrical Supply | Stuart C Irby Co |
| Sunshine Lighting Inc | Sygma Network | Tangipahoa Water District |
| Tates Plumbing Service | Taxation & Rev. Dept-City of Monroe | Taylor Fortune Dist Inc |
| Taylor Freezer & Equipment | Taylorman Service Company Inc | TDS Telecom |
| Teachers Pet Inc/Radio Shack/Service Office Centre | Tech Maintenace Supply Inc | Teche Electric Supply Inc |
| Techtronics Inc | Terrebonne Parish Consolidated Govn'T | Terri Williams |
| Terry Sloss | Texas Digital Systems | Thompsons /Fresh America |
| Tiger Island True Value | Timecomet Corporation | Times Picayune |
| Timmins Hdw & Furn Inc | Tli Teche Lumber & Building Supply Inc | TLD Specialty Cleaning |
| Toms Commercial Refrigeration & Air | Town of Broussard | Town of Delhi |
| Town of Kinder Utility Division | Town of Rayville | Town of Vinton |
| Town of Walker | Tracys Lawn Service | Trap Recyclers Inc |
| Tri County Fire Prot. Inc | Tri Parish Electrical Supply Inc | Tri Star Industrial Lighting Inc |
| TSSI Taylor Sales & Service Inc | Tugwell Supply Company | Turf Lawn Care LLC |
| U.S. Restaurant Properties Inc | United Office Supply & Equip Co Inc | United Parcel Service |
| Universal Manufacturing Co Inc | Universal Supply Co Inc | Us Communications Inc |
| Utilities Inc. of Louisiana | Utilities Board City of Gulf Shores | Utilities Board of the City of Daphne |
| Utilities Board of the City of Livingston | Utilities of Bay St Louis | Utility Payment Processing |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 157 of 187

| | | |
|---|---|---|
| Valley Supply Co of Houma | Verizon | Verns Lawn Service |
| Vicksburg Locksmith Company Inc | W.B.R.P Natural Gas & Water Systems | Waltco Inc. |
| Walters Plumbing Company | Ward #2 Water District | Waste Management Acadiana |
| Waste Management of Meridian Hauling | Waste Management Santa Clara County | Wastewater Specialties Inc |
| Water District No.1 of Johnson County | Water Engineer | Water Works and Sewer Board City of Thomasville |
| Water Works District #3 | Waterworks Department | Waterworks District #1 |
| Watkins Plastering Co Inc | Watson Electric Co Inc | Watts Up |
| Wausau Tile Inc | Wel-Don Plumbing & Drain Service | Wendis Flower Cart |
| Westar Energy | White Refrigeration Service | Wil Cal Lighting |
| Wilsons Welding Services Inc | Winnsboro Office Supply | Wood Associates |
| Worcester Ind. Prod. Corp | WW Grainger Inc | Yellow Page.Net |
| Young Life | Zachary Printing & Office | Zeadie W Matheny |
| Zee Medical Service | | |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 158 of 187

# EXHIBIT C

# DEBTORS' OWNERSHIP STRUCTURE

# DEBTORS' OWNERSHIP STRUCTURE



**The Sydran Group, LLC (NV)**
Owns 100% of Sydran Services, LLC and 100% of Sydran Investors, LLC

**Ownership:**
**Class A Preferred:**
Participating Investors - $61,500,000
Non-Participating Investors - $20,000,000
Allied - $3,000,000
BKC - $3,000,000

**Class B Common:**
Sydran Investors III, LLC - 50.1% (before exercise of warrant/ 33.07% (post exercise)
Non-Participating Investors - 46.48% (before exercise of warrant/ 30.69% (post exercise)
Investors - 1.71% (before exercise of warrant/ 26.13% (post exercise)
BKC - 1.71% (before exercise of warrant/ 10.13% (post exercise)
Allied - 1.71% (before exercise of warrant/ 10.13% (post exercise)

**Sydran Investors, LLC**
Owns 50.01% of BK-Sydran Ventures, LLC

**Ownership:**
The Sydran Group, LLC    100%

**BK-Sydran Ventures, LLC**
Owns approximately 28 BK Restaurants in Sacramento and Fresno ADIs

**Ownership:**
Sydran Investors, LLC    50.01%
BKC    49.99%

**Capitalization**
$26,000,000 Equity Commitment ($18,000,000 funded)

**Sydran Services, LLC (NV)**
Management Services to all operating companies and direct and indirect ownership of Sydran I, II, III, IV and Sydran BK Services, LLC

**Ownership:**
The Sydran Group, LLC    100%
**Debt:**
$112,000,000    Senior Debt [approximate]
$15,973,000    Allied and Participating Investors Sub Debt
$8,100,000    Burger King Debt

**Sydran Casual Dining Services, LLC (NV)**
Holder of 95% LP interest in Sydran III

**Ownership:**
Sydran Services, LLC    100%
[$10,000,000 Capital Contribution]

**Sydran Food Services III L.P. (CA)**
Assets have been sold via Chili's sale

**Ownership:**
Sydran Services, LLC    5% GP Interest
Sydran Casual Dining Services, LLC    95% LP Interest

**Sydran III Texas, Inc.**
Assets have been sold via Chili's sale

**Ownership:**
Sydran Food Services, III

**Sydran Food Services IV, LLC (NV)**
Owns approximately 50 BK Restaurants in Alabama, Mississippi and Florida

**Ownership:**
Sydran BK Services, LLC    100%
**EMAC Debt:**    $15,000,000 [approx.]

**Sydran BK Services, LLC (NV)**
Owns approximately 18 BK Restaurants in KS City

**Ownership:**
Sydran Services, LLC - 100% Common
$75,000,000
BKC - Preferred    $22,500,000
Participating Investors - Preferred    $3,000,000

**Sydran Food Services II, L.P. (CA)**
Owns approximately 151 BK Restaurants in Louisiana, Mississippi and Arkansas

**Ownership:**
Sydran Services, LLC    .001% GP Interest
Sydran BK Services    99.999% LP Interest

**Sydran Development, LLC (NV)**

**Ownership:**
Sydran Services, LLC    100%

**Sydran Food Services, L.P. (CA)**
Owns approximately 17 BK Restaurants in Northern California

**Ownership:**
Sydran Services, LLC    .001% GP Interest
Sydran BK Services    99.999% LP Interest

# EXHIBIT D

# HOLDINGS COMPANIES' OWNERSHIP STRUCTURE

# HOLDINGS COMPANIES' OWNERSHIP STRUCTURE



**SYDRAN HOLDINGS, LLC**
**a Nevada limited liability company**

**OWNERSHIP STRUCTURE**

| | Member Name | Class A Units | Class A% Interest |
|---|---|---|---|
| **CLASS A MEMBERS** | Sydran Holdings, Inc. | 10,000 | 1.0% |
| | Matthew Schoenberg | 740,000 | 74.0% |
| | Y.L. LEK Investment Company | 125,000 | 12.5% |
| | CYMI Investment Company | 125,000 | 12.5% |
| | **Member Name** | **Class B Units** | **Class B% Interest** |
| **CLASS B MEMBERS** | Sydran Holdings II, Inc. | 10,000 | 1.0% |
| | Matthew Schoenberg | 765,000 | 76.5% |
| | Charles T. Dooly | 35,000 | 3.5% |
| | Kenneth A. Freed | 35,000 | 3.5% |
| | Nan Marie Karns and Richard R. Karns, Co-Trustees of the Nan Marie Karns and Richard R. Karns Family Trust Dated 2/12/96 | 35,000 | 3.5% |
| | Frank Rackstraw | 35,000 | 3.5% |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust Dated June 5,1995 | 35,000 | 3.5% |
| | Y.L. LEK Investment Company | 25,000 | 2.5% |
| | CYMI Investment Company | 25,000 | 2.5% |
| | **Member Name** | **Class C Units** | **Class C% Interest** |
| **CLASS C MEMBERS** | Sydran Holdings IV, Inc. | 10,000 | 1.0% |
| | Matthew Schoenberg | 480,000 | 48.0% |
| | Kenneth A. Freed, Trustee Matthew Schoenberg 1995 Children's Trust | 200,000 | 20.0% |
| | SJS Holdings, Inc. | 15,000 | 1.5% |
| | Charles T. Dooly | 90,000 | 9.0% |
| | Kenneth A. Freed | 90,000 | 9.0% |
| | Nan Marie Karns and Richard R. Karns, Co-Trustees of the Nan Marie Karns and Richard R. Karns Family Trust Dated 2/12/96 | 50,000 | 5.0% |
| | Frank Rackstraw | 15,000 | 1.5% |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust Dated June 5,1995 | 25,000 | 2.5% |
| | David Schmille | 25,000 | 2.5% |

| | Member Name | Class D Units | Class D % Interest |
|---|---|---|---|
| **CLASS D MEMBERS** | Sydran Holdings VI, Inc. | 10,050 | 1.0050% |
| | Matthew Schoenberg | 492,462 | 49.2462% |
| | Kenneth A. Freed, Trustee Matthew Schoenberg 1995 Children's Trust | 190,955 | 19.0955% |
| | SJS Holdings, Inc. | 10,050 | 1.0050% |
| | Charles T. Dooly | 75,377 | 7.5377% |
| | Kenneth A. Freed | 75,377 | 7.5377% |
| | Nan Marie Karns and Richard R. Karns, Co-Trustees of the Nan Marie Karns and Richard R. Karns Family Trust Dated 2/12/96 | 40,201 | 4.0201% |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust Dated June 5,1995 | 35,176 | 3.5176% |
| | Frank Rackstraw | 20,101 | 2.0101% |
| | David Schmille | 40,201 | 4.0201% |
| | SJS Holdings, II, LLC | 5,025 | 0.5025% |
| | Myrna Schultz | 5,025 | 0.5025% |
| | Member Name | Class E Units | Class E % Interest |
| **CLASS E MEMBERS** | Matthew Schoenberg | 760,101 | 76.0101% |
| | SJS Holdings, Inc. | 10,101 | 1.0101% |
| | Charles T. Dooly | 47,979 | 4.7979% |
| | Kenneth A. Freed | 47,979 | 4.7979% |
| | David Schmille | 47,979 | 4.7979% |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust Dated June 5,1995 | 17,678 | 1.7678% |
| | Nan Marie Karns and Richard R. Karns, Co-Trustees of the Nan Marie Karns and Richard R. Karns Family Trust Dated 2/12/96 | 17,678 | 1.7678% |
| | Iver T. Bowden | 10,101 | 1.0101% |
| | Frank Rackstraw | 10,101 | 1.0101% |
| | Myrna Schultz | 10,101 | 1.0101% |
| | SJS Holdings II, LLC | 10,101 | 1.0101% |
| | Mark Rhodes | 10,101 | 1.0101% |

82700-003\DOCS_SF:41411.2

| | Member Name | Class F Units | Class F% Interest |
|---|---|---|---|
| **CLASS F MEMBERS** | Matthew Schoenberg | 762,500 | 76.25% |
| | SJS Holdings, Inc. | 10,000 | 1.00% |
| | Charles T. Dooly | 47,500 | 4.75% |
| | Kenneth A. Freed | 47,500 | 4.75% |
| | David Schmille | 47,500 | 4.75% |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust Dated June 5,1995 | 17,500 | 1.75% |
| | Nan Marie Karns and Richard R. Karns, Co-Trustees of the Nan Marie Karns and Richard R. Karns Family Trust Dated 2/12/96 | 17,500 | 1.75% |
| | Frank Rackstraw | 10,000 | 1.00% |
| | SJS Holdings, II, LLC | 10,000 | 1.00% |
| | Myrna Schultz | 10,000 | 1.00% |
| | Mark Rhodes | 10,000 | 1.00% |
| | Iver T. Bowden | 10,000 | 1.00% |

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 165 of 187

# SYDRAN HOLDINGS IX, LLC
## a Nevada limited liability company

## OWNERSHIP STRUCTURE

| CLASS A MEMBER | Matthew Schoenberg | 76.25% |
|---|---|---|
| **CLASS B MEMBERS** | SJS Holdings, Inc. | 1.00% |
| | Charles T. Dooly | 4.75% |
| | Kenneth Freed | 4.75% |
| | David Schmille | 4.75% |
| | Nan Marie Karns and Richard R. Karns, Co-Trustees of the Nan Marie Karns and Richard R. Karns Family Trust Dated 2/12/96 | 1.75% |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust Dated June 5,1995 | 1.75% |
| | Frank Rackstraw | 1.00% |
| | SJS Holdings II, LLC | 1.00% |
| | Mark Rhodes | 1.00% |
| | Iver Bowden | 1.00% |
| | Myrna Schultz | 1.00% |
| | TOTAL | 100.0% |

## SYDRAN GROUP HOLDINGS, LLC
### a Nevada limited liability company

### OWNERSHIP STRUCTURE

| CLASS A MEMBER | Sydran Investors IV, LLC (see below) | 50.10% |
|---|---|---|
| CLASS B MEMBER | New York Life Capital Partners | 22.81% |
| | The Variable Annuity Life Insurance Company, American General Annuity Insurance Company, The Franklin Life Insurance Company and American Gen. Life and Accident Insurance Company | 11.41% |
| | Kinsman Holdings, LLC | 5.70% |
| | BancBoston Capital, Inc. | 5.70% |
| | GATX Capital Corporation | 2.85% |
| | SunTrust Equity Partners* | 1.43% |
| | TOTAL | 100.0% |

*Proper legal entity name is "Sun Trust Banks, Inc."


## SYDRAN INVESTORS IV, LLC
### A Nevada limited liability company

### OWNERSHIP STRUCTURE

| MEMBER | Matthew Schoenberg, sole member | *30,000 |
|---|---|---|
| SHARE ASSIGNEES | Kenneth A. Freed, Trustee of the Matthew Schoenberg 1995 Children's Trust | 40,000 |
| | Charles T. Dooly | 7,000 |
| | Kenneth A. Freed | 7,000 |
| | David Schmille | 4,000 |
| | Iver Bowden | 4,000 |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust dated June 5, 1995 | 2,500 |
| | Frank Rackstraw | 1,500 |
| | Mark Rhodes | 1,500 |
| | Myrna Schultz | 1,500 |
| | SJS Holdings, LLC | 1,000 |
| | TOTAL | 100,000 |

*retained interest

## BK-SYDRAN HOLDINGS, LLC
### a Nevada limited liability company

### OWNERSHIP STRUCTURE

| MEMBER | | |
|---|---|---|
| | Burger King Corporation | 49.99% |
| | Sydran Investors II, LLC (see below) | 50.01% |
| | TOTAL | 100.0% |

## SYDRAN INVESTORS II, LLC
### A Nevada limited liability company

### OWNERSHIP STRUCTURE

| CLASS A MEMBER | Matthew Schoenberg | 40.536% |
|---|---|---|
| CLASS B MEMBER | Matthew Schoenberg 1995 Children's Trust | 35.714% |
| | Charles T. Dooly | 4.75% |
| | Kenneth A. Freed | 4.75% |
| | David Schmille | 4.75% |
| | Steven Grossman and Jacqueline Lee Grossman, Trustees of the Steven Grossman and Jacqueline Lee Grossman 1995 Living Trust dated June 5, 1995 | 1.75% |
| | Nan Marie Karns and Richard R. Karns, Co-Trustees of the Nan Marie Karns and Richard R. Karns Family Trust Dated February 12, 1996 | 1.75% |
| | SJS Holdings, Inc. | 1.00% |
| | Frank Rackstraw | 1.00% |
| | SJS Holdings II, LLC | 1.00% |
| | Myrna Schultz | 1.00% |
| | Mark Rhodes | 1.00% |
| | Iver Bowden | 1.00% |
| | TOTAL | 100.00% |

# BK-SYDRAN HOLDINGS II, LLC
## a Nevada limited liability company

## OWNERSHIP STRUCTURE

| MEMBER | | |
|---|---|---|
| | Burger King Corporation | 49.99% |
| | Sydran Investors II, LLC | 50.01% |
| | TOTAL | 100.0% |

# EXHIBIT E

# CONWAY, DEL GENIO, GRIES & CO., L.L.C.

# LIST OF POTENTIAL BUYERS

# Conway, Del Genio, Gries & Co., L.L.C.
## List of Potential Buyers

| | | |
|---|---|---|
| Allied Capital | American Pizza Company | American Securities Capital Partners, L.P. |
| Apple Gold, Inc. | Argonne Capital Group, LLC | Atlas Holdings FRM LLC |
| BNB Land Venture, Inc. | Breckenridge Group, Inc. | Bruckmann, Rosser, Sherrill & Co. LLC |
| Carrols Corporation | Castle Harlan Inc. | Centre Partners Management LLC |
| Charon Capital LLC | Citicorp Venture Capital Ltd. | Cracken, Harkey & Co., L.L.C. |
| Desai Capital Management Inc. | Goldco, Inc. | Greenwich Street Capital Partners |
| Grotech Capital Group | H & K Investments | Halifax Group (The) |
| Harman Management Corp. | HIG Capital | Horizon Partners LTD. |
| Interfoods of America, Inc. | J.W. Childs Associates, L.P. | Jacobson Partners |
| Jan Companies | JLL Partners | Kazi Foods |
| Kessler Family, LLC | KPS Special Situations Fund, L.P. | Main Street and Main Incorporated |
| Mirabile Investment Corp. | Moody Company (The) | MSD Capital, L.P. |
| Nautic Partners, LLC | NPC International, Inc. | Oak Hill Capital Management Inc. |
| Pacifica Capital Group | Pegasus Capital Advisors, L.P. | Pilot Corporation |
| Pizza Properties Ltd. | Quad-C Management Inc. | Quality Dining, Inc. |
| Restaurant Concepts, Inc. | Ripplewood Holdings L.L.C. | Roark Capital Group |
| Robinson Restaurant, Inc. | Saunders Karp & Megrue, L.P. | Scarbrough Management Corporation |
| Schuster Enterprises, Inc. | Sentinel Capital Partners | Sun Capital Partners, Inc. |
| Swisshelm Group, Inc. | Ted Burke | Twoton Inc. |
| Vestar Capital Partners | Warburg Pincus LLC | |

# EXHIBIT F

# TRINITY CAPITAL, LLC

# LIST OF POTENTIAL BUYERS

## Trinity Capital, LLC
## List of Potential Buyers

| | | |
|---|---|---|
| Apollo | Ares Management | Barrington |
| Blackstone | Cadigan | Carlyle |
| Castle Harlan | Catterton Partners | Cypress |
| Financo Private Equity | Freeman Spogli | Global Retail Partners |
| GTCR | Hicks Muse | Investcorp |
| Jordan Co | Jupiter Capital | JW Childs |
| Leonard Green | MMC Capital | Oaktree |
| One Equity (Bank One) | Ripplewood | Sander's Corp |
| Schroder Ventures | Swander Pace | The Shansby Group |
| Western Presidio | Windpoint Partners | |

## Six (6) Targeted Buyers

| | | |
|---|---|---|
| Acon Investments, LLC | Allied Capital | Bruckmann, Rosser, Sherrill & Co., Inc. |
| Cerberus | D.E. Shaw Laminar Portfolios, L.L.C. | Sun Capital Acquisition Corp. |

# EXHIBIT G

# LIQUIDATION ANALYSIS

# Sydran Services, LLC
**Summary Liquidation Analysis**
Based on Book Values as of September 29, 2004

Estimated Proceeds and Wind Down Expenses for Sydran Services, LLC for CHASE-related Collateral
(*$ in thousands*)

| | Actual Balance Sheet at 9/29/04 (Unaudited) | Estimated % Recovery Low | High | Estimated Liquidation Value (Unaudited) Low | High | Note Reference |
|---|---|---|---|---|---|---|
| **Assets To Be Liquidated** | | | | | | |
| Cash | 436 | 100% | 100% | 436 | 436 | 1 |
| Accounts receivable, net | 296 | 60% | 68% | 182 | 205 | 2 |
| Inventories | 1,270 | 52% | 63% | 656 | 798 | 3 |
| Prepaid Expenses | 2,633 | 4% | 8% | 74 | 153 | 4 |
| Property Plant and Equipment, net | | | | | | |
| Land/Building Improvements | 909 | 69% | 97% | 629 | 879 | 5 |
| Buildings - Capital Lease Obligation | 66,024 | 0% | 0% | - | - | 5 |
| Leasehold Improvements | 15,984 | 0% | 0% | - | - | 5 |
| Furniture & Equipment (Lien Holder - Tax Payment/Chase/ BKC) | 24,734 | 14% | 14% | 3,479 | 3,479 | 5 |
| Potential Value for Undermarket Leases (Net of Real Property Taxes) | NA | NA | NA | 520 | 1,319 | 6 |
| Intangibles - Franchise Cost and Fees, net | 5,579 | 0% | 0% | - | - | 7 |
| Other Assets | 1,872 | 0% | 0% | 6 | 7 | 7 |
| **Total Asset Proceeds** | 119,738 | 5% | 6% | 5,982 | 7,277 | |
| **Less: Estimated Costs of Liquidation** | | | | | | |
| Trustee Fees @ 3% | | | | 179 | 218 | 8 |
| Wind Down Costs - SG&A | | | | 527 | 355 | |
| Wind Down Costs - Operations | | | | 5,247 | 5,096 | |
| Professional Fees | | | | 878 | 444 | |
| Subtotal | | | | 6,832 | 6,113 | |
| *Total Liquidation Proceeds Available for Distribution to Secured Personal Property Tax Claimants, Tax Payment Obligees, and Chase Bank Group* | | | | - | 1,164 | 9 |

# Sydran Services, LLC

**Summary Liquidation Analysis**
Based on Book Values as of September 29, 2004

Estimated Proceeds and Wind Down Expenses for Sydran Services, LLC for GE/GMAC-related Collateral
*($ in thousands)*

| Assets To Be Liquidated | Actual Balance Sheet at 9/29/04 (Unaudited) | Estimated % Recovery Low | High | Estimated Liquidation Value (Unaudited) Low | High | Note Reference |
|---|---|---|---|---|---|---|
| Cash | 54 | 100% | 100% | 54 | 54 | 1 |
| Accounts receivable, net | | | | | | |
| AR - GMAC | 5 | | | 1 | 1 | 2 |
| AR - GE | 2 | | | 0 | 1 | 2 |
| Inventories | | | | | | |
| Inventory - Lienholder - GMAC | 137 | 52% | 63% | 71 | 86 | 3 |
| Inventory - Lienholder - GE | 63 | 52% | 63% | 33 | 40 | 3 |
| Prepaid Expenses | | | | | | |
| Prepaid Expenses - GMAC | 148 | 21% | 29% | 32 | 43 | 4 |
| Prepaid Expenses - GE | 68 | 21% | 29% | 15 | 20 | 4 |
| Property Plant and Equipment, net | | | | | | |
| Land/Building Improvements | | | | | | |
| Buildings - Capital Lease Obligation | | | | | | |
| Leasehold Improvements | | | | | | |
| Furniture & Equipment (Lien Holder - GMAC) | 2,271 | 19% | 19% | 425 | 425 | 5 |
| Furniture & Equipment (Lien Holder - GE) | 1,061 | 19% | 19% | 199 | 199 | 5 |
| Potential Value for Undermarket Leases for GE (Net of Real Prop Taxes) | | | | - | 50 | 6 |
| Intangibles - Franchise Cost and Fees, net | | | | | | 7 |
| Other Assets | | | | | | 7 |
| Total Asset Proceeds | 3,809 | 22% | 24% | 830 | 918 | 8 |
| Less Estimated Costs of Liquidation | | | | | | |
| Trustee Fees @ 3% | | | | 25 | 28 | |
| Wind Down Costs - SG&A | | | | 73 | 45 | |
| Wind Down Costs - Operations | | | | 728 | 643 | |
| Professional Fees | | | | 122 | 56 | |
| Subtotal | | | | 947 | 771 | |
| *Net Liquidation Proceeds Available for Distribution* | | | | $ - | $ 147 | |
| *Potential Value for Undermarket Leases of GE* | | | | | 50 | |
| *Net Liquidation Proceeds Available for Distribution to Secured Property Tax Claimants, GE and GMAC* | | | | $ - | $ 97 | 10 |

**Sydran Services**
**Liquidation Analysis - Recovery by Entity**

## LOW CASE

| Assets To Be Liquidated | 1 Sydran Food Services | 2 Sydran Food Services II | 3 Sydran Food Services IV Chase/BKC | 4 Sydran Food Services IV GE/GMAC | 5 Sydran Services | 6 Sydran BK Services | Total Chase (1+2+3+6) $ | % | Total GE/GMAC (4) $ | % | Total Consolidated $ | % | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Recovery Based on Balance Sheet @ 9/29/04 | | | | | | | | | |
| Cash | 78 | 254 | 22 | 54 | 25 | 57 | 436 | 100% | 54 | 100% | 490 | 100% | 1 |
| Accounts receivable, net | 6 | 35 | 1 | 1 | 140 | 1 | 182 | 61% | 1 | 20% | 184 | 60% | 2 |
| Inventories | 46 | 529 | 42 | | - | 39 | 656 | 52% | | | 656 | 52% | 3 |
| Inventories - GE/GMAC | - | | | 104 | | | | | 104 | 52% | 104 | 52% | 3 |
| Prepaid Expenses | (9) | 74 | 18 | 46 | (29) | 19 | 74 | 3% | 46 | 21% | 120 | 4% | 4 |
| Property Plant and Equipment, net | | | | | | | | | | | | | 5 |
| Land/Building Improvements | 629 | - | - | - | - | - | 629 | 69% | - | | 629 | 69% | |
| Buildings - Capital Lease Obligation | - | - | - | - | - | - | - | 0% | - | | - | 0% | |
| Leasehold Improvements | - | - | - | - | - | - | - | 0% | - | | - | 0% | |
| Furniture & Equipment (Chase / BKC) | 237 | 2,596 | 244 | - | 106 | 296 | 3,479 | 14% | - | | 3,479 | 14% | 6 |
| Furniture & Equipment (GE/GMAC) | - | - | - | 624 | - | - | - | | 624 | 19% | 624 | 19% | |
| Potential Value for Undermarket Leases | 138 | 308 | 75 | - | - | - | 520 | 0% | - | | 520 | 0% | 7 |
| Intangibles - Franchise Cost and Fees, net | - | - | - | - | - | - | - | 0% | - | | - | 0% | 7 |
| Other Assets | 4 | - | - | - | 1 | - | 6 | 0% | - | | 6 | 0% | |
| **Total Asset Proceeds** | **1,128** | **3,796** | **401** | **830** | **244** | **413** | **5,982** | **5%** | **830** | **22%** | **6,812** | **6%** | |
| | | | | | | | | | | | | | |
| Less: Estimated Costs of Liquidation | | | | | | | | | | | | | |
| Trustee Fees @ 3% | 34 | 114 | 12 | 25 | 7 | 12 | 179 | | 25 | | 204 | | 8 |
| Wind Down Costs - SG&A | 99 | 334 | 35 | 73 | 22 | 36 | 527 | | 73 | | 600 | | |
| Wind Down Costs - Operations | 989 | 3,329 | 352 | 728 | 214 | 362 | 5,247 | | 728 | | 5,975 | | |
| Professional Fees | 166 | 557 | 59 | 122 | 36 | 61 | 878 | | 122 | | 1,000 | | |
| **Subtotal** | **1,288** | **4,335** | **458** | **947** | **279** | **471** | **6,832** | | **947** | | **7,779** | | |
| | | | | | | | | | | | | | |
| **Total Proceeds Available for Distribution** | | | | | | | | | | | | | 9,10 |

## HIGH CASE

| Assets To Be Liquidated | 1 Sydran Food Services | 2 Sydran Food Services II | 3 Sydran Food Services IV Chase/BKC | 4 Sydran Food Services IV GE/GMAC | 5 Sydran Services | 6 Sydran BK Services | Total Chase (1+2+3+6) $ | % | Total GE/GMAC (4) $ | % | Total Consolidated $ | % | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Recovery Based on Balance Sheet @ 9/29/04 | | | | | | | | | |
| Cash | 78 | 254 | 22 | 54 | 25 | 57 | 436 | 100% | 54 | 100% | 490 | 100% | 1 |
| Accounts receivable, net | 6 | 39 | 1 | 2 | 158 | 1 | 205 | 69% | 2 | 22% | 207 | 68% | 2 |
| Inventories | 56 | 644 | 50 | | | 48 | 798 | 63% | | | 798 | 63% | 3 |
| Inventories - GE/GMAC | | | | 126 | | | | | 126 | 63% | 216 | 8% | 3 |
| Prepaid Expenses | (10) | 109 | 25 | 62 | 4 | 25 | 153 | 6% | 62 | 29% | 216 | 8% | 4 |
| Property Plant and Equipment, net | | | | | | | | | | | | | 5 |
| Land/Building Improvements | 879 | - | - | - | - | - | 879 | 97% | - | | 879 | 97% | |
| Buildings - Capital Lease Obligation | - | - | - | - | - | - | - | 0% | - | | - | 0% | |
| Leasehold Improvements | - | - | - | - | - | - | - | 0% | - | | - | 0% | |
| Furniture & Equipment (Chase / BKC) | 237 | 2,596 | 244 | - | 106 | 296 | 3,479 | 14% | - | | 3,479 | 14% | 6 |
| Furniture & Equipment (GE/GMAC) | - | - | - | 624 | - | - | - | | 624 | 19% | 624 | 19% | |
| Potential Value for Undermarket Leases | 317 | 845 | 120 | 50 | - | - | 1,319 | 19% | 50 | | 1,369 | 19% | 7 |
| Intangibles - Franchise Cost and Fees, net | - | - | - | - | - | 37 | - | 0% | - | | - | 0% | 7 |
| Other Assets | 5 | - | - | - | 2 | - | 7 | 0% | - | | 7 | 0% | |
| **Total Asset Proceeds** | **1,569** | **4,487** | **461** | **918** | **295** | **466** | **7,277** | **6%** | **918** | **24%** | **8,195** | **7%** | |
| | | | | | | | | | | | | | |
| Less: Estimated Costs of Liquidation | | | | | | | | | | | | | |
| Trustee Fees @ 3% | 47 | 135 | 14 | 28 | 9 | 14 | 218 | | 28 | | 246 | | 8 |
| Wind Down Costs - SG&A | 77 | 219 | 23 | 45 | 23 | 23 | 355 | | 45 | | 400 | | |
| Wind Down Costs - Operations | 1,099 | 3,142 | 323 | 643 | 206 | 326 | 5,096 | | 643 | | 5,739 | | |
| Professional Fees | 96 | 274 | 28 | 56 | 18 | 28 | 544 | | 56 | | 600 | | |
| **Subtotal** | **1,318** | **3,769** | **388** | **771** | **248** | **391** | **6,113** | | **771** | | **6,884** | | |
| | | | | | | | | | | | | | |
| **Total Proceeds Available for Distribution** | **251** | **718** | **74** | **147** | **47** | **74** | **1,164** | | **147** | | **1,311** | | 9,10 |

(A) A negative cash balance of $140K for Sydran Casual Dining has been excluded from the Liquidation analysis.
(B) Notes 1 - 10 can be found as part of the Notes to Liquidation Analysis.

SYDRAN SERVICES, LLC
NOTES TO LIQUIDATION ANALYSIS

The Liquidation Analysis reflects the Debtors' estimate of the proceeds that would be realized if the Debtors individual entities were to be liquidated in accordance with Chapter 7 of the Bankruptcy Code.  The Liquidation Analysis was prepared by the Debtors with the assistance of CDG and is based on estimated assets of the Debtors as of September 29, 2004.  Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management, and upon assumptions with respect to the liquidation decisions that could be subject to change. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

Except as specifically addressed in the Notes to the Liquidation Analysis, the issues of potential recoveries from avoidance actions and final bankruptcy claims reconciliation have not been addressed in the Liquidation Analysis.

The Liquidation Analysis assumes the Chapter 11 Cases were converted to cases under Chapter 7 of the Bankrutpcy Code and the Debtors assets were liquidated by a Chapter 7 Trustee.  It is assumed that a liquidation of the Company's assets would commence when it is determined by the court that a going concern sale would not provide the best value to the Creditors.  This analysis assumes that the process begins immediately following the November fiscal month-end and would take approximately four months in total to complete.

Upon conversion to a Chapter 7 liquidation at the end of fiscal November, all stores operations would cease.  The Company estimates selling all inventory to other Burger King restaurant operators during the first week to ten days of the liquidation process. Based on an appraisal done by GB Asset Appraisers ("GBAA"), the time to sell all of the Company's furniture, fixtures and equipment in a "forced-sale" liquidation is six weeks.  The Company would be required to pay rent and utilities on the store locations for a period of two months in order to occupy the locations and have access to the equipment and inventory as the liquidation was carried out.  (See Note 5 for details on the sale of PP&E).

Concurrently, accounts receivable would be collected and the corporate operations would wind down substantially whereby almost all positions would be phased out. Certain corporate personnel, such as those in Financial and Management Information

Case: 04-45343   Doc# 242-3   Filed: 12/10/04   Entered: 12/10/04 15:39:52   Page 178

Systems areas, would be retained as necessary to support the Chapter 7 trustee in the completion of an orderly liquidation.

Over the last two month period, the collection of the remaining accounts receivable would take place along with the completion of the claims reconciliation process.

### Operating Entities

The Sydran Group is the ultimate parent of the debtors. It is a holding company privately owned by various individuals, institutional investors, and BKC. Sydran Services is a direct, wholly-owned subsidiary of Sydran Group. Sydran Services in turn directly and indirectly owns and manages the remaining Debtors, including the Debtors' primary operating entities, Sydran I, Sydran II, Sydran IV, and Sydran BK Services. Sydran Casual Dining Services, LLC does not have any operations or assets, and is not included in this analysis. The chart below provides further detail about the operating entities.

| Debtor | Restaurants (#) | Location | Secured Creditors |
|---|---|---|---|
| Sydran BK Services | 17 | Kansas, Missouri | Chase / BKC |
| Sydran I | 15 | Northern California | Chase / BKC |
| Sydran II | 147 | Louisiana, Mississippi, and Arkansas | Chase / BKC |
| Sydran IV | 48 | Florida, Alabama, and Mississippi | Chase / BKC, GE, GMAC |
| Sydran Services | None | Manages operations | Chase / BKC |

The liquidation analysis has been developed by applying the same recovery assumptions by asset class across the five operating entities above. All entities have Chase / BKC as a Secured Creditor. Chase/BKC would be entitled to recovery amounts for Sydran BK Services, Sydran I, Sydran II, and Sydran Services.

In addition to Chase/BKC, Sydran IV has GE and GMAC as Secured Creditors. Based on the collateral agreements with GE, GMAC and Chase, GE and GMAC are entitled to receive the proceeds related to the assets within the stores that serve as their collateral. The Company has estimated separate recoveries within Sydran IV for GE, GMAC and Chase/BKC. The Company has allocated proceeds related to the assets at Sydran IV including cash, accounts receivable, inventory, and prepaid assets between the Chase/BKC restaurants and the GE/GMAC restaurants based on the total number of restaurants within the Sydran IV operating company. The proceeds related to PP&E are based on the store-by-store appraisal provided by GBAA.

Costs associated with the liquidation have been allocated between entities on a pro-rata basis related to the total asset proceeds recovered for each entity (with Sydran IV further allocated as discussed above between GE, GMAC and Chase/BKC). It is

assumed that it will cost more to generate the higher asset recovery. All four categories of expenses (trustee fees, wind down costs – SGA, wind down costs – operations, and professional fees) were allocated in this manner.

The following notes describe the significant assumptions reflected in the Liquidation Analysis.

*Note 1 – Cash*

Based on estimates by management, the Company is projecting to have cash balances as of the end of fiscal November of $490K. The balance excludes $675K that the Company has estimated would be necessary to pay PACA claims. Additionally, the cash balance excludes approximately $1.3 million of cash related to sales taxes that have been collected by the Company for November sales and not yet paid to the appropriate parties. The estimated cash balance as of November has been allocated to the individual entities based on the percentage of cash each entity had compared to the Company as a whole as of September 29. As a result of senior secured creditors being impaired, the Company is not expected to have any cash available for distribution to non-priority unsecured pre-petition creditors. This analysis excludes the negative cash balance associated with Sydran Casual Dining of $149K, which represents checks that were issued but never cashed.

*Note 2 – Accounts Receivable*

Accounts receivable primarily consists of insurance claims and refunds from other third parties. As of September 29, 2004, the Company had a consolidated accounts receivable balance of $304K. Accounts receivable balances related to BK Bucks and Insurance Receivables representing approximately $230K have been assumed collectable at a range of 80% to 90% of book value. Other accounts receivable categories are assumed uncollectible. This analysis excludes all intercompany receivables.

*Note 3 – Inventories*

Inventory primarily consists of food with minimal amounts for condiments, paper, merchandise and equipment. In a liquidation, the Company believes that store operations would cease immediately. However, the Company would continue to occupy the restaurants and pay rent so that equipment and inventory could be sold. It is anticipated that inventory items could be sold to other BK restaurants and food distributors in the area within seven to ten days. Store managers would work with hourly employees for seven to ten days to assist with the liquidation of inventory.

Based on the collateral agreements with GMAC, GE and Chase / BKC, GMAC and GE would have the right to recover proceeds associated with the sale of inventory from stores that represent the GE/GMAC collateral and Chase / BKC lenders would receive proceeds from the sale of inventory from the stores that are Chase / BKC collateral. For the purposes of this Liquidation Analysis, the high estimate assumes 65% recovery on inventory and the low estimate assumes 55%. Merchandise inventory, which consists of short-term promotional and tie-in items, is expected to achieve a recovery of 0% to 30%.

*Note 4 – Prepaid Expenses*

Prepaid assets consist of prepaid insurance, prepaid taxes and "other" prepaid assets, which consist of items such as prepaid permits, service contracts, and gift cards. Prepaid workers comp insurance may be collectable as the Company's estimated payroll for the policy may be higher than actual payroll paid. The Company has assumed prepaid workers comp insurance to be collectable at 70% to 90% of its book value. In a Chapter 7 liquidation, the Company might find it difficult to collect outstanding balances on most other prepaid assets such as prepaid sales and property taxes, prepaid liability insurance and other prepaid items. Other prepaid insurance is assumed collectable at a low estimate of 0% and a high estimate of 10%. Prepaid service contracts, prepaid taxes and other prepaid items are assumed to be not collectable.

*Note 5 – Property & Equipment, Net*

PP&E consists of land, building, leasehold improvements, furniture and equipment (includes Phase I Kitchens, Menuboards, Order Confirmation Units, Early Successor Incentive Program) and computer hardware and software.

The Company's counsel retained GBAA to conduct an appraisal of Sydran's furniture and equipment, which was provided in a report on August 11, 2004. The appraisal performed by GBAA represents an equity-bid by a liquidator for these assets under a bankruptcy court-authorization process. The Company believes that it is reasonable to retain a liquidator to assist with the disposition of assets because the Company has 227 owned or operated restaurants in eight states. Additionally, the Company believes that the retention of a nationally recognized and experienced liquidator would be more efficient for the Company and ultimately, improve the overall return in the liquidation. Under the equity-bid scenario, the liquidator calculates its costs and returns to include a risk premium. This type of liquidation would guarantee a fixed return to the estate if gross sales of equipment did not reach the appraised amount. However, the liquidator expects to be compensated for its risk and as a result, the liquidator fee is more expensive than a non-guaranteed fee-based liquidation. Under a non-guaranteed, fee-based liquidation, the liquidator's fees would be less than the liquidator's fees in an

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 181

equity-bid, however, the liquidator would not guarantee a return and the risk of not achieving the projected recovery would shift to the estate.

GBAA determined the equipment value based on the following key assumptions:

- The equipment would be sold in a "forced liquidation" scenario over a period of six weeks. GBAA defines a forced liquidation value as "*a professional opinion of the estimated most probable price expressed in terms of currency which could typically be realized at a properly advertised and conducted public auction sale, held under forced sale conditions and under present day economic trends, as of the effective date of the appraisal report.*"
- The assets would be sold "as-is" and "where-is" via a one day theatre style "ballroom" auction sale
- All liquidation sales would be final sales without any warranty to the buyers
- All equipment remains in working condition and in similar state to what GBAA viewed during its physical inspections

The estimated liquidation value of the Company's equipment, including office equipment at the corporate headquarters and regional headquarters as determined by GBAA is approximately $4.1 million. The appraisal covers 228 restaurant locations that were owned or operated at the time of the appraisal. Four of the restaurants covered by the appraisal are currently closed, with three expected to reopen. The Company owns the equipment within these restaurants, and the value of the equipment in all four restaurants has been included in the liquidation analysis.

The liquidation value of $4.1 million excludes operating expenses needed to sell the equipment over the six week period, which are detailed in Note 8. GBAA's operating expenses exclude store rent and utilities, which, when included, may make total expenses of the equipment liquidation exceed the proceeds.

*Chase/ BKC -Related Property & Equipment Recovery*
The Company has excluded the equipment related to the GE and GMAC restaurants from the proceeds available to Chase / BKC. The collateral used to calculate the FF&E value relates to Chase/BKC restaurant furniture and equipment.

Chase/BKC also would collect proceeds related to the remaining PP&E, which is attributed to a fee owned property. The value for the fee owned property is assumed to be a high estimate of $1.5 million and a low estimate of $1.25 million. This property serves as collateral for surety bonds related to utilities of approximately $600K. In a liquidation scenario, we have assumed that the utilities would draw down the bonds. The bonding company would then receive the first $600K in proceeds from the sale of this fee owned property. Real property taxes of approximately $21K have been

excluded from the above estimates of property value. The real property taxes are deducted as part of determining the proceeds available to Chase / BKC.

The building capital lease obligation is the asset that represents the present value of the lease payments for all leases that qualify under FASB 13 as a capitalized lease. The leasehold improvements are improvements made to the building which converts to the landlord at the end of the lease. As a result, no value has been assumed for these obligations.

*GE and GMAC-Related Property & Equipment Recovery*
Both GE and GMAC would receive net proceeds directly related to their collateral (i.e., the equipment in their restaurants). (See Note 9 for detail on GE and GMAC recoveries.)

*Note 6 – Sale of Leases*

Keen Realty, LLC ("Keen") was hired by the Company's counsel to analyze 67 retail leaseholds that are located in AL, AR, CA, FL, LA, MO and MS and to provide an estimated market value range for the Company's real estate interests. The properties that were evaluated were selected with assistance from Keen. Keen informed the Company that any property with less than 10 years remaining on its lease would not have any equity value to the estate. Keen did not believe that any of the master leases would have any value as they typically require that one party take assignment of a lease for multiple properties in different markets. However, they did evaluate master leases that had terms of more than 10 years and were located in markets within the same region.

The purpose of the analysis was to provide the Company's counsel with an estimated market value range for each of the Company's retail leasehold interests, as of November 2004. The property rights being valued by Keen consist of the leasehold interest. The evaluation of the properties takes into account, among other things, the following factors:
- the relationship between the contract rent and the market rent
- the desirability of the particular location and general vicinity
- the availability of comparable space in the area
- the size and configuration of the facility
- delivery of the space in an "as-is" condition
- the assignee would not be able to obtain rent free period to build out space, and
- other various lease provisions, including, but not limited to, the clauses pertaining to rent, term, options and percentage rent (where appropriate).

Keen has assumed that all information that it has received regarding the properties is accurate, as they have not inspected the properties, but instead relied on the

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 183 of 187

information it was provided. Keen's analysis assumes that the leaseholds will be disposed of in an orderly fashion over a period of 60 to 120 days.

In order to apply a current value to each leasehold property, Keen estimated the lump sum, up front payment the Company could reasonably expect to receive from a third party upon an assignment of the lease at the same terms. Therefore, subletting the leases at different rent terms was not considered.

The calculation of the estimated market values was determined as follows:
- Determine the advantage rent (market rent minus contract rent)
- Calculate the present value of the advantage rent over the remaining term of the lease at an appropriate discount rate, which was determined by the type of retail area and property.
- Discount the present value to account for the acquisition of the leaseholds and the other costs a new tenant does not usually incur such as paying rent during downtime and complete renovation costs of the premises

Based on its analysis, Keen has concluded that 21 leaseholds have value to a potential buyer. The value range on these individual properties ranges from a low of $0 to a high value on one property of $400K. On a combined basis, the 21 properties have a value ranging from $575K to $1.55 million. This value excludes any incremental costs associated with marketing the properties which have not been determined. The value also excludes real property taxes associated with these leases. Real property taxes in total of $55K on the low end and $176K on the high end have been netted against each individual lease that has potential value.

*Note 7 – Intangibles and Other Assets*

The franchise costs (goodwill) which are the excess of cost over book value of acquired assets have been assumed to have no liquidation value. Recoveries on other assets such as lease deposits are assumed to be a high estimate of 90% and a low estimate of 70%. Other deposits such as sign and utility deposits are expected to have no recovery.

*Note 8 – Costs Associated with Liquidation*

The Company is anticipating a shutdown of all store locations immediately upon conversion of the Chapter 11 cases to a Chapter 7 liquidation. As part of the liquidation, the Company would rely on a Chapter 7 trustee to implement the liquidation, however, the Company has made assumptions as to the administration of the wind down. Certain employees of the Company would work with a trustee to sell assets and administer the remaining estate. The wind down is expected to result in four main areas of costs: Trustee fees, wind-down costs – SG&A, wind-down costs – operations and professional fees.

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 184 of 187

**Trustee fees** – Trustee fees are estimated to be 3% of total asset proceeds.

**Wind-down costs – SG&A** – Due to the size of the Company, which includes 227 owned or operated restaurants in eight states, it is assumed that the trustee would rely on a small group of existing corporate personnel to help oversee the wind down of the estate over a four month period. The core areas of employees would include:

| | |
|---|---|
| Finance - | Oversee claims analysis, final cash collections, payroll, W-2 preparations and other finance related issues. Employees would receive a stay bonus of 1 week for every week worked. |
| Legal – | Oversee immediate legal matters and liaison with outside counsel. Employees would receive a stay bonus of 1 week for every week worked. |
| IT – | Maintain computer systems and assist with information access. Employees would receive a stay bonus of 1 week for every week worked. |
| District Mgrs – | Field managers recognized at the corporate level needed to assist with the sale of inventory and shutdown of store locations. DM's would receive 1 week bonus for every two weeks worked. |

Other SG&A expenses would include rent and utilities for the corporate office, file storage expense, and continued business insurance.

**Wind-down Costs – Operations** – In an effort to maximize sale value of inventory and equipment, the Company would cease operations upon conversion of the Chapter 11 cases to a Chapter 7 liquidation to minimize the expense associated with the process of liquidation. These expenses include rent and utilities, which, when combined with other expenses related to the liquidation, may exceed the recovered proceeds. The rent payments for two additional months would provide the liquidator with access to the stores to facilitate the sale of the equipment. Current rent expense is approximately $2.0 million per month, which is used in this analysis.

The Company has estimated utility expenses for the restaurant locations during the liquidation based on an 8% increase over the comparable prior year period's utility expenses. As a result of the restaurants not operating during the liquidation, management has estimated that the utility usage will decrease significantly. The Company has estimated expenses for gas, electricity and water to be 25% of prior year's actual expense during the liquidation. An estimate of one to two month is used to determine a range of potential expenses for utilities. This range is then reduced by $375K which is the amount of deposits the Company has paid to the utilities as part of the Chapter 11 case.

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 185 of 187

To assist with the sale of inventory, management would retain selected store level employees in the weeks immediately following the shutdown. Due to the large number of stores and geographic dispersion of the locations, it is assumed employees would need to be retained in every location for a limited amount of time after operations cease. This Liquidation analysis assumes that all store managers would remain for seven to ten days and 2 hourly employees (per store) would remain for seven to ten days. We have assumed a stay bonus for all store employees that assist in the wind-down of 1 week bonus for every 2 weeks of employment.

As discussed in Note 5, the Company would hire a liquidator to sell the Company's store and headquarter equipment. Based on the analysis by GBAA, they estimated costs to sell the Company's equipment to be $1.3 million. This amount includes:

- Operating expenses related to supervision of the sale of the equipment (most likely by current store employees),
- Advertising related to the liquidation to create a universe of interested parties
- Misc. operating expenses, and
- Liquidator's costs and returns representing an equity-bid inclusive of a risk premium. (See Note 5 for discussion on equity-bid and fee-based liquidation)
- Rent and utility expenses are **NOT** included in the $1.3 million expense calculation.

As discussed above, wind down costs – operations are allocated pro-rata between the Chase / BKC related operating companies (and the stores related to Chase / BKC for Sydran IV) and the GE /GMAC related stores (as related to Sydran IV) based on total asset recovery.

**Professional Fees** - For professional fees it is assumed that the trustee would hire professionals to assist in the liquidation process. Total fees are assumed to range from $500K to $1.0 million.

*Note 9 – Recoveries to Secured Personal Property Tax Claimants and Chase / BKC/ Tax Payment Obligees*

Recoveries to Secured Personal Property Tax Claimants, and Chase / BKC / Tax Payment Obligees are based on the Company's estimate of liquidation value of all assets not related to cash, accounts receivable, prepaid expenses, inventory and FF&E associated with the GE and GMAC restaurants. The estimated liquidation value for the equipment currently in the Chase/BKC restaurants was determined by GBAA in their store-by-store asset appraisal.

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 186 of 187

Personal property taxes have a first lien in many of the jurisdictions where the Debtors conduct its operations and the lien may cover all personal property, not just the FF&E located in that jurisdiction. To be conservative, the Debtors have assumed personal property taxes would be paid first. Following the satisfaction of the Secured Personal Property Tax Claimants, the Tax Payment Obligees would be paid based on an inter-creditor agreement between the Tax Payment Obligees and Chase / BKC.

*Note 10 – Recoveries to Secured Personal Property Tax Claimants, GE, and GMAC*

Personal property taxes have a first lien in many of the jurisdictions where the Debtors conduct its operations and the lien may cover all personal property, not just the FF&E located in that jurisdiction. To be conservative, the Debtors have assumed personal property taxes would be paid first. Following recoveries to Secured Personal Property Tax Claimants, GE and GMAC recoveries are based on the Company's estimate of liquidation value of cash, accounts receivable, prepaid expenses and inventory associated with the GE and GMAC restaurants as well as the estimated liquidation value for the equipment currently in the GMAC and GE stores as determined by GBAA in their store-by-store asset appraisal.

*Note 11 – Recoveries to Unsecured Creditors*

Based on the assumptions of the liquidation analysis and the projected proceeds, there will be no funds available for distribution to the unsecured creditors.

Case: 04-45343    Doc# 242-3    Filed: 12/10/04    Entered: 12/10/04 15:39:52    Page 187 of 187